US v Michael Hari
CR 18-150(1) (DWF/HB)

# Exhibit B

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Central District of Illinois



In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

1█ South Main Road, Clarence, Illinois, as further
described in Attachment A.

)
)
)
)
)
)

Case No. 18-MJ-7052

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, which is attached hereto and specifically incorporated herein by reference.

located in the _____ Central _____ District of _____ Illinois _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, which is attached hereto and specifically incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§922(o), 844(i), 924(c), & 1951 | Possession of a machinegun, arson, attempted arson, using a destructive device during a crime of violence, and robbery |

The application is based on these facts:
See affidavit of FBI Special Agent Barbara Robbins

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Barbara Robbins, FBI Special Federal Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 03/13/2018 _____

*Judge's signature*

City and state: _____ Urbana, IL _____

Eric I. Long, United States Magistrate Judge
*Printed name and title*

00011452

### AFFIDAVIT

I, Barbara Robbins, being duly sworn, depose and state:

### Introduction

1.      I am a Detective Sergeant with the University of Illinois Police Department and have been so for approximately 21 years. In addition, I have been assigned as a Special Federal Officer to the Federal Bureau of Investigation (FBI), Joint Terrorism Task Force (JTTF) for the last 5 years. My duties with the FBI include investigating domestic terrorism such as violent crimes and bombings within the Continental United States.  I maintain multiple duties with the Police Department as well, including security detail for high level officials visiting the University.  I have extensive experience in executing search warrants, arrest warrants, interviews and seizures of evidence.

2.      I make this affidavit in support of an application for a search warrant for the store/office located at 1█ South Main Road, Clarence, Illinois, 60960 (see Attachment A) for items described in Attachment B. This store/office belongs to MICAHAEL HARI, who along with JOE MORRIS, MICHAEL MCWHORTER, and ELLIS " EJ" MACK, has been charged with possession of a machinegun, in violation of 18 U.S.C. § 922(o). This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## Probable Cause

3.      On August 5, 2017, an explosive device was thrown through the window of the Dar Al Farooq Islamic Center (DAF), located at 8201 Park Avenue South, Bloomington, Minnesota, at approximately 5:00 a.m. The device exploded while five individuals were inside the building, causing extensive damage. Subsequent to the explosion, FBI Minneapolis conducted an interview of a witness who was present during the explosion. The witness stated he exited the front door of DAF Mosque after prayer, and while walking to his vehicle, heard the noise of glass breaking. The witness turned to look toward the noise and observed a man run from the exterior of DAF to a dark-colored truck. The witness observed the truck depart the parking lot at a high rate of speed. FBI Minneapolis collected video from DAF which captured the exterior parking lot. Shortly before the explosion, a dark truck is seen departing the parking lot of DAF Mosque.

4.      On November 7, 2017, a secretary at the Women's Health Practice entered the building located at 2125 S. Neil St., Champaign, Illinois, at approximately 7:30 a.m. Once in the building, she discovered a broken window, glass on the floor, and a device on the inside of the surgical room. The Women's Health Practice is a medical practice for women's services, which includes abortions.

5.      Multiple law enforcement agencies responded to the scene including the University of Illinois Police Department, Champaign Police Department, FBI, and ATF. The device was rendered safe. The device itself was described as a segment of PVC pipe with a plastic cap on one end and duct tape over the other end. The powder located

2

00011454

within the pipe was determined to have the presence of thermite, a pyrotechnic

compound. A magnesium strip was also present in the device. The combination of these

factors led the bomb technician to the initial conclusion that the device was designed to

burn. Responders also noted that the room in which the device was located was the

surgical room and contained oxygen tanks.

6.      On December 26, 2017, the Ford County Sheriff, Mark Doran, gave the FBI

multiple photographs. Sheriff Doran advised he received the photographs from an

individual, who has access to everything inside the residence of HARI's parents' home,

and who took the photographs. The individual took the photographs on approximately

December 16, 2017, at HARI's parents' home in the room that HARI occupies when he

is there. The individual said that, while HARI has his own place in Clarence, Illinois, he

stays at his parents' home quite often because his Clarence home has no running water

or electricity. Below are some of the photos:



00011455



7.      After the individual provided the photographs, he/she became a confidential source (CS1). CS1 reported that HARI has guns and bomb-making material inside HARI's parents' home. CS1 has no criminal history. CS1's motivation for cooperation is that he/she does not want anyone to get hurt. The FBI has paid CS1 approximately $1,000 to date for information provided.

