UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
District Court File No. 18-150(1) (DWF/HB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S OPPOSITION** |
| v. | ) | **TO DEFENDANT'S MOTION** |
| | ) | **TO DISMISS** |
| MICHAEL HARI, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its undersigned counsel, respectfully files this opposition to the defendant's Motion to Dismiss the Indictment (CM/ECF Document No. 94). The Indictment, which charges the defendant with multiple offenses for his alleged role in bombing and setting fire to the Dar Al Farooq Islamic Center in Bloomington, Minnesota, easily survives the defendant's various challenges. As described below, the defendant's claims ignore the plain language of the statutory provisions at issue, minimize and/or misconstrue the relevant legal standards, and misapply the governing law. For these reasons, among others, the government respectfully urges this Court to reject each of the defendant's arguments and deny his motion in its entirety.

## I.   RELEVANT BACKGROUND

The defendant moves under Fed. R. Crim. P. 12 to dismiss the indictment. A court reviewing a Rule 12 motion is to accept the allegations in the indictment as true. *See, e.g.*, *United States v. Winningham*, 953 F. Supp. 1068, 1075 (D. Minn. 1996) (citations omitted).

In pertinent part, the Indictment alleges that in the summer of 2017, the defendant rented a pickup truck in Illinois before driving to Minnesota with his alleged coconspirators, Joe Morris and Michael McWhorter.  Throughout that drive, the men carried with them a pipe bomb that the defendant had constructed in Illinois.  During their interstate drive, the trio stopped at a gas station to purchase diesel fuel and gasoline, which they mixed together in a plastic container.  In the early morning hours of August 5, 2017, the three men arrived at the Dar al Farooq Islamic Center in Bloomington, Minnesota. While there, Morris broke one of the center's windows and tossed the plastic container with the fuel and gasoline mixture into the building.  Then, McWhorter lit the fuse on the pipe bomb built by the defendant and threw that bomb through the broken window and into the area where Morris had just tossed the fire-accelerating mixture.  Shortly thereafter, the pipe bomb exploded, igniting the diesel fuel and gasoline mixture, and causing damage to the center.  Following the bombing, the three men drove the pickup truck back to Illinois, where the defendant eventually returned the rented vehicle.

On June 20, 2018, a federal grand jury charged the defendant, McWhorter, and Morris with: (1) intentionally defacing, damaging, and destroying religious real property because of the religious character of that property, in violation of 18 U.S.C. § 247(a)(1); (2) intentionally obstructing and attempting to obstruct by force and the threat of force the free exercise of religious beliefs, in violation of 18 U.S.C. § 247(a)(2); (3) conspiring to commit federal felonies by means of fire and explosives, in violation of 18 U.S.C. § 844; and (4) carrying and using a destructive device during and in relation to crimes of violence,

in violation of 18 U.S.C. § 924(c).  In addition, the defendant was charged with possessing an unregistered destructive device.

On January 24, 2019, McWhorter and Morris pled guilty to intentionally obstructing and attempting to obstruct by force and the threat of force the free exercise of religious beliefs (Count Two), and to using a destructive device during and in relation to crimes of violence (Count Four).

On July 18, 2019, the defendant filed a Motion to Dismiss the Indictment (CM/ECF Document No. 94).  As the following discussion demonstrates, the defendant's motion is without merit and should be denied.

## II.   ARGUMENT

In his motion, the defendant launches several challenges to the indictment, all of which focus on § 247.  Specifically, the defendant claims that: (a) the statute is unconstitutional because its enactment exceeds Congress's authority under the Commerce Clause; (b) the § 247 pre-prosecution certification for this case is inadequate; (c) the two § 247 violations charged in the indictment are not "crimes of violence" as the term is defined in § 924(c); and (d) the two § 247 charges are multiplicitous.  Each of the defendant's arguments fails.

As described below, § 247 is a valid exercise of Congress's Commerce Clause authority; the two distinct § 247 violations are categorically crimes of violence; and the certification is substantively unreviewable and procedurally sound.

### A. Section 247 is a Valid Exercise of Congress's Commerce Clause Authority

The defendant's primary attack is a facial challenge to the constitutionality of § 247. Specifically, the defendant claims that § 247(a) is an improper exercise of Congress's authority under the Commerce Clause, which grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3.

In reviewing constitutional challenges to federal statutes, courts must treat legislation as presumptively constitutional.  *See United States v. Morrison*, 529 U.S. 598, 607 (2000) ("Due respect for the decisions of a coordinate branch of Government demands that [the judicial branch] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.").   In part because of that presumption of constitutionality, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully."  *See United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Phelps-Roper v. Ricketts*, 867 F.3d 883, 891-92 (8th Cir. 2017)

citing *Salerno* for the proposition that a facial challenge is "the most difficult challenge to mount successfully").[1]

The defendant's claim that § 247 is facially invalid falls far short of this standard. As every federal court to address the issue has found, Congress validly exercised its Commerce Clause authority when it passed § 247. *See United States v. Ballinger*, 395 F.3d 1218, 1222 (11th Cir. 2005) (en banc) ("we have little trouble concluding that § 247, both facially and as applied to [the defendant], is a constitutional expression of Congress' well-established power to regulate the channels and instrumentalities of interstate commerce in order to prevent their use for harmful purposes."), *cert. denied*, 546 U.S. 829 (2005); *United States v. Grassie*, 237 F.3d 1199, 1209-11 (10th Cir. 2001) ("by making interstate commerce an element of the crime under [§ 247], to be decided on a case-by-case basis, constitutional problems are avoided." (citing *Morrison* and *Lopez*)), *cert. denied*, 533 U.S. 960 (2001); *United States v. Roof*, 225 F. Supp. 3d 438, 452 (D.S.C. 2016) ("the Court holds § 247 is constitutional facially and as applied in this case").

