UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 18-150(1) (DWF/HB) |
| | ) | |
| v.             Plaintiff, | ) | |
| | ) | **DEFENDANT'S MEMORANDUM IN** |
| | ) | **SUPPORT OF MOTION TO** |
| MICHAEL HARI, | ) | **SUPPRESS FRUITS OF UNLAWFUL** |
| | ) | **SEARCH AND SEIZURE AND** |
| Defendant. | ) | **RECONSIDER THE MOTION FOR A** |
| | ) | ***FRANKS* HEARING** |
| | ) | |

## I.     THE PROCEDURAL POSTURE

### A.  The Need For a *Franks* Hearing

On July 18, 2019, Michael Hari moved to suppress the search of his home, office, parent's home, and cellular phone on the ground, among others, that the search warrant affidavit was tainted by material omissions and misrepresentations. He therefore moved for a *Franks* hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

On August 8, 2019, the motions hearing was held and counsel for Mr. Hari was permitted to present legal argument in support of her motion for the *Franks* hearing, and the government was permitted to present its arguments against such a hearing. Regardless, counsel for both sides presumed that any such hearing, if granted, would be held at a future date with time to arrange for the necessary witnesses.

By denying Mr. Hari's motion for a *Franks* hearing by oral order, the Court essentially denied his motion to suppress the searches on the ground that the affidavit was

1

incomplete and false, finding probable cause before defense counsel was able to challenge the veracity of the affiant and before briefing was even complete. Because the review of the sufficiency of a search warrant affidavit is limited to its four corners, there is no way to litigate the accuracy of the affidavit without a *Franks* hearing.

Although typically, an attack on the sufficiency of a search warrant is limited to the four corners of the warrant and supporting affidavit, a defendant is entitled to a hearing to pierce the allegations in a search warrant upon a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). The substantial preliminary showing has two prongs. First, the defendant must show that "the affiant omitted facts with the intent to mislead the issuing judge, or omitted the facts in reckless disregard of the fact that the omissions would mislead," and second, he must show that "the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *United States v. Gater*, 868 F.3d 657, 60 (8th Cir. 2017); Doc. No. 41 at 4.

The preliminary showing required to warrant a *Franks* hearing is a modest one. Plainly, it cannot be that the defendant must establish that he would prevail at the hearing in order to get a hearing in the first place. In *Franks*, the Supreme Court held that the standard to *prevail* at a *Franks* hearing is a preponderance of evidence. The substantial showing required to trigger a hearing, therefore, is less than a preponderance and can be based on an offer of proof. *Franks*, 438 U.S. at 156. *See also* 2 Wayne R. LaFave, *Search*

& *Seizure* § 4.4 (4ᵗʰ ed. 2009) ("threshold showing" required to trigger hearing is "less, of course, than a preponderance of the evidence"); *U.S. v. Legault*, 323 F.Supp.2d 217, 225 (D. Mass. 2004) ("[a] substantial showing 'lies somewhere between mere denials on the one hand and proof by a preponderance [of the evidence] on the other.'"); *U.S. v. Brown*, 322 F.Supp.2d 101, 107 (D. Mass. 2004) (same).

> To meet this initial burden and "mandate an evidentiary hearing," the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.

*Franks*, 438 U.S. at 171-72. This initial burden was met through defense counsel's briefing and exhibits as well as through arguments presented at the August 8, 2019 motions hearing. In furtherance of the attack on the search warrant, counsel now briefs the second prong of the required *Franks* showing and respectfully asks the Honorable Court to reconsider the oral order in light of this briefing.

### B.  The Four Corners of the Search Warrants

Mr. Hari, challenges the fruits of four search warrants for lack of probable cause, staleness, and lack of nexus to any criminal activity.[1] The search warrant affidavits, while

---

[1] Although Defendant's Pretrial Motion to Suppress Fruits of Unlawful Search and Seizure filed on July 18, 2019 also challenges (1) the search of a U-Haul storage unit at 3XX E. University, Champaign, Illinois, and (2) the search of 1XX North 1900E Road, Paxton, Illinois on August 21, 2018, Mr. Hari does not persist in these challenges. *See* ECF Doc. 93.

long and detailed, are in large part constructed from identical boilerplate language. The amount of information contained therein should not be presumed to be an indication of their strengths. Instead, the affidavits are filled with disjointed anecdotes and information alleged by Mr. Hari's co-defendants and other informants. Moreover, there is a distinct missing connection between the information provided and the search warrant locations. Mr. Hari asks this court to consider the search warrants with a critical eye and ultimately conclude that the search warrants and their fruits must be suppressed.

## II.     THE RELEVANT FACTS[2]

The following facts are derived from the District of Minnesota indictment and the Illinois search warrants challenged herein. The indictment alleges that Mr. Hari and his companions rented a truck in Champaign, Illinois and drove it to a mosque in Bloomington, Minnesota. (ECF Doc. 14 ¶¶ 6–7). The indictment further alleges that on August 5, 2017,

---

[2] At the August 8, 2019 motions hearing, the Government offered nine exhibits. Each exhibit will be abbreviated accordingly.

1. **MH Govt Ex 1:** The search warrant for Mr. Hari's business office, 100 S. Main Rd., Clarence, Illinois (dated March 13, 2018).
2. **MH Govt Ex 2**: The search warrant for the home of Mr. Hari's parents, 112 North 1900E Rd., Paxton, Illinois (dated March 13, 2018).
3. **MH Govt Ex 3**: The search warrant for Mr. Hari's home, 209 West First Street North, Clarence, Illinois (dated March 23, 2018).
4. **MH Govt Ex 4**: The search warrant for U-Haul Storage Unit #227, Champaign, Illinois (dated March 16, 2018).
5. **MH Govt Ex 5**: The search warrant for three Cellular Phones taken from the home of Josie McWhorter (dated April 4, 2018).
6. **MH Govt Ex 6**: Aerial Map of West 1st Street, Clarence, Illinois.
7. **MH Govt Ex 7**: FBI Receipt for three cellular phones.
8. **MH Govt Ex 8**: Joe Morris email, March 4, 2018.
9. **MH Govt Ex 9**: Joe Morris email, March 10, 2018.

