UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
District Court File No. 18-150(1)(DWF/HB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **RESPONSE BY THE UNITED** |
| | ) | **STATES IN OPPOSITION TO** |
| Plaintiff, | ) | **DEFENDANT'S MOTIONS** |
| | ) | **(A) TO SUPPRESS SEARCH** |
| vs. | ) | **AND SEIZURE EVIDENCE,** |
| | ) | **AND (B) SEEKING** |
| MICHAEL HARI, | ) | **RECONSIDERATION OF** |
| | ) | **THE COURT'S ORDER** |
| Defendant. | ) | **DENYING A *FRANKS*** |
| | ) | **HEARING** |

The United States of America, through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, Assistant United States Attorneys John Docherty and Julie E. Allyn, respectfully submits this response in opposition to Defendant Michael Hari's Memorandum in Support of his Motion to Suppress Search and Seizure Evidence. CM/ECF document number "Doc. No." 129. In that Memorandum, Mr. Hari also asks the Court to reconsider its August 8, 2019, oral order denying his Motion for a *Franks* Hearing. Doc. No. 118.

Hari originally challenged six search warrants. He persists in his challenge to only four: Two search warrants dated March 13, 2018, one authorizing the search of Defendant's office at 100 South Main Road, Clarence, Illinois (introduced at the August 8 motions hearing as Government Exhibit ("Gov't Exh.") 1), and a second authorizing the search of the home of the Defendant's parents, 112 North 1900E Road, Paxton, Illinois

1

(Gov't Exh. 2)[1]; (3) a March 23, 2018[2] warrant authorizing a search of the Defendant's home, 209 West First Street North, Clarence, Illinois (Gov't Exh. 3); and (4) a warrant dated April 4, 2018 authorizing the search of the Defendant's cellular telephone (Gov't Exh. 5).

This Court need not reconsider its earlier order denying a *Franks* hearing, because Hari still has not come forward, as he must in order to obtain a *Franks* hearing, with evidence of deliberate falsehood or deliberate omission by law enforcement that amounts to a "substantial preliminary showing."   Nor should this Court be persuaded by Hari's attacks on the search warrants.  Hari claims that the affidvits in support of the two March 13, 2018 search warrants do not establish a nexus to criminal activity, claims that the information in the affidavits is stale, and therefore concludes the affidavits do not establish probable cause.  Hari claims the affidavit in support of the March 23, 2018 search warrant for his house does not establish a nexus, contains stale information, and is fruit of the poisonous tree (namely the March 13, 2018 search warrants).  Finally, Hari claims that the affidavit in support of the search warrant for his cellular telephone failed to establish a nexus and contained stale information.

---

[1] Hari originally challenged a second search warrant for his parents' home, dated August 21, 2018, but has dropped that challenge, see Defendant's Memorandum, Doc. No. 129, at page 3, n.2. Hari also withdrew his challenge to a warranted search of a self-storage facility in Champaign, Illinois, *id.*

[2] This warrant is described as a March 26, 2018 warrant in the heading on page 22 of the Defendant's Memorandum, but Exhibit 3 is dated, in the lower left, "03/23/2018."

These allegations of Hari's are wrong.  In fact, as established below in this Opposition, the affidavits in support of the warrants are long, detailed, and amply establish probable cause, as well as a nexus to criminal activity, with evidence that is not stale.

## FACTS AND PROCEDURAL HISTORY

At approximately five in the morning on Saturday, August 5, 2017, a bomb was thrown into the imam's office of the Dar al-Farooq Islamic Center in Bloomington, Minnesota.  The glass of the window of the office had first been smashed with a sledgehammer, making a hole through which the explosive device could be thrown. Investigation showed the device had been made by packing black gunpowder into a length of PVC pipe, to which a container holding a mixture of gasoline and diesel fuel had been taped.  The bomb exploded, causing extensive blast damage to the imam's office.  The device also started a fire, but the building's automatic sprinkler system quickly activated and doused the flames.  Beyond the blast damage, the imam's office also sustained fire, smoke, and water damage.

The FBI immediately began an extensive investigation.  One of the investigation's lines of inquiry identified a person who needed to be investigated further, either to clear the person of suspicion, or to establish to law enforcement that the investigation of this person should continue.  As part of the investigative process, law enforcement applied to this Court for several search warrants.  The affidavits submitted by an FBI Agent in support of the applications for those search warrants stated that a witness had seen a man running from Dar al-Farooq and getting into a dark, full-sized truck which then drove out of the mosque's parking lot at high speed.

Some months later, in January of 2018, an anonymous caller to an FBI tip line identified defendant Michael Hari, who lived in the downstate Illinois village of Clarence, as one of several people who had perpetrated the Dar al-Farooq bombing.   The FBI conducted multiple interviews in Clarence and the surrounding area, and executed multiple search warrants which had been issued by a magistrate judge of the U.S. District Court for the Central District of Illinois.   Defendant Hari was eventually indicted both in the Central District of Illinois (on Hobbs Act robbery charges and firearms charges) and the District of Minnesota (on federal civil rights and bomb charges).   Four of the Illinois search warrants, listed and described above at pages one and two of this pleading, are at issue in this suppression motion.

Both the Minnesota and the Illinois search warrants have now been disclosed in discovery to counsel for Mr. Hari.   The Defendant claimed the Illinois search warrants did not include material that should have been disclosed to the Illinois magistrate judge, and sought a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).   Among the claimed irregularities in the Illinois search warrant affidavits was the absence, from the Illinois search warrant affidavits, of the adjective "full-sized" to describe the dark truck that an eyewitness saw driving away from Dar al-Farooq, when that adjective had been used in the Minnesota search warrant affidavits.   Hari also claimed that more information about a confidential source's potential for bias should have been included in the Illinois search warrant affidavits. The affidavits included information about payments made by the FBI to the confidential source, but the defense asserted that the affidavits should also have

described the rocky history of the relationship between the confidential source and Michael Hari.

In a hearing on August 8, 2019, before this Court, the Honorable Magistrate Judge Hildy Bowbeer, in an oral order, denied the defense motion for a *Franks* hearing.  The Court ruled that no showing had been made that the adjective "full-sized" had been omitted with intent to mislead the Illinois magistrate judge or with reckless disregard for the omission's potential to mislead the Illinois magistrate judge.  MH Tr., pp. 40-41.[3]  The Court also ruled that the absence of "full-sized" from the Illinois affidavit had no bearing on whether probable cause existed; if the adjective was inserted into the Illinois affidavit, probable cause would still have been present.  The Court further held that the omission from the Illinois search warrant affidavits of additional material tending to show bias on the part of one of the confidential sources quoted in the affidavit similarly was not necessary to a probable cause finding.  The Court found that even if that information had been provided, probable cause would still have been established by the affidavit, and the Illinois magistrate judge would have signed the warrant. MH Tr., pp. 42-44.  The Court, in its oral ruling, stressed the volume of evidence in the Illinois search warrant affidavits, MH Tr., p. 41 (describing "abundant information upon which to find probable cause . . . [including] other elements of the eyewitness's account, the information received from the confidential sources, the recorded conversations of Mr. Hari and his alleged co-

---

[3] The transcript of the August 8, 2019 motions hearing is cited in this Opposition as "MH Tr." followed by the number of the page or pages being cited.

conspirators, and the statement from the co-defendant, Michael McWhorter, that implicated Mr. Hari in the charged offense.")

Mr. Hari now seeks reconsideration of Magistrate Judge Bowbeer's order denying a *Franks* hearing, and also challenges, under four corners review, the four search warrants described above. The defense claims a general lack of probable cause, and more specifically claims that the affidavits in support of those search warrant applications fail to establish a nexus between the crimes under investigation and the place to be searched, and that the information set out in the affidavits is stale. As to the later two search warrants, Hari also claims those warrants are fruit of the poisonous tree, the poisonous tree in question being the allegedly deficient first two warrants.

None of these claims is correct. The magistrate judge's decision to deny a *Franks* hearing was thoughtful and explained thoroughly on the record. The affidavits supporting the four search warrant applications establish, to a standard of probable cause and more, that evidence and contraband will be found in the places to be searched, and establish a nexus between the crimes and the places for which search warrants are sought. Furthermore, none of the information in the affidavits is stale. Since the first two warrants are valid, the two later warrants cannot be fruit of the poisonous tree. Finally, even if there was a problem with one or more of the warrants, the FBI was entitled to rely in good faith on the Central District of Illinois magistrate judge's decision to issue the warrants.

