# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>     Plaintiff,<br><br>v.<br><br>Michael Hari (01),<br><br>     Defendant. | Case No. 18-cr-0150(01) (DWF/HB)<br><br><br>**REPORT AND<br>RECOMMENDATION** |

James S. Becker and Shannon R. Elkins, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, for Defendant Michael Hari

John Docherty and Julie E. Allyn, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415; and Timothy Visser, Department of Justice, Civil Rights Division, 950 Pennsylvania Avenue Northwest, Washington, DC 20530; for the United States of America

HILDY BOWBEER, United States Magistrate Judge

   This case is before the undersigned United States Magistrate Judge on Defendant

Michael Hari's Motion to Suppress Fruits of Unlawful Search and Seizure [Doc.

No. 93].[1]  The motion was referred to the undersigned for a report and recommendation

pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1.  The Court

held a hearing on the motion on August 8, 2019.  Hari filed a post-hearing memorandum

---

[1]  At the motion hearing on August 8, 2019, Defendant Michael Hari represented that his Motion to Suppress Eyewitness Identifications [Doc. No. 85] and Motion to Suppress Statements [Doc. No. 89] were moot and could be denied as moot.  Accordingly, the Court recommends that those motions be denied as moot.

in support of the motion [Doc. No. 129][2] on September 5, 2019, and the Government

filed a post-hearing memorandum in opposition to the motion [Doc. No. 133] on

September 23, 2019, at which time the Court took the motion under advisement. For the

reasons set forth below, the Court recommends that the motion be denied.

## I.    Background

### A.    Allegations in the Indictment

On June 20, 2018, Defendant Michael Hari ("Hari") was charged by Indictment

with four counts: (1) Intentionally Defacing, Damaging, and Destroying Religious Real

Property Because of the Religious Character of that Property, in violation of 18 U.S.C.

§ 247(a)(1) and 18 U.S.C. § 2 ("Count 1"); (2) Intentionally Obstructing, and Attempting

to Obstruct, by Force and the Threat of Force, the Free Exercise of Religious Beliefs, in

violation of 18 U.S.C. § 247(a)(2) and 18 U.S.C. § 2 ("Count 2"); (3) Conspiracy to

Commit Federal Felonies by Means of Fire and Explosives, in violation of 18 U.S.C.

§ 247(a)(2) ("Count 3"); (4) Carrying and Using a Destructive Device During and in

---

[2]  Hari's memorandum is captioned "Defendant's Memorandum in Support of Motion to Suppress Fruits of Unlawful Search and Seizure *and Reconsider the Motion for a Franks Hearing*." (Def.'s Mem. at 1 [Doc. No. 129] (emphasis added).) This Court denied Hari's motion for a *Franks* hearing [Doc. No. 93] in an oral order issued on August 8, 2019. (Mot. Hr'g Tr. at 39:17–44:17 [Doc. No. 127]; *see* Ct. Mins. [Doc. No. 118].) To the extent Hari intended to ask this Court to reconsider its ruling, Hari has not filed a motion for reconsideration. But even if Hari had properly moved for reconsideration, he has provided no new evidence or argument that would warrant reconsideration. To the extent Hari intended to appeal this Court's ruling on his motion for a *Franks* hearing, that is a matter for the District Court. *See United States v. Mays*, No. 19-CR-0075 (ECT/HB), 2019 WL 4565636, at *1 (D. Minn. Sept. 20, 2019) (determining that a motion for a *Franks* hearing is non-dispositive and reviewing the magistrate judge's order for clear error).

Relation to Crimes of Violence, in violation of 18 U.S.C. § 924(c)(1)(B)(2) and

18 U.S.C. § 2 ("Count 4"); and (5) Possession of an Unregistered Destructive Device,

in violation of 26 U.S.C. §§ 5845(a) and 5861(d), and 18 U.S.C. § 2 ("Count 5").  (*See*

Indictment [Doc. No. 14].)

Count 1 of the Indictment alleges that on August 5, 2017, Hari and two other

individuals, Michael McWhorter ("Michael McWhorter") and Joe Morris ("Morris"),

intentionally defaced, damaged, and destroyed the Dar al Farooq Islamic Center in

Bloomington, Minnesota, because of the religious character of that property.  (Indictment

¶ 1.)  Count 1 further alleges that the offense occurred in and affected interstate

commerce and involved the use of a dangerous weapon, fire, and explosives.  (*Id.*)

Count 2 of the Indictment alleges that Hari, Michael McWhorter, and Morris

intentionally used force to obstruct the free exercise of religious beliefs by individuals at

the Dar al Farooq Islamic Center.  (*Id.* ¶ 2.)  Count 2 further alleges that the offense

occurred in and affected interstate commerce and involved the use of a dangerous

weapon, fire, and explosives.  (*Id.*)

Count 3 of the Indictment alleges that Hari, Michael McWhorter, and Morris

conspired to knowingly use fire and explosives to commit the felonies charged in Counts

1 and 2 of the Indictment.  (*Id.* ¶ 3.)  The purpose of the alleged conspiracy was to deface,

damage, and destroy the Dar al Farooq Islamic Center for the purpose of frightening and

intimidating Muslims and interfering with their free exercise of religious liberty.  (*Id.*