8.      On January 27, 2018, a second confidential source (CS2)[1] provided information that three individuals - HARI, MCWHORTER, and MORRIS – were responsible for the bombing carried out at the DAF Mosque, in Bloomington, Minnesota, as well as the attempted bombing at the Women's Health Practice in Champaign, Illinois. CS2 reported to be aware of this information because CS2 had previously worked for HARI, who recruited CS2 into an organization led by HARI.

---

[1]CS2 has a criminal history that includes convictions for possession of drug paraphernalia/ possession of cannabis charges in the late 1990s. In the early 2000s, CS2 had a conviction for drunk driving and misdemeanor assault. CS2 currently has a pending attempted assault charge. CS2 has been paid $1,000 by the FBI for information provided.

4

9.     CS2 reported seeing, during a meeting on or about January 27, 2018, in the group's possession, illegal firearms (fully automatic), M4s, video jammers, and tannerite, which the group locked in a safe inside HARI's store/office in Clarence, Illinois. CS 2 also said that one night when CS was drinking with MORRIS and MCWHORTER, MORRIS began talking about throwing a black powder pipe bomb at a mosque in Minnesota. MORRIS told CS2 that he made the pipe bomb and that MCWHORTER threw it in the mosque. MORRIS claimed HARI was going to pay them $18,000 for their participation in the Minnesota bombing. MORRIS later told CS2 that he made and placed the incendiary device at the Women's Health Practice in Champaign. MORRIS complained to CS2 that it did not go off and MORRIS had no idea why. MORRIS told CS2 that the truck, which was used to get away, was rented in Champaign, possibly at Enterprise Rent-A-Car.

10.     Records obtained from Enterprise Holdings indicate that HARI rented a black Nissan Frontier crew cab on July 27, 2017, with a beginning mileage of 13,873. The vehicle was returned on August 6, 2017, the day after the Minnesota bombing, with an ending mileage of 16,948. The round trip distance from Champaign, Illinois to Bloomington, Minnesota is approximately 1,040 miles.

11.     On February 13, 2018, CS1 provided pictures of items in the garage at HARI's parents' home in Paxton, which HARI has access to. Included in the pictures was a photograph of the Anarchist's Handbook, which includes instructions for the creation of thermite. The photographs also show tools, such as a drill, that may be used in the creation of a pipe bomb.

00011457

12.     On February 19, 2018, a tip was provided by email to the Bureau of

Alcohol, Tobacco, Firearms and Explosives' (ATF) anonymous tipline indicating

explosive devices were contained in a suitcase and one gray bag, in a shed at the back of

the property located in Clarence, Illinois. The tip stated:

> this is a possible terrorism threat i know a man named [J.O.] he is about
> 30 years old he is always talking about getting the ▮▮▮▮ and here
> lately he said he is really going to get them he has been buying a lot of
> wierd chemicals like nail polish remover and battery acide and i thought
> he was making meth because he has science things like beakers too but
> he said no it is for a ▮▮▮ schredder and he has four big black suitcases
> in his shed and a little greay bag and they are full of stuff like pipes and
> caps and wires nails and he told me to watch the news this week he lives
> at [Address in Clarence, Illinois] his house is a brown and yellow trailer
> and a garage put together and he has a lot of sheds but the one with that
> stuff in it is the red shed with white boards that is far in the back of his
> yard i know his kid and we hang out but i am afriad someone will get
> hurt if someone doesnt do something i also sent something about it to
> the newspaper so if you just blow it off like you did that school schooter
> kid in florida the press will know you got a tip so you better check it out
> just saying you did screw up once and he has a rebel flag on a pole in
> front of his house there is lots of them in town but his is the brown and
> yellow house on the north end of main road he also has kids and he just
> got out of jail [J.O.] and you better check it out because i thin it is bomb
> stuff for sure.

13.     An FBI Computer Scientist was provided the IP address from which the

above referenced email originated. He determined that the IP was a proxy, which is

generally intended to ensure anonymity and make difficult any trace back.