---

[1] From the outset, the defendant seeks to minimize the burden he must meet to invalidate § 247. For example, the defendant repeatedly cites *Bond v. United States*, 564 U.S. 211 (2011) and *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) to suggest that the relevant standards are not nearly as demanding as Supreme Court precedent dictates. However, neither case is of any relevance to the issues presently before the Court. *Bond* addressed the narrow question of whether a litigant had standing to challenge the constitutional validity of a statute. *See Bond*, 564 U.S. at 214 ("This case presents the question whether a person indicted for violating a federal statute has standing to challenge its validity."). *Ezell*, which is not binding on this Court, addressed the narrow issue of how plaintiffs could succeed in enjoining a city from enforcing a statute that the plaintiffs claimed violated the Second Amendment. *Ezell*, 651 F.3d at 694-715. Neither case provides any instruction to this Court on how to assess the defendant's facial Commerce Clause challenge to § 247.

The defendant has not shown why these decisions are wrong—nor can he, as controlling standards plainly confirm that § 247 is constitutionally valid.

### i. Congress has authority under the Commerce Clause to regulate three broad categories of activity

The Commerce Clause vests Congress with the power to regulate three broad categories of activity. *See, e.g.*, *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005) (citations omitted). First, "Congress may regulate the use of the channels of interstate commerce." *See United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (citations omitted). Second, "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* Third, Congress has the power to regulate "activities that substantially affect interstate commerce." *Id.*

In attacking § 247, the defendant improperly wishes away the first two categories and fixates on the third category alone. In doing so, he argues almost exclusively by general reference to *Lopez* and *Morrison*. However, as described below—and in sharp contrast to the statutes at issue in *Lopez* and *Morrison*—Congress took account of all three categories when it passed § 247.

### ii. Section 247 is a valid exercise of Congress's authority to regulate the channels and instrumentalities of interstate commerce

Congress amended § 247 in 1996. The amended language directly addressed the 1995 decision in *Lopez*, in which the Supreme Court assessed a statute that lacked an interstate commerce jurisdictional element and did not attempt to regulate either the channels or instrumentalities of interstate commerce. *See Lopez*, 514 U.S. at 559-61.

Consequently, the Supreme Court determined that the statute at issue could survive only by a finding that the regulated activity substantially affected interstate commerce. *Id.* The Supreme Court then invalided the statute at issue after finding that it failed to regulate activity that met the "substantial affect" standard. *Id*. at 567-68.

Following *Lopez*, Congress reworded the jurisdictional element of § 247(b) so that the violations outlined in § 247(a) would apply only to offenses "in or affect[ing] interstate or foreign commerce." In doing so, Congress could not have been clearer that the modified language of § 247's jurisdictional element was meant to adhere to the dictates of *Lopez*. *See Ballinger*, 395 F.3d at 1235 ("the new language was specifically drafted to mirror the Supreme Court's articulation in *Lopez* of the nature and extent of the commerce power." (citing H.R. Rep. No. 104-621, at 7 (1996), ("The Committee is aware of the Supreme Court's ruling in *United States v. Lopez* . . . [The amended § 247], by contrast [to the statute struck down in *Lopez*], specifically limits its reach to conduct which can be shown to be in or to affect interstate commerce."))). *See also* 142 Cong. Rec. H6451-01 (June 18, 1996) (statement of Rep. Hyde) ("The interstate commerce requirement [of § 247] is intended to avoid the problem identified in *United States v. Lopez*"); 142 Cong. Rec. E1258-02 (July 11, 1996) (statement of Rep. Hyde) ("[Section 247's jurisdictional element], unlike the provision at issue in *Lopez*, requires the prosecution to prove an interstate commerce nexus in order to establish a criminal violation").

Against the backdrop of this clear legislative intent, and despite the provision's clear text, the defendant pretends that in modifying § 247(b) Congress meant to <u>only</u> regulate the third category identified in *Lopez*. The defendants in *Ballinger* and *Roof* unsuccessfully

7

tried the same approach. *See Ballinger*, 395 F.3d at 1235 (the defendant's interpretation

"would read the 'in commerce' language out of the statute altogether"); *Roof*, 225 F. Supp.

3d at 453 (same). The Eleventh Circuit's thoughtful yet swift dismissal of the defendant's

approach is worth citing at length:

> Simply put, § 247 contains unambiguous jurisdictional language—covering
> offenses *in* or *affecting commerce*—that must be given its proper effect. In this
> important respect, § 247 differs significantly from the statute invalidated in *Lopez*,
> which did not contain any clarifying jurisdictional statement, thus leaving
> substantial ambiguity about which type of commerce power Congress intended to
> exert. Here, in sharp contrast, by using the phrase "in or affects commerce,"
> Congress has clearly invoked *Lopez* category 3—its power to regulate activities that
> substantially affect commerce—as well as categories 1 and 2—its power to regulate
> the use of the channels and instrumentalities of interstate commerce.

*Ballinger*, 395 F.3d at 1235 (internal citations omitted) (emphasis in original).[2]

As *Ballinger* notes, in modifying § 247's jurisdictional element, Congress sought to

properly exercise the full extent of its Commerce Clause authority. *See, e.g.*, H.R. Rep.

104-621 at 7 ("Under this new formulation of the interstate commerce requirement, the

Committee intends that where in committing, planning, or preparing to commit the offense,

the defendant either travels in interstate or foreign commerce, or uses the mail or any

facility or instrumentality of interstate or foreign commerce, the statute will be satisfied.

These are but two examples of the many factual circumstances which would come within

the scope of [§ 247's] interstate commerce requirement."). In doing so, Congress took care

---

[2] Essentially acknowledging that the reasoning in *Ballinger* defeats his argument, the
defendant urges the Court to ignore *Ballinger* by saying that the Eleventh Circuit merely
"employed as-applied analysis." *See* Doc. 94 at 9, n. 5. However, as noted above, the en
banc *Ballinger* court explicitly held that § 247 was a constitutional exercise of Congress's
Commerce Clause authority, "both *facially* and as applied." 395 F.3d at 1222 (emphasis
added).

not to exceed that authority by closely adhering to the dictates of *Lopez*. *See, e.g.*, *id.* ("[In contrast to *Lopez*, § 247] specifically limits its reach to conduct which can be shown to be in or to affect interstate commerce.  Thus, if in prosecuting a particular case, the government is unable to establish this interstate commerce connection, [§ 247] will not apply to the offense.").