Michael McWhorter lit the fuse of a bomb, allegedly made by Mr. Hari, and Joe Morris threw the bomb into a mosque window he had broken. (*Id.* ¶¶ 9-10).[3]

Following the alleged crime, investigators in Minnesota sought search warrants here, for other suspects, and investigators in Illinois obtained numerous search warrants in their investigation of Mr. Hari. Four of the Illinois search warrants were issued for and executed at the following locations: (1) Mr. Hari's office ("office"), issued March 13, 2018; (2) Mr. Hari's parents' home, also issued March 13, 2018; (3) Mr. Hari's residence, issued March 26, 2018; and (4) Mr. Hari's cell phone, issued April 4, 2018. Each of the search warrant affidavits contained substantially the same allegations. The following allegations were included in all four search warrants to support probable cause.

On December 16, 2017, a confidential source ("CS1") allegedly took photos at the home of Mr. Hari's parents in the room where Mr. Hari sleeps when he stays there. (MH Govt Ex. 1, Affidavit ¶ 6).[4] On February 13, 2018, CS1 provided law enforcement with additional photos from inside the garage of Mr. Hari's parents. (*Id.* ¶ 11.) CS1 allegedly told law enforcement Mr. Hari "ha[d] access" to his parents' garage. (*Id.*).

On January 27, 2018, a confidential source ("CS2") first alleged to law enforcement that Mr. Hari was involved in the Minnesota mosque bombing. (*See, e.g.*, MH Govt Ex. 1, Affidavit ¶ 8). CS2 also told law enforcement he or she saw illegal firearms, M4s, video

---

[3] According to the search warrants affidavits, on November 7, 2017 the same individuals also allegedly attempted to bomb a women's health clinic.

[4] CS1, his history with Mr. Hari, and his undisclosed motivations are one of the major reasons a *Franks* Hearing is warranted. *See* ECF Doc.

jammers and tannerite in Mr. Hari's office that same day, January 27, 2018. (*Id.* ¶ 9).

According to the search warrant affidavits, CS2 did not explain the connection between the

alleged bombing and the items observed.

On February 20, 2018, in cooperation with law enforcement, CS2 recorded a

conversation with Mr. Hari in which CS2 spoke about the "bang bangs" and Mr. Hari

responded, "[W]e moved that stuff already anyway … There is nothing illegal in our vault."

(*Id.* ¶ 17). Then, a week later, during a neighborhood canvass, Mr. McWhorter's brother

told law enforcement that Mr. Hari had dropped off firearms at his house. (*Id.* ¶ 17.)[5]

Officers also interviewed Mr. McWhorter, who on March 10, 2018, confirmed that Mr.

Hari moved the firearms from his office to the home of his brother. (*Id.* ¶ 26.)

Law enforcement also interviewed Mr. McWhorter's wife, Josie McWhorter, on

February 28, 2018. (*Id.* ¶ 23.) During the interview, Mrs. McWhorter gave investigators

three cell phones she believed belonged to Mr. Hari, Mr. McWhorter, and Mr. Morris. (*Id.*

¶ 25.) Mrs. McWhorter believed Mr. Hari unintentionally left his phone because he was in

a rush to leave. (*Id.*)

The search warrant for Mr. Hari's phone noted that Mrs. McWhorter "voluntarily

turned the [d]evices over to the FBI," and the Affiant sought the warrant "out of an

---

[5] During the same neighborhood canvass, Mr. McWhorter's brother also told law enforcement that, a month earlier, Mr. Hari offered to show him and others "science stuff" at Mr. Hari's office. (*Id.* ¶ 20.) Mr. Hari demonstrated a chemical reaction between fluid and metal. (*Id.*) On another alleged occasion, Mr. Hari attempted another demonstration with "powdery substances, . . . but nothing happened." (*Id.* ¶ 21.)

abundance of caution" to comply with the Fourth Amendment. (MH Govt Ex. 5, Affidavit ¶ 35.)

On March 10, 2018, Michael McWhorter told investigators that Mr. Hari, Mr. McWhorter, and Mr. Morris did not bring their cell phones with them when they went on "missions," and placed them in Faraday bags to block their signals. (*Id.* ¶ 33.) On March 13, 2018, after his arrest, Mr. McWhorter alleged that Mr. Hari talked with "higher ups" on the phone in "indirect ways," ostensibly to avoid tracing calls. (*Id.* ¶ 34.)

The relevant search warrants were issued and executed from March 13, 2018 to August 21, 2018.

## III.    PROBABLE CAUSE AND THE WARRANT REQUIREMENT

The express purpose of the Fourth Amendment is to secure the "houses, papers, and effects" of this nation's citizens from governmental intrusion, U.S. CONST., AM. IV, and so its protective force is strongest at the private home's doorstep." *Kyllo v. United States*, 533 U.S. 27, 31 (2001). Thus, any police official seeking to invade a private home must first obtain a valid search warrant upon showing probable cause to the satisfaction of a neutral magistrate. *Groh v. Ramirez*, 540 U.S. 551, 559-60 (2004). "When a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) (citation and internal punctuation omitted). Probable cause means that, before any warrant may lawfully issue, law enforcement must make a minimal showing that:

> [G]iven all the circumstances set forth in the affidavit [], including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates*, 462 U.S. 213, 238 (1983). The remedy for a violation of a suspect's Fourth Amendment rights against unreasonable search and seizure is that the fruits of illegal police activity must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). As will be shown next, the warrant affidavits at issue here failed to make the requisite probable-cause presentation and their fruits must therefore be suppressed.

### A. There Must Be a Nexus Between the Place to Be Searched and Evidence of a Crime.

The Supreme Court has held that, even where the police can make some form of probable cause showing, this does not permit any and all exploratory searches the police may wish to undertake. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Rather, the authorization must be sharply limited "to the specific areas and things for which there is probable cause to search," so as to ensure that any search-seizure "will be carefully tailored to its justification." *Id.* A closely related concept is the "nexus" criterion, meaning an informational-logical thread that connects the probable-cause presentation to the place to be searched, and evidence or contraband to be seized. *See, e.g., United States v. Colbert,* 828 F.3d 718, 726 (8th Cir. 2016).