**ARGUMENT**

I.    **THE DECISION TO DENY A *FRANKS* HEARING WAS SOUND, AND SHOULD NOT BE RECONSIDERED.**

In her Order denying Hari's motion for a *Franks* hearing the magistrate judge clearly articulated the well-settled legal criteria applicable to such a motion, and cited to the record in explaining her decision. Her decision was substantively correct and was the outcome of a proper procedure. The magistrate judge's Order should stand.

**A) Standard For Reconsideration Of A Magistrate Judge's Order.**

A motion for reconsideration of a magistrate judge's order in a criminal case is not authorized anywhere in the Federal Rules of Criminal Procedure or in the Local Rules of the U.S. District Court for the District of Minnesota. By contrast, Fed. R. Civ. P. 50(b), 52(b), and 59 authorize reconsideration motions in civil cases. The Eighth Circuit has noted, without deciding, that motions for reconsideration in criminal cases are nevertheless allowed in some other circuits, under the same standards that apply in civil cases. *United States v. Luger*, 837 F. 3d 870, 875 (8th Cir. 2016). Given the Eighth Circuit's declination to clearly either allow or disallow motions for reconsideration, it seems that either Hari cannot file a motion for reconsideration in a criminal case at all, or else, if he does, he may only bring such a motion under the civil standard, under which a motion for reconsideration is allowed only to correct "manifest errors of law or fact . . . or present[ing] newly-discovered evidence." *Bradley Timberland Res. v. Bradley Lumber Co.*, 712 F. 3d 401, 407 (8th Cir. 2013). Hari has presented no new evidence in his pleading, and any claim that there was a manifest error of law in the magistrate judge's order is incomprehensible,

given how punctiliously that order stayed within the procedural and substantive framework set out in *Franks* and the cases following it.

In his motion for reconsideration, Hari simply rehashes the same arguments and facts he made to this Court initially.  He again claims, as he did in the first round of this litigation, that Detective Sergeant Robbins misled the magistrate in the Central District of Illinois, *see,* Defendant's Memorandum at p. 33, but brings forward no new evidence, and cites no new law.

The motion for reconsideration should be denied.

### B)  The Motion For A *Franks* Hearing Was Correctly Denied.

Assuming for the sake of argument that the Court proceeds to the merits of the *Franks* hearing claim, given that nothing new has been brought forward by Hari, there is no reason to change the Order previously entered.

### C)  The Burden On A Defendant Who Seeks A *Franks* Hearing Is Substantial.

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court created for criminal defendants a limited ability to inquire into the veracity of statements made by law enforcement officers, under oath, in affidavits submitted in support of search warrants.

Before even being granted a *Franks* hearing, a defendant must make a substantial preliminary showing that the statements in question were not only false, but also that the affiant knew they were false, or at least had been recklessly indifferent to whether the statement was true or not, and that the statement in question was necessary to the issuing magistrate's probable cause finding.  If the statement is false, but the falsity is the result of innocent mistake or negligence, the defendant will not get a hearing.  If the statement is a

deliberate falsehood, but after correcting it or excising it from the affidavit, probable cause is still present in the affidavit, the defendant will not get a hearing.

Hari claims the burden on a defendant who seeks a *Franks* hearing is "modest." This is not correct. In fact, the burden on a defendant who seeks a *Franks* hearing is substantial. "In order to be entitled to a hearing under *Franks* the defendant must make a 'substantial preliminary showing' of a false or reckless statement or omission and must also show that the alleged false statement or omission was necessary to the probable cause determination." *United States v. Milton*, 153 F.3d 891, 896 (8th Cir. 1998) (*citing United States v. Fairchild*, 122 F.3d 605, 610 (8th Cir. 1997)). "Such a showing is not easily made." *United States v. Engler*, 521 F.3d 965, 969 (8th Cir. 2008); *see also, United States v. Hively*, 61 F.3d 1358, 1360 (8th Cir. 1995) ("The 'substantial preliminary showing' requirement needed to obtain a Franks hearing is not lightly met").

In his search for legal authority supporting a standard of a "modest" preliminary showing for a *Franks* hearing, or at least a preliminary showing that is "less than a preponderance of the evidence," Hari cites two federal district court cases from the District of Massachusetts, *United States v. Legault*, 323 F. Supp. 2d 217, 225 (D. Mass. 2004) and *United States v. Brown*, 322 F. Supp. 2d 101, 107 (D. Mass. 2004). In these two cases, decided only a few weeks apart (June 25, 2004 for *Brown*, followed on July 8 by *Legault*), the same judge, the Honorable John Stearns, quoted the same paragraph from the same Supreme Judicial Court of Massachusetts opinion, *Commonwealth v. Ramirez*, 617 N.E. 2d 983, 997-98 (Mass. 1993) for the "less than a preponderance" standard urged on this Court by Hari. *Ramirez* itself cites a single Illinois Supreme Court case, *People v. Lucente*,

506 N.E. 2d 1269 (Ill. 1987).  Importantly, Judge Stearns stated that because the warrants at issue had been issued to state police officers by state judges, he would follow Massachusetts law in resolving the *Franks* issue, and also noted that Massachusetts state law is more favorable to defendants in search and seizure cases than federal law.  *Legault*, 323 F. Supp. 2d at 220 & n.2.  *Legault* and *Brown*, while issued by a federal district court, are not decisions rooted in federal law.

In addition, Hari cites LaFave's treatise on search and seizure in support of his assertion that the preliminary showing needed for a *Franks* hearing is modest.  When one consults the section of LaFave cited by Hari, and checks the footnotes, the reader finds that LaFave also cites the same paragraph from *Commonwealth v. Ramirez* as did Judge Stearns.  (LaFave also cites three other state court cases, including *Lucente*, but no federal cases.)  Hari's entire argument for anything less than a "substantial" preliminary showing comes down to a single Massachusetts state court case.

Turning to what it is that federal courts have said about what federal law mandates for a required preliminary showing, beginning with the Supreme Court in *Franks* itself, federal courts have been uniform in characterizing the showing needed for a *Franks* hearing as substantial.  *Franks v. Delaware*, 438 U.S. 154, 155 (1978) ("substantial preliminary showing" needed); *United States v. Bradley*, 924 F. 3d 476, 481 (8th Cir. 2019) (*quoting United States v. Williams*, 669 F. 3d 903, 905 (8th Cir. 2012) (same).  A defendant must show deliberate or reckless falsity or omission; a showing of mere negligence or innocent mistake is insufficient. *United States v. Butler*, 594 F. 3d 955, 961 (8th Cir. 2010).

Finally, Hari is simply incorrect in stating that a *Franks* hearing is needed before the four corners review of the search warrants can proceed.  It is true that the *Franks* issue needs to be resolved before the four corners review, because if anything is removed from the warrant affidavits, it would be important to know that.  But the question has been resolved – nothing will be removed.  Hari has conflated the correct statement that the *Franks* issue needs to be resolved before four corners review proceeds with the incorrect statement that the *Franks* issue must be resolved by means of a *Franks* hearing.

It may also be that Hari's claim focuses on the fact that in deciding whether there has been a substantial preliminary showing justifying a *Franks* hearing a Court necessarily evaluates probable cause, at least to the extent of deciding whether, with the allegedly false statements corrected, or missing information provided, probable cause still remains.  This is a part of the procedure for evaluating a *Franks* hearing motion.  There is nothing in the record indicating that by performing this required procedure the magistrate judge has in any way predetermined the still-pending motions for four corners review of probable cause, or the specific claims made by Hari of staleness and lack of nexus.

The *Franks* issue has been resolved.  It was resolved without a hearing.  Four corners review may therefore proceed, and it is to four corners review that we now turn.

## II.    THE SEARCH WARRANT AFFIDAVITS IN THIS CASE ESTABLISH A NEXUS BETWEEN THE PLACE TO BE SEARCHED AND THE CRIMES UNDER INVESTIGATION; THEY ESTABLISH PROBABLE CAUSE TO SEARCH; THEY DO NOT CONTAIN STALE INFORMATION.