¶ 4.)  The Indictment alleges that, as part of the conspiracy, Hari constructed a pipe

bomb, rented a pickup truck in Illinois, and drove with Michael McWhorter and Morris

on August 4 and 5, 2017, from Illinois to Minnesota.  (*Id.* ¶¶ 5–7.)  Along the way, the three men allegedly purchased diesel fuel and gasoline, which they mixed together in a plastic container.  (*Id.* ¶ 8.)  On August 5, 2017, Morris allegedly broke a window of the Dar al Farooq Islamic Center with a hammer and threw the plastic container through the window.  (*Id.* ¶¶ 9, 20.)  Michael McWhorter allegedly lit the fuse on the pipe bomb and threw it through the broken window immediately afterward.  (*Id.* ¶ 10.)  The pipe bomb exploded and ignited the plastic container, which caused blast, fire, and smoke damage to the Dar al Farooq Islamic Center.  (*Id.* ¶ 11.)  Hari allegedly waited in the rented truck, to which Michael McWhorter and Morris immediately returned, and Hari drove out of the parking lot at a high rate of speed and returned to Illinois.  (*Id.* ¶ 12.)

The offense charged in Count 4 of the Indictment is based on the allegation that Hari, Michael McWhorter, and Morris knowingly possessed a pipe bomb during the felonies charged in Counts 1 and 2.  (*Id.* ¶ 25.)  The offense charged in Count 5 is founded on the allegation that the pipe bomb was not registered to Hari in the National Firearms Registration and Transfer Record.  (*Id.* ¶ 26.)

### B.    Hari's Motion to Suppress

Hari filed the motion to suppress evidence on July 18, 2019.  He originally challenged four search warrants for the following properties as lacking in probable cause and relying on stale information:

- 1XX South Main Road, Clarence, Illinois, which is Hari's office.  The search warrant was issued by United States Magistrate Judge Eric I. Long, Central District of Illinois, and executed on March 13, 2018.  The search warrant and

application were admitted as Government Exhibit 1 at the motion hearing.

- 1XX North 1900E Road, Paxton, Illinois, which is Hari's parents' home. The search warrant was issued by Magistrate Judge Long and executed on March 13, 2018. The search warrant and application were admitted as Government Exhibit 2 at the motion hearing.

- 2XX West 1st Street North, Clarence, Illinois, which is Hari's residence. The warrant was issued by Magistrate Judge Long and executed on March 26, 2018. The search warrant and application were admitted as Government Exhibit 3 at the motion hearing.

- U-Haul Storage Unit #227, 3XX East University, Champaign, Illinois. The warrant was issued by Magistrate Judge Long and executed on March 16, 2018. The search warrant and application were admitted as Government Exhibit 4 at the motion hearing.

(*See* Def.'s Mot. Suppress at 1–2 [Doc. No. 93].)

Hari challenged two other warrants as lacking probable cause, containing stale information, and lacking valid consent to search:

- Search warrant for 1XX North 1900E Road, Paxton, Illinois, which Hari's parents' home. This warrant was executed on August 21, 2018. Two electronic devices were seized pursuant to the warrant, and consent-to-search forms were signed by Hari's family members.

- Search warrant for a black ZTE cell phone with a serial number ending in OFC9, which allegedly belongs to Hari. The phone was seized on February 28, 2018, and

the search warrant was obtained on April 4, 2018.  The search warrant and

application were admitted as Government Exhibit 5 at the motion hearing.

(Def.'s Mot. Suppress at 3–4.)

Finally, Hari moved to suppress the seizure and search of a box that UPS delivered

to his home in March 2018.  (Def.'s Mot. Suppress at 4.)  Hari's neighbor gave the

package to law enforcement officers on April 1, 2018.

The Court held a hearing on the motion to suppress on August 8, 2019.  With

respect to the UPS box, the Government indicated it would "not go[] forward on that

consent.  There's nothing much in the way of evidence there."  (Mot. Hr'g Tr. at 52:6–7.)

The Court understands this statement to mean that the Government will not introduce at

trial any evidence obtained as a result of the seizure and search of the box.  In addition,

neither party introduced any evidence or testimony about the seizure and search of the

box.  The Court therefore finds moot this aspect of Hari's motion to suppress and

accordingly will recommend that it be denied as moot.

In Hari's post-hearing memorandum, he abandoned his challenge to the search of

the U-Haul storage unit and the search of his parents' home on August 21, 2018.  (Def.'s

Mem. at 3 n.2 [Doc. No. 129].)  That leaves the following searches and seizures at issue:

(1) 1XX South Main Road, Clarence, Illinois, on March 13, 2018 (Gov't Ex. 1); (2) 1XX

North 1900E Road, Paxton, Illinois, on March 13, 2018 (Gov't Ex. 2); (3) 2XX West 1st

Street North, Clarence, Illinois, on March 26, 2018 (Gov't Ex. 3); and (4) Hari's cell

phone on April 4, 2018 (Gov't Ex. 5).

### III.   Discussion

Hari seeks to suppress evidence obtained from the execution of four search warrants for lack of probable cause, staleness, and lack of nexus to criminal activity.  He also seeks to suppress the warrantless seizure of his cell phone.