14.     On the same day, the Ford County Sheriff's Department, University of

Illinois Police Department, and the FBI, responded to the address determined to be

J.O.'s residence. A consent search of the residence was conducted, which resulted in

00011458

multiple explosive devices being discovered, in a shed at the back of J.O.'s residence, just as the tip had indicated. J.O. and his wife were very cooperative during the entire search of the premises. Both J.O. and his wife said they did not know anything about the devices that were discovered, and said they believed HARI was responsible for placing the devices on his premises.[2]

15.    One of the devises recovered at J.O.'s residence was a pipe bomb attached to a small green propane tank. Photographs of the device were taken by a robot used to render the devices safe. CS1 reported to be aware that in approximately 2008, HARI had possession of multiple green propane tanks. CS1 said they were smaller in size, like "one you would take to go camping." CS1 observed the picture taken by the robot and said the tank looked "very similar to the tanks HARI had possession of in 2008."

16.    On February 19, 2018, CS2 took screen shots of a Facebook post by MCWHORTER, which said "Clarence gonna be on the news again, this shit is crazy man". Shortly after another Facebook user commented, "Mike Hari?" the post was deleted.

17.    On February 20, 2018, CS2 conducted a consensual recording of a meeting that included HARI, MORRIS, and MCWHORTER. During the conversation, CS2 said

---

[2] It should be noted that J.O. has a pending case against HARI, for an alleged assault that occurred in June 2017. The incident involved a fight/argument between the two when HARI accused J.O. of being on his property. Allegedly, HARI held J.O. down and subsequently held an air soft gun to J.O.'s head until police arrived. HARI appeared in court on January 23, 2018. According to the Ford County Sheriff's Department, the case is scheduled for a hearing on March 13, 2018, and trial on April 9, 2018.

7

00011459

he/she thought it was out of place for MORRIS to make a comment about the "bang bangs." HARI said, "Yeah that was a little out of place." HARI later said, "Well, I think we are in a friendly crowd, and we moved that stuff already anyway." HARI then said, "There is nothing illegal in our vault."

18.     On February 27, 2018, law enforcement conducted a neighborhood canvass in an attempt to find any witnesses who may have knowledge of the devices that were discovered on J.O.'s property. During the canvass, multiple people were interviewed, including MCWHORTER's brother (hereafter, "the brother"). When we questioned the brother on who lived at his home, we believed the brother was being misleading about who lived at his residence. We requested to conduct a search of the brother's residence and the brother consented to a search of his residence. The brother said that a few days earlier, HARI and MORRIS had arrived at his residence in a Ford Taurus and dropped off a bag. A search of the residence revealed four shotguns and four assault rifles inside a camouflage bag. Law enforcement also recovered a black hard-gun case, a green plate carrier with soft armor, and a bandoleer containing multiple 12-gauge bullets. An ATF special agent later indicated that three of the four ARs field-tested to be fully automatic. Based on information and belief, these firearms would meet the definition of a "machinegun," as defined by 18 U.S.C. § 921(a)(23) and 26, U.S.C. § 5845(b).

19.     When asked to clarify why HARI and MORRIS brought the guns to his house, the brother said HARI told him, "the police will want to come talk to me, can I keep them here until I speak to them?" MORRIS then told the brother, HARI doesn't

8

want to have the guns when the police come to speak to him. The brother said he placed the shotguns in the case when HARI and MORRIS arrived, and admitted his DNA would be on the shotguns. The brother thought HARI and MORRIS dropped the weapons off on February 20, 2018, between 2:30 pm-3:30 p.m., "before the kids got off school." MORRIS carried all the weapons up the stairs. While law enforcement officers were interviewing the brother on his front porch, HARI arrived driving a gray Mazda. HARI identified himself as "Mike Hari." I asked HARI if I could help him. HARI said he wanted to speak to the brother. I advised HARI that I was speaking to him, and that he could come back when our conversation was finished. HARI then asked the brother where "EJ" was. ("EJ" is the nickname of ELLIS MACK.) The brother advised HARI that MACK was at MCWHORTER's house down the road. HARI looked into the front door of the brother's residence for approximately five seconds, then departed in the gray Mazda. SA Smith observed HARI drive to MCWHORTER's residence.