Even if the Court were inclined to follow the defendant's approach of setting aside § 247's legislative history and disregarding the thoughtful analyses of the statute by every federal court that has addressed its validity under the Commerce Clause, the fact remains that § 247(a) explicitly applies only to offenses "in and affect[ing] interstate commerce." As the Eighth Circuit has repeatedly found, that phrase is a "term of art" that allows Congress to exercise the full extent of its Commerce Clause power without exceeding it. *See United States v. Mosby*, 60 F.3d 454, 456 (8th Cir. 1995); *United States v. Letts*, 264 F.3d 787, 789-90 (8th Cir. 2001) (citing *Mosby*).  *See also United States v. Schmidt*, 571 F.3d 743, 746-47 (8th Cir. 2009) (statute with an "in or affecting interstate commerce" jurisdictional element "is expressly tied to interstate commerce" (citing, among other cases, *United States v. Stuckey*, 255 F.3d 528, 530 (8th Cir. 2001); *United States v. Shelton*, 66 F.3d 991, 992 (8th Cir. 1995); *United States v. Rankin*, 64 F.3d 338, 339 (8th Cir. 1995))).

Section 247(b)'s "in or affecting interstate commerce" element helps demonstrate why the defendant's reliance on *Lopez* and *Morrison* is misplaced.  In both *Lopez* and *Morrison*, the Supreme Court invalidated statutes that (1) entirely lacked an interstate commerce jurisdictional element, (2) made no attempt to regulate the instrumentalities and channels of interstate commerce, and thus (3) could only be justified by a finding that the

9

regulated activity substantially affected interstate commerce.  In sharp contrast, § 247 has a mandatory jurisdictional element that explicitly seeks to regulate offenses that occur *in* interstate commerce.

*Morrison* helps demonstrates the importance of this contrast.  In *Morrison*, the Supreme Court invalidated a provision of the Violence Against Women Act (VAWA) that afforded a civil remedy to the victims of gender-motivated violence, but that civil remedy lacked an interstate commerce jurisdictional element.  *Morrison*, 529 U.S. at 601-02. Meanwhile, *Morrison* made clear that another provision of the same act that provided a criminal remedy for incidents of domestic violence occurring in interstate commerce was plainly an appropriate exercise of Congress's Commerce Clause authority.  *See id.* at 613, n. 5 ("The Courts of Appeals have uniformly upheld this criminal sanction as an appropriate exercise of Congress' Commerce Clause authority, reasoning that '[t]he provision properly falls within the first of *Lopez's* categories as it regulates the use of channels of interstate commerce.'" (citing *United States v. Lankford*, 196 F.3d 563, 571-72 (5th Cir. 1999)).

Unlike the invalid VAWA civil remedy, and like the valid VAWA criminal provision, § 247 includes a jurisdictional element that properly exercises Congress's authority to regulate offenses that occur *in* interstate commerce.  *See* 18 U.S.C. § 247(b). The act in question thus plainly regulates, among other things, the instrumentalities of interstate commerce.  As has often been noted, Congress "has the power to regulate instrumentalities of interstate commerce," and even "[p]urely intrastate activity falls within this power when an instrumentality of interstate commerce is used."  *See United States v.*

*Corum*, 362 F.3d 489, 495 (8th Cir. 2004) (citing *Lopez*, 514 U.S. at 558; *United States v. Baker*, 82. F.3d 273, 275 (8th Cir. 1996)).[3]

### iii.   Section 247 is a valid exercise of Congress's power to regulate conduct that substantially affects interstate commerce

In addition to being a valid exercise of Congress's Commerce Clause authority under the first two *Lopez* categories, § 247(a) is also a valid exercise of Congress's power to regulate activities that "substantially affect" interstate commerce.

As noted above, the defendant's facial attack on the constitutionality of § 247(a) wishes away the first two *Lopez* categories, and focuses exclusively on the third.  In doing so, the defendant fails to fully and clearly articulate his burden under that third category.  As the Supreme Court has stated, a court's task in assessing the third *Lopez* category "is a modest one."  *See Gonzales*, 545 U.S. at 22.  Specifically, a reviewing court need only determine whether Congress had a "rational basis" for concluding that the activities it seeks to regulate, taken in the aggregate, substantially affect interstate commerce.  *Id.* (citations omitted).

Though the defendant casually breezes over the "rational basis" standard, he properly notes that *Lopez* set out a four-part test for assessing whether Congress can validly regulate activities that substantially affect interstate commerce.  That test instructs courts to balance: (1) whether the statute contains an "express jurisdictional element" that limits

---

[3] In *Corum*, the Eighth Circuit also noted that "no additional showing of an interstate nexus is necessary when a statute regulates" activity defined by the first two *Lopez* categories. 362 F.3d at 494 (citing *United States v. Gil*, 297 F.3d 93, 100 (2d Cir. 2002); *United States v. Marek*, 238 F.3d 310, 318 (5th Cir. 2001); *United States v. Gilbert*, 181 F.3d 152, 158 (1st Cir. 1999); *United States v. Clayton*, 108 F.3d 1114, 1117 (9th Cir. 1997)).

its reach; (2) whether the regulated activity is commercial/economic in nature; (3) whether Congress made findings regarding the regulated activity's impact on interstate commerce; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated.  As discussed below, these factors weigh in favor of finding that Congress had a rational basis for regulating the activities proscribed by § 247(a).

> a) *Section 247's express jurisdictional element helps ensure, through case-by-case inquiry, that the proscribed conduct affects interstate commerce*

With respect to the first two factors, though the conduct specifically proscribed by § 247(a) is not inherently commercial, the statute's jurisdictional element ensures the required nexus between the offense and interstate commerce.