A search is not constitutional unless the warrant provides probable cause to believe that evidence of a crime will be found in the place to be searched. This concept of requiring

a showing of "nexus," is deeply rooted in the case law interpreting the Fourth Amendment. *See e.g. United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000) (citing *United States v. Koelling*, 992 F.2d 817, 823 (8th Cir. 1993)).  However, a court may not "arrive at probable cause simply by piling hunch upon hunch." *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004).

Specifically as to search warrants for residences, the nexus requirement makes clear that the warrant application must show that evidence of a crime is likely to be found in a person's home, not simply that police suspect a person of a crime, and thus that person's home should be searched. "[I]t cannot follow in all cases, simply from the existence of probable cause to believe a suspect guilty, that there is also probable cause to search his residence." *United States v. Lucarz*, 430 F.2d 1051, 1055 (9th Cir. 1970); *see also States v. Helton*, 314 F.3d 812, 821 (6th Cir. 2003) (where investigation revealed a defendant was closely connected to possession of narcotics, a search warrant for his home was invalid without any reliable evidence linking that residence to the drug trade); *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) ("The critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978))). In other words, just because a person is suspected of a crime does not give police the authority to search that person's home.

Because suspicion that an individual committed a crime does not automatically amount to probable cause to search that person's home or other areas, it is crucial to proving nexus that police establish actual suspicion regarding the specific location. Failure to provide such information is fatal to a probable-cause presentation. *United States v. Frangenberg*, 15 F.3d 100, 102 (8th Cir. 1994) (because the warrant did not indicate how suspect was connected to the place to be searched, it was doubtful that the application provided adequate basis for search). "Factors to consider in determining if a nexus exists includes the nature of the crime and the reasonable, logical likelihood of finding useful evidence." *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017). Ultimately, the issuing judge must have sufficient information upon which to base a finding that "there is a fair probability that contraband or evidence of a crime will be found" in the place to be searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Mr. Hari challenges four search warrants, which fell below these standards, resulting in violations of his Fourth Amendment rights against unreasonable search and seizure.

### B. Particularity Between the Place to Be Searched and Evidence of a Crime is Required.

In addition to establishing a nexus between a particular crime and a particular location, the proffered probable-cause showing must support findings by the issuing magistrate that: (i) it is now probable; (ii) that "contraband, evidence of a crime, or a fugitive will be" found at the described place; (iii) at the particular timeframe when the

warrant is to be executed. *United States v. Grubbs*, 547 U.S. 90, 96 (2006). Hence, for example, where the probable cause presentation predicts a suspect will be transporting illicit drugs in 1990 Dodge Truck at a specified time, the police are not authorized to search a 1987 Oldsmobile Cutlass the suspect happens to be driving at that time. *United States v. Hogan*, 25 F.3d 690, 693 (8th Cir. 1994). In such a case, the requisite connection between probable-cause presentation and time-place-object of permissible search is missing.

As laid out below, the four virtually identical search warrants challenged in this case, (for Mr. Hari's office, home, the home of his parents, and his cell phone), all fail to point out what law enforcement specifically expects to find at each specific location. Tellingly, "Attachment B," the "Evidence to be Seized," in each of the four search warrants is identical and explains that law enforcement intends to seize any great number of things that could be indicative of any great number of crimes. Vis-à-vis, law enforcement suspects Mr. Hari is guilty of crimes and would like to search any place he might be keeping things, regardless of where they may be. As addressed above however, being the suspect of a crime does not give law enforcement carte blanche authority to search everywhere a suspect goes.

### C. Stale Information Renders a Warrant Invalid.

Search warrants also require fresh information in order for a proper finding of probable cause. Because it relates to the Fourth Amendment's probable cause requirement, the constitutional dimensions of Mr. Hari's staleness argument are well rooted in the case law. "[I]t is manifest that the proof must be of facts so closely related to the time of the

issue of the warrant as to justify a finding of probable cause *at that time*." *Sgro v. United States*, 287 U.S. 206, 210, (1932) (emphasis added). Therefore, the age of the information contained within a search warrant affidavit is a factor a reviewing judge must consider in determining probable cause. If the information is too old, it is stale, and probable cause may no longer exist. *United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002); *see also United States v. Palega*, 556 F.3d 709, 715 (8th Cir. 2009) (holding that it is insufficient for probable cause to exist "*as of some time in the past*" (quotation omitted) (emphasis added)); *United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998) ("probable cause must exist at the time of the search and not merely at some earlier time"). Simply put, fresh information about a crime can support probable cause to search a place, and old information cannot.

How old is too old? "There is no bright-line test for determining when information in a warrant is stale." *United States v. Pruneda*, 518 F.3d 597, 604 (8th Cir. 2008). Courts decide how old is too old, and "[p]robable cause is not determined by merely counting the number of days between the time of the facts relied upon and the warrant's issuance." Wayne R. LaFave, 2 Search & Seizure § 3.7(a), at 464 (5th ed. 2012) (footnote omitted). Rather, a court reviewing a search warrant must instead look to the timeliness of the information, which depends on the circumstances of the individual case, including the nature of the crime under investigation and the property sought in the search. *See United States v. Gibson*, 123 F.3d 1121, 1124 (8th Cir. 1997). Easily moveable or consumable items may not be expected to be found after a period of time.

12

Other courts have analyzed a similar list of factors when considering staleness.

> Instead of measuring staleness solely by counting the days on a calendar, courts must also concern themselves with the following variables: "the character of the crime (chance encounter in the night or regenerating conspiracy?), the criminal (nomadic or entrenched?), the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), the place to be searched (mere criminal forum of convenience or secure operational base?), *etc.*"

*United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998) (quoting *Andresen v. State*, 331 A.2d 78, 106 (Md. App. 1975)). More recently, the Sixth Circuit has refined the list of factors. "[A] district court should consider the following four factors in determination whether a probable cause finding is stale: 'the defendant's course of conduct; the nature and duration of the crime; the nature of the relevant evidence; and any corroboration of the older and more recent information.'" *United States v. Helton*, 314 F.3d 812, 822 (6th Cir. 2003) (citing *United States v. Czuprynski*, 46 F.3d 560, 567 (6th Cir. 1995) (*en banc*)).