The evidence in the warrant affidavits was not stale, particularly given the evidence the affidavits presented of ongoing, organized criminal activity.  The affidavits in support

of the applications for the four search warrants were all drafted by Detective Sergeant Barbara Robbins of the University of Illinois Police Department, who, at the time this case was being investigated, was assigned to the Joint Terrorism Task Force of the FBI's Springfield, Illinois Division.  The affidavits are, as Hari himself points out, "long and detailed."  The affidavits for the four search warrants are quite similar, but the similarity is caused by the affidavits all being drafted in connection with the same investigation, and recounting a lengthy history of ongoing, organized criminal behavior in multiple Midwestern locations.

While the general rule of staleness is that "[a] warrant becomes stale if the information supporting the warrant is not 'sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search,'" *United States v. Brewer*, 588 F. 3d 1165, 1173 (8th Cir. 2009) (quoting *United States v. Palega*, 556 F. 3rd 709, 715 (8th Cir. 2009)), deciding what is "sufficiently close" requires more than "simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit," *United States v. Formaro*, 152 F. 3d 768, 771 (8th Cir. 1998) (quoting *United States v. Lamorie*, 100 F. 3d 547, 554 (8th Cir. 1996)).  The same evidence might be stale in one case, but fresh in another.  A thorough staleness analysis considers multiple factors, including "the lapse of time since the warrant was issued, the nature of the criminal activity, and the kind of property subject to the search."  *United States v. Gibson*, 123 F. 3rd 1121, 1124 (8th Cir. 1997).

While Hari acknowledges that the nature of the crime under investigation is important when evaluating staleness, he then lumps the case at bar into the general category of "violent crime" and quotes a single sentence fragment from a First Circuit murder case, *United States v Charest*, 602 F. 2d 1015, 1018 (1st Cir. 1979) for the proposition that after 16 days, it was not likely a gun used to commit a murder would still be in a defendant's home. A case less like the case at bar would be hard to find. Detective Sergeant Robbins's affidavit does not describe a solitary and isolated act of violence, as did *Charest*, but an ongoing, months-long, multi-state, criminal campaign of bombings, home invasions, and armed robberies (carried out with illegal, fully-automatic infantry assault rifles) perpetrated by an organized domestic terrorist organization. The bombing of the Dar al-Farooq Islamic Center in Minnesota is described in paragraph three of the affidavit, while the recruitment by Hari of his co-defendants Morris and McWhorter to assist in the mosque bombing is in paragraph nine, and the hatred of Muslims that motivated the attack is in paragraph 28. The bombing of the Women's Health Clinic in Champaign, Illinois is described in paragraph four, a home invasion in Indiana is set forth in paragraph 29, the attempted framing of an innocent person by planting explosives on his property is recounted in paragraph 30, an armed robbery is in paragraph 32, while the illegal possession of multiple, fully automatic weapons is not confined to a paragraph or two, but permeates Detective Sergeant Robbins's affidavit.

Evidence in investigations of ongoing criminal activity goes stale far less quickly than in an investigation of a single-act violent crime case. *United States v. Colbert,* 828 F. 3d 718, 727 (8th Cir. 2016) (even information obtained months before warrant was

executed was not stale where there was evidence of an ongoing criminal enterprise and one observation was made less than three weeks before the warrant was executed); *United States v. Jeanetta*, 533 F. 3d 651, 655 (8th Cir. 2008) ("[i]n investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant does not necessarily make the information stale").

The items being sought by the FBI when they executed these search warrants included guns, ammunition, explosives, and manuals and instructions about bomb-making. These are not items that will be only briefly on the premises. They are items of "enduring utility" to Hari and the group around him, *United States v. Church*, 823 F. 3d 351, 363 (6th Cir. 2016).

In this case, the pattern of criminal activity described above is ample evidence of the ongoing nature of the crimes under investigation. The items sought are not going to be only transiently in the place to be searched. The information in the warrant affidavits was not stale. (The dates on which particular observations set out in the affidavit were made is below, in the sections of this pleading devoted to specific search warrants.)

The search warrants also established a nexus between the places to be searched and the crimes under investigation. In establishing a nexus between probable cause to search the place specified in the search warrant and the crimes under investigation, an affidavit in support of a search warrant application need only set forth a *fair probability* that, given the circumstances set forth in the affidavit, contraband or evidence of a crime will be found in a particular place. *United States v. Tellez*, 217 F.3d 547, 549 (8th Cir. 2000)(citations omitted)(emphasis added). Because the requisite nexus does not require certainty that

contraband will be found in a particular location, "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant…." *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009)(quotations omitted). In making these inferences, Federal courts of appeals have found that few places are more likely for concealing contraband than a defendant's home:

> "The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime."

*United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting *United States v. Green*, 634 F.2d 222, 226 (5th Cir. 1981)); *see United States v. Jenkins*, 901 F.2d 1075, 1080-81 (11th Cir. 1990)(holding that nexus between items to be seized and a defendant's home could be established circumstantially where the contraband is capable of being hidden in a residence).

The same reasoning applies when evaluating a search of a business. Again, it is a commonsense inference that evidence will be hidden at a business if the business provides both privacy and easy access. *United States v. Malcom*, No. CR11-3057-MWB, 2012 WL 2428209 *10 (N.D. Iowa June 26, 2012). Under these standards, all four warrants establish a nexus between the place to be searched and the crimes under investigation.

The four warrants are taken up individually.

**A) The Affidavit Supporting The Application For A Warrant To Search Hari's Office At 100 South Main Road In Clarence Did Not Contain Stale Information, And Established A Nexus Between The Crimes Being Investigated And The Place To Be Searched.**

The warrant to search Hari's office at 100 South Main Road in Clarence (Gov't Exh. 1) was supported by a first-hand observation, made on January 27, 2018 by a confidential source, of illegal, fully automatic firearms, video jammers, and tannerite, inside a locked safe in Hari's office.  Govt. Exh. 1, paragraph nine.

At paragraph 17 of the affidavit, the same confidential source recounted Hari saying, in response to a statement about "bang bangs" that "we moved that stuff already anyway," and "there is nothing illegal in our vault."  Hari relies on these statements to claim both that the information in the warrant affidavit is stale, and that the warrant affidavit fails to establish a nexus between criminal activity and Hari's office.  This statement of Hari's was limited to "our vault" which is only a portion of the structure at 100 South Main Road; and the fact that there is nothing illegal in a vault is not the same as saying there is no evidence in the vault.  Law enforcement was not required to credit this statement of Hari's, and even if they did, law enforcement was not required to declare the entire structure at 100 South Main Road off-limits because of a single ambiguous statement of Hari's, limited to one portion of the structure.  Nor, because the vault could have contained items that, although not illegal, were of evidentiary value, did even the vault within 100 South Main Road have to be carved out of the search warrant's scope.

In paragraphs 20 and 21, the brother of co-defendant Michael McWhorter described an event, also from approximately January 27, 2018 (the affidavit describes the date as

approximately one month before an FBI neighborhood canvas; that canvas was conducted

on February 27, 2018, see MH Tr., p. 61), when Hari placed a piece of braided wire in a

fluid and caused a reaction that led to the wire and the fluid glowing, and then igniting.

The significance of this observation to a bomb case is apparent, but its significance is

reinforced at paragraph 27, when co-defendant McWhorter describes using a magnesium

strip, rather than a conventional fuse, to set off the incendiary device that was placed in the

Women's Health Practice in Champaign on November 7, 2017.  McWhorter's brother, in

paragraph 21 of the affidavit, also describes another, this time unsuccessful, effort by Hari

to cause a reaction, when he poured a red powder into a fire.  This event took place

approximately "one month ago" or approximately February 13, 2018.  Hari, according to

McWhorter's brother, had hoped the powder would ignite.

Hari claims the observations in paragraphs 20 and 21 do not help establish probable

cause because these experiments "are not indicative of criminal activity."  It is entirely

unpersuasive for Hari to claim experiments with explosives and incendiary chemicals are

not indicative of criminal activity when the criminal activity under investigation includes

throwing a bomb into a mosque and placing an incendiary device in an abortion clinic.

In paragraph 22, McWhorter's brother says he saw, a couple of days after the

incident with the powder that did not burn, which would be about February 15, 2018, Hari

and co-defendant Morris cleaning weapons at the 100 South Main Road office, and that

Hari told McWhorter's brother two of the weapons were "fully auto."  McWhorter himself,

not his brother, states in paragraph 26 that he and other members of the militia group had

fired the weapons, and that the weapons had been stored at 100 South Main Road, before being moved to McWhorter's brother's house.