### A.   Overview of Applicable Legal Standards

A search warrant must be supported by probable cause, supported by a sworn affidavit, and must describe with particularity the place to be searched and the items or persons to be seized.  U.S. Const. amend IV.  The task of a judge presented with a search warrant is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  As the very term implies, probable cause "deal[s] with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  The affidavit must establish a "nexus . . . between the item to be seized and criminal behavior."  *Warden v. Hayden*, 387 U.S. 294, 307 (1967).  There must also be a nexus between the contraband and the place to be searched.  *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000).

"There is no bright-line test for determining when information is stale."  *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995).  "The passage of time is not necessarily the controlling factor in determining staleness, as other factors, such as the nature of the criminal activity involved and the kind of property subject to the search,

must be considered." *United States v. Gettel*, 474 F.3d 1081, 1086 (8th Cir. 2007) (quotation and internal quotation marks omitted); *see United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999) (stating that "the lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated").

A court reviewing a previous determination of probable cause must give "great deference" to the issuing judge's assessment. *Id.* at 236 (quotation omitted). A reviewing court's task is "simply to ensure that the [issuing judge] had a substantial basis for concluding that probable cause existed." *Id.* at 238–39 (cleaned up). In making such a determination, courts consider the totality of the circumstances. *Id.* at 238. In addition, if the issuing judge "relied solely on the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999) (quotation omitted).

### B.    The Search Warrant for Hari's Office

#### 1.    Relevant Averments in the Supporting Affidavit

FBI Detective Sergeant Barbara Robbins swore out the affidavit in support of the application for the warrant to search Hari's office at 1XX South Main Road, Clarence, Illinois. The following relevant averments are included in the supporting affidavit.

Detective Robbins has particular experience investigating domestic terrorism such as violent crimes and bombings. (Gov't Ex. 1 (Aff. ¶ 1).) The premises at 1XX South Main Road were described as a "store/office" belonging to Hari. (*Id.* ¶ 2.) At that time,

8

Hari had been charged with possession of a machine gun. (*Id.*) Detective Robbins also described the bombing of the Dar al Farooq Islamic Center on August 5, 2017, and a broken window and potential explosive device located inside the Women's Health Practice in Champaign, Illinois, on November 7, 2017. (*Id.* ¶¶ 3–5.)

On December 26, 2017, Ford County Sheriff Mark Doran gave several photographs to the FBI that had been obtained from an individual with "access to everything inside the residence of Hari's parents' home, and who took the photographs." (*Id.* ¶ 6.) The photographs had been taken on approximately December 16, 2017, "at Hari's parents' home in the room that Hari occupies when he is there." (*Id.*) The individual said that Hari "stays at his parents' home quite often because his Clarence home has no running water or electricity." (*Id.*) The individual became a confidential source for law enforcement, referred to as "CS1." (*Id.* ¶ 7.) CS1 told officers that Hari kept guns and bomb-making materials inside his parents' home. (*Id.*) CS1 has no criminal history, and CS1's motivation for cooperating was "that he/she does not want anyone to get hurt." (*Id.*) CS1 was paid $1,000 for his/her information. (*Id.*)

On January 27, 2018, a second confidential source, "CS2," told law enforcement that Hari, Michael McWhorter, and Morris were responsible for the bombing at the Dar al Farooq Islamic Center and the attempted bombing at the Women's Health Practice. (*Id.* ¶ 8.) CS2 had previously worked for Hari and was recruited by Hari into an organization. (*Id.*) During a meeting of the organization earlier in the day on January 27, 2018, CS2 saw fully automatic firearms, M4s, video jammers, and Tannerite in the group's possession. (*Id.* ¶ 9.) Those items were locked in a safe in Hari's office. (*Id.*)

9

CS2 told investigators that Morris had previously discussed throwing a pipe bomb at a mosque in Minnesota. (*Id.*) Morris said he made the device, and Michael McWhorter threw it. (*Id.*) Morris told CS2 he also made the device found at the Women's Health Practice. (*Id.*) Morris told CS2 that the getaway truck was rented in Champaign, possibly at Enterprise Rent-A-Car. (*Id.*)

Investigators obtained records from the Enterprise Rent-A-Car in Champaign showing that Hari rented a black Nissan Frontier crew cab on July 27, 2017, and returned it on August 6, 2017. (*Id.* ¶ 10.) The odometer readings reflected that 3075 miles had been driven; the round-trip distance from Champaign, Illinois, to Bloomington, Minnesota, is 1040 miles. (*Id.*)

On February 13, 2018, CS1 provided photographs of items in Hari's parents' garage, to which Hari had access. (*Id.* ¶ 11.) A copy of *The Anarchist's Handbook*, which contains instructions for manufacturing thermite, and a drill and other tools that could be used to make pipe bombs were included in the photographs. (*Id.*) The device recovered from the Women's Health Practice clinic contained powder with Thermite. (*Id.* ¶ 5.)

An anonymous tip was emailed to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") on February 19, 2018, indicating that a suitcase and gray bag containing explosive devices were located in a shed on property owned by a man described as "J.O." (*Id.* ¶ 12.) The tipster said that J.O. had been buying and storing items such as nail polish remover, battery acid, pipes, wires, and nails to make bombs. (*Id.*) Later that day, investigators searched J.O's property with his consent and

discovered multiple explosive devices in a shed. (*Id.* ¶ 14.) J.O. and his wife disclaimed any knowledge of the devices and said they believed Hari had placed them there. (*Id.*) One of the devices was a pipe bomb attached to a small green propane tank. (*Id.*) CS1 told investigators Hari possessed multiple small green propane tanks in 2008 and confirmed the propane tank recovered from J.O.'s property looked similar to the ones Hari had ten years earlier. (*Id.* ¶ 15.)