20.     The brother also said that, approximately one month earlier, he, HARI, and MORRIS were at HARI's store/office in Clarence when HARI asked, "do you want to see some science stuff?" The brother said HARI poured some fluid in the snow on the doorstep of the store/office, then placed a piece of "a braided wire [approximately] one inch in length, that was flat" inside the fluid. After a few minutes, the metal and fluid began to glow and eventually ignited for approximately 2-3 minutes. The brother said the fluid was contained in a "break fluid bottle" approximately 8-12 inches high.

21.     According to the brother, on another occasion approximately one month ago, HARI, MORRIS, and he were again at the store/office when HARI pulled out two

9

00011461

containers from the store/office. The brother described the containers as "clear" and "about the size of a coffee can." Both containers were approximately 1/3 full. One container had a white powdery substance inside, while the other container had a red powdery substance inside. The brother did not know what either of the powdery substances contained. According to the brother, HARI took a scoop of the red powder and poured it in a burning fire, hoping it would ignite, but nothing happened. When nothing happened, HARI said, "Oh, that didn't do anything." MORRIS said the powdery substances should "burn really hot."

22.     According to the brother, a couple days after the incident with the powder, he was again at the store/office with HARI and MORRIS. The brother said he saw HARI and MORRIS cleaning some of the same weapons that were taken from his house by law enforcement on February 27, 2018. When the brother saw the weapons, he said "those look neat." HARI responded, "Don't tell anyone I don't want a lot of people knowing I have them." HARI said, "They are lightly modified, two are semi-auto and one is fully auto."

23.     On February 28, 2018, Agent Smith MCWHORTER's wife and her minor daughter (hereafter, "the wife" and "the daughter"). According to the wife, her last communication with MCWHORTER was on February 27, 2018, when MCWHORTER called from MACK's phone. The wife said she told MCWHORTER that the FBI only wanted to talk to him and asked MCWHORTER where he was. MCWHORTER replied, "I can't tell you, I love you" and then ended the call.

00011462

24.    The daughter said that on February 27, 2018, during the consent search of MCWHORTER's brother's house, she was at home. She said HARI was also at the house and that he was on the phone with MCWHORTER for approximately 2-3 minutes. HARI told the daughter, "If the FBI wants to talk to you, tell them you want to talk to a lawyer." HARI then stated, "I will wait here to find out what is going on down the road," referring to the search at the brother's house. The daughter also said HARI kept going in and out of the house. She said HARI eventually pushed EJ out the door saying, "Let's go for a ride." The daughter believed HARI appeared to be in a rush and that EJ appeared as though he did not want to go.

25.    On the same date, the wife provided me with three cellular telephones she claimed belonging to HARI, MCWHORTER, and MORRIS. She said the black ZTE phone belonged to HARI, which she thought he unintentionally left due to HARI being in a rush to leave; the black phone with a cracked screen belonged to MORRIS; and the silver phone with the black/red protective case belonged to her husband, MCWHORTER. She said MCWHORTER's phone was not pin protected and the assigned number ended in 1768.

26.    On March 10, 2018, Agent Smith interviewed MCWHORTER. MCWHORTER initially denied having any knowledge of any type of explosive or incendiary type of devices. MCWHORTER said he was aware of four shotguns and four assault rifles that belonged to HARI. MCWHORTER described one of the assault rifles as "really small" and said three rifles had aluminum lowers. MCWHORTER also said three of the rifles were illegal; two were "full auto" and two were "way too damn

11

00011463

short." MCWHORTER said the rifles belonged to HARI and that HARI bought all the pieces to build the assault rifles (ARs). MCWHORTER said he assisted in drilling an AR to enable it to shoot fully automatic. HARI instructed MCWHORTER on how to make the alterations. The ARs were drilled at HARI's parent's house in the garage. HARI, MORRIS, MCWHORTER and MACK knew the weapons were fully automatic because they all fired the weapons outside of Paxton. According to MCWHORTER, the weapons had been stored in a vault in HARI's office in Clarence. MCWHORTER said law enforcement would find his fingerprints on the ARs. MCWHORTER admitted to bringing the ARs and shotguns to the brother's house in a camouflage bag and a black plastic case. MCWHORTER's description of the bags and weapons matches the description of what law enforcement officers seized from the brother's house on February 27, 2018.