An express jurisdictional element "may establish that the enactment is in pursuance of Congress's regulation of interstate commerce." *Morrison*, 529 U.S. at 612.  In the Eighth Circuit, a jurisdictional element like the one found in § 247(b) effectively ensures a statute's validity under the Commerce Clause.  *See, e.g.*, *United States v. House*, 825 F.3d 381, 386 (8th Cir. 2016);  *see also United States v. Vong*, 171 F.3d 648, 654 (8th Cir. 1999) ("*Lopez* invalidated a statute [ . . .] *because* the statute did not contain an express jurisdictional nexus to interstate commerce.") (emphasis added)).[4]

---

[4] The existence of an express jurisdictional element was also dispositive in the District of South Carolina's assessment of § 247 in *Roof*.  *See* 225 F. Supp. 3d at 453-54 ("But § 247 does have a jurisdictional element, restricting it to conduct that has a sufficient nexus with interstate commerce.  Statutes prohibiting noncommercial conduct that include such jurisdictional elements are universally upheld as within Congress's Commerce Clause powers.") (citing collected cases from the First, Fourth, Sixth, and Eighth Circuits).

Such a jurisdictional element is important because it "ensure[s], through case-by-case inquiry," that the proscribed conduct affects interstate commerce. *Lopez*, 514 U.S. at 561. As the legislative history described above makes clear, Congress had this exact sort of "case-by-case inquiry" in mind when it modified the jurisdictional element in § 247(b), and Congress included that element for the express purpose of avoiding a fatal shortcoming of the legislation at issue in *Lopez* and *Morrison*. *See* Sec. II (A) (ii), *supra*.

> b) *Congress's legislative findings identified specific ways in which places of worship affect interstate commerce*

The defendant states that he found "no record of 'express congressional findings'" regarding the substantial effects that the activity § 247(a) proscribes has on interstate commerce. However, the relevant congressional record includes many discussions about the effect that places of worship have on interstate commerce. For example, in presenting the statute to members of Congress, one of the legislation's co-sponsoring senators stated:

> As the record makes clear, the churches, synagogues, and mosques that have been the targets of arson and vandalism, serve many purposes. On Saturdays or Sundays, they are places of worship. During the rest of the week, they are centers of activity. A wide array of social services, such as inoculations, day care, aid to the homeless, are performed at these places of worship. People often register to vote, and vote at the neighborhood church or synagogue. Activities that attract people from a regional, interstate area often take place at these places of worship. There is ample evidence to establish that Congress is regulating an activity that has a "substantial effect" upon interstate commerce.

142 Cong. Rec. S6517-04, at *S6522 (June 19, 1996) (statement of Sen. Kennedy).

In exercising its authority under the Commerce Clause, Congress is "not required to make formal findings as to the substantial burdens that an activity has on interstate commerce." *Lopez*, 514 U.S. at 562-63. Despite this, and as the Tenth Circuit has

observed, § 247's "legislative history is informative on the specific impact of church attacks on interstate commerce." *See Grassie*, 237 F.3d at 1209 (noting that the statute's legislative history contains "references to a broad range of activities in which churches engage, including social services, educational and religious activities, the purchase and distribution of goods and services, civil participation, and the collection and distribution of funds for these and other activities across state lines." (citing 142 Cong. Rec. S7908–04, at *S7909 (1996) (joint statement of floor managers regarding H.R. 3525, The Church Arson Prevention Act of 1996); 142 Cong. Rec. S6517–04, at *S6522 (1996) (statement of Sen. Kennedy); *Church Burnings: Hearings on the Federal Response to Recent Incidents of Church Burnings in Predominantly Black Churches Across the South Before the Senate Comm. on the Judiciary,* 104th Cong. 37 (1996) (appendix to the prepared statement of James E. Johnson and Deval L. Patrick))).

These legislative materials thus provide further evidence that Congress validly exercised its Commerce Clause authority by regulating activity that substantially affects interstate commerce.

### c) The link between the activity Section 247 proscribes and its effects on interstate commerce is not attenuated

As is plain on its face, § 247 protects, among other things, places of worship such as churches, synagogues, and mosques. In spite of this fact, the defendant wrongly asserts that "there is no demonstrated or even speculated link" between any of the activity proscribed by § 247 and interstate commerce. This District has explicitly disagreed with the defendant. Specifically, this District has stated that, "It is well established that religious

organizations can and do engage in and affect interstate commerce." *See United States v. Corum*, No. 01-cr-236, 2002 WL 1285078, at *3 (D. Min. June 5, 2002) (citing *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564 (1997); *Grassie*, 237 F.3d at 1209; *United States v. Ballinger*, 153 F. Supp. 2d 1361, 1366-70 (N.D. Ga. 2001)).

Several circuits have joined this District in noting that places of worship are involved in commercial activity. *See, e.g.*, *United States v. Renteria*, 557 F.3d 1003, 1010 (9th Cir. 2009) (discussing how a synagogue was used for interstate commercial purposes); *United States v. Rayborn*, 312 F.3d 229, 234-35 (6th Cir. 2002) ("While the church's activities were undertaken primarily to facilitate worship, they nonetheless were commercial in nature."); *United States v. Odom*, 252 F.3d 1289, 1294-95 (11th Cir. 2001) ("churches can and do engage in commerce."); *United States v. Terry*, 257 F.3d 366, 370 (4th Cir. 2001) (operation of daycare center in a church building "was itself a commercial activity").

Taken as a whole, the *Lopez* four-part test demonstrates that Congress had a rational basis for determining that the activities proscribed by § 247 substantially affect interstate commerce. Thus, § 247 is also a valid exercise of Congress's power under the third *Lopez* category. As a result, the defendant's facial attack on the statute must fail.

### B. The Section 247 Certification is Procedurally Sound and Substantively Unreviewable

The defendant next claims that the government's certification of this prosecution, made pursuant to § 247(e), is "insufficient" because it is "devoid of any substantive justification." Doc. 94 at 19-21. The defendant's argument is without merit. The

certification meets the requirements of the statute, and the substance underlying the government's decision to prosecute is an unreviewable act of prosecutorial discretion.

Section 247(e) specifies that a prosecution under § 247 may not proceed unless the Attorney General or his designee—in this case, the then-Acting Assistant Attorney General for the Civil Rights Division, John Gore—certifies that, "in his judgment," prosecution is "in the public interest and necessary to secure substantial justice." 18 U.S.C. § 247(e). On June 18, 2018, Acting Assistant Attorney General Gore issued such a certification for this case. That certification is attached to this pleading as Exhibit A. As the defendant concedes, the certification demonstrates that the government complied with § 247(e)'s statutory requirements.