As a general matter, both within the Eighth Circuit and in other circuits, the passage of even a few months between the evidence of illegal activity and the application for a warrant often draws a court's scrutiny. *United States v. Button*, 653 F.2d 319, 325 (8th Cir. 1981) (information stale because statement that drug transactions occurred over previous 6 months failed to establish that PCP, a highly portable substance, would be found in residence at time warrant issued); *United States v. Hython*, 443 F.3d 480, 486-87 (6th Cir. 2006) (information stale because affidavit failed to include either a date or a reference to recentness of activity); *United States v. Roach*, 582 F.3d 1192, 1201-02 (10th Cir. 2009)

13

(information stale because at time of warrant application, defendant's isolated admission of gang membership was nearly 1.5 years old).

Courts have also evaluated staleness in cases concerning crimes of violence. *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979) (footnote omitted).  The First Circuit found, "[a] sixteen day lag between the commission of a murder and the issuance of a search warrant for a murder weapon of this type is too long for a finding of probable cause that the gun will still be located on defendant's premises." *Id*. at 1018.

Finally, in other miscellaneous cases, it is clear that the passage of a few months between the allegation of illegal activity and the application for a search warrant produces stale information. *See, e.g., Durham v. United States*, 403 F.2d 190, 195 (9th Cir. 1968) (search unlawful where counterfeiting activity occurred more than four months before the warrant was issued); *United States v. Neal*, 500 F.2d 305, 309 (10th Cir. 1974) (information stale where "no reference in the affidavits as to what occurred during the three months after the discontinuance of" individual's participation in stolen vehicle scheme and no information that material sought to be recovered remained on the described premises).

Even Eighth Circuit cases concluding that probable cause *did* exist in the face of older evidence make clear that a months-long gap between illegal conduct and the issuance of a search warrant must be buttressed by either recent information or some factor that makes the passage of time permissible. *See, e.g., United States v. Smith*, 266 F.3d 902, 904-05 (8th Cir. 2001) (information in the affidavit regarding three controlled buys at defendant's residence occurring three months prior to application for search warrant not

stale because drugs likely to still be in place to be searched and because warrant in response to ongoing narcotics operation); *United States v. Hartje*, 251 F.3d 771, 775 (8th Cir.2001) (lapse of one month between five methamphetamine transactions (which had occurred over the course of two months) and an application for search warrant did not render information stale in light of the ongoing nature of crimes); *United States v. Formaro,* 152 F.3d 768, 770 (8th Cir. 1998) (information regarding controlled buy made two and one-half weeks before the application for a warrant not stale); *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995) (upholding a warrant based in part on three-year-old information about the defendant's illegal possession of a firearm, because the suspected offense was continuing in nature and because expert testimony established that possessors of illegal firearms often keep their weapons for a long period of time).

## IV.    THE WARRANT SPECIFIC LEGAL ANALYSIS

On March 13, 2018, law enforcement conducted a search warrant at Mr. Hari's office and his parents' home. (MH Govt Ex. 1, 2). Using the foregoing legal authority, Mr. Hari challenges both search warrants for lack of nexus and staleness, and thereby, lack of probable cause.

### A. The Fruits of the March 13, 2018 Search Warrant for Mr. Hari's Office Must Be Suppressed

The search warrant affidavit for Mr. Hari's office fails to establish a nexus between the office and the alleged criminal activity and the information within the Affidavit was stale. The Affidavit alleges that CS2 reported seeing illegal firearms, M4s, video jammers,

15

and tannerite in the office, in the group's possession. (MH Govt Ex. 1, Affidavit ¶ 9.) But the affidavit did not actually allege who had these items or to whom they belonged.

Moreover, CS2 alleged in the affidavit that "one night" Mr. Morris was talking about throwing a pipe bomb at a mosque, and later told him he placed an incendiary device at the Women's Health Practice in Champaign. (*Id.*) Mr. McWhorter's brother also reported previously seeing Mr. Hari and Mr. Morris with the same guns at the office that were eventually taken from the brother's property. (*Id.* ¶ 22.) Without additional facts, suspicious activity at one location—particularly if the location is undisclosed—is not sufficiently specific to provide a nexus for probable cause at another. *See Johnson*, 848 F.3d at 878 (search warrant affidavit "specifically t[ied] the sexual assault with evidence" at the defendant's residence in a different town).

The allegations that Mr. McWhorter's brother saw Mr. Hari with guns at the office and then later brought the same guns to the brother's home, explains nothing more than Mr. Hari moved the guns out of the office. (*Id.* ¶ 19, 22, 26.) In light of the brother's specific allegations that any potentially incriminating material had been *removed* from the office, there was no probable cause to search the office without further particularized knowledge. In fact, CS2 disclosed that Mr. Hari specifically said, "There is nothing illegal in our vault." (*Id.* ¶ 17.) Any vague suspicion arising from Mr. Hari simply being seen with guns is vitiated by the fact that Mr. Hari had *cleared* the office of those same guns.

Mr. McWhorter's brother also told law enforcement that Mr. Hari offered to show Mr. Morris and himself some "science stuff" at Mr. Hari's office. (*Id.* ¶ 20.) However, the

"science stuff" Mr. McWhorter went onto describe in the affidavit does not indicate any criminal activity. (*Id.* ¶ 20–21.) Lighting something on fire or putting something unidentified into a fire, only for it to have no effect, is not indicative of criminal activity. (*Id.* ¶ 21.)

The remainder of the search warrant affidavit for Mr. Hari's office does not pertain in any way to the office itself. Other allegations about Mr. Hari's activities, without a showing of their connection to the office to be searched, provided no substantive additions to the affidavit.

The search warrant affidavit for Mr. Hari's office alleges that CS2 reported seeing firearms, M4s, video jammers, and tannerite in the office on Jan. 27, 2018. (*Id.* ¶ 9.) Around the same time, Mr. McWhorter's brother reported seeing Mr. Hari with chemicals, albeit benign ones, and weapons at the office. (*Id.* ¶ 20–22.) But at the end of February, Mr. McWhorter's brother told law enforcement that Mr. Hari had moved his firearms and all other contraband from the office. (*Id.* ¶ 17–19, 22, 26.) Not only was the information about the alleged contraband in the office almost two months old by the time the search warrant was signed by the magistrate; from their conversation with the brother, law enforcement specifically knew that the alleged "illegal" firearms in the office were no longer there. Information about allegedly suspicious objects in the office in January was stale by the execution of the search warrant in March. The fruits of the search warrant must be suppressed for staleness and lack of nexus.