In sum, the affidavit establishes that weapons had been stored at 100 South Main Road, and that some weapons had been moved from there (leaving "nothing illegal in the vault" which is not the same as nothing at all anywhere in the building) at 100 South Main Road; that on at least two occasions near February 27, 2018 (about three weeks before the search warrant), experiments with explosives and incendiary chemicals had been conducted at 100 South Main Road; and that Hari, in a conversation with his co-conspirators, had described the vault at 100 South Main Road as "our vault." The use of that particular possessive adjective by Hari is significant, because it confirms a deduction that could be made from the number of meetings held at 100 South Main Road, the storage of weapons at that location, and the conduct of experiments at that location – 100 South Main Road was not a place where militia members were only briefly present. When read as a whole, the affidavit shows the office at 100 South Main Road was the main base of operations for the militia group. Although the Eighth Circuit has not had cause to rule on the question, the Sixth Circuit has adopted the commonsense conclusion that a warrant for a criminal enterprise's main base of operations goes stale more slowly than would a warrant for a place that is only used briefly by a criminal group. *United States v. Church, supra*, 823 F. 3d at 363 (6th Cir. 2016). While the Sixth Circuit's holding in *Church* addressed a claim of staleness, as a matter of logic, the fact that the office at 100 South Main Road was also a main base of operations should also strengthen the conclusion (already strongly

present in the affidavit, for the reasons above) that there is a nexus between the office and the crimes under investigation.

Finally, in *Illinois v. Gates*, the Supreme Court held that probable cause was a "fair probability" to believe that contraband or evidence of a crime would be found in a place to be searched, and that when evaluating probable cause a magistrate was entitled to draw reasonable inferences from the facts presented in an affidavit. *Illinois v. Gates*, 462 U.S. 213, 238 (1983)("fair probability") and 240 (inferences).  In *United States v. Malcom*, No. CR11-3057-MWB, 2012 WL 2428209 *10 (N.D. Iowa June 26, 2012) the district court judge held that it is "reasonable" for a magistrate to infer that one of the places evidence will be secreted is a business.

For all these reasons, this Court should find that the warrant for 100 South Main Road, Clarence, Illinois, was supported by an affidavit that established a nexus between the crimes under investigation and the place to be searched, and did so with evidence that was not stale.

**B)  Because Hari Had No Reasonable Expectation Of Privacy In His Parents' Home In Paxton, Illinois, He May Not Challenge The Warranted Search Of That Home And The Warrant Is Otherwise Valid.**

Hari seeks to suppress evidence seized from his parent's home, in part, because his "mere presence" at that location was insufficient to establish probable cause.  Hari further seeks to argue the affidavit in support of the search of his parents' house was stale and fails to establish a nexus to his criminal activity.  Hari's own argument reveals he does not have standing to contest the search warrant of his parents' home.

## 1. Hari Lacks Standing to Challenge the Search of his Parents' Home.

The Fourth Amendment protects against searches and seizures that are unreasonable because they intrude upon a person's "reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J. concurring). But one can ask a court to suppress evidence only because one's own expectation of privacy was intruded upon, not the expectation of privacy of someone else. There are "necessary limits on the ability of individuals to assert Fourth Amendment interests in property to which they lack a 'requisite connection . . . Fourth Amendment rights are personal.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2227 (2018). As the Eighth Circuit has held:

> The Fourth Amendment's "protection against unreasonable searches and seizures extends to a person's privacy in temporary dwelling places such as hotel or motel rooms." *United States v. Conner*, 127 F.3d 663, 666 (8th Cir.1997). Nonetheless, "in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). An expectation of privacy in the place searched is defined as "one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.' " *Id*. (*quoting Rakas v. Illinois*, 439 U.S. 128, 143–44 (1978)).

*United States v. Bohmont*, Nos. 09-2580 and 09-2592, 2011 WL 1088655 (8th Cir. March 25, 2011).

In this case, Hari, according to paragraph 6 of the affidavit (and Hari has presented no contrary or additional facts to this Court) Hari, although he "has his own place in

Clarence, Illinois, . . . stays at his parents' home quite often because his Clarence home has no running water or electricity."  Gov't Exh. 2.  There is apparently one particular room inside the parents' home in Paxton that Hari occupied when he was there.  Affidavit, paragraph 6.  There is no indication Hari paid rent, had a lease, worked around the house, or, in any other way had a reasonable expectation of privacy in the Paxton residence that was rooted in the law of real or personal property.

Most tellingly, in this case, Hari asserts, with a good deal of emphasis, that there is no evidence that he himself even went into the garage where law enforcement, during its warranted search, found firearms.  Defendant's Memorandum, Doc. No. 129, at p. 19.  The burden is on the defense to show that Hari had a reasonable expectation of privacy in the Paxton residence. *United States v. Long*, 797 F. 3d 558, 564 (8th Cir. 2015) (burden is on one claiming a Fourth Amendment violation to show "both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept").  Hari has not shown any expectation of privacy in his parents' home, much less that any such expectation is objectively reasonable.  Far from arguing that he had such an expectation, Hari has denied any such expectation.  He was, he claims, "merely present."

The standard rule is that a person has a reasonable expectation of privacy in a home where he is an overnight guest. *Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990).   But in *Olson*, unlike in this case, the defendant was actually on the premises at the time of the search.  Hari did not own or rent the home in Paxton.  Whatever expectation of privacy he had in his parents' home could only be activated if he was actually present, and there is no indication he was actually present when the home was searched pursuant to warrant.  And

finally, Hari tries to disown any knowledge of contraband or evidence being on the premises, particularly in the garage, thereby forfeiting his ability to meet his burden of establishing a reasonable expectation of privacy in the Paxton home.

Hari's motion to suppress the Paxton search warrant should be denied because he has failed to establish that he had a reasonable expectation of privacy in the place that was searched.

### 2. The Warrant Affidavit Established a Nexus Between the Paxton Residence and the Crimes Under Investigation, and did so with Information that was not Stale.

Even if Hari does had a reasonable expectation of privacy in the Paxton residence, the affidavit for that search warrant does not contain stale information, and the affidavit establishes a nexus between the home and the crimes of using a destructive device, possession of machine guns, Hobbs Act robbery, and other matters under investigation by law enforcement.

In paragraph six of the affidavit, photographs taken inside the parents' home, and forwarded first to the county sheriff on December 26, 2017, and then onward to the FBI, are displayed.  While the photographs do not reproduce clearly, Hari, at page 21 of his Memorandum, classifies the photographs as among the "three pieces of evidence that placed any suspicion at all on the home of Mr. Hari's parents."  At paragraph 11 of the affidavit, the affiant recounts information, dated February 13, 2018, from a confidential source, stating that the Anarchist's Handbook (which includes instructions on how to create thermite – thermite was used in the Women's Health Practice incendiary device, Affidavit at paragraph 13) is in the garage of the Paxton residence, as are tools suitable for fabricating

a pipe bomb.  At paragraph 26 of the affidavit, there is a discussion of illegal firearms that had apparently been converted to fully automatic "at Hari's parent's house in the garage."

There is no need to belabor again the points made above.  The Paxton residence was searched as part of an investigation into ongoing, indeed organized, criminal activity.  The items sought in the search were of enduring utility to the members of the militia group. While the Paxton residence was not a base for the militia group in the same way as was the Clarence office, there is direct, eyewitness testimony, corroborated by photographs, of firearms being converted to fully automatic in the Paxton residence's garage, of instructions for the creation of thermite being present, and of tools suitable for building pipe bombs being on the premises.  This evidence was not stale, and this evidence amply establishes a nexus between the Paxton residence and the crimes under investigation.

Hari's claims that the Paxton residence search warrant of March 13, 2018 was unsupported by probable cause, and failed to establish a nexus, and included stale information, should be turned aside by this Court.  The motion to suppress the warrant should be denied.

**C) The Affidavit Supporting The Application Of A Warrant To Search Hari's Residence At 209 West 1st Street North In Clarence Established A Nexus Between The Crimes Being Investigated And The Place To Be Searched And Is Not Stale.**

As already discussed in exhaustive detail regarding the other affidavits supporting the search warrants, the facts in the search warrant affidavit for Hari's home are not stale especially given the ongoing and organized nature of the crimes being investigated.  Those previous arguments are incorporated herein.  Certainly, there is substantial information in

the affidavit detailing ongoing criminal conduct, to include conduct by Hari only but a few weeks before the issuance of the search warrant.  *See*, Gov't Exh. 3, paragraphs 18, 19, 23-25.  Moreover, as discussed below, the facts in the affidavit established a sufficient nexus between Hari's home and the crimes under investigation.