On February 19, 2018, CS2 took screenshots of a Facebook post by Michael McWhorter, stating, "Clarence gonna be on the news again . . . ." (*Id.* ¶ 16.) Another user commented, "Mike Hari?" (*Id.*) The next day, CS2 consensually recorded a conversation involving Hari, Morris, and Michael McWhorter. (*Id.* ¶ 17.) Morris commented about the "bang bangs," and Hari agreed with CS2 that the comment "was a little out of place." (*Id.*) Hari then said, "Well, I think we are in a friendly crowd, and we moved that stuff already anyway," and "There is nothing illegal in our vault." (*Id.*)

On February 27, 2018, investigators canvassed J.O.'s neighborhood and interviewed several people, including Michael McWhorter's brother ("Herbert McWhorter"),[3] who said Hari and Morris left a bag at his house a few days earlier. (*Id.* ¶ 18.) Investigators obtained Herbert McWhorter's consent to search his residence and located a bag containing four shotguns and four assault rifles. (*Id.*) Three of the assault rifles were tested and deemed to be fully-automatic. (*Id.*) Investigators also recovered a

---

[3] Michael McWhorter's brother is identified later in this Report and Recommendation as Herbert McWhorter, and the Court will refer to him by his name in the interest of clarity and consistency.

gun case, a green plate carrier with soft armor, and a bandolier with 12-gauge bullets. (*Id.*)

While the investigators were interviewing Herbert McWhorter on his front porch, Hari arrived at the scene and said he wanted to speak with Herbert McWhorter. (*Id.* ¶ 19.) Detective Robbins told Hari he (Hari) could come back later. (*Id.*) Hari then asked Herbert McWhorter where "EJ" was. (*Id.*) Investigators knew "EJ" to be Ellis Mack ("Mack"). (*Id.*) Herbert McWhorter told Hari that EJ was at Michael McWhorter's house. (*Id.*) Hari then looked into the front door of Herbert McWhorter's residence for about five seconds before departing and driving to Michael McWhorter's house. (*Id.*)

Herbert McWhorter then told investigators that he, Hari, and Morris were at Hari's office about a month earlier when Hari asked if they wanted "to see some science stuff." (*Id.* ¶ 20.) Hari poured some fluid in the snow on the doorstep of the office and placed a piece of wire inside the fluid. (*Id.*) After a few minutes, the fluid ignited and burned for two to three minutes. (*Id.*) On another occasion at the office, Hari removed two containers, one with a white powdery substance and one with red. (*Id.* ¶ 21.) Hari scooped some red powder into a fire, hoping it would ignite, but it did not. (*Id.*) Morris said the powder should have burned "really hot." (*Id.*) A couple of days later, at the office, Herbert McWhorter saw Hari and Morris cleaning the weapons they later took to Herbert McWhorter's house. (*Id.* ¶ 22.) Hari said they weapons were "lightly modified, two are semi-auto and one is fully auto." (*Id.*)

On February 28, 2018, investigators interviewed Michael McWhorter's wife, Josie

McWhorter, and her minor daughter. (*Id.* ¶ 23.) Josie McWhorter said she had last communicated with Michael McWhorter the day before, when he called from Mack's phone. (*Id.*) Josie McWhorter told Michael McWhorter the FBI wanted to speak with him and asked where he was. (*Id.*) Michael McWhorter replied, "I can't tell you. I love you." (*Id.*) The daughter said she had been at her home at the time of the consensual search the day before at Herbert McWhorter's home, and that Hari had also been there. (*Id.* ¶ 24.) Hari told the daughter not to speak to the officers, and he went in and out of the house. (*Id.*) Hari eventually pushed Mack out the door and said, "Let's go for a ride." (*Id.*) Josie McWhorter gave Detective Robbins three cellular phones that she said belonged to Hari, Michael McWhorter, and Morris. (*Id.* ¶ 25.) She said the black ZTE phone belonged to Hari and that he unintentionally left it behind because he was in a rush to leave. (*Id.*)

During an interview on March 10, 2018, Michael McWhorter initially denied any knowledge of explosive or incendiary devices. (*Id.* ¶ 26.) However, Michael McWhorter later said Hari had four shotguns and four assault rifles, three of which were illegal. (*Id.*) Michael McWhorter said he helped Hari alter the rifles with a drill so that they would be fully automatic. (*Id.*) Michael McWhorter said that happened at Hari's parents' house in the garage. (*Id.*) According to Michael McWhorter, the weapons were stored in a vault in Hari's office. (*Id.*)

Michael McWhorter then admitted to his participation in the attempted bombing at the Women's Health Practice and the bombing at the Dar al Farooq Islamic Center. (*Id.* ¶¶ 27–28.) He described Hari's and Morris's involvement as well. (*Id.* ¶¶ 27–28.)

Michael McWhorter provided numerous details about the rental vehicles, how the devices were manufactured and detonated, transportation logistics, and the men's respective roles.  (*Id.* ¶¶ 27–28.)