27.     MCWHORTER admitted to his participation in the attempted bombing of the Women's Health Practice on November 7, 2017. MCWHORTER said HARI, MORRIS, and MCWHORTER were in a gray Dodge Ram 2500, which HARI rented at Enterprise Rent-A-Car in Champaign. (Records obtained from Enterprise revealed that HARI had rented a grey Dodge Ram at the time the pipe device was left in the women's clinic.) MCWHORTER said the thermite device was made in Clarence before the attempted bombing. MCWHORTER said HARI made the device out of a white PVC pipe. MCWHORTER said "in the middle of the night" MORRIS was dropped off; that MORRIS proceeded to smash the window and threw the device in the window at the practice; and that they picked MORRIS up north of the practice. MCWHORTER said

00011464

they would sometimes use a magnesium strip to set off a thermite device. According to MCWHORTER, the magnesium strip sets off the thermite device a lot faster "than a normal wick would." He said the magnesium strip looks like tape, but it is metal, "blackish grey in color."

28.    MCWHORTER also admitted to his participation in the bombing of the Dar Al Farooq Islamic Center on August 5, 2017. MCWHORTER said MCWHORTER, HARI, and MORRIS drove to Minnesota in a charcoal gray Nissan Frontier, which HARI rented from Enterprise Rent-A-Car in Champaign. According to MCWHORTER, HARI picked up MORRIS and MCWHORTER from their homes prior to departing Illinois. HARI, MCWHORTER, and MORRIS each had specific roles for the bombing. HARI was the driver, MORRIS was responsible for smashing the window in, and MCWHORTER was responsible for throwing the bomb in the window. MCWHORTER claimed it was HARI's idea to target the Mosque. MCWHORTER said they did not intend to kill anyone, but they wanted to "scare them out of the country" (referring to Muslims), because they push their beliefs on everyone else. MCWHORTER also said they committed the bombing mainly to "show them hey, you're not welcome here, get the fuck out." MCWHORTER said MORRIS smashed the window in with a sledgehammer. MCWHORTER described the device as a "huge ass black powder bomb." The device was approximately 18"-24" tall. MCWHORTER initially said it was made out of PVC, but then stated it was probably metal. MCWHORTER admitted igniting the device with a green fuse. MCWHORTER said he didn't want to be anywhere near it when it went off. MCWHORTER said after he threw the bomb inside

13

he saw a man, who looked "directly at him." MCWHORTER said this occurred at

approximately 3:00 a.m. to 4:00 a.m. MCWHORTER said, "we were long gone before it

went off" (referring to the bomb exploding).

29.     MCWHORTER also admitted that he, HARI, MORRIS, and MACK

participated in a home invasion in Indiana. MCWHORTER was unsure of the exact date

but it was after December, 2017. MCWHORTER stated that the group believed the

home was of a Hispanic drug dealer that could be robbed of the cash inside. He said the

group was armed with the automatic weapons and posed as police officers executing a

search warrant. However, MCWHORTER stated they did not find any cash in the

residence. In addition, MCWHORTER claimed the group had conducted three Wal-

Mart robberies in Illinois.

30.     MCWHORTER also admitted that he, HARI, and MORRIS planted the

explosive devices on J.O.'s property. According to MCWHORTER, the motivation was

to get J.O. in trouble prior to the court hearings for HARI. MCWHORTER said that

HARI sent the "tip" to ATF.

31.     Separately from MCWHORTER, law enforcement also interviewed

MACK on March 10, 2018. MACK admitted that he shot the automatic weapons outside

of Paxton, Illinois so that he could feel how it felt to fire an automatic weapon. MACK

also admitted to participating in a home invasion with HARI, MORRIS, and

MCWHORTER. MACK believed the home invasion was in Indiana but was unsure of

the date. MACK said he was provided a 12-gauge shotgun as his weapon during the

14

home invasion. MACK later identified the shotgun as one of the weapons taken from the brother's residence.

32.    MACK also admitted to participating with the group in a Wal-Mart robbery. MACK believed that the robbery took place in Mattoon, Illinois. MACK said that when MORRIS approached a Wal-Mart clerk and demanded money, she called out on the radio and the group left the Wal-Mart. (According to reports from the Mt. Vernon, Illinois police department, MACK's description of the robbery appears to match an attempted robbery of a Wal-Mart in Mt. Vernon not Mattoon, Illinois.)