Despite there being no indication in the statute that substantive review of the certification is at all appropriate, the defendant claims that the Court should proceed with a substantive evaluation of the government's decision to charge him with violating § 247. The defendant's argument is easily defeated because it ignores the actual language of the statute and is contrary to Eighth Circuit precedent applying bedrock constitutional principles of separation of powers.

Certification under § 247(e) involves a quintessential prosecutorial decision that, like other prosecutorial decisions, falls soundly within the discretion of the Executive Branch. *See, e.g.*, *Greenlaw v. United States*, 554 U.S. 237, 246 (2008) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." (citing *United States v. Nixon*, 418 U.S. 683, 693 (1974))). Prosecutors "have this latitude because they are designated by statute as the President's delegates to help him

discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting U.S. Const., art. II, § 3). Courts have thus recognized the need for judicial restraint in this area, as prosecutorial judgments are "particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985); *see also United States v. Moeller*, 383 F.3d 710, 713 (8th Cir. 2004) (citing *Wayte*).

The defendant's assertion that the Court should ignore these principles and substantively review the § 247(e) certification rests on a comparison to a certification provision in juvenile federal law, which is codified at 18 U.S.C. § 5032. However, as the Eighth Circuit has explicitly held, the analogous provision of the § 5032 certification is "an unreviewable act of prosecutorial discretion." *See United States v. Juvenile Male J.A.J.*, 134 F.3d 905, 909 (8th Cir. 1998) [hereinafter *Juvenile Male J.A.J. (1998)*].

In *Juvenile Male J.A.J. (1998)*, the defendant challenged the sufficiency of the government's § 5032 certification that "a substantial federal interest in the case justified federal jurisdiction." *Id.* at 905. The Eighth Circuit began its analysis by noting that of the four circuits to have addressed the issue, three found that certification of a substantial federal interest is not reviewable. *Id.* at 906 (noting that the Third, Fifth, and Eleventh Circuits found that the certification was not reviewable, while the Fourth Circuit found that it was).

In joining the majority position, the Eighth Circuit noted that "a statute's failure to provide meaningful standards for judicial review can be dispositive that review is not permitted." *Id.* at 907 (citing *Webster v. Doe*, 486 U.S. 592, 599-600 (1988) ("[E]ven when

Congress has not affirmatively precluded judicial oversight, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.")).  The Eighth Circuit then determined that "[s]uch a lack of standards [was] fatal to the [defendant's] argument for reviewability."  *Id.* at 908 (citing *Webster*).

Since 1998, the weight of authority has become even more lopsided.  In total, nine circuits have agreed that the § 5032 certification of a "substantial federal interest" is not subject to substantive judicial review.  *See United States v. F.S.J.*, 265 F.3d 764, 771 (9th Cir. 2001) ("[C]ertification of a 'substantial federal interest' under § 5032 is not subject to judicial review except for such formalities as timeliness and regularity (e.g., signed by the proper official) and for allegations of unconstitutional prosecutorial misconduct."); *United States v. Doe*, 226 F.3d 672, 678 (6th Cir. 2000) ("[T]he Attorney General's decision to certify a 'substantial Federal interest' in a juvenile prosecution may not be reviewed for factual accuracy."); *United States v. Smith*, 178 F.3d 22, 26 (1st Cir. 1999) (holding that the "United States Attorney's certification of a substantial federal interest constitutes an unreviewable act of prosecutorial discretion"); *United States v. Jarrett*, 133 F.3d 519, 541 (7th Cir. 1998) (holding that courts may review technical aspects and constitutional challenges to certification but "courts cannot review the substantive basis of the Attorney General's certification of a 'substantial Federal interest' under 18 U.S.C. § 5032"); *In re Sealed Case*, 131 F.3d 208, 212-215 (D.C. Cir. 1997) (distinguishing Fourth Circuit's outlier decision in *United States v. Juvenile Male No. 1*, 86 F.3d 1314 (4th Cir. 1996) at length and holding that courts may review the § 5032 certification "only to determine its

presence and whether it facially supports [a federal court's] jurisdiction"); *United States v. Juvenile No. 1*, 118 F.3d 298, 304 (5th Cir. 1997) ("Our analysis of the language, structure, and legislative history of § 5032 leads us to conclude . . . that Congress did not intend for the courts to second-guess the Attorney General's determination that a 'substantial Federal interest' exists in a particular case."); *Impounded (Juvenile R.G.)*, 117 F.3d 730, 736 (3d Cir. 1997) (holding that a court may not substantively review a § 5032 certification that there was a substantial federal interest in prosecution); *United States v. I.D.P.*, 102 F.3d 507, 513 (11th Cir. 1996) ("[A]bsent allegations of bad faith or facial non-compliance with the statute, judicial review of the Attorney General's decision that a substantial federal interest exists under section 5032 would not be appropriate.").

Notably, the certification provision of § 5032 requires the Attorney General or his designee to "certify *to the appropriate district court* … that there is a substantial federal interest in the case."  *See* 18 U.S.C. § 5032 (emphasis added).  Even with this express statutory reference to the courts, which is absent in § 247's certification requirement, the Eighth Circuit (and eight other circuits) easily held that substantive judicial review is inappropriate. [5]

The defendant asserts, contrary to the overwhelming weight of authority, that certification under § 247(e) is subject to substantive judicial review.  To support his

---

[5] While a court may not substantively review a certification that prosecution of a particular case is in the public interest, a court can of course review an allegation that the government did not comply with the procedural step of obtaining a required certification.

threadbare argument, he points to an earlier juvenile delinquency case, *United States v. Juvenile Male*, 923 F.2d 614 (8th Cir. 1991) [hereinafter *Juvenile Male (1991)*]. [6]

In *Juvenile Male (1991)*, the Eighth Circuit allowed a very limited review of an entirely different—and easily distinguishable—certification provision in the delinquency code. Specifically, the Eighth Circuit grappled with the provision of § 5032 that requires the Attorney General or his designee to certify that "the offense charged is a crime of violence that is a felony or [an enumerated drug crime]." *Id.* The Eighth Circuit permitted the district court to determine whether the offenses covered by the certification were in fact the ones defined by Congress. *Juvenile Male (1991),* at 617-18. This narrow and unremarkable finding is consistent with the overwhelming majority of circuit courts that have permitted "technical" review of the certification process but have flatly rejected a substantive review of the Attorney General's determination that a particular prosecution presents a substantial federal interest. *See* pp. 15-16 *supra. See also Impounded (Juvenile R.G.)*, 117 F.3d at 736 (noting that while a court may review §5032's requirement that a crime is one of violence, it may not substantively review the determination that federal prosecution is in the public interest).