**B. The Fruits of the March 13, 2018 Search Warrant for the Home of Michael Hari's Parents Must Be Suppressed.**

"Mere presence" at a location or with other individuals is insufficient to establish probable cause. *United States v. Di Re*, 332 U.S. 581, 593 (1948) (invalidating defendant's arrest in a car with other suspects where there was no evidence the defendant was present or took part in the crime and the informant did not indicate the defendant's role). Where the defendant had a "coming and going" relationship with the owner of a home in which marijuana was found, "[t]o allow probable cause to be established by such a showing would subject [defendant] to arrest for . . . mere presence in an area where criminal activities were allegedly taking place." *United States v. Wynn*, 544 F.2d 786, 789–790 (5th Cir. 1977).

But probable cause based on mere presence is appropriate in certain unique situations. For example, probable to arrest exists where two individuals share a home as "a base of operations" for criminal activities and "contraband [is] in a prominent position" at that location. *Ker v. California*, 374 U.S. 23, 37 (1963). Probable cause may be imputed to multiple present actors if it is unclear who is responsible for contraband. *Maryland v. Pringle*, 540 U.S. 366, 373 (2003) (specifying this rule applies in situations like a "small automobile" because "a car passenger . . . will often be engaged in a common enterprise with the driver").

Without more, familial relations do not automatically provide a basis for probable cause. *Walczyk v. Rio*, 496 F.3d 139, 162 (2d Cir. 2007) (concluding a search of the defendant's parents' home was not supported by probable cause where the defendant did

not live there and the neighbors had not seen the defendant with contraband there); *Poolaw v. Marcantel*, 565 F.3d 721, 730 (10th Cir. 2009) ("Our sibling circuits [addressing] the question have held that a search warrant resting primarily on a familial relation is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.") (quotations omitted).

Here, CS1 did not allege enough specific information to establish probable cause that the firearms or materials in the home of Mr. Hari's parents actually belonged to him or if he actually had access to them. Instead, CS1 merely alleged Mr. Hari often stayed at his parents' home. (MH Govt Ex. 2, Affidavit ¶ 6.) Not only did the affidavit fail to show that Mr. Hari was responsible for the materials, but it also failed to show how the contents of the photographs were connected to the reported guns and bomb-making materials. (*Id.* ¶ 7.)

In fact, there was no evidence in the affidavit to suggest that Mr. Hari even had knowledge of the materials found in the garage. Mr. Hari allegedly slept at his parents' house, but CS1 did not indicate that Mr. Hari ever went into the garage. CS1 failed to allege Mr. Hari had anything beyond "access" to his parents' garage. (*Id.* ¶ 11.) To assume that, because Mr. Hari slept there, he would (1) have possession or control over any and all items there, or (2) be guilty of any crimes associated with the items, is to erode the particularized nature of a proper finding of probable cause.

Besides the fact that the search warrant affidavit fails to establish what is suspicious about the contents of the photographs in the garage and the room where Mr. Hari slept, this

was not a situation where the alleged contraband was so obviously placed that anyone with a propinquity to the evidence was subject to probable cause for related crimes. This was a house and a garage, not a small car. The contraband was not in a prominent position on the property, where anyone would have seen it. Finally, Mr. Hari was not associated with anyone else who law enforcement knew had criminal ties to the house.

Mr. Hari's mere presence by occasionally sleeping at his parents' home should not be misconstrued as providing particularized probable cause that Mr. Hari was engaging in criminal activity there. If probable cause is present in this case, then almost any adult child who has keys to their parents' home and visits with any regularity is criminally liable for any books, chemicals, tools or any illegal items in the parents' home.

### 1. The Home of Mr. Hari's Parents Lacked a Nexus to Alleged Criminal Activity.

Besides the unsubstantiated allegations about the benign items in the garage and the room that Mr. Hari sometimes occupied, there was no nexus between allegations of criminal activity and the home of Mr. Hari's parents. The remainder of the search warrant affidavit did not pertain in any way to their house. Other allegations about Mr. Hari's activities, without a showing of their connection to the house to be searched, provided no substantive additions to the affidavit.

For example, law enforcement did not established a nexus between the guns found at Mr. McWhorter's brother's home and the home of Mr. Hari's parents. (*Id.* ¶ 18.) In fact, the investigation indicated that Mr. Hari was moving his firearms from the office safe to

the home of Mr. McWhorter's brother, negating probable cause to believe that his firearms would be found in the home of his parents. (*Id.* ¶ 19.) A lack of probable cause anywhere does not transform into probable cause everywhere, without further particularized knowledge.

The Affidavit does not allege that any guns were stored in the garage or that there would be any reason to find evidence in the garage after Mr. Hari and Mr. McWhorter allegedly drilled the ARs (at some point in the past) to make them fully automatic. (*Id.* ¶ 26.) To the contrary, Mr. McWhorter told law enforcement that the ARs they drilled at the home of Mr. Hari's parents (at some unknown time in the past) were kept in the vault in the office until Mr. McWhorter took the ARs and shotguns to his brother's home himself. (*Id.* ¶ 26).

### 2. The Information in the Search Warrant for the Home of Mr. Hari's Parents Was Stale.

At base, only three pieces of evidence placed any suspicion at all on the home of Mr. Hari's parents. All of them were stale. The photographs were taken by CS1 on December 16, 2017. (*Id.* ¶ 6.) The photographs from the garage were provided to law enforcement on Feb. 13, 2018. (*Id.* ¶ 11.) The search warrant application failed to allege when the ARs were drilled in the garage of Mr. Hari's parents. (*Id.* ¶ 26.)

The search warrant for the parents' home lacked a nexus to criminal activity and any reason to believe that evidence of criminal activity would be stored at the home and garage of Mr. Hari's parents. And the information, which failed to connect Mr. Hari to

items in the home, was stale. The fruits of the search warrant for the home of Mr. Hari's

parents must be suppressed.

**C. The Fruits of the March 26, 2018 Search Warrant of Mr. Hari's Residence Must Be Suppressed.**

Mr. Hari challenges the search of his residence on the basis of staleness, lack of

nexus and as fruit of the poisonous tree - the prior illegal searches on March 13, 2018.