As previously detailed, the requisite nexus does not require certainty that contraband will be found in a particular location, rather certain inferences may be drawn from the totality of the circumstances, including the inference that a criminal will hide evidence of crimes in the privacy of their home.  *Alexander*, 574 F.3d at 490; *Kapordelis*, 569 at 1310.  Accordingly, the "common-sense realization" that a defendant would hide contraband in their home, *Kapordelis*, 569 F.3d at 1310, is clearly applicable here in establishing a nexus between Hari's home and the criminal activity, especially given the totality of the circumstances exhaustively detailed in the affidavit.  The applicability of this inference is evident within the affidavit itself.  Paragraph 35 of the affidavit specifically references that Hari told CS2 that he had removed "everything illegal" from his office, but that the illegal items were "close enough that if they needed them they could get them quickly."  Gov't Exh. 3, p. 16.  As "few places are more convenient than one's residence for … hiding fruits of a crime," *Id.*, the natural and logical inference would be that those items were moved to Hari's home, the subject of the search warrant.

Moreover, the affidavit for Hari's home contains a specific reference to suspicious activity occurring at his house directly related to the crimes being investigated.   In paragraph 33, codefendant McWhorter told law enforcement that approximately one week before the bombing of the mosque in Minnesota, Hari purchased "approximately 10 pounds

of black powder" in one pound containers. *Id*. McWhorter realized this black powder was purchased for use in the "device" used to bomb the mosque. *Id*. Hari admitted to McWhorter he had burned some of these containers of black powder *at his house* in Clarence. *Id*.

Finally, Hari's argument that the search warrant for his home was based on "unlawfully obtained evidence," (Doc. No. 129, pp. 23, 26), from previous searches, fails for at least two reasons. First, as argued above, the search warrants for Hari's office and the Paxton residence are constitutionally valid. Such a finding negates Hari's "fruit of the poisonous tree" argument completely. Second, any references to the prior searches are comprised of only a few sentences in the second half of the last paragraph of the entire affidavit. Exh. 3, paragraph 35. And those references only allude to the *lack* of evidence. The affidavit does not mention a piece of evidence that would be suppressed should the prior searches be found invalid, and so there is no allegedly tainted evidence mentioned in the affidavit. Such *de minimus* mentioning of prior searches in the affidavit does not otherwise alter or taint the ample probable cause contained in the affidavit. The motion to suppress the warrant for Hari's home should be denied.

### D) Agent Smith Properly Obtained Hari's Cell Phone From Josie Mcwhorter As Hari Abandoned His Phone And There Was Probable Cause To Believe Evidence Was On The Phone.

Joel Smith, a Special Agent in the FBI's Champaign, Illinois office, who is the lead investigator into the crimes committed by Hari and his codefendants in Illinois, testified at length at the motions hearing. Agent Smith explained in exhaustive detail to learning Hari was a suspect in planting explosive devices at a home in Clarence, Illinois; that Hari stored

a duffle bag of potentially illegal firearms at a house in Clarence; and that as the FBI arrived in Clarence to investigate, Hari and codefendants left town and refused to say where they went.  Before all this, Agent Smith had already learned from multiple sources that Hari was involved in explosives and other crimes.   As Agent Smith realized Hari and his codefendants had fled, Josie McWhorter, the wife of one of the disappeared codefendants, offered Agent Smith Hari's phone.  Hari had left the phone behind, in the home owned by Josie, when he fled the previous day and never returned to retrieve it.  Agent Smith took the abandoned phone from Josie, knowing that the phone must have evidence of Hari's illegal activities and that such evidence can easily be destroyed on a phone.

### 1.  The Applicable Factual Basis Supports the Temporary Seizure of Hari's Abandoned Cell Phone.

Agent Smith specifically testified that on February 19, 2018, he received a tip claiming there were explosive devices located on property owned by J.O., in the town of Clarence, Illinois.  MH Tr., pp. 54, 57.  Agents had determined that the source of the tip concerning J.O.'s property was sent using a proxy IP address that kept the tipster anonymous.  MH Tr., p. 58.  Law enforcement followed up on the tip by conducting a consensual search of J.O.'s property, where they found explosives in his shed.  MH Tr., pp. 59-60.  J.O., however, "immediately" believed Defendant Hari was responsible for planting the explosives in his shed since J.O. had accused Hari of assault.  MH Tr., p. 60.

At the time of this tip and discovery of explosives, Agent Smith had already learned from "multiple sources" that Hari was "involved in explosives," including being responsible for the bombing of a mosque in Minnesota, the attempted bombing of the

Women's Health Practice in Champaign, Illinois, and multiple Walmart robberies. MH Tr., p. 101.

On February 27, 2018, Agent Smith conducted a neighborhood canvas of Clarence, to see if any residents had information concerning the discovered explosives. MH Tr., pp. 61-62. Clarence is an "extremely small" town of only about five roads and 15 to 20 houses that are all close to each other, making Clarence the type of town where the presence of law enforcement would stand out. MH Tr., pp. 62-63.

The neighborhood canvassing included Agent Smith talking with Herbert McWhorter ("Herbert")[4] on his front porch. MH Tr., p. 64. Herbert is co-defendant Michael McWhorter's brother and both Herbert and Michael McWhorter live on the same block in Clarence. *Id.* Herbert informed Agent Smith that Hari and co-defendant Joe Morris ("Morris") recently had brought over a duffle bag to his home. MH Tr., pp. 69-70. With Herbert's consent, Agent Smith searched the duffle bag and discovered multiple firearms, including four AR-15 style assault weapons with no serial numbers. MH Tr., pp. 70-71. By this time, approximately five FBI agents had converged on Herbert's house, in addition to Ford County Sheriff's Deputy Kaeding, to assist with the collection of evidence. MH Tr., p. 72.

While other agents secured the weapons, Agent Smith continued talking with Herbert on the front porch when Hari arrived at the house wanting to speak with Herbert.

---

[4] So as to avoid any confusion with co-defendant Michael McWhorter, first names were used for those having the last name of "McWhorter."

MH Tr., pp. 74-75.  Agent Smith identified himself to Hari as an agent with the FBI and

let him know he could only talk with Herbert when Agent Smith was done.  MH Tr., p. 75.

Hari, however, ignored Agent Smith.  Hari asked Herbert about where to find Ellis Mack

("Mack")[5] and learned that Mack was just down the road at the home of Michael

McWhorter and his wife Josie McWhorter ("Josie"). MH Tr., p. 76.  Agent Smith then

specifically observed Hari stare into Herbert's home for several seconds through the

cracked open front door.  MH Tr., p. 77.  At that time, officers were inside securing the

recovered weapons for transport.  MH Tr., pp. 77-78.  Hari then left and Agent Smith

observed Hari drive over to Josie's home just down the block.  MH Tr., p.78.

Agent Smith continued talking with Herbert after Hari left.  According to Herbert,

Hari, Michael McWhorter and Morris were supposedly part of a "security group" seizing

drugs from "people" and they had weapons at a building used as Hari's "office."  MH Tr.,

pp. 73, 79.  Contemporaneous with this conversation, Agent Smith and Deputy Kaeding

observed Hari going back and forth between Josie's house and his car that was parked in

front of her home.  MH Tr., p. 79.  Ultimately, after Hari was only at Josie's home for

approximately 20 minutes, Deputy Kaeding observed Hari leave Josie's house with her son

Mack.  MH Tr., p. 80.

That evening, Agent Smith continued speaking with Herbert.  Herbert explained that

approximately a month earlier, he had seen the weapons seized from his home at Hari's

---

[5] Ellis Mack is a codefendant with Hari in charges from the Central District of Illinois. MH Tr., p. 56.  Mack is Josie McWhorter's son and Josie McWhorter is married to codefendant Michael McWhorter.  *Id.*, MH Tr., p. 57.  Mack is McWhorter's stepson.  MH Tr., p. 86.

office[6] and Hari told him one of the weapons was fully automatic.  MH Tr., p. 82.  At the time Agent Smith learned this information, he knew Hari had a prior felony conviction that would prohibit him from possessing firearms, and that moreover, possession of fully automatic weapons is generally illegal.  MH Tr., pp. 84-85.