Michael McWhorter also admitted that he, Hari, and Morris had planted the explosive devices on J.O.'s property for the purpose of getting J.O. into trouble before a court hearing, and that Hari had emailed the tip to the ATF.  (*Id.* ¶ 30.)  Michael McWhorter further admitted to participating in a home invasion, robbing three Wal-Mart stores, and shooting automatic weapons outside Paxton with Hari, Morris, and Mack.  (*Id.* ¶¶ 26, 29.)

Investigators interviewed Mack on March 10, 2018.  (*Id.* ¶ 31.)  Mack confirmed that he had shot automatic weapons, participated in a home invasion, and robbed a Wal-Mart with Hari, Morris, and Michael McWhorter.  (*Id.* ¶¶ 31–32.)

### 2.    Nexus

Hari alleges the search warrant affidavit for his office did not establish a nexus between his office and the alleged criminal activity.  The Court disagrees.  The affidavit contains the following facts to establish the requisite nexus.  CS2 told investigators in January 2018 that Hari, Michael McWhorter, and Morris bombed the Dar al Farooq Islamic Center and attempted to bomb the Women's Health Practice.  CS2 had seen fully automatic firearms, M4s, video jammers, and Tannerite in Hari's possession and said they were kept in a safe in Hari's office.  Herbert McWhorter told investigators in February 2018 that he saw Hari attempt to ignite fluid and a wire on the doorstep of his office about a month earlier.  Herbert McWhorter also saw Hari attempt to ignite a red

14

powdery substance at the office.  Finally, Herbert McWhorter told investigators he saw Hari and Morris cleaning two semiautomatic and one fully automatic weapon at the office.

The Court concludes that this specific information, considered in the totality of all the other facts in the affidavit, established that a search of Hari's office would likely result in the discovery of evidence of the alleged criminal activities under investigation. Investigators were not required to credit Hari's recorded self-serving statements that "we moved that stuff already anyway" and "[t]here is nothing illegal in our vault."  (*Id.* ¶ 17.) But even if the guns had been removed from the office by the time the search warrant was executed in March 2018, there was still evidence that Hari had at one time used his office to store contraband and evidence of illegal activity, and it was reasonable to believe that evidence such as the video jammers, Tannerite, and ignitable fluid, wire, and powders could still have been present there.

### 3.    Staleness

Hari next argues that information contained in the search warrant affidavit for his office was stale.  He observes that although Herbert McWhorter said he saw Hari in January 2018 with chemicals and weapons at his office, Herbert McWhorter told investigators in February 2018 that Hari had moved his firearms and other contraband from the office.  In addition, two months passed between January 2018 and when the warrant was executed in March 2018.

Hari overlooks, however, that Herbert McWhorter reported seeing Hari attempt to ignite fluid, wire, and powder on two occasions only about a month before the search

warrant was executed. Moreover, considering all of the facts in the affidavit together, it would be reasonable to infer that that office was a primary and frequent location for Hari and members of his alleged "organization" to meet and discuss the criminal activities under investigation, store and clean guns, and store and test materials for making bombs. Considering the nature of the criminal activities under investigation, the items stored in the office, and the recurrent association of office with criminal activity, the Court finds the information linking the office to criminal activity was not stale.

### C.    The Search Warrant for Hari's Parents' Home

The affidavit submitted in support of the search warrant for Hari's parents' home at 1XX North 1900E Road, Paxton, Illinois, is materially indistinguishable from the affidavit submitted in support of the search warrant for Hari's office, and the same information is included in the same numbered paragraphs. (*See* Gov't Exs. 1, 2.) Therefore, the Court incorporates by reference the averments recounted in Part III.B.1 above.

Hari first argues that the search warrant for his parents' home was not supported by probable cause because "familial relations" and his "mere presence" at the home do not establish a nexus between the location and criminal activity. (Def.'s Mem. at 18.) The Government responds that Hari has not shown a reasonable expectation of privacy in his parents' home and thus he lacks standing to challenge the search of that home.

"Fourth Amendment rights are personal rights that may not be asserted vicariously." *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004). "[A] defendant must demonstrate that he personally has an expectation of privacy in the place

searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).

Here, Hari has not claimed, much less shown, a reasonable expectation of privacy in his parents' home. (*See* Def.'s Mem. at 18–22.) He has evaded his burden entirely. The Court suspects why. If Hari argues he had a reasonable expectation of privacy in his parents' home because he stayed there frequently, he will have established more of a connection to the residence than "familial relations" and "mere presence" would otherwise allow. But the Court cannot ignore the statements of CS1, as set forth in the affidavit, that Hari occupied a certain room in his parents' house when he stayed there and that "while Hari has his own place in Clarence, Illinois, he stays at his parents' home quite often because his Clarence home has no running water or electricity." (Gov't Ex. 2 (Aff. ¶ 6).) CS1 also told investigators that Hari kept guns and bomb-making materials in his parents' home. (Aff. ¶ 7.) CS1's statements indicate that Hari was a frequent overnight guest at his parents' home, that he stayed in the same room when he slept overnight, and that he kept some possessions there. The Court finds this is enough to establish a reasonable expectation of privacy in the room where Hari "quite often" slept, although not in the remainder of his parents' house and property.