Conclusion

33.    I submit that there is probable cause to issue the requested search warrants for the premises described in Attachment A for the things described in Attachment B.


BARBARA ROBBINS, Special Federal Officer
Federal Bureau of Investigation


Subscribed and sworn to before me this
13th day of March 2018.


ERIC I. LONG
United States Magistrate Judge

00011467

## ATTACHMENT A

### DESCRIPTION OF PREMISES TO BE SEARCHED

The premises to be searched is the building located at 1█ South Main Road, Clarence, Illinois 60940. The premises is described as a one-story, brick building. A photograph of the premises to be searched is included below.



## ATTACHMENT B

### EVIDENCE TO BE SEIZED

All evidence that relates to violations of Title 18, United States Code, Sections 922(o), 844(i), 924(c), and 1951, including but not limited to:

1.    Firearms, ammunition, magazines, holsters, gun cases, gun containers, ammunition containers, and any items, tools, manuals, or instructions regarding automatic weapons and/or machineguns;

2.    Any and all materials related to destructive devices or their construction, including but not limited to, destructive devices, pipe bombs, explosive materials, black powder, tannerite, fuses, metal caps, metal or plastic PVC pipes, nails, and books, manuals, or instructions regarding bomb making.

3.    Any and all safes or other secured or locked containers that law enforcement is unable to search on the premises;

4.    Any and all clothing or items related to armed robbery and/or appearing as a law enforcement officer, including police uniforms, patches, badges, body armor, hard soft or armor plates, ski masks, and helmets.

5.    Books, notes, or other records containing names, addresses, or telephone numbers;

6.    Substantial amounts of currency;

7.    Financial records relating to obtaining, transferring, depositing, withdrawing, converting, or storing large amounts of currency, or spending large sums of money, including, but not limited to, statements of account, deposit slips, money

order or cashier's check receipts, cancelled checks, check registers, passbooks, other records from financial institutions, ledgers, financial statements, stock certificates, bonds, other financial instruments, credit card records, and receipts;

8.     Photographs of other persons, property, locations, or firearms constituting evidence of associations between persons or participation in the aforementioned offenses; and

9.     Records evidencing occupancy or ownership of the premises described above, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence;

10.     Records evidencing travel to Bloomington, Minnesota or Wal-Marts in Watseka, Mattoon, and Mt. Vernon, Illinois, including but not limited to, maps and receipts, including but not limited to gas, hotel, and rental car receipts.

11.     The foregoing list of items to be seized, in paragraphs 1 through 10, includes all of the items of evidence in whatever form and by whatever means they may have been created or stored, that may contain evidence of or be used to facilitate violations of Title 18, United States Code, Sections 922(o) (possession of a machine gun), 844(i) (arson and attempted arson), 924(c) (using a destructive device during a crime of violence), and 1951 (robbery in commerce), as detailed above, including any hand-made form, any photographic form or any electrical, electronic, digital or magnetic form, such as any information on an electronic, digital or magnetic storage device like a floppy diskette, hard disk, backup media, CD-ROM, thumb drive, optical disc, electronic

2

00011470

dialer, electronic notebook, as well as printout or readouts from any digital or magnetic storage device, computer hardware, including data-processing devices (such as central processing units, desktop computers, self-contained "laptop" or "notebook" computers, and Personal Digital Assistants -- PDAs); internal and peripheral storage devices (such as fixed disks, floppy disks, external hard disks, floppy disk drives and diskettes, tape drives and optical storage devices, thumb-drives, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, routers, cables and connections, recording equipment, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts, that can be used to restrict access to computer hardware (such as physical lock and keys), computer software, including programs to run operating systems, applications, utilities, compilers, interpreters, video, web browsers, and communications programs, all computer-related documentation including written, recorded, printed, or electronically-stored material which explains or illustrates how to configure or use computer hardware, software, or other related items, and all computer passwords and data security devices, including encryption devices, chips and circuit boards. All seized items containing digital evidence shall be imaged onsite or at a computer forensics laboratory to be forensically examined by forensic experts.

3