---

[6] The defendant also cites to the District of South Carolina's decision in *Roof*, 225 F. Supp. 3d at 450-51. The *Roof* court noted that it was "compelled" to review the Attorney General's certification because of the controlling precedent in the Fourth Circuit—the same precedent that nine other circuits, including the Eighth Circuit, have rejected. Moreover, even in the context of that minority view, the *Roof* court still noted that its review was "limited," acknowledged that the Attorney General's decision to certify was entitled to "great deference," and easily upheld the Attorney General's certification decision. *Id.* at 451.

The defendant asserts that *Juvenile Male (1991)* stands for broad proposition that certification requirements are subject to substantive judicial review.  It does not.  Rather, the case stands for the proposition that limited review is permitted to determine whether juvenile prosecution comported with the statutory requirement that only a crime of violence may be pursued.  *See Juvenile Male (1991)*, at 617-18.  Moreover, the Eighth Circuit's decision seven years later in *Juvenile Male J.A.J. (1998)* unequivocally forecloses any argument that *Juvenile Male (1991)'s* limited holding opens the door to substantive judicial review of a certification that there is an adequate federal interest in prosecution.  *See Juvenile Male J.A.J. (1998)*, at 909 ("We conclude that the text and structure of § 5032, in addition to separation of powers concerns, demonstrate that [the certification] of a substantial federal interest is an unreviewable act of prosecutorial discretion.").

In short, § 247(e) requires that the Attorney General or his designee certify in writing that federal prosecution under § 247 is in the public interest and is necessary to secure substantial justice.  But the substance underlying the government's decision to prosecute a case under § 247 is an unreviewable act of prosecutorial discretion.  Because the government has met the conditions of § 247(e), the Court's review of the certification requirement is at an end and prosecution of this case may proceed.

## C.  The Section 247 Violations Charged in Count One and Count Two are Categorically Crimes of Violence

The defendant's third argument targets Count Four, which charges the defendant with violating § 924(c) by carrying and using a destructive device during and in relation to crimes of violence.  Specifically, the defendant asserts that the § 247 violations charged in

Count One and Count Two are not categorically crimes of violence, and thus Count Four

(the § 924(c) violation) must be dismissed.  The defendant is wrong.  As discussed below,

each of the § 247 violations charged in this case is categorically a crime of violence as

defined by § 924(c).

### i. Section 247 is a divisible statute containing various offenses with distinct elements

For the purposes of the § 924(c) violation charged in Count Four, the term "crime

of violence" is defined in § 924(c)(3)(A).  That provision—which is commonly referred to

as the "elements" or "force" clause—defines "crime of violence" as "a felony [that] has as

an element the use, attempted use, or threated use of physical force against the person or

property of another."  As the defendant correctly notes, the § 924(c) violation charged in

Count Four hinges on whether the § 247 violations charged in Counts One and Two—that

is, the "predicate offenses"—are "crimes of violence" as defined in § 924(c)'s force clause.

This determination is made through the categorical approach, under which the Court is to

look at the predicate offenses to determine whether those offenses necessarily meet the

definition outlined in § 924(c)(3)(A).  *See, e.g.*, *United States v. Castleman*, 572 U.S. 157,

168-69 (2014) (citing *Shepard v. United States*, 544 U.S. 13 (2005) and *Taylor v. United

States*, 495 U.S. 575 (1990)). [7]

---

[7] The Supreme Court recently struck down as unconstitutionally vague the residual clause of § 924(c)(3)(B).  *See generally United States v. Davis*, 139 S. Ct. 2319 (2019).  In light of *Davis*, the government agrees with the defendant that whether the § 247 offenses in this case are "crimes of violence" is to be judged in relation to the definition provided in § 924(c)(3)(A)'s force clause.

The obvious starting point for the categorical approach is determining the elements of the predicate offenses. *See, e.g.*, *Mathis v. United States*, 136 S. Ct. 2243, 2248-49 (2016). "'Elements' are the 'constituent parts' of a crime's legal definition—the things the 'prosecution must prove to sustain a conviction.'" *Id.* (citations omitted). As this case demonstrates, there are times when a single statute defines multiple crimes. *Id.* (citing *Descamps v. United States*, 570 U.S. 254, 260-61 (2013)). Such statutes are "divisible." *Id.* When a statute is divisible, courts apply a slight modification to the categorical approach, in which judicial review starts with a determination of which crime, with which elements, forms the relevant predicate offense. *Id.* (citing *Taylor*, 495 U.S. at 602). Once the reviewing court properly identifies the relevant predicate offense from a divisible statute, the court then applies the categorical approach as it ordinarily would. *Id.*

Even a passing glance at § 247 reveals that the statute specifies a number of distinct offenses. The statute is thus divisible, and the modified categorical approach applies. Here, the government charged the defendant with two separate § 247 offenses: a violation of § 247(a)(1) and a violation of §247(a)(2). The defendant begins his categorical approach analysis by outlining the baseline elements of those two distinct offenses. As the defendant concedes, each provision has force as an element:

- § 247(a)(1) prohibits **intentionally defacing, damaging, or destroying any religious real property**, or attempting to do so, because of the religious character of the property, when the offense is in or affecting interstate commerce.

- § 247(a)(2) prohibits intentionally obstructing, **by force or threat of force**, or attempting to do so, any person in the enjoyment of his or her exercise of religion, when the offense is in or affecting interstate commerce.