**1. Mr. Hari's Residence Lacked a Nexus to the Alleged Criminal Activity.**

A search warrant for Mr. Hari's residence was sought on March 26, 2018,

approximately two weeks after search warrants were executed at his office and the home

of his parents. But specific allegations about Mr. Hari's activities, without a showing of

their connection to Mr. Hari's residence, provided no substantive additions to the affidavit

to establish nexus.

For example, law enforcement did not establish a nexus between the guns found at

Mr. McWhorter's brother's and Mr. Hari's property. (*Id.* ¶ 18.) In fact, the investigation

indicated that Mr. Hari moved the firearms from his office to the home of a third party,

negating probable cause to search his home for firearms. (*Id.* ¶ 19, 35.)

Further, Mr. Hari's burning of "some" black powder containers in the fireplace of

his home is not indicia of criminal activity. (*Id.* ¶ 33.) In fact, if Mr. Hari burned any

containers, then they would be "perishable" or destroyed and no longer there. Neither Mr.

McWhorter nor the search warrant Affiant allege how the container burning related to the

eventual alleged use of black powder in a bomb. (*Id.* ¶ 33.)

Finally, the fact that the items in the photos provided by CS1 were not present during the execution of the search warrant at the home of Mr. Hari's parents on March 13, 2018 does not carry any implication as to the location of items in other places, including in his home. (*Id.* ¶ 35.) The Fourth Amendment protects American citizens from searches of their homes on mere law enforcement hunches. Without a nexus between the alleged criminal activity and Mr. Hari's part-time residence, the search warrant lacked probable cause and its fruits must be suppressed.

## 2. The Information in the Search Warrant for Mr. Hari's Residence Was Stale.

The only concrete piece of evidence that minimally suggested suspicious or criminal activity at Mr. Hari's part-time residence, burning the black powder containers, was stale. Mr. McWhorter alleged that the black powder was purchased about one week before the Minnesota bombing, which occurred on August 5, 2017. (*Id.* ¶ 33.) By the time the affiant applied for the search warrant in March of 2018, the information that Mr. Hari had "burned some of the containers" was more than seven months old. Based on staleness and lack of nexus, the search warrant affidavit for Mr. Hari's home failed to establish probable cause and its fruits of the invalid search warrant must be suppressed.

## 3. The Search Warrant for Mr. Hari's Home Was Based on Unlawfully Obtained Evidence and Is Fruit of the Poisonous Tree.

"Courts use the suppression of evidence under the exclusionary rule as a remedial device that is 'restricted to those areas where its remedial objectives are thought most efficaciously served.'" *United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012)

(quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). If the defendant "comes forward with specific evidence demonstrating taint, the ultimate burden of persuasion to show the evidence is untainted lies with the government." *United States v. Hastings*, 685 F.3d 724, 728 (8th Cir. 2012) (quotations omitted). If the controversial evidence has enough attenuation from the primary illegality so as "to be purged of the primary taint," it is no longer inadmissible fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

Attenuation requires consideration of "whether there was a sufficient factual nexus between the constitutional violation . . . and the challenged evidence." *United States v. Yorgensen*, 845 F.3d 908, 913 (8th Cir. 2017) (internal quotations omitted). "When determining if sufficient attenuation exists, [courts] must focus on three specific factors: (1) the time elapsed between the illegality and acquisition of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *United States v. Faulkner*, 636 F.3d 1009, 1015 (8th Cir. 2011) (quotations omitted) (citing *Brown v. Illinois*, 422 U.S. 590, 603–604 (1975)). Intervening circumstances include independent, unrelated sources of probable cause. *See id.* (outstanding arrest warrant); *United States v. Vega-Rico*, 417 F.3d 976, 980 (8th Cir. 2005) (post-*Miranda* statement conducted four days after Fourth Amendment violation for purposes unrelated to the violation). The third factor "is considered the most important factor because it is directly tied to the purpose of the exclusionary rule—deterring police misconduct." *Faulkner*, 636 F.3d at 1016 (quotations omitted).

24

Fruits of a Fourth Amendment violation that occur during the same related investigation substantially undermine any potential attenuation. *See United States v. Guevara-Martinez*, 262 F.3d 751, 755 (8th Cir. 2001) (contrasting *United States v. Watson*, 950 F.2d 505, 508 (8th Cir. 1991), where the fruit was "the result of a *subsequent* investigation). In *Guevara-Martinez*, in suppressing the fruits of an unlawful detention, the court found it significant that the challenged evidence, fingerprints, were obtained only after the detention and interrogation. 262 F.3d at 756. The court noted that there was "no evidence that the fingerprints were obtained as a matter of course through routine booking procedures, rather than for the purpose of assisting the [illegal] investigation." *Id.*

Nevertheless, "if the information merely facilitates or shortens the subsequent investigation, it does not taint the investigation's results." *Watson*, 950 F.2d at 508. In *Watson*, a grand jury used information illegally obtained beyond the scope of an unrelated search warrant to indict the defendant on charges of false currency transaction reporting. *Id.* at 506–507. The court held that minimal information, which was limited to the defendant's name, alias, and names of certain banks, was "separate and independent" from the official investigation. *Id.* at 508. Where the illegally obtained information "merely facilitated the investigation," rather than being "necessary to a successful investigation," it remained untainted. *Id.*

Here, like the prior March 13, 2018 search warrants, the search warrant for Mr. Hari's residence fails for lack of probable cause due to staleness and lack of nexus. The only unique additional information in this affidavit, regarding the search of the office and

25

the storage unit (which failed to yield the items photographed by CS1), is invalid because it is fruit of the poisonous tree, even if it does provide probable cause. The illegal search based on the invalid search warrant for Mr. Hari's office was not so attenuated from the search warrant for Mr. Hari's part-time residence as to dissipate the taint from the invalid search warrant.

Under the *Brown* factors, the taint from the primary illegality did not dissipate. There were only 13 days between the two prior search warrants (for Mr. Hari's office and the home of his parents) and the search warrant for Mr. Hari's residence. There were no intervening circumstances, like an independent source of probable cause. Instead, the same investigation and information was used in the new search warrant for his residence.

Finally, the first three search warrants were all boilerplate resuscitations of the facts and allegations unearthed in the investigation. (MH Govt Ex. 1, 2, 3) Except for minor additions and alterations to each search warrant to ensure it had some reference to the place to be searched, each was nearly identical. This cursory drafting, with a strategy of throwing in the kitchen sink to cover up the lack of probable cause, indicates exactly the type of misconduct that the exclusionary rule is designed to deter.