By late evening of February 27, 2018, Agent Smith spoke with Josie.  Josie was "distraught" and "crying" asking, "why would he take my son if he weren't guilty of something?"  MH Tr., p. 85.  Josie was referring to Hari taking her son, Mack, and having no idea of his whereabouts.  MH Tr., pp. 85-86.  Agent Smith went to Josie's home late the next morning for a full interview about her concerns.  The home belonged to Josie and her husband.  Morris sometimes stayed at the house, but Hari did not live there.  MH Tr., pp. 93-94.  When Agent Smith arrived at Josie's home, Hari and the other men were still unaccounted for, and Josie had learned that Morris and Michael McWhorter had not shown up for work that day.  MH Tr., p. 88.

Josie explained that the prior evening, Michael McWhorter had called her from Mack's phone.  MH Tr., p. 87.  Josie confronted her husband, asking him where he was and why did they leave.  MH Tr., pp. 87-88, 119.  Michael McWhorter, however, replied only that he could not tell her and that he loved her; and then he terminated the call.  MH Tr., pp. 87-88, 119.  Although this was the following day, Josie was still distraught during the interview, evidently having cried all night.  MH Tr., p. 89.  Josie explained she had no

---

[6] Other evidence, in particular Government's Hearing Exhibit One, establishes that Hari's office is located in Clarence, Illinois.

idea why, in her words, they "fled," and asked Agent Smith to help her locate her son.  MH Tr., p. 89.

Agent Smith also spoke to Josie's daughter, who was home the day before with Hari and Mack.[7]  The daughter specifically explained to Agent Smith that Hari had arrived at her home, while Mack was also there, wanting to see "what was going on up the road," referring to watching the search of Herbert's home.  MH Tr., p. 90.  During that time, Hari went in and out of the house and the daughter observed Hari talking on the phone to Michael McWhorter.  MH Tr., p. 90.  At one point, Hari told her "the FBI is here and if they want to talk to you, tell them that you want a lawyer."  MH Tr., p. 91.  Eventually, Hari, appearing rushed, told Mack "let's go for a ride" and started pushing Mack out the door, although it appeared that Mack did not want to leave.  MH Tr., p. 92.

After these interviews, Josie, unsolicited by Agent Smith, offered him three cell phones, advising him "I have their phones here if you want them."  MH Tr., p. 92.  Josie explained she believed Hari left his phone at her home in his rush to leave.  MH Tr., p. 95.  Josie retrieved the three cell phones from a table in the living room, which was the room they were all in during the interview.  MH Tr., p. 93.  Josie was able to distinguish for Agent Smith which of the three cell phones belonged to Hari, Morris and Michael McWhorter.  MH Tr., p. 95.  Josie described an additional phone belonging to Hari that she did not have in her home.  MH Tr., p. 95.  Josie signed a receipt of property form and Agent Smith left with the three phones.  MH Tr., pp. 96-97; Gov't Exh. 7.  Agent Smith

---

[7] As the daughter was approximately 16-17 years old at the time, MH Tr., p. 90, her identity was not disclosed during the hearing.

placed the phones in "airplane mode" to preserve any evidence, but did not search the phones at that time.  MH Tr., p. 113.  Rather, Detective Sergeant Robbins later obtained a federal search warrant to search all three phones.  MH Tr., p. 113; Gov't Exh. 5.

Agent Smith testified he took the phones at that time without a search warrant believing Josie had authority to give him the phones, especially as the phones had been "abandoned" in her home.  MH Tr., pp. 98-99.  Agent Smith further asserted he had probable cause to believe the phones held evidence of various crimes given the immediate weapons investigation, and reporting from "sources" that Hari was involved in the bombing of a mosque in Minnesota and the Women's Health Practice in Illinois.  MH Tr., pp. 100-101.  Knowing Hari had just used phones to communicate with coconspirator Michael McWhorter, but also knowing that "phones can be wiped remotely," he believed the circumstances required his immediate seizure of the phones to avoid destruction of evidence.  MH Tr., pp. 100-103.

Agent Smith was constitutionally justified in temporarily seizing Hari's phone without a warrant.  Agent Smith had numerous valid reasons for this seizure: Hari abandoned the phone, thereby abdicating his possessory interest; Josie had apparent authority to give him the phone; and, he had probable cause to believe the phone contained evidence of a crime that could be destroyed if not immediately seized.  Each reason alone sufficiently supports the seizure – but the combined impact of the intertwined reasons clearly supports the seizure of Hari's cell phone pending a search warrant.

## 2. Hari Forfeited his Expectation of Privacy When he Abandoned his Phone.

Agent Smith reasonably believed Hari abandoned his phone at Josie's home. Seizure of abandoned property does not violate the Fourth Amendment. "When individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had." *United States v. Segars*, 31 F.3d 655, 658 (8th Cir. 1994)(quotations omitted); *Abel v. United States*, 362 U.S. 217, 241 (1960)(warrantless seizure of abandoned property does not violate the Fourth Amendment). The court should look to the totality of the circumstances in determining if property was abandoned, including, but not limited to, factors such as denial of ownership and physically relinquishing the property. *United States v. Liu*, 180 F.3d 957, 960 (8th Cir. 1999). Verbal disclaimer of ownership, nevertheless, is not *required* for a finding of abandonment. *Id.* (citations omitted)(emphasis added). The salient circumstances are the objective facts available to the officers, not the owner's subjective intent. *Id.* (citation omitted). Further, "[t]he existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary." *Segars*, 31 F.3d at 658.

In *Liu*, officers discovered a possible drug courier's bag on a train. 180 F.3d at 959. Officers asked the defendant if the bag belonged to him and he affirmatively claimed it did. *Id.* As the officers continued to question the defendant, however, the defendant walked off the train and left the bag behind. *Id.* The district court suppressed the evidence. The Eighth Circuit in *Liu*, however, overturned the lower court despite the defendant's affirmative claim of ownership. The Court in *Liu*, held the district court clearly erred by

failing to sufficiently consider the totality of the circumstances with respect to the defendant's physical relinquishment of the property. *Id.* at 960-961. For example, the district court failed to properly account for the officer's objective belief that the defendant was fleeing the premises and had displayed other behavior "not indicative of an intent to return." *Id.* at 961. Like in *Liu*, Hari manifested his physical relinquishment of his phone when he fled the premises and did not return.

Based on the totality of the facts known to Agent Smith, he had numerous objective reasons to believe Hari had abandoned his cell phone. An FBI investigation was slowly circling ever closer to Hari. Hari knew this investigation was closing in on him, and more importantly, Agent Smith knew Hari knew. Agent Smith personally witnessed Hari stare into Herbert's house at the exact moment agents were seizing Hari's cache of guns. From that moment forward, everything witnessed or learned by Agent Smith supported only one conclusion: Hari abandoned his phone in his efforts to flee from police.

First, when Hari left Herbert's home, he immediately went to the house of a fellow coconspirator, Michael McWhorter. Hari's conduct there was sufficiently odd to be noteworthy: moving back and forth between the home and his car, and quickly leaving with McWhorter's step-son, Mack. Next, Agent Smith received a "distraught" phone call from Josie "crying" because she believed Hari took her son and she did not know where they were. In fact, Agent Smith learned Michael McWhorter had refused to tell his wife their location. This now elevates the simple fact of Hari leaving the home with Mack to an act more akin to an abduction. Then, the next day, now approximately 20-24 hours later, the men were still gone and had not reported to work that day. Throughout all this, Agent

Smith was well aware that Hari had previously fled the country to avoid prosecution.  MH Tr., pp. 103-104.  If Hari was capable of making multiple trips to his car, and able to take Mack from the house before leaving, then Hari would have been equally capable of taking his cell phone.   Having failed to do so, Hari relinquished his property and clearly demonstrated to Agent Smith that he abandoned his phone.

Hari asserts he could not have abandoned his phone because he "left it in the private home of a trusted friend, Mr. McWhorter.  Mr. Hari had no reason to believe he was relinquishing his expectation of privacy."  Doc. No. 129, p. 29.  But Hari's subjective belief is immaterial to this analysis.  Rather, the facts as viewed by Agent Smith are such: Hari left his phone in Josie's house, then ran off with her son and husband, never told her where they were, did not return to claim his phone, and left no instructions as to what to do with the phone.  These are not the actions of a person who would then have an expectation of privacy in that phone.