The Court now returns to Hari's argument that "familial relations" and his "mere presence" at his parents' home do not establish a nexus between the home and criminal activity. This argument fails to account for the averments in the affidavit that Hari

occupied a certain room in his parents' house when he stayed there, that he stayed at his

parents' house "quite often," and that he kept guns and bomb-making materials there.

Additionally, CS1 told investigators in mid-February 2018 that Hari had access to his

parents' garage, and CS1 gave the investigators photos he had taken inside the garage of

*The Anarchist's Handbook*, which included instructions for making Thermite, and tools

such as a drill that could be used to make bombs.  (Aff. ¶ 11.)  On March 10, 2018,

Michael McWhorter told investigators that he had helped Hari drill an assault rifle so that

it would shoot fully automatically and that the drilling took place in Hari's parents'

garage.  (Aff. ¶ 26.)  The Court finds that the above averments establish a nexus between

the parents' home and the crimes under investigation, which included not only the Dar Al

Farooq bombing but also possession of a machine gun.  (Aff. ¶ 2.)

      Hari next contends the information in the search warrant affidavit was stale.  The

Court disagrees.  CS1 provided information about Hari's connection to the home in

December 2017 and mid-February 2018, and Michael McWhorter provided information a

mere three days before the search warrant was issued.  Although the affidavit does not

include the dates the rifles were drilled or the dates the photographs were taken, there is

no reason to believe this activity did not occur close in time to when CS1 and Michael

McWhorter provided the information.  There is also no reason to believe Hari had ceased

sleeping overnight at his parents' home.

### D.    The Search Warrant for Hari's Residence

      The first 32 paragraphs of the affidavit submitted in support of the search warrant

for Hari's residence are materially indistinguishable from the affidavit submitted in

support of the search warrant for Hari's office and his parents' home, and the same

information is included in the same numbered paragraphs. (*See* Gov't Exs. 1, 2, 3.)

Therefore, the Court incorporates by reference the averments recounted in Part III.B.1

above, as supplemented by Part III.C above. The affidavit submitted in support of the

warrant for Hari's residence includes the following additional relevant facts. Michael

McWhorter told investigators during an interview on March 13, 2018, that he and Hari

had traveled to a gun shop in Indiana and purchased about 10 pounds of black powder.

(Gov't Ex. 3 (Aff. ¶ 33).) Hari said he had burned some of the black powder later used to

make the Minnesota incendiary device in the fireplace of his residence. (*Id.*)

Hari first argues that the search warrant affidavit did not establish a nexus between

his home and criminal activity. He observes that the only explicit connection to his

residence was Michael McWhorter's statement to investigators that Hari had burned

some black powder in his fireplace. A judge presented with a warrant, however, "may

draw reasonable inferences from the totality of the circumstances in determining whether

probable cause exists . . . ." *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir.

2000). Given the totality of the circumstances described in the affidavit, including the

black powder Hari allegedly had at his residence at one time, the Court finds it would be

reasonable to infer that Hari would have had contraband or evidence related to the

criminal activity under investigation at his residence. *See United States v. Carpenter*,

341 F.3d 666, 671 (8th Cir. 2003) (where the affidavit contained no nexus between a

residence and suspected contraband, finding "[a]s a matter of common sense, it is logical

to infer that someone in possession of valuable contraband would store that contraband in

19

a safe, accessible location such as his or her residence").

Hari next asserts that the information in the search warrant affidavit was stale. The Court disagrees. In light of the brief amount of time after Michael McWhorter gave critical information to investigators, the nature of the crimes under investigation, the kind of property to be seized, and the close connection between Hari and his residence, the Court finds the information in the affidavit was not stale.

Finally, Hari submits the search warrant was based on evidence that was obtained unlawfully from his office and his parents' home. The Court has already determined that those prior searches and seizures were lawful, however, and thus no evidence should be suppressed on this basis.

### E.     Hari's Cell Phone

Hari challenges both the warrantless seizure of his cell phone from Josie McWhorter's home and the subsequent search of the phone pursuant to a warrant.

#### 1.     The Warrantless Seizure of the Phone

##### a.     Relevant Facts

FBI Special Agent Joel Smith received a tip from the ATF on February 19, 2018, that explosive devices, pipes, wires, nail polish remover, and other chemicals were located in a shed owed by J.O. (Mot. Hr'g Tr. at 57:12–20.) When a bomb squad searched the shed and located the devices and materials, J.O. told them he believed Hari had placed the items there. (*Id.* at 59:13–14, 60:3–6.) Agent Smith initiated a neighborhood canvass on February 27, 2018, to determine who had placed the explosives in the shed. (*Id.* at 61:13–16.) During the canvass, Agent Smith spoke with Herbert

20

McWhorter, who eventually consented to a search of his house. (*Id.* at 63:18–21, 69:14–17.) Herbert McWhorter said that Hari and Morris had a bag at his house a few days earlier. (*Id.* at 69:22–70:3.) Herbert McWhorter showed Agent Smith a large black duffle bag, a hard gun carrying case, a plate carrier (body armor), and a bandolier. (*Id.* at 69:13–24.) Agent Smith found four shotguns and four AR-15 type weapons in the duffle bag and gun case. (*Id.* at 71:6–7.)