However, the Court must also account for subsection (d) of § 247, which sets out the penalties for various violations of the statute. Specifically, § 247(d) specifies the conditions under which a violation is a misdemeanor, a 3-year felony, a 20-year felony, a 40-year felony, or a life-felony. Thus, subsection (d) makes clear that § 247 delineates at least five separate crimes. *See Descamps*, 570 U.S. at 263-64 (noting application of the "modified categorical approach" when a statute "lists multiple, alternative elements, and so effectively creates several different crimes") (internal citations and quotations omitted).

Both § 247 offenses in this case were charged as 20-year felonies under subsection (d)(3). That 20-year provision requires the government to prove, in addition to the elements mentioned above, that the offense resulted in bodily injury to another person or, as charged in this case, that it involved the use, attempted use, or threatened use of a dangerous weapon, explosive, or fire. *See* 18 U.S.C. §247(d)(3). Because § 247(d)(3) effectively grafts an extra element onto the § 247 violations charged in the Indictment by requiring proof that the offenses involved the use, attempted use, or threatened use of a dangerous weapon, explosive, or fire, the predicate offenses in this case are more accurately described as violations of § 247(a)(1), (d)(3) and § 247(a)(2), (d)(3). As described below, each of these predicate offenses is categorically a crime of violence as defined in § 924(c).

### ii.  The Section 247 offense charged in Count Two is categorically a crime of violence

The § 247(a)(2), (d)(3) violation charged in Count Two contains, as an express element, that the defendant *used force or the threat of force* to obstruct "a person" in the

exercise of religion.  As he must, the defendant concedes that this provision includes force as an element.  However, he claims that the force contemplated by the statute need not be "force against the person or property *of another*," as required by § 924(c)(3)(A).  The defendant's proffered distinction is illusory.  To violate § 247(a)(2), a defendant cannot use force (or the threat of force) against him or herself to obstruct his or her own exercise of religion.

The defendant's suggestion that this violation does not require force against another person is even more farcical in the context of a 20-year § 247(a)(2) violation since the defendant's offense necessarily either resulted in bodily injury or involved the use of a weapon or fire.  Moreover, as § 247(a)(2) makes clear, the defendant must "intentionally obstruct," by force or threat of force, "any person" in the enjoyment of that person's free exercise of religious beliefs.  It simply makes no sense whatsoever to use the term "obstruct" to refer to a defendant's use of force against himself with the intent of interfering with his own religious exercise.  Put another way, a person cannot violate § 247(a)(2) by using force or the threat of force against himself with the intent of interfering with his own religious freedoms—and he certainly cannot do so while using a weapon or fire.  Consequently, a violation of § 247(a)(2), (d)(3) is categorically a crime of violence as defined by § 924 (c)(3)(A).

### iii.  The Section 247 offense charged in Count One is categorically a crime of violence

The defendant's argument fares no better with respect to the § 247 offense charged in Count One.  As was the case with the conduct proscribed under Count Two, the offense

charged in Count One also contains an express element of force, since the intentional defacement, damage, or destruction of property involves force against religious real property.   The defendant concedes this point, but again argues that a violation of § 247(a)(1) is not a crime of violence because it allows for a situation in which a defendant can use force against his or her own religious real property, rather than the property "of another."   Again, the argument is illusory.

The defendant ignores key statutory aspects of the § 247(a)(1), (d)(3) violation charged in Count One.  These aspects further establish that the category of property covered by the offense is narrower, not broader, than the category covered by the term "property of another" in § 924(c)'s force clause.  First, § 247 defines "religious real property" as "any church, synagogue, mosque, religious cemetery, or other religious real property, including fixtures or religious objects contained within a place of religious worship, or real property owned or leased by a nonprofit, religiously affiliated organization."  18 U.S.C. § 247(f).[8]

---

[8] Without providing a pincite, the defendant references *United States v. Corum*, 362 F.3d 489 (8th Cir. 2004), for the general proposition that § 247 applies to "*any* religious property."  *See* Doc. 94 at 29 (emphasis in original).  *Corum* does not support that suggestion.  It appears that the relevant portion from *Corum* discusses an entirely different statute.  *See Corum*, 362 F.3d at 493 (noting that § 844 prohibits the destruction of "any building, vehicle, or other real or personal property").  While *Corum* does address a First Amendment challenge to § 247(a)(2), no part of the opinion addresses § 247's definition of "real religious property."

The statute then requires that any intentional defacement, destruction, or damage to "real religious property" be "*because of* the religious character of that property." 18 U.S.C. § 247(a)(1) (emphasis added).[9]

Having ignored both the statutory definition of "religious real property," and the motivational element that a defendant's conduct be "because of" the religious character of the targeted property, the defendant claims that the offense charged in Count One is not a crime of violence because a person could damage, deface, or destroy his own property and still violate § 247. Yet that argument is entirely divorced from the statute's requirements, and none of the fantastical examples the defendant cites could be charged under § 247(a)(1), let alone § 247(a)(1), (d)(3).

For example, the defendant suggests a case in which religious leaders destroy "their own church" to unite followers or garner sympathy. But a religious leader is not a sole "owner" of his or her church. Moreover, this scenario does not involve damage "because of the religious nature of the property," and therefore does not violate § 247(a)(1). Even if this conduct could be considered to violate § 247(a)(1), it would still meet the "crime of violence" definition because it would involve the use of force against the "property of another." Specifically, the far-fetched example contemplates a church with "leaders" (in the plural) and "followers" (in the plural), thus demonstrating the property damaged by one part of the group would also belong to the other (*i.e.*, "another").

---

[9] Notably, Merriam-Webster's Dictionary defines "to deface" as "to deliberately damage cause the damage or destruction of <u>another's property</u>." *Deface*, Merriam-Webster, https://www.merriam-webster.com/thesaurus/deface (emphasis added).

The defendant's analogy to arson cases in which individuals burn down their own property for insurance payouts likewise fails because it ignores the actual conduct § 247 proscribes.  Even if one imagines a person destroying his or her own religious real property with the aim of getting an insurance payout, that conduct would not be "because of the religious nature of the property" and thus it would not violate § 247(a)(1).