Because the rest of the information in the search warrant clearly lacked probable cause for lack of nexus and staleness, the additional tainted information in the search warrant for Mr. Hari's residence did not merely facilitate the investigation, but was necessary to it. The combined weakness of all the search warrants necessitated a stronger showing of evidence because the investigation had turned up so little useful, specific

information. As fruit of the poisonous tree, the fruits of the search warrant of Mr. Hari's residence must be suppressed.

### D. The Fruits of the April 4, 2018 Search Warrant for Mr. Hari's Cell Phone Must Be Suppressed.

Law enforcement first obtained Mr. Hari's cell phone because he "unintentionally" left it at Mr. McWhorter's home. (MH Govt Ex. 5, ¶ 27.) Knowing that Mr. Hari "unintentionally" left it in a rush, Mrs. McWhorter gave FBI Agent Joel Smith the cell phone. (*Id.*). Mrs. McWhorter did not have the authority to provide FBI Agent Joel Smith with the phone and she lacked the authority to consent a search of the phone. Mrs. McWhorter, herself, could not access the phone as she did not know the protective pin number. Without valid consent, a search of the phone required a valid search warrant.

The search warrant, ultimately obtained on April 4, 2018, failed to establish a nexus between Mr. Hari's cell phone and what evidence law enforcement hoped to find. The information law enforcement *did* have was stale and disconnected. The fruits of the search warrant seized from Mr. Hari's phone must be suppressed.

### 1. Mr. Hari's Cell Phone Was Unlawfully Seized

The Fourth Amendment protects against searches and seizures conducted by government officials. *See Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971). "Logically, a person's protectable expectation of privacy must extend both to places and objects. A contrary conclusion would emasculate the plain language of the Fourth Amendment, which protects 'papers' and 'effects.'" *United States v. Kelly*, 529 F.2d 1365,

1369 (8th Cir. 1976). "Warrantless searches and seizures are per se unreasonable unless there are special circumstances which excuse compliance with the Fourth Amendment warrant requirement." *Id*. at 1371. A warrantless seizure "is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971); *United States v. Harris*, 747 F.3d 1013, 1016 (8th Cir. 2014). And the burden is on the government to show the applicability of one of the "specifically established and well-delineated exceptions." *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011)(quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)).

In the instant case, the government concedes that Mr. Hari's cell phone was seized from Mrs. McWhorter without a warrant. Instead, the government attempts to offer two exceptions to the warrant requirement: (1) Mr. Hari abandoned his phone and thereby abandoned his expectation of privacy, giving Mrs. McWhorter authority to consent to its seizure and search and (2) exigent circumstances existed and law enforcement needed to act quickly to preserve evidence, (MH. 98-99, 104-105).

### a. Mr. Hari did not abandon his cell phone nor his expectation of privacy.

Abandonment cannot be presumed simply because Mr. Hari "unintentionally" left his cellular phone in Mrs. McWhorter's home. In *United States v. Crumble*, the defendant abandoned a cell phone, thereby "relinquish[ing] his reasonable expectation of privacy" when he left the cell phone in a wrecked Buick with a shot-out window with the keys still in the ignition. 878 F.3d 656, 659-660 (8th Cir. 2018) (quotations and alteration

28

omitted)(focusing on the state of the vehicle and accessibility to the public). But here, Mr. Hari did not leave his phone in a public place where it was accessible to just anyone. He left it in the private home of a trusted friend, Mr. McWhorter. Mr. Hari had no reason to believe he was relinquishing his expectation of privacy. Moreover, in *Crumble*, the defendant "denied any knowledge of the wrecked Buick," *id.* at 660, but Mr. Hari never disclaimed ownership over the phone. And it is not clear that he ever understood how to retrieve the phone once it was taken.

> '[O]ne does not cede dominion over an item to another just by putting him in possession. For example, one does not give authority to a common carrier to turn over goods he shipped to law enforcement merely by entrusting the goods to the common carrier.
>
> A girlfriend does not give her boyfriend authority to consent to a search of her purse left in the trunk of a rental car by the mere fact of their relationship and her having left it in the car.
>
> A person who entrusts a briefcase to a friend solely for storage and then instructs the friend to destroy the briefcase does not thereby give the friend authority to let the FBI search the briefcase.

*United States v. James*, 353 F.3d 606, 614 (8th Cir. 2003)(citing *United States v. Kelly*, 529 F.2d 1365, 1371 (8th Cir. 1976); *United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993), and ; *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000)), respectively.

In *James*, the defendant entrusted computer discs labeled with the defendant's name, "private" and "confidential" to a third party. *James*, 353 F.3d at 614. And the discs were accessible only with an "advanced computer." *Id.* Based upon these facts, the Eight Circuit found "there was no evidence of authority beyond the mere act of storage.". The Court

found a bailee does not have "actual authority to look at the contents of the items, or to consent to another's searching them" and concluded that neither the bailee, nor the investigating officers could have reasonably believed the bailee had the authority to consent to the search of the discs. *Id.* at 614–616.

Therefore, in order to show the validity of Mrs. McWhorter's consent to seize and search Mr. Hari's cell phone, the government must present evidence of authority beyond the mere act of storage. But Mr. Hari did not give Mrs. McWhorter permission to exercise control over his cell phone, or to consent to its search. And Agent Smith did not know how Mrs. McWhorter had Mr. Hari's phone nor where she found it. (MH. 120).

Further, Mr. Hari pin protected his cell phone so that neither Mrs. McWhorter nor others could access his protected information, evidencing a desire that no one, including Mrs. McWhorter, view the contents of his cellular phone. *See e.g. Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001) (finding no authority to search personal files on a shared computer because defendant had evidenced a privacy interest in protecting the files with a password).