### 3. Agent Smith Reasonably Believed Josie McWhorter had Apparent Authority to Give Him a Phone Abandoned in her Home.

Knowing the phone was abandoned in Josie's home, Agent Smith believed she had authority to give him Hari's phone.  As Agent Smith testified, Josie "offered" him the phones, from a home she owned, and from the common living room area.

Third party consent is a well recognized exception to the Fourth Amendment's warrant requirement.  *United States v. Clutter*, 674 F.3d 980, 983 (8th Cir. 2012).  An officer does not need a warrant if law enforcement has consent to search from "'[a] third party with 'common authority' over a property….'"  *United States v. Fife*, 356 F.Supp.3d

790, 796 (N.D. Iowa 2019)(quoting *United States v. Hinkle*, 456 F.3d 836, 840 (8th Cir. 2006)).  "'Common authority is a function of mutual use, joint access, and control….'" *Fife*, 356 F.Supp.3d at 796 (quoting *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003)).  If a third party lacks actual authority to have consented to a seizure or search of shared premises or property, the Fourth Amendment is "not violated if the officers reasonably relied on the third party's apparent authority to consent …." *Clutter*, 674 F.3d at 983 (citing *James*, 353 F.3d at 615).  When an agent relies on a consenting party's apparent authority, the agent does not need to be correct, but the reliance must be reasonable.  *Illinois v. Rodriguez*, 497 U.S. 177, 185-86, 110 S.Ct. 2793 (1990).

In *Clutter*, police officers went to a defendant's home while he was in custody seeking to seize several computers.  674 F.3d at 983.  At the home, officers encountered defendant's family member and informed him of their concerns regarding the computers in the home.  The family member told officers he owned the home, invited them in, gave officers permission to search, signed consent forms for the computers, and urged the officers to take the computers.  *Id.*  The officers took two computers from a common area of the house.  *Id.*  Officers then later obtained a search warrant to search the contents of the computer.  *Id.*

The defendant in *Clutter* argued there was no valid consent for a warrantless seizure of the computers by claiming there was no evidence that the consenting family member "used or had electronic access" to the computers.  *Id.*  The court rejected that argument, and instead looked at the totality of the circumstances in concluding the officers' reliance on apparent authority was valid.  The court in *Clutter* reasoned as follows: the officers took

the property from the person who owned the home; that person was in actual possession of the property; the officers were taking the computers to avoid destruction of evidence; the officers knew the computer was in an area accessible by the third party giving the consent; that person knew why the officers were taking the computers; the person giving consent in fact asked the officers to take the computers; and, the person giving consent signed a consent form.  *Id.* at 984-985.  Based on this, the Court in *Clutter* held the officers "reasonably relied on [the third party's] actual or apparent authority to consent to a temporary seizure, without inquiring as to whether he used or had electronic access to computers." *Id.* (internal quotations omitted).  Similarly, here, Agent Smith's reliance on Josie's apparent authority to hand him Hari's cell phone was equally valid irrespective of her ability to access the phone.

Hari's reliance on *United States v. James* is misplaced as he conveniently left out critical facts that distinguishes *James* from his case.  In addition to the details that the defendant in *James* marked his property as "confidential," "personal," and "private" – facts utterly lacking with respect to Hari's cell phone – the officers in *James* also knew that the defendant had left his property to be destroyed, not to be stored.  *United States v. James*, 353 F.3d 606, 615 (8th Cir. 2003).  Since those officers in *James* knew the defendant had a desire to keep others from seeing the contents of his property by wanting it destroyed, the court held the officers could not rely on third party consent.  *Id.*  There are no such crucial facts in this case of Hari's intention, such as his intention to have his phone stored or destroyed.  As Agent Smith had no indication of facts to contradict Josie's apparent authority, the ruling in *James* is not applicable.

Agent Smith, rather, reasonably relied on Josie's apparent authority to give him Hari's cell phone. The facts in *Clutter* are nearly identical to what is before this Court. Just like the totality of the circumstances in *Clutter*, here: Agent Smith took the phones from the person who owned the home; she was the person in actual possession of the phones; Agent Smith took them to avoid the destruction of evidence; he believed the phone was in a common area accessible to Josie, that is, the living room; Josie knew why Agent Smith was taking the phones; and in fact, Josie was the person who voluntarily offered Agent Smith the phones; and finally, she signed a property evidence form.

Moreover, the Court in *Clutter* also found that since the defendant was in custody at the time officers seized his computers, there was no meaningful interference with his possessory interests. *Clutter*, 674 F.3d at 984 ("[a] seizure of property occurs when there is some meaningful interference with an individual's possessory interests in that property.")(quotations omitted). Like in *Clutter*, given the evidence that Hari did indeed flee, was living in the woods, and never attempted to retrieve his phone, MH Tr., p. 111, the seizure of his phone did not meaningfully interfere with his possessory interest.

### 4. Given that Agent Smith Had Probable Cause to Search the Phones, Exigent Circumstances Necessitated Seizing the Phones.

By the time Josie handed Agent Smith the phones, he had ample probable cause to believe there would be evidence in Hari's phone, and the training to know that evidence on a cell phone could easily be destroyed. "'Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizures of

the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some recognized exception to the warrant requirement is present.'" *Clutter*, 674 F.3d at 985, (quoting *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)).

Agent Smith had probable cause, based on the statements of multiple sources, Herbert's statements, and the discovery of a duffle bag full of weapons, to believe Hari and his coconspirators were involved in weapons and explosives crimes. Concomitantly, Agent Smith had probable cause to believe that Hari's phone specifically would contain evidence. As Agent Smith testified, Hari had used a phone as recently as the evening before the seizure to talk with McWhorter, and any cell phone used by Hari could show "pattern of life" between coconspirators, as well as GPS evidence to prove if Hari had left the state to commit a "criminal violation." MH Tr., pp. 100, 102.

An agent's seizure of a phone or computer will be justified as exigent circumstances when a defendant knows of the investigation and thus could destroy evidence. *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013) ("the exigencies of the circumstances also demanded continuing seizure; [the defendant] knew about the investigation and could destroy the evidence); *United States v. Robinson,* No. 11CR380 DWF/TNL 2012 WL 1110086, *10, D. Minn. 2012) ("based upon the officer's training and experience, the officer could reasonable (sic) assume that exigent circumstances existed to seize temporarily Defendant's Motorola Android cellular telephone because Defendant could easily have destroyed the information contained within the telephone….").

There is abundant evidence that Hari knew of the investigation.  In fact, Agent Smith believed Hari fled and left his phone precisely to inhibit law enforcement.  MH Tr., pp. 124-125.  Agent Smith testified *multiple* times that he knew "phones can be wiped remotely."  MH Tr., pp. 103, 105, 129.  Agent Smith was justified by exigent circumstances in seizing the phones and later obtaining a search warrant.

### E) The Search Warrant Of Hari's Phone Was Constitutionally Valid As There Was Sufficient Probable Cause, A Nexus To The Alleged Activity And The Information Was Not Stale.

Hari claims that given his practice of turning his phone off for missions, the affidavit in support of the search warrant for his phone lacked probable cause and a nexus between the phone and crimes.  Doc. No. 129, p. 31.  As Hari's phone would contain evidence regardless of whether his phone was "on" during "missions," the affidavit in support of searching his phone contained a showing of sufficient probable cause.  Moreover, as the affidavit contains details such as Hari using a phone to call a coconspirator the night before Agent Smith seized the phone, the affidavit does not fail for staleness.

The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached judge; (2) contain a particular description of "the place to be searched, and the persons or things to be seized"; and (3) be based "upon probable cause, supported by Oath or affirmation." *Dalia v. United States*, 441 U.S. 238, 255 (1979); *see also* U.S. Const. amend. IV.  "Probable cause exists, if under the totality of the circumstances, a showing of facts can be made sufficient to create a fair probability that evidence of a crime will be found in the place to be searched." *United States v. Wallace*, 550 F.3d 729, 732 (8th Cir. 2008) (citations and internal quotation marks omitted). When

evaluating whether probable cause supported the issuance of a warrant, a court is to assess the "totality-of-the-circumstances" including the "'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983). A reviewing court "is simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." *Id.* (quotation omitted).  A court's review should be "flexible" and not "hypertechnical," but the affidavit "must provide the magistrate with a substantial basis for determining the existence of probable cause." *Id.* at 236, 239.  An issuing judge "may draw reasonable inferences ... in determining whether probable cause exists." *Wallace,* 550 F.3d at 732. After all, affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Ventresca,* 380 U.S. 102, 108 (1965).  A reviewing court accords great deference to a magistrate judge's determination as to whether an affidavit establishes probable cause. *Gates,* 462 U.S. at 236; *United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008).