As Agent Smith and Herbert McWhorter continued talking on the porch, Hari drove up, exited the car, asked to speak to Herbert McWhorter, and asked Herbert McWhorter where Mack was. (*Id.* at 75:5–76:4.) Herbert McWhorter said Mack was at Josie McWhorter's house. (*Id.* at 76:6–7.) Josie McWhorter is married to Michael McWhorter, and she is Ellis Mack's mother. (*Id.* at 57:9–10; 76:12–14.)

Hari left and drove to Josie McWhorter's house. (*Id.* at 78:7–14.) Another officer conducting surveillance saw Hari make two trips from the house to his vehicle. (*Id.* at 79:20–22.) Hari then left the house with Mack. (*Id.* at 80:8–10.)

Later than night, Agent Smith spoke with Josie McWhorter on the phone. (*Id.* at 85:8–13.) She was upset and said that Hari had taken her son, Mack. (*Id.* at 86:9–13.) Josie McWhorter agreed to an interview the next day at her house. (*Id.* at 86:22–87:6.)

The following day, Josie McWhorter told Agent Smith that her husband had called the night before from Mack's phone and said he could not tell her why they left. (*Id.* at 87:15–19.) He was with Hari, Morris, and Mack. (*Id.* at 88:1–2.) None of the four men showed up for work on the day of the interview. (*Id.* at 88:3–11.) Josie McWhorter was distraught and said they had "fled." (*Id.* at 89:12–19.) She told Agent Smith that she had

three phones at her residence "if you want them." (*Id.* at 92:18–25.) Josie McWhorter

retrieved the phones from a location in the same room in which they were talking and

gave them to Agent Smith. (*Id.* at 93:11–15.) She said Hari had probably left his phone

there unintentionally because he was in a rush to leave. (*Id.* at 95:17–18.) Agent Smith

believed Hari left the phone because he knew law enforcement would be able to track his

cell phone. (*Id.* at 124:21–125:1.) Agent Smith took the phones with him and left a

receipt. (*Id.* at 96:7–13.) By that time, about 20 to 24 hours had passed since Hari left

his phone at Josie McWhorter's house. (*Id.* at 98:8–10.)

Agent Smith believed Hari and the others had fled for fear of being prosecuted for

the weapons that were discovered at Herbert McWhorter's house. (*Id.* at 99:2–10.) He

knew that Hari had fled before during a child custody dispute. (*Id.* at 103:23–104:1.)

Michael McWhorter later told Agent Smith that they fled on February 27 because they

knew their fingerprints could be on the weapons. (*Id.* at 112:1–2.) Agent Smith took the

phones from Josie McWhorter's house because he did not want evidence on the phones to

be altered or destroyed. (*Id.* at 103:3–5.) Agent Smith believed Hari had used his phone

to plan and conduct the criminal activity under investigation, plan his escape, and

navigate to the location of the Dar al Farooq Islamic Center. (*Id.* at 100:3–15, 101:10–

102:21.) Neither Hari nor Josie McWhorter ever asked for the phones back. (*Id.* at

105:11–21.)

### b.    Abandonment

Hari argues that his cell phone was seized unlawfully when Josie McWhorter gave

it to Agent Smith.  He denies he abandoned the phone in the McWhorters' home.

"It is well-established that a defendant does not have a reasonable expectation of privacy in abandoned property."  *United States v. Crumble*, 878 F.3d 656, 659 (8th Cir.), *cert. denied*, 139 S. Ct. 187 (2018).  "Whether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent."  *United States v. Tugwell*, 125 F.3d 600, 602 (8th Cir. 1997).  Only objective information known to the officers at the time of the search is relevant.  *Id.*  Two key factors are "denial of ownership and physical relinquishment of the property."  *Crumble*, 878 F.3d at 659 (quotation omitted).

The Court finds the first factor is neutral: Hari neither denied nor claimed ownership of the phone at the time it was seized.  As to the second factor, "a person does not abandon his property merely because he gives it to someone else to store."  *United States v. James*, 353 F.3d 606, 616 (8th Cir. 2003).  However, if the owner does not instruct the other person to destroy, store, safeguard, or care for the item, but simply leaves it behind, such objective facts would support a finding that the item was abandoned.  *United States v. Nowak*, 825 F.3d 946, 949 (8th Cir. 2016).  Here, Hari did not give any instructions about his cell phone to Josie McWhorter, otherwise indicate an intention that she safeguard it or keep it private, or indicate that he wanted the phone back.

Other information known to Agent Smith also supports a finding of abandonment. Hari knew that law enforcement officers had recovered the guns stored at Herbert McWhorter's house.  Hari quickly gathered some items from the McWhorters' house and

left with Mack. Mack's mother, Josie McWhorter, was distraught and told Agent Smith

that Hari had taken Mack. Twenty to twenty-four hours later, Hari, Michael McWhorter,

Morris, and Mack had not returned to the McWhorters' house, contacted her about the

phones, or reported to work. On balance, the Court finds that Hari abandoned his phone.

Consequently, he relinquished his expectation of privacy in the phone and cannot

challenge the legality of the seizure under the Fourth Amendment.