The defendant's references to *Andrade v. United States*, 116 F. Supp. 2d 778 (W.D. Tex. 2000), and *United States v. Miller*, 767 F.3d 585 (6th Cir. 2014), entirely miss the mark and further demonstrate the defendant's incomplete reading of § 247.  With respect to the conduct referenced in *Andrade*, the Branch Davidians did <u>not</u> destroy the compound in Waco, Texas, "because of the religious characteristic of the property."  Rather, as the cited opinion suggests, the Branch Davidians set fire to the property in order to interfere with and obstruct a government raid of the property.  *Andrade*, 116 F. Supp. 2d at 785.

The defendant also references *Miller*, a hate crime case in which members of a small Amish sect attacked members of another Amish sect.  *Miller*, 767 F.3d at 590.  The conduct at issue there plainly involved the use of force by a defendant against "another person."  Even if extrapolated out to the § 247(a)(1) context, one religious sect destroying the real religious property of another sect because of the religious nature of the property would still involve damage to the property "of another," and thus would constitute a crime of violence under § 924(c)(3)(A).

### iv. The categorical approach requires hypotheticals that have a realistic probability of actual application

In light of the defendant's proffered hypotheticals, it is worth emphasizing that the categorical approach requires hypotheticals that are based in a "realistic probability, not a theoretical possibility, that the [government] would apply its statue to conduct falling outside the generic definition" of crime of violence outlined in § 924(c)(3)(A). *See Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007). As the Eighth Circuit has put it, when construing *Duenas-Alvarez*: "[T]he categorical approach is not an invitation to apply legal imagination to the . . . offense." *United States v. Roblero-Ramirez*, 716 F. 3d 1122, 1126 (8th Cir. 2013) (quotations and citations omitted). The Supreme Court has indicated that an offender, whose burden it is to demonstrate that realistic probability, "may show that the statute was so applied in his own case. But he must at least point to his own case or other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he argues." *Duenas-Alvarez*, 549 U.S. at 193. In the specific example of the case at bar, that would be a § 247 prosecution that did not involve violent force. Defendant has pointed to no prosecutions under § 247 that did not involve violent force, and of course, the facts underlying his own prosecution, taken as true for purposes of this motion as they must be, involve violent force. As described above, the defendant's proffered scenarios fail to meet the requirements of § 247. Those failed hypotheticals are fanciful enough. Conceiving of any conduct that could fall within § 247's

actual ambit without being a crime of violence would require the exact sort of baseless theoretical imagination that is barred by *Duenas-Alvarez*. *See id.*[10]

### D.  The Indictment is Not Multiplicious

The defendant's final argument claims that Counts One and Two are multiplicitous. An indictment is multiplicitous if it "charg[es] the same offense in more than one count." *See, e.g.*, *United States v. Mann*, 701 F.3d 274, 285 (8th Cir. 2012) (internal citations and quotations omitted).  As described repeatedly above, § 247 spells out a number of different offenses.  The § 247(a)(1) offense charged in Count One is different from the § 247(a)(2) offense charged in Count Two.  Thus, the Indictment is not multiplicitous.

The defendant correctly notes that the applicable standard for determining if an indictment is multiplicitous comes from *Blockburger v. United States*, which states:

> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

284 U.S. 299, 304 (1932) (citing *Gavieres v. United States*, 220 U.S. 338, 342 (1911)).

The defendant's argument is easily defeated because § 247(a)(1) "require[s] proof of an element not required to be proved by [§ 247(a)(2)]."  *See Mann*, 701 F.3d at 286

---

[10] The *Duenas-Alvarez* rule is particularly applicable here, where the statute contains a certification provision ensuring that the Attorney General or his designee certifies in any given case that prosecution is in the interest of justice.  *See* Sec. II (B), *supra*. Consequently, even if there was a conceivable application of § 247 that did not involve the person or property of another, there is no "realistic probability" that the government would pursue prosecution under the statute.

(referencing *Blockburger*).   The reverse is also true: § 247(a)(2) requires proof of an element not required to be proved for a conviction under § 247(a)(1).

As described above, § 247(a)(1) prohibits intentionally defacing, damaging, or destroying religious real property, or attempting to do so, because of the religious character of the property.   Meanwhile, § 247(a)(2) prohibits intentionally obstructing, by force or threat of force, or attempting to do so, any person in the enjoyment of his or her exercise of religion.[11]

To convict an individual of violating § 247(a)(1), the government must prove beyond a reasonable doubt that he or she destroyed religious real property *because of* the religious character of the property.   Proof of the motive element—the fact that the conduct occurred "because of" the religious character of the property—is <u>not</u> required to sustain a conviction for § 247(a)(2).

To convict an individual of violating § 247(a)(2), the government must prove beyond a reasonable doubt that he or she intentionally obstructed a person's free exercise of religious beliefs.   Proof of the fact that the obstruction impacted (or attempted to impact) a victim's free religious exercise is <u>not</u> required to sustain a conviction for § 247(a)(1).

Therefore, Count One (the § 247(a)(1) offense) and Count Two (the § 247(a)(2) offense) are not multiplicious.   *See Mann*, 701 F.3d at 286.

---

[11] As described in Section II (A), *supra*, both violations also require that the offense is in or affecting commerce.

**III.     CONCLUSION**

For the foregoing reasons, each one of the defendant's arguments is without merit.

Therefore, the government respectfully requests that the Court deny his Motion to Dismiss

in its entirety.

Respectfully submitted,

ERIC S. DREIBAND
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

By:      */s/ Timothy Visser*
TIMOTHY VISSER
Trial Attorney, U.S. Department of Justice
Civil Rights Division, Criminal Section

ERICA H. MacDONALD
United States Attorney

*/s/ John Docherty*
JOHN DOCHERTY
Assistant United States Attorney
MN Attorney Reg. No. 017516X

*/s/ Julie E. Allyn*
JULIE E. ALLYN
Assistant United States Attorney
MN Attorney Reg. No. 256511

## CERTIFICATE OF SERVICE

August 7, 2019

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ John Docherty*
JOHN DOCHERTY