### b. No exigent circumstances existed at the time Mr. Hari's cell phone was seized.

Although exigent circumstances may make it reasonable to permit police action without prior judicial approval in some instances, none of those instances apply to the seizure of Mr. Hari's cell phone. The record fails to reveal the exigent circumstances at hand. The cellular phones were at Mrs. McWhorter's home and Agent Smith could have

frozen the scene, waiting at the home until a valid search warrant was obtained – *if*, in fact, a magistrate found probable cause to seize the phones at issue. The phones were given to Agent Smith in late morning or early afternoon of February 28, 2018, a reasonable time to obtain a warrant from a judicial officer. (MH. 87). Mr. Hari's cell phone was not contraband or an object dangerous in itself, and it was not easily disposable.

Agent Smith's reliance on Mrs. McWhorter's apparent authority to consent to the seizure and search of Mr. Hari's cell phone was unreasonable and there were no exigent circumstances justifying its warrantless seizure. The fruits of the cell phone must be suppressed.

### 2. The Search Warrant Affidavit for the Cell Phone Lacked Probable Cause.

The Affidavit for the search of Mr. Hari's phone did not specify any information giving reason to believe that a search would reveal any incriminating information. In fact, the Affidavit specified that Mr. Hari *turned off* his phone before he went on "missions," and used Faraday bags, thus explicitly negating any inference that incriminating information would be found on the phones. In light of these facts negating the likelihood of evidence on the phones, the search warrant affidavit fails to express how or why the phone would have evidence.

### 3. Mr. Hari's Phone Lacked a Nexus to the Alleged Criminal Activity.

Similarly, the fact that the defendants turned their phones off and blocked the signal prior to traveling to Champaign or Minnesota cuts against a finding that the cell

phones would contain any pertinent information on those phones. (MH Gov. Ex. 5, ¶ 33.)
The affidavit failed to provide any additional information that would reasonably lead to
the conclusion that evidence of a crime would be found on the phone.

### 4. The Information for the Search Warrant Was Stale.

The only information in the Affidavit that provides a date regarding Mr. Hari's
phone is that he went on a "mission" to Champaign on November 7, 2017. (*Id.* ¶ 33.)
This was well before the April 2018 search warrant, causing the sole allegation to be
stale. The remainder of any information relating to the cell phone provides no basis for a
timeline, such as when Mr. Hari was making calls to "higher-ups" or what cellular phone
he was using. (*See, e.g.*, *id.* ¶ 34.)

## V.   THE "GOOD FAITH EXCEPTION" CANNOT SAVE THE WARRANTS

Notwithstanding all of this, the government may seek to save the warrants by
invoking the good-faith exception to the Fourth Amendment exclusionary rule articulated
in *United States v. Leon*, 468 U.S. 897, 919-20 (1984). Under *Leon*, a search pursuant to
an erroneously-issued warrant may yet be upheld in some instances, but only so long as the
police so rely on the warrant in *objective* good faith. *Id.* at 920. In this context "good faith"
means a *bona fide* effort by the police to comply with the Fourth Amendment's strictures
and intent. *See id.*

The Eighth Circuit has held,

The good faith exception will not apply if: (1) the judge issuing the warrant
was misled by statements that the affiant knew were false or would have

known were false except for "his reckless disregard of the truth;" (2) "the issuing magistrate wholly abandoned his [or her] judicial role;" (3) the affidavit in support of the warrant is "so lacking in indicia or probable cause as to render official belief in its existence entirely unreasonable;" or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

*United States v. Lindsey*, 284 F.3d 874, 878 (8th Cir. 2002). Thus, under the first exception to *Leon*, the issuing judge must not be deliberately misled by law enforcement. But the warrants in this case cannot be saved by assuming innocent law enforcement officers relied upon a judicially authorized search warrant.

In this case, Detective Sergeant Barabara Robbins with the University of Illinois Police Department was the Affiant in the four search warrants challenged by Mr. Hari for the search of his office, residence, parents' home, and cellular phone. At the time the search warrants were sought, Detective Robbins was one of the main case agents investigating Mr. Hari and she knew a great deal about him. As submitted in the Motion and Memorandum in Support of a *Franks* Hearing, Detective Robbins changed the description of the getaway vehicle at the mosque bombing, what was seen (and not seen) on surveillance cameras in the area and she chose to exclude what she knew about Mr. Hari's history with CS1, his brother. There is little doubt that Detective Robbins wanted to search every place Mr. Hari stayed or frequently visited.

But it is the role of the neutral, detached magistrate that reviews the facts before them and provides protection between the desires of law enforcement and a citizen's Fourth Amendment rights. In the search warrants at hand, Detective Robbins misled the reviewing

magistrate by submitting inaccurate statements and hiding the true motivations of CS1. Her Affidavits and the signed search warrants cannot be saved by the *Leon* exception.

Additionally, exclusionary rule must apply where the warrant affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923. Put differently, the *Leon* good-faith inquiry asks "whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization." *United States v. Houston*, 665 F.3d 991, 995 (8th Cir. 2012) (citations and internal punctuation omitted). Under that standard, *Leon* will not save a warrant where a well-trained officer "would have known that his [or her] affidavit failed to establish probable cause and that he [or she] should not have applied for the warrant." *Malley v. Briggs*, 475 U.S. 335, 345 (1986).

Here, Detective Robbins' probable cause presentations failed to justify the searches with regard to particularity and nexus. Particularity and nexus are not complex legal concepts. And it was entirely unreasonable for Detective Robbins, a Sergeant with the University of Illinois Police Department of 21 years, to rely on the warrants because the particularity and nexus deficiencies were so glaring. Simply to suspect an individual of multiple criminal violations does not provide sufficient probable cause to search their home, their office, their cellular phone, and the home of their parents.

Based on the record here, it appears that Detective Robbins and others were keen to arrest Mr. Hari and search his office, home, and parents' home so that they could verify their suspicions that each location contained evidence of wrongdoing. But the Fourth

34

Amendment requires a revers ordering of events, *i.e.*, probable cause first, then search and seizure.  Law enforcement violated Mr. Hari's Fourth Amendment rights and the direct and derivative fruits cannot be saved by *Leon* and must be suppressed.

## VI.    CONCLUSION

For all these reasons, Mr. Hari asks that the Court grant his motion suppress the direct and derivative fruits of the unlawful searches and seizures as a remedy for the violations of his Fourth Amendment rights.

Dated:  September 5, 2019                              Respectfully submitted,

*s/ Shannon Elkins*
_____
SHANNON ELKINS
Attorney No. 332161
Attorney for Defendant
Office of the Federal Defender
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415