The affidavit submitted in support of the search of Hari's cell phone, like all the affidavits discussed in detail, established that various crimes were committed and set forth a strong connection between these crimes and Hari.  The affidavit provided a clear factual basis demonstrating that evidence related to these crimes would likely be found on the phones.  This more than meets the legal requirements for the issuance of a search warrant.

Hari's one and only argument to claim there is a lack of probable cause and nexus, is the mere assertion that if Hari turned off his phone or used a Faraday bag to block his phone signal, then there would be no evidence on the phone.  Doc. No. 129, p. 31.  This argument fails on its face.  If Hari did not have his phone with him, or otherwise blocked

his phone's signal while on "missions," then this lack of phone usage – which could be found by searching of the phone – is itself evidence.  Certainly if a person uses his phone with certain frequency, and then that usage goes dark exactly during the time of the illegal activity, this is evasive behavior evidencing a defendant's involvement in a crime.

Moreover, the affidavit specifically details Hari's use of phones unrelated to "missions."  For example, paragraph 26 discusses Hari using a phone just the evening before the phone was seized to call coconspirator McWhorter.  Gov't Exh. 5, p.12.  Similarly, paragraph 33 states that Hari would call coconspirators prior to going on the "missions."  *Id.*, p. 16.  Paragraph 34 almost entirely discusses Hari's use of phones.  For example, that Hari "has phones" and would contact people by having them call him back or Hari added extract digits when dialing a phone to contact people.  *Id.* p. 16.  The search of Hari's cell phone would corroborate these calls and establish communications between coconspirators.  This type of evidence alone is enough to establish probable cause in the affidavit.

The affidavit, however, contained additional facts supporting probable cause and a nexus to phones to believe evidence would be on Hari's phone.  In several paragraphs, the affidavit noted conduct that could have been done using a cell phone.  For example, paragraph 14 details that the anonymous tip concerning J.O. was sent by *email*; paragraph 15 states that the *IP address* was sent using a proxy; paragraph 18 references the use of *Facebook*; paragraph 34 discusses that Hari has a proton *email account* which masks the IP address.  *Id.* pp. 6, 7, 8, 16.

The United States Supreme Court decision in *Illinois v. Gates* requires this warrant affidavit to be viewed in light of the totality of the circumstances and to accord due deference to the judge who issued it.  Applying those standards here compels a finding that the court had a reasonable basis to conclude that there was probable cause to believe crimes were committed, that there was a connection between these crimes and the defendant and that evidence would be found on the cell phones.  The facts detailed in the affidavit, indeed all the affidavits, far exceeds the "fair probability" standard required by the Fourth Amendment and the issuing judge's determination in that regard should be accorded deference.

## III.    OFFICERS EXECUTED THE SEARCH WARRANTS IN GOOD FAITH.

Even if the warrant was found to lack probable cause, the evidence should not be suppressed due to the application good-faith exception to the exclusionary rule as set forth by *United States v. Leon*, 468 U.S. 897  (1984) and its progeny. When violations of the warrant requirement occur, the Exclusionary Rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Leon*, 468 U.S. at 906. The Exclusionary Rule is not to "be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral magistrate judge's determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid." *United States v. Taylor*, 119 F.3d 625, 629 (8th Cir.1997) (citing *Leon*, 468 U.S. at 905, 922).

The Supreme Court's rationale for the good-faith exception is that it is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.   In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.   Once the warrant issues, there is literally nothing more the police officer can do in seeking to comply with the law.   Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.   *Leon*, 468 U.S. at 921 (internal quotation and citation omitted). "The Exclusionary Rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916.

"[S]uppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *United States v. Hessman*, 369 F.3d 1016, 1021 (8th Cir. 2004) (citing *Leon*, 468 U.S. at 918).   The good-faith exception does not exclude evidence when an officer's reliance on a warrant issued by a judge or magistrate is objectively reasonable.   *Leon*, 468 U.S. at 922.

An officer's reliance is not objectively reasonable, and the good-faith exception does not apply, in four limited circumstances, none of which is present here: (1) when the issuing judge is misled by information that is false or made in reckless disregard for the truth; (2) when the issuing judge completely abandons her judicial role; (3) when the information provided to the judge includes so little indicia of probable cause that the officer's belief in

its existence is entirely unreasonable; and (4) when the warrant is so facially deficient, i.e., in failing to particularize the place to be searched or the things to be seized, that the executing officer cannot reasonably presume it to be valid. *Id.* at 923; *see also Hessman*, 369 F.3d at 1020 (noting these four situations).

The first exception is not applicable.  Hari attempts to bootstrap his motion for a *Franks* hearing into a claim that this first *Leon* exception applies.  In his motion for a *Franks* hearing and the hearing held on that motion, Hari aired fully his allegations about Detective Sergeant Robbins's veracity.  In denying the motion for a *Franks* hearing, the magistrate judge declined to adopt any of those allegations.   Outside of the *Franks* hearing context, there is likewise no indication whatsoever that the affidavit contained information that was either false or made in reckless disregard for the truth.

The second exception is also inapplicable.  Under the second exception, the issuing judge abandons his judicial role when he serves as a mere "rubber stamp" or an "adjunct law enforcement officer." *Leon*, 468 U.S. at 914. The Fourth Amendment's warrant requirement ensures that there is a neutral and detached magistrate who makes a probable cause determination and stands between the citizens and the officers who are "engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14  (1948).  For example, one way an issuing judge acts as a rubber stamp is when the affidavit lacks probable cause and the judge issues the warrant without question or hesitation. *See United States v. Swift*, 720 F. Supp. 2d 1048, 1058–59 (E.D. Ark. 2010). The affidavit here was thorough and detailed.  It contained a summary of investigative efforts spanning multiple crimes and jurisdictions.  It was not a conclusory or boilerplate

application, but rather alleged specific facts supporting the affiant's reasonable belief that there was probable cause to search each place.

The third exception to *Leon* is likewise inapplicable.  Under the third circumstance for refusal to apply the good-faith exception, "[e]vidence should be suppressed only if the affiant-officer could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Gibson*, 928 F.2d 250, 254 (8th Cir.1991) (citing *Leon*, 468 U.S. at 921–23). The *Leon* inquiry "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal" in light of all of the circumstances. *Leon*, 468 U.S. at 922 n.23.  This rule was not fashioned to provide incentives for detectives to write better search warrants, but "to deter unlawful police conduct" by suppressing evidence gained from a search the officer knew to be unconstitutional. *Id.* at 918–19.

Here, there is nothing to indicate that a reasonably well-trained officer such as Detective Sergeant Robbins would have believed this affidavit failed to establish probable cause, which again is a common-sense analysis dependent upon examination of the totality of the circumstances.  To the contrary, this affidavit set forth in painstaking detail the facts and circumstances connecting the defendant to multiple crimes with several coconspirators. Any reasonably trained officer in Detective Sergeant Robbins's position would have believed this warrant was valid.

Likewise the fourth circumstance, when the warrant is so facially deficient, in failing to particularize the place to be searched or the things to be seized, that the executing officer cannot reasonably presume it to be valid, is inapplicable.   The warrant applications

specified very specific items of evidence to be seized from the locations that were related to the facts set forth in the affidavit.  The warrant, on its face, was specific, particularized and supported by a lengthy investigation.  Any reasonable officer would have believed it to be valid.

## CONCLUSION

For all the reasons explained above, Defendant Hari's motion to suppress evidence and motion to reconsider the *Franks* ruling should be denied.

Respectfully Submitted,

Dated: September 23, 2019

ERICA H. MacDONALD
United States Attorney

*s/ Julie E. Allyn*

BY: JULIE E. ALLYN
Assistant U.S. Attorney
Attorney ID No. 256511

*s/ John Docherty*

BY: JOHN DOCHERTY
Assistant United States Attorney
Attorney ID No. 017516X