### c.    Exigent Circumstances

Alternatively, the Court finds that exigent circumstances justified the seizure of

Hari's phone. "Where law enforcement authorities have probable cause to believe that a

container holds contraband or evidence of a crime, but have not secured a warrant," an

office may seize the item "pending issuance of a warrant to examine its contents, if the

exigencies of the circumstances demand it or some other recognized exception to the

warrant requirement is present." *United States v. Place*, 462 U.S. 696, 701 (1983). An

officer's intention to avoid the destruction or tampering of evidence is a valid reason to

temporarily seize evidence while a warrant is obtained. *See United States v. Clutter*,

674 F.3d 980, 985 (8th Cir. 2012).

When Agent Smith seized Hari's phone from Josie McWhorter's house, he had

probable cause to believe there would be evidence of criminal activity on the phone. He

had recently recovered explosive devices from J.O.'s shed that J.O. said had been planted

by Hari, and guns from Herbert McWhorter's house that Herbert McWhorter said Hari

had left there. Herbert McWhorter had told Agent Smith that he saw Hari cleaning the

guns at his office, that Hari kept two clear tubs of white and red powder in his office, and

that Hari ignited some fluid and braided metal on his office steps. (Mot. Hr'g Tr. at 82:14–17, 82:25–83:12.) Agent Smith believed Hari had used the phone to plan and conduct the criminal activity under investigation, plan his escape, and navigate to the location of the Dar al Farooq Islamic Center.

The Court finds that Agent Smith had probable cause to believe Hari's cell phone contained evidence of a crime. Agent Smith further believed that Hari knew about the investigation and could remotely destroy or tamper with the evidence on the phone. Thus, exigent circumstances justified the seizure of Hari's phone until a search warrant could be obtained.

### 2.    The Search of the Phone Pursuant to a Search Warrant

Detective Robbins submitted a search warrant application and affidavit to Magistrate Judge Long on April 4, 2018, for the three cell phones seized from Josie McWhorter's house, including Hari's phone. (Gov't Ex. 5.) Hari challenges the validity of the warrant on the grounds of deficient probable cause, lack of nexus, and staleness.

Nearly all of the facts averred in Detective Robbins' previous affidavits were repeated verbatim in the affidavit provided in support of the warrant for Hari's phone, and the Court incorporates those facts by reference here. Additionally, the supporting affidavit included Michael McWhorter's statement that before a "mission," Hari would call Michael McWhorter's phone to arrange a meeting at Hari's office. (Gov't Ex. 5 (Aff. ¶ 33).) Michael McWhorter said that he, Hari, and Morris either did not bring their phones on their missions or turned them off to block the signal. (*Id.*) Michael McWhorter said that Hari used phones but either had people call him back or used extra

digits when dialing.  (*Id.* ¶ 34.)  The affidavit also described how law enforcement seized Hari's phone.  (*Id.* ¶ 35.)

Hari argues the affidavit lacked probable cause and a nexus between the phone and criminal activity because the affidavit specified that Hari turned off his phone before going on a "mission" to block its signal, thus "negating any inference that incriminating information would be found on the phone[]."  (Def.'s Mem. at 31.)  However, the fact that Hari turned off his phone to block the signal during a "mission" adds to probable cause and nexus, rather than negates them; that is, a pattern of lack of phone usage or no phone signal during the precise time a crime occurred could be evasive behavior indicating involvement in the crime.  Furthermore, Hari's argument overlooks averments in the affidavit that Hari used a phone to call Michael McWhorter the night before the phone was seized (Gov't Ex. 5 (Aff. ¶ 26)), that Hari called Michael McWhorter before missions to schedule meetings, and that Hari used phones to communicate with others. The Court finds the affidavit set forth adequate probable cause and described a nexus between the phone and criminal activity.

Hari argues the information in the affidavit was stale because the only date associated with his phone was a "mission" to Champaign, Illinois, on November 7, 2017. This argument fails to account for Hari's phone call to Michael McWhorter the night before the phone was seized and the seizure of the phone from the McWhorters' house on February 28, 2018.  Thus, the information in the affidavit was not stale.

### F.    The *Leon* Good Faith Exception

Finally, even if one or more of the search warrants were invalid, the Court finds

that the good-faith exception to the exclusionary rule established in *United States v. Leon*,

468 U.S. 897, 922 (1984), would apply. Hari has not shown that the judge who issued

the warrants "was misled by information in an affidavit that the affiant knew was false or

would have known was false except for his reckless disregard of the truth," or that that

the issuing judge "wholly abandoned his judicial role." *See id.* at 923. Nor were the

affidavits so lacking in probable cause that reliance on them was objectively

unreasonable, or the warrants so facially deficient that their validity could not be

presumed. *See id.*

## IV.    Recommendation

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Defendant Michael Hari's Motion to Suppress Fruits of Unlawful Search
   and Seizure [Doc. No. 93] be **DENIED**, except as to the UPS box delivered
   to Hari's home in March 2018, which should be **DENIED AS MOOT**;

2. Defendant Michael Hari's Motion to Suppress Eyewitness Identifications
   [Doc. No. 85] be **DENIED AS MOOT**; and

3. Defendant Michael Hari's Motion to Suppress Statements [Doc. No. 89] be
   **DENIED AS MOOT**.


Dated:  October 21, 2019                   s/ *Hildy Bowbeer*
                                           HILDY BOWBEER
                                           United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in D. Minn. LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.