UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 18-150(1) (DWF/HB) |
| | ) | |
| v.          Plaintiff, | ) | |
| | ) | **DEFENDANT'S OBJECTIONS TO THE** |
| | ) | **REPORT & RECOMMENDATION** |
| MICHAEL HARI, | ) | **REGARDING A *FRANKS* HEARING** |
| | ) | **AND THE SUPPRESSION OF** |
| Defendant. | ) | **EVIDENCE** |
| | ) | |

## I.      INTRODUCTION

Defendant Michael Hari submits these Objections to the Magistrate Judge's Oral Order from the bench (ECF 118) denying his motion for a *Franks*' Hearing, (ECF 96, 97), and the Report and Recommendation (R&R), (ECF 140), which suggests that the Court deny all of his motions to suppress, (ECF 93).

## II.      BACKGROUND

Defendant Michael Hari moved to suppress the search of his home, office, parent's home, and cellular phone on the ground, among others, that the search warrant affidavit was tainted by material omissions and misrepresentations. He moved for a *Franks* hearing on that basis, which the Magistrate Judge denied from the bench.

The relevant factual background for Mr. Hari's motion may be found in Mr. Hari's memorandum of law, (ECF 97), the attached seven exhibits (Exhibits A – G) that accompanied his original motion (ECF 96), and his Memorandum in Support. (ECF 129).

These documents lay out the law, all of the issues with the search warrants, and the legal analysis.

In a Motion to Suppress, Mr. Hari also moved for suppression of direct and derivative evidence procured via a number of search-seizure actions, all based upon different warrants and probable-cause proffers. The Magistrate Judge issued a written R&R recommending denial of these motions.

The relevant factual background for Mr. Hari's motion may be found in his memorandum of law, (ECF 97), along with attached exhibits (Exhibits A – G) and his Memorandum in Support. (ECF 129). Mr. Hari now submits these Objections to the Magistrate Judge's recommendations, summarized above.

## III.   OBJECTIONS

### A.   *Franks* hearing

#### 1.   Legal standard

Upon a "substantial preliminary showing that a false statement knowingly, and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," a defendant is entitled to a hearing to pierce the allegations in a search warrant. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). The substantial preliminary showing has two prongs. First, the defendant must show that "the affiant omitted facts with the intent to mislead the issuing judge, or omitted the facts in reckless disregard of the fact that the omissions would mislead," and second, he must show that "the affidavit,

2

if supplemented by the omitted information, could not support a finding of probable

cause." *United States v. Gater*, 868 F.3d 657, 660 (8th Cir. 2017).

> To meet this initial burden and mandate an evidentiary hearing, the
> challenger's attack must be more than conclusory and must be
> supported by more than a mere desire to cross-examine. There must
> be allegations of deliberate falsehood or of reckless disregard for the
> truth, and those allegations must be accompanied by an offer of
> proof. They should point out specifically the portion of the warrant
> affidavit that is claimed to be false; and they should be accompanied
> by a statement of supporting reasons.

*Franks*, 438 U.S. at 171-72. If the defendant can meet these requirements, the Fourth

Amendment requires that a *Franks* hearing be held at the defendant's request.  *Id*. at 171.

### 2.      The *Franks* proffer

In the memorandum in support of a *Franks* hearing (ECF 97) and at the pretrial

motions hearing on August 8, 2019, counsel made a substantial preliminary showing that

false statements were made by the affiant in the search warrant affidavits either

knowingly, intentionally, or with reckless disregard for the truth. To be more specific,

Mr. Hari offered the following by way of proffer:

*(a). Description of Target Vehicle:* The warrant affidavits describe the account of

a claimed eyewitness to relevant events at the Dar al Farooq Islamic Center, *i.e.,*

placement and ignition of an explosive device. (*E.g.,* ECF 97-1 at 2, ¶ 3). In particular,

the affidavit says this witness described having seen the perpetrator flee in a "dark-

colored truck." (*Id.*) In fact, the police reports show this witness described the vehicle in

question as a "full-sized" truck. (ECF 97 at 5-6). But the vehicle supposedly rented by

Mr. Hari was not a "full-sized" truck at all. (ECF 97 at 5-8). It appears the highly-

pertinent omission was designed to paper over a discrepancy. (*Id.*). And to create the false impression that a rental vehicle tied to Mr. Hari had been seen by eyewitnesses and/or captured on CCTV, which is untrue. (*Id.*).

     *(b). Bias of Confidential Informant:* The affidavits describe the information provided by a confidential informant—referred to as CS1—who claimed that Mr. Hari stored firearms and explosives at the home of Mr. Hari's parents in Illinois. (*See, e.g.,* ECF 97-1 at 3-4). The affidavits say CS1's sole motivation was "that he/she does not want anyone to get hurt." (*Id.*). In reality, CS1 was Mr. Hari's brother, with whom Mr. Hari had a longstanding feud which entailed allegations of criminal trespass, theft, and even physical threats. (*See, e.g.,* ECF 97-7). There was also claimed alteration of photo evidence. (*See id.*) The relationship had deteriorated to such a degree that Mr. Hari sought a court-issued order for protection, backed by police assistance. (*See id.*). Clearly, then, CS1 had ample motive to prevaricate and falsely accuse—and to do so directly to the police, as a perceived eye-for-eye to avenge the prior order for protection. And there was a *modus operandi* of altering photo evidence—such that a reasonable magistrate would question whether photos submitted by CS1 truly depicted things and places as claimed, or whether the photos were doctored to create a false impression. And yet, none of this was mentioned in the affidavits. Rather, the affidavits make the faulty claim that CS1's sole motivation was altruistic in nature. This was untrue. And an accurate recitation of the situation would have altered the probable-cause analysis, to a significant degree.

*(c). Remaining information:* Mr. Hari pointed out the remaining information presented in the affidavits involved accusations of criminal conduct and consisted of another informant's report of a secondhand conversation among Mr. Hari and others, as well as the word of Mr. McWhorter, his brother, and EJ Mack. (ECF 97 at 13-14). But none of this remaining information had a connection to the home of Mr. Hari's parents or other challenged places of search-seizure. (*Id.*)

Hence, the *Franks* memorandum and accompanying exhibits served as an offer of proof as to why the statements were made knowingly, intentionally, or with reckless disregard for the truth. The exhibits, which were known to the affiant at the time the search warrant affidavits were drafted, proved inaccuracies and omissions that were highly relevant to the probable-cause question.

### 3.       Overruling the Magistrate Judge's bench order

The Magistrate Judge essentially invited Mr. Hari to deem its bench order denying a *Franks* hearing as part-and-parcel of the R&R, and to seek this Court's *de novo* review of the question. (*See* ECF 140 at 2 n.2). Indeed, the Magistrate Judge cited *United States v. Mays,* No. 19-cr-75, 2019 WL 4565636 (D. Minn. Sept. 20, 2019), a decision issued by a judicial officer in this district, which thoroughly describes the appropriate procedure to seek district court review of a Magistrate Judge's ruling on a *Franks* motion.[1]

---

[1] Hence, the government is incorrect to suggest that the rules of civil procedure might apply to this question. (*See* ECF 133 at 7).  The government's analogy fails to acknowledge the significance of an individual's Fourth, Fifth and Sixth Amendment rights under the Constitution and their right to due process. Moreover, the *Luger* case cited by the government explains, "Although this court has never had occasion to do so, courts in other Circuits have held that this civil standard applies to motions for reconsideration raised in criminal cases *outside of the suppression context*." *U.S. v. Luger*, 837 F.3d 870, 875 (8th Cir. 2016) (emphasis added). Thus, as the *Luger* Court concluded, the civil procedure for

For the reasons described above, this Court should overrule the Magistrate Judge's bench order, and grant the *Franks* motion. A *Franks* hearing would highlight the above misstatements and omissions found in the warrant affidavits. It would demonstrate why the misstatements and omissions were critical to the ultimate probable-cause determination, resulting in invasive and unconstitutional search-seizure actions. And it would specify which search-seizure actions might be justified by the remaining probable-cause showing set forth in the affidavits, and which search-seizure actions must fail after excising the misstatements and omissions at issue.

Because the Magistrate Judge denied the *Franks* motion from the bench and prior to briefing on the question of probable-cause, the defense lacked a prior opportunity to show how the probable-cause presentation of each challenged warrant stacked up, when the above information was removed from the equation. The remainder of this paper will thus consider each challenged warrant—with and without the above misstatements and omissions in the mix—to show why the probable-cause presentation falls short and why suppression is the correct result.

**B.    Search-seizure at parents' home.**

The R&R recommends that this Court deny Mr. Hari's motion to suppress, with respect to the search-seizure action taken pursuant to a warrant covering the home of Mr. Hari's parents. As shown below, the R&R has reached the incorrect conclusion and this

---

reconsideration is not applicable in the suppression context of criminal cases involving violations of an individual's constitutional rights.

Court should order suppression of any direct and derivative evidence obtained as a result of that flawed warrant and resultant search-seizure.

### 1. Standing and probable cause

Both the government's response brief and the R&R misconstrue the significance of Mr. Hari's mere presence at his parents' home.  Although Mr. Hari frequently slept there and was free to come and go, as CS1 confirms, the analysis for (1) whether a person has "standing" and a reasonable expectation of privacy to challenge a Fourth Amendment violation and (2) whether "probable cause" exists to search for evidence of criminal activity - are two separate issues that require different analysis.

Thus, while an overnight guest has standing to challenge a search in violation of the Fourth Amendment, the overnight guests' mere presence on the property – as a suspect in a criminal investigation – does not give law enforcement the right to enter or search the premises where they slept without first establishing probable cause to a neutral and detached magistrate. *See e.g. Minnesota v. Olson*, 110 S.Ct. 1684 (1990); *Jones v. United States*, 362 U.S. 257 (1960); *Rakas v. Illinois*, 439 U.S. 128 (1978). There still must be a sufficient nexus between the criminal activity and the place to be searched. Simply because Mr. Hari stayed at his parents' home and because he was a suspect in a criminal investigation, did not provide law enforcement a sufficient nexus to search the parents' home.

"Mere presence" at a location or with other individuals is insufficient to establish probable cause. *United States v. Di Re*, 332 U.S. 581, 593 (1948) (invalidating defendant's arrest in a car with other suspects where there was no evidence the defendant was present

or took part in the crime and the informant did not indicate the defendant's role). Where the defendant had a "coming and going" relationship with the owner of a home in which marijuana was found, "[t]o allow probable cause to be established by such a showing would subject [defendant] to arrest for . . . mere presence in an area where criminal activities were allegedly taking place." *United States v. Wynn*, 544 F.2d 786, 789–790 (5th Cir. 1977).

Without more, familial relations do not automatically provide a basis for probable cause. *Walczyk v. Rio*, 496 F.3d 139, 162 (2d Cir. 2007) (concluding a search of the defendant's parents' home was not supported by probable cause where the defendant did not live there and the neighbors had not seen the defendant with contraband there); *Poolaw v. Marcantel*, 565 F.3d 721, 730 (10th Cir. 2009) ("Our sibling circuits [addressing] the question have held that a search warrant resting primarily on a familial relation is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.") (quotations omitted).

Here, CS1 did not allege enough specific information to establish probable cause that the firearms or other random materials in the home of Mr. Hari's parents actually belonged to Michael Hari or if he actually had access to them. Instead, CS1 merely alleged Mr. Hari often stayed at his parents' home. (MH Govt Ex. 2, Affidavit ¶ 6.) Not only did the affidavit fail to show that Mr. Hari was responsible for the materials or knew they were there, but it also failed to show how the contents of the photographs were connected to the reported crimes under investigation. (*Id.* ¶ 7.)

In fact, there was no evidence in the Affidavit to suggest that Mr. Hari had knowledge of the materials found in the garage. Mr. Hari occasionally slept at his parents'

home, but CS1 did not indicate that Mr. Hari ever went into the garage or had anything beyond "access" to the garage. (*Id.* ¶ 11.) To assume that, because Mr. Hari slept there, he would (1) have possession or control over any and all items there, or (2) be guilty of any crimes potentially associated with the items, is to erode the particularized nature of a proper finding of probable cause.

Besides the fact that the search warrant affidavit fails to establish what is suspicious about the contents of the photographs in the garage and the room where Mr. Hari slept, this was not a situation where the alleged contraband was so obviously placed that anyone with a propinquity to the evidence was subject to probable cause for related crimes. This was a house and a garage, not a small car. The firearms (contraband for a felon, but not for a law abiding citizen) were not in a prominent position on the property where anyone would have seen them. Likewise, the items in the garage are not contraband and could have belonged to anyone who had access to the garage.

Mr. Hari's mere presence by occasionally sleeping at his parents' home should not be misconstrued as providing particularized probable cause that Mr. Hari was engaging in criminal activity there. If probable cause is present in this case, then almost any adult child who has keys to their parents' home and visits with any regularity is criminally liable for any books, chemicals, tools or any illegal items in the parents' home.

The remainder of the search warrant affidavit does not pertain to the home of Mr. Hari's parents. Other allegations about Mr. Hari's activities, without a showing of their connection to the house to be searched, provided no substantive additions to the affidavit.

For example, law enforcement did not establish a nexus between the guns found at Mr. McWhorter's brother's home and the home of Mr. Hari's parents. (*Id.* ¶ 18.) In fact, the investigation indicated that Mr. Hari was moving his firearms from the office safe to the home of Mr. McWhorter's brother (where they were recovered), negating probable cause to believe that his firearms would be found anywhere else, including the home of Mr. Hari's parents. (*Id.* ¶ 19.) A lack of probable cause anywhere does not transform into probable cause everywhere, without further particularized knowledge.

The Affidavit does not allege that any illegal guns were stored in the garage or that there would be any reason to find evidence in the garage after Mr. Hari and Mr. McWhorter allegedly drilled the ARs (at some point in history) to make them fully automatic. (*Id.* ¶ 26.) To the contrary, Mr. McWhorter told law enforcement that the ARs they drilled at the home of Mr. Hari's parents were kept in the vault in the office until Mr. McWhorter, himself, took the ARs and shotguns to his brother's home. (*Id.* ¶ 26). Thus, the drilled ARs had already been recovered by law enforcement by the time they sought to search the home of Mr. Hari's parents.

### 2.   Staleness

At base, only three pieces of evidence placed any suspicion at all on the home of Mr. Hari's parents. All were stale, or otherwise indeterminate on the crucial question of temporal proximity. The photographs of the home were taken by CS1 on December 16, 2017. (*Id.* ¶ 6.) The photographs from the garage were provided to law enforcement on Feb. 13, 2018. (*Id.* ¶ 11.) And the search warrant application failed to allege *when* the ARs were drilled by Mr. McWhorter in the garage of Mr. Hari's parents. (*Id.* ¶ 26.)

The search warrant for the parents' home lacked a nexus to criminal activity and any reason to believe that evidence of criminal activity would be stored in the home or garage. The information, which still failed to connect Mr. Hari to any specific criminal activity, was stale. The fruits of the search warrant for the home of Mr. Hari's parents must be suppressed on this additional ground.

### 3.    Informant

"When an affidavit is based in substantial part on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant considerations-but not independent, essential elements-in finding probable cause." *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)(citing *Illinois v. Gates*, 462 U.S. 213, 230 (1983). "The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993) (citing *Draper v. United States*, 358 U.S. 307, 313 (1959).

While the Eighth Circuit has "repeatedly rejected any blanket conclusion that an informant's drug use, pending charges, or cooperation is so suspect that it necessarily vitiates probable cause" the omission of other information that goes to an informant's reliability, veracity, and basis of knowledge  is "highly relevant" to the probable cause determination. *United States v. Ketzeback,* 358 F.3d 987, 991 (8th Cir. 2004) (referencing *United States v. Allen,* 297 F.3d 790, 795-96 (8th Cir. 2002); *United States v. Tyler,* 238 F.3d 1036, 1038-39 (8th Cir. 2001); *United States v. Gladney,* 48 F.3d 309, 315 (8th Cir.1995); *United States v. Wold,* 979 F.2d 632, 634-35 (8th Cir.1995); *United States v. Flagg,* 919 F.2d 499, 501 (8th Cir.1992) (per curiam).

In the case at hand, the Affiant's omissions were reckless at best. CS1 is Michael Hari's estranged brother, J.H., and the two men have had a well-documented antagonistic past. The Affiant was well aware of their history and J.H.'s motive to lie, but omitted these facts, relevant to J.H.'s credibility, from the affidavits. This is particularly troublesome because CS1 provided information and ten photographs in support of searching the home of Michael Hari's parents and included in the search warrant affidavits when his reliability and veracity would have otherwise been in doubt.

### a. Prior Accusations Against One Another

In two January 22, 2018 FBI Reports, seven weeks prior to drafting the search warrant affidavits, the Affiant explained she searched for any law enforcement contacts Michael Hari or his brother, J.H., had in the past.[2] In doing so, the Affiant came upon a Rantoul Police report from December 13, 2016 regarding a call-in bomb threat at Rural King, a business in Rantoul, Illinois.[3]  The reports noted that J.H. (CS1) called local law enforcement and told them his brother, Michael Hari, is a felon in possession of numerous firearms and he thought calling in a bomb threat is something he (Michael Hari) would do.[4]  He also made other irrelevant accusations against Mr. Hari. And Mr. Hari was never questioned, investigated nor charged with anything in Rantoul.

In another FBI report from January 22, 2018, the Affiant noted that Michael Hari's name was ran by the ATF Fairview Heights Office in St. Louis, Missouri on December

---

[2] FBI Report, Case ID# 266S-SI-2476026, B. Robbins, January 22, 2018. (BATES 10108, 10145).
[3] FBI Report, Case ID# 266S-SI-2476026, B. Robbins, January 22, 2018. (BATES 10151).
[4] *Id.*

29, 2016.[5] When the Affiant called the office, she spoke to an agent who advised, "a complaint came in by a family member," but was transferred to the Springfield Division of the ATF.[6] And the Affiant contacted the Springfield office.

The same FBI Report discloses that the Affiant learned of another incident on March 7, 2016 at the Department of Veterans Affairs Medical Center wherein J.H. (CS1) called the police because Michael Hari was trying to get information on him through legal paperwork.[7] Regardless of the reasoning or the truth, the incident is another example of the antagonistic relationship between the two men and another instance where the Affiant was aware that CS1 called police trying to incriminate Michael Hari.

### b.  The Emergency Order For Protection Filed Against J.H.

In a January 2018 FBI report, the Affiant noted, "Following the police report on the [Rantoul] bomb threat Michael Hari, Jr. got an order of protection on [J.H.] for the time period of 02/22/2016 – 03/14/2016."[8] But even this misstates the timing of events.

Well before J.H. called the Rantoul Police Department to implicate Michael Hari in the call-in bomb threat (12/13/2016), and before the ATF tip from a "family member" (12/29/2016), and before the incident with the Department of Veterans Affairs (03/07/2016), Michael Hari filed an Emergency Petition for Order of Protection

---

[5] FBI Report, Case ID# 266S-SI-2476026, B. Robbins, January 22, 2018. (Bates 9952).
[6] *Id.*
[7] *Id.*

[8] FBI Report, Case ID# 266S-SI-2476026, B. Robbins, January 22, 2018. (Bates 10145-10146).

(hereinafter EOFP) against J.H. on February 22, 2016. (ECF 97, Exhibit G). Mr. Hari's Emergency Petition preceded all of J.H.'s calls to law enforcement regarding his brother.

In his Petition, Mr. Hari alleged that J.H. entered his home and property at 2** W. 1st Street North, Clarence, IL a number of times between January 14, 2016 and January 23, 2016 without Mr. Hari's permission. *Id*. at p. 3. Mr. Hari claimed that when he called his brother to ask him, his brother admitted to trespassing but denied stealing his trail cameras. Mr. Hari notes that he called the Ford County Sheriff's Office to report the theft of his trail cameras and J.H.'s admission to trespassing and the police thereafter collected evidence. *Id*. Mr. Hari alleged that after filing the report, the trail cameras reappeared on a tree on January 23, 2016. *Id*. When the two men met face-to-face at their parents' home, an argument ensued and Michael Hari felt physically threatened. *Id*. at p. 4. He knew his brother regularly carried a firearm and was aware of past incidents where J.H. shot at other individuals following an argument and Mr. Hari wished to avoid harm. *Id*.

In the "Miscellaneous Remedies" portion of the EOFP Petition, Michael Hari asked, "That Respondent be further ordered and enjoined as follows: Respondent is enjoined from making any harassing complaints against Petitioner." *Id.* at p. 11.  The EOFP was granted and served upon J.H. the same day. *Id*. at pp. 12, 21. Thus, despite the Emergency Order For Protection, J.H. continued to call the Rantoul Police, the ATF and the VA on Mr. Hari, alleging a number of things.

Thus, it is clear from the number of FBI reports authored by the Affiant, that she was working very closely with J.H. (CS1) and Ford County Sheriff Mark Doran during her investigation of Michael Hari from January – March 2018 and was therefore aware of

all of the incidents wherein J.H. called different agencies trying to implicate his brother in wrongdoing. And the Affiant was aware of the EOFP filed by Mr. Hari to stop his brother from harassing him. Thus, it is troubling that the Affiant did not disclose any of this information in her the affidavits but rather explained, "CS1's motivation for cooperation is that he/she does not want anyone to get hurt. The FBI has paid CS1 approximately $1,000 to date for information provided."[9]

These omissions – if added to the Affidavit – would have called CS1's credibility and the ten photos he took into serious question. If, as required under a *Franks* analysis, either all of CS1's motivations were *included* in the Affidavit to search the home of Michael Hari's parents or if CS1's information was *excluded* entirely, because of the malicious past between CS1 and Michael Hari, no probable cause would have existed to authorize the search of Mr. Hari's parents' home.  The only proffered nexus to his parents' home was (1) the information provided by CS1, and (2) Mr. McWhorter's allegation that he and Mr. Hari drilled ARs in the parents' garage at some unknown time in the past. Thus, a *Franks* hearing must be held to ferret out the reasons for the exclusions and any other omissions and misstatements in the affidavits.

## C.    Search-seizure of business office

Also contrary to the R&R, the Court should suppress direct and derivative fruits stemming from search-seizure actions under the warrant for Mr. Hari's business office, for the reasons that follow:

---

[9] ECF 97, Exhibit A, p. 4 and Exhibit B, p. 4;

1.      **Nexus**

The discussion above demonstrates that a valid warrant must establish a nexus between the probable-cause presentation and the place to be subjected to official search-seizure action (including the requirement that the sought-after items will be at that place at the time of the proposed search-seizure).

With respect to the warrant application covering Mr. Hari's business office, the affidavit attempts to establish a nexus in two ways. First, the Affidavit explains that on January 27, 2018, CS2 saw illegal firearms, M4s, video jammers, and tannerite locked in the group's safe inside the office in Clarence, Illinois. (MH Govt Ex. 1, Affidavit ¶ 9.) And at the office, the brother of Mr. McWhorter, Herbert McWhorter, "saw HARI and MORRIS cleaning some of the same weapons that were taken from his house by law enforcement on February 27, 2018." (Id. ¶ 22.)

The allegations that Herbert McWhorter saw Mr. Hari with guns at the office and that Michael McWhorter later brought the same guns to the Herbert McWhorter's home, explains that the guns were moved out of the office and were no longer there. (Id. ¶ 19, 22, 26.) In fact, CS2 wore a wire and Mr. Hari specifically said, "[t]here is nothing illegal in our vault." (Id. ¶ 17.) In light of the information from two separate sources, that any potentially incriminating material had been removed from the office, there was no probable cause to search the office without further particularized knowledge about what was there and what law enforcement believed they would find. (Id. ¶ 22, 26.) In fact, the statements of Michael and Herbert McWhorter were also used to federally indict Mr.

Hari, Mr. Morris, Mr. McWhorter and Ellis Mack with possession of a machinegun. (Id. ¶ 2.)

The second attempt to connect the alleged criminal activity with Mr. Hari's office in Clarence, Illinois is the claim that two failed science experiments were conducted at the office approximately one month prior to police contact on February 27, 2018. (Id. ¶ 20, 21.) Herbert McWhorter told law enforcement that sometime around the end of January, Mr. Hari offered to show Mr. Morris and himself some "science stuff" at the office. (Id. ¶ 20.) He poured some fluid in the snow and placed a piece of braided wire in the fluid, which eventually ignited. (Id. ¶ 20.) Around the same time, Mr. McWhorter's brother also claimed that Mr. Hari poured a scoop of a red powdery substance into a burning fire, hoping it would ignite, but nothing happened. (Id. ¶ 21.) Both of these failed experiments presumably occurred outside in the snow and in an outdoor fire. However, neither the unknown fluid, the braided wire, nor the red powdery substance are indicative of criminal wrongdoing, and they fail to provide a sufficient nexus to search the office. Other than the above-mentioned events, the remainder of the search warrant affidavit for Mr. Hari's office does not pertain in any way to the office itself. Other allegations about Mr. Hari's activities, without a showing of their connection to the office to be searched, provided no substantive additions to the Affidavit.

## 2. Staleness

At the end of February, Herbert McWhorter told law enforcement that Mr. Hari had moved his firearms and all other contraband from the office. (Id. ¶ 17–19, 22, 26.) Not only was the information about the alleged contraband in the office stale by the time

the search warrant was signed by the magistrate; from their conversation with Herbert

McWhorter, law enforcement specifically knew that the alleged "illegal" firearms in the

office were no longer there. Information about allegedly suspicious objects in the office

in January was stale by the execution of the search warrant in March. There was no new

information linking the office to criminal activity and any items seized from the office

must be suppressed.

While the R&R cites a number of paragraphs explaining that Mr. Hari is the

suspect in the criminal investigations of (1) the bombing of the Dar al Farooq Islamic

Center, (2) planting an explosive device inside the Women's Health Practice, (3)

possessing illegal firearms, and (4) planting a suitcase and gray bag containing explosive

devices in a shed on the property of a third party, it fails to address – what exactly law

enforcement expects to find at the office.  (ECF 140, p. 9).  The R&R suggest that Mr.

Hari's recorded statements "we moved all that stuff already anyway" and "[t]here is

nothing illegal in our vault" should be discredited, despite corroboration by Herbert

McWhorter and co-defendant Michael McWhorter: two key witnesses relied upon in the

Affidavit.

The information in the Affidavit was stale at the time the search warrant was

sought and any nexus between the illegal possession of firearms and the office that may

have existed earlier in time did not exist on March 13, 2018. Any items seized from the

office must be suppressed.

D.      **Search-seizure of defendant's residence**

Mr. Hari challenges the search of his residence due to the lack of nexus between the criminal activity and his home, the staleness of the information, and as fruit of the poisonous tree - the prior illegal searches on March 13, 2018.

1.      **Nexus**

A search warrant for Mr. Hari's residence was sought on March 26, 2018, approximately two weeks after search warrants were executed at his office and the home of his parents. But specific allegations about Mr. Hari's activities, without a showing of their connection to Mr. Hari's residence, provided no substantive additions to the affidavit to establish nexus.

To establish a nexus between the alleged criminal activity and Mr. Hari's home, the Affiant explains that Michael McWhorter went to a gun shop with Mr. Hari approximately one week before the bombing in Minnesota in August of 2017 and purchased ten pounds of black powder. (Govt Ex. 3, ¶ 33) And that at some unknown time thereafter, Mr. Hari burned "some" of the black powder containers in the fireplace of his home. (*Id.* ¶ 33).

Additionally, the Affidavit infers that because CS2 reported that Hari said everything illegal had been removed from the office on Main Road and that the items were close enough that if they needed them they could get them quickly, that the items *might* be in Mr. Hari's home. (*Id.* ¶ 35). The Affidavit also suggests that since most of the questionable items photographed by CS1 in December 2017 were not present when the search warrant was executed on the home of Mr. Hari's parents on March 13 and 14, 2018

… and since those items were also not present in any other search location, that they *might* be at Mr. Hari's residence. (*Id.* ¶ 35).

Finally, the fact that the items in the photos provided by CS1 were not present during the execution of the search warrant at the home of Mr. Hari's parents on March 13, 2018 does not carry any implication as to the location of items in other places, including in his home. (*Id.* ¶ 35). The Fourth Amendment protects American citizens from searches of their homes on mere law enforcement hunches. Without a nexus between the alleged criminal activity and Mr. Hari's part-time residence, the search warrant lacked probable cause and its fruits must be suppressed.

### 2.    Staleness

The only concrete piece of evidence that minimally suggested suspicious or criminal activity at Mr. Hari's part-time residence, burning the black powder containers, was stale. Mr. McWhorter alleged that the black powder was purchased about one week before the Minnesota bombing, which occurred on August 5, 2017. (*Id.* ¶ 33). By the time the Affiant applied for the search warrant in March of 2018, the information that Mr. Hari had "burned some of the containers" was more than seven months old. Based on staleness and lack of nexus, the search warrant affidavit for Mr. Hari's home failed to establish probable cause and its fruits of the invalid search warrant must be suppressed.

### 3.    Fruit of Poisonous Tree

 "Courts use the suppression of evidence under the exclusionary rule as a remedial device that is 'restricted to those areas where its remedial objectives are thought most efficaciously served.'" *United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012)

(quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). If the defendant "comes forward with specific evidence demonstrating taint, the ultimate burden of persuasion to show the evidence is untainted lies with the government." *United States v. Hastings*, 685 F.3d 724, 728 (8th Cir. 2012) (quotations omitted). If the controversial evidence has enough attenuation from the primary illegality so as "to be purged of the primary taint," it is no longer inadmissible fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

Attenuation requires consideration of "whether there was a sufficient factual nexus between the constitutional violation . . . and the challenged evidence." *United States v. Yorgensen*, 845 F.3d 908, 913 (8th Cir. 2017) (internal quotations omitted). "When determining if sufficient attenuation exists, [courts] must focus on three specific factors: (1) the time elapsed between the illegality and acquisition of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct." *United States v. Faulkner*, 636 F.3d 1009, 1015 (8th Cir. 2011) (quotations omitted) (citing *Brown v. Illinois*, 422 U.S. 590, 603–604 (1975)). Intervening circumstances include independent, unrelated sources of probable cause. *See id.* (outstanding arrest warrant); *United States v. Vega-Rico*, 417 F.3d 976, 980 (8th Cir. 2005) (post-*Miranda* statement conducted four days after Fourth Amendment violation for purposes unrelated to the violation). The third factor "is considered the most important factor because it is directly tied to the purpose of the exclusionary rule—deterring police misconduct." *Faulkner*, 636 F.3d at 1016 (quotations omitted).

Fruits of a Fourth Amendment violation that occur during the same related investigation substantially undermine any potential attenuation. *See United States v. Guevara-Martinez*, 262 F.3d 751, 755 (8th Cir. 2001) (contrasting *United States v. Watson*, 950 F.2d 505, 508 (8th Cir. 1991), where the fruit was "the result of a *subsequent* investigation).

Here, like the prior March 13, 2018 search warrants, the search warrant for Mr. Hari's residence fails for lack of probable cause due to a lack of nexus and the staleness of the information. The only unique additional information in this Affidavit, is (1) Mr. Hari allegedly told Mr. McWhorter that he burned "some" of the black powder containers at his home between the time he purchased them in July of 2017 and the time of Mr. McWhorter's statement to law enforcement after his arrest in March of 2018 and (2) some of the items law enforcement was looking for were not present at any of the other places searched (referring to execution of the prior search warrants). Thus, it is difficult to say which of these two additional facts influenced the signing magistrate's probable cause determination.

The illegal searches based on the invalid search warrants for the home of Mr. Hari's parents and for Mr. Hari's office were not so attenuated from the search warrant for Mr. Hari's part-time residence as to dissipate the taint from the invalid search warrant. In fact, the search warrant affidavit for Mr. Hari's home relied upon the *lack* of evidence found at his office and parents' home to insinuate that the items might in fact be at Mr. Hari's home. Under the *Brown* factors, the taint from the primary illegality did not dissipate. There were only 13 days between the two prior search warrants and the search warrant for Mr. Hari's

residence. There were no intervening circumstances, like an independent source of probable cause. Instead, the same investigation and information was used in the new search warrant for his residence.

Finally, the first three search warrants were all boilerplate resuscitations of the facts and allegations unearthed in the investigation. (MH Govt Ex. 1, 2, 3) Except for minor additions and alterations to each search warrant to ensure it had some reference to the place to be searched, each was nearly identical. This cursory drafting, with a strategy of throwing in the kitchen sink to cover up the lack of probable cause, indicates exactly the type of misconduct that the exclusionary rule is designed to deter.

Because the rest of the information in the search warrant clearly lacked probable cause to search any one place, the additional tainted information in the search warrant for Mr. Hari's residence did not merely facilitate the investigation, but was necessary to it. The combined weakness of all the search warrants necessitated a stronger showing of evidence because the investigation had turned up so little useful, specific information. As fruit of the poisonous tree, the fruits of the search warrant of Mr. Hari's residence must be suppressed.

### E.    Search-seizure of mobile device

Law enforcement first obtained Mr. Hari's cell phone because he "unintentionally" left it at Mr. McWhorter's home. (MH Govt Ex. 5, ¶ 27). Knowing that Mr. Hari "unintentionally" left it in a rush, Mrs. McWhorter gave FBI Agent Joel Smith the cell phone. (*Id).* Mrs. McWhorter did not have the authority to provide FBI Agent Joel Smith with the phone and she lacked the authority to consent a search of the phone. Mrs.

McWhorter, herself, could not access the phone as she did not know the protective pin number. Without valid consent, a search of the phone required a valid search warrant.

The search warrant, ultimately obtained on April 4, 2018, failed to establish a nexus between Mr. Hari's cell phone and what evidence law enforcement hoped to find. The information law enforcement *did* have was stale and disconnected. The fruits of the search warrant seized from Mr. Hari's phone must be suppressed.

### 1.   Unlawful seizure

The Fourth Amendment protects against searches and seizures conducted by government officials. *See Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971). "Logically, a person's protectable expectation of privacy must extend both to places and objects. A contrary conclusion would emasculate the plain language of the Fourth Amendment, which protects 'papers' and 'effects.'" *United States v. Kelly*, 529 F.2d 1365, 1369 (8th Cir. 1976). "Warrantless searches and seizures are per se unreasonable unless there are special circumstances which excuse compliance with the Fourth Amendment warrant requirement." *Id*. at 1371. A warrantless seizure "is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 474 (1971); *United States v. Harris*, 747 F.3d 1013, 1016 (8th Cir. 2014). And the burden is on the government to show the applicability of one of the "specifically established and well-delineated exceptions." *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011)(quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)).

In the instant case, the government concedes that Mr. Hari's cell phone was seized from Mrs. McWhorter without a warrant. Instead, the government attempts to offer two

exceptions to the warrant requirement: (1) Mr. Hari abandoned his phone and thereby abandoned his expectation of privacy, giving Mrs. McWhorter authority to consent to its seizure and search and (2) exigent circumstances existed and law enforcement needed to act quickly to preserve evidence, (MH. 98-99, 104-105).

### a.      Abandonment

The R&R suggests that Mr. Hari abandoned his cell phone because he did not instruct Josie McWhorter "to destroy, store, safeguard, or care for the item," but simply left it behind. (R&R p. 23). In doing so, the R&R relies on *United States v. Nowak*, 825 F.3d 946 (8th Cir. 2016), wherein the defendant fled a vehicle during a traffic stop, leaving his backpack behind.

"[A] person does not abandon his property merely because he gives it to someone else to store" or keep watch over. *United States v. James*, 353 F.3d 606, 616 (8th Cir. 2003); *see also United States v. Kelly*, 529 F.2d 1365, 1371 (8th Cir. 1976); *United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993), and ; *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000)). And abandonment cannot be presumed simply because Mr. Hari "unintentionally" left his cellular phone in Mrs. McWhorter's home.

In *United States v. Crumble*, the defendant abandoned a cell phone, thereby "relinquish[ing] his reasonable expectation of privacy" when he left the cell phone in a wrecked Buick with a shot-out window with the keys still in the ignition. 878 F.3d 656, 659-660 (8th Cir. 2018) (quotations and alteration omitted)(focusing on the state of the vehicle and accessibility to the public). But here, Mr. Hari did not leave his phone in a public place where it was accessible to just anyone. He left it in the private home of a

trusted friend, Mr. McWhorter. Mr. Hari had no reason to believe he was relinquishing his expectation of privacy. Moreover, in *Nowak*, the defendant fled on foot from a traffic stop to avoid arrest. In contrast, Mr. Hari left Josie McWhorter's house when law enforcement were not present, the day before law enforcement went to her house to seize the cellular phone. And Mr. Hari never disclaimed ownership over the phone.

Therefore, in order to show the validity of Mrs. McWhorter's consent to seize and search Mr. Hari's cell phone, the government must present evidence of authority beyond the mere act of storage. It is significant that Mr. Hari did not give Mrs. McWhorter permission to exercise control over his cell phone nor to consent to its search. And Agent Smith did not know how Mrs. McWhorter had Mr. Hari's phone nor where she found it. (MH. 120).

Further, Mr. Hari pin protected his cell phone so that neither Mrs. McWhorter nor others could access his protected information, evidencing a desire that no one, including Mrs. McWhorter, view the contents of his cellular phone. *See e.g. Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001) (finding no authority to search personal files on a shared computer because defendant had evidenced a privacy interest in protecting the files with a password).

### b.      Exigent circumstances

Although exigent circumstances may make it reasonable to permit police action without prior judicial approval in some instances, none of those instances apply to the seizure of Mr. Hari's cell phone. The record fails to reveal the exigent circumstances at hand. The cellular phones were at Mrs. McWhorter's home and Agent Smith could have

frozen the scene, waiting at the home until a valid search warrant was obtained – *if*, in fact, a magistrate found probable cause to seize the phones at issue. The phones were given to Agent Smith in late morning or early afternoon of February 28, 2018, a reasonable time to obtain a warrant from a judicial officer. (MH. 87). Mr. Hari's cell phone was not contraband or an object dangerous in itself, and it was not easily disposable.

Agent Smith's reliance on Mrs. McWhorter's apparent authority to consent to the seizure and search of Mr. Hari's cell phone was unreasonable and there were no exigent circumstances justifying its warrantless seizure. The fruits of the cell phone must be suppressed.

### 2.    Probable Cause

The Affidavit for the search of Mr. Hari's phone did not specify any information giving reason to believe that a search would reveal any incriminating information. In fact, the Affidavit specified that Mr. Hari *turned off* his phone before he went on "missions," and used Faraday bags, thus explicitly negating any inference that incriminating information would be found on the phones. In light of these facts negating the likelihood of evidence on the phones, the search warrant affidavit fails to express how or why the phone would have evidence.

### 3.    Nexus

Similarly, the fact that the defendants turned their phones off and blocked the signal prior to traveling to Champaign or Minnesota cuts against a finding that the cell phones would contain any pertinent information on those phones. (MH Gov. Ex. 5, ¶ 33).

The affidavit failed to provide any additional information that would reasonably lead to the conclusion that evidence of a crime would be found on the phone.

### 4.      Staleness

The only information in the Affidavit that provides a date regarding Mr. Hari's phone is that he went on a "mission" to Champaign on November 7, 2017. (*Id.* ¶ 33). This was well before the April 2018 search warrant, causing the sole allegation to be stale. The remainder of any information relating to the cell phone provides no basis for a timeline, such as when Mr. Hari was making calls to "higher-ups" or what cellular phone he was using. (*See, e.g.*, *id.* ¶ 34).

### F.      The "Good Faith" Exception does not apply

Notwithstanding all of this, the government may seek to save the warrants by invoking the good-faith exception to the Fourth Amendment exclusionary rule articulated in *United States v. Leon*, 468 U.S. 897, 919-20 (1984). Under *Leon*, a search pursuant to an erroneously-issued warrant may yet be upheld in some instances, but only so long as the police so rely on the warrant in *objective* good faith. *Id.* at 920. In this context "good faith" means a *bona fide* effort by the police to comply with the Fourth Amendment's strictures and intent. *See id.*

The Eighth Circuit has held,

The good faith exception will not apply if: (1) the judge issuing the warrant was misled by statements that the affiant knew were false or would have known were false except for "his reckless disregard of the truth;" (2) "the issuing magistrate wholly abandoned his [or her] judicial role;" (3) the affidavit in support of the warrant is "so lacking in indicia or probable cause as to render official belief in its existence entirely unreasonable;" or (4) the

warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

*United States v. Lindsey*, 284 F.3d 874, 878 (8th Cir. 2002). Thus, under the first exception to *Leon*, the issuing judge must not be deliberately misled by law enforcement. But the warrants in this case cannot be saved by assuming innocent law enforcement officers relied upon a judicially authorized search warrant.

In this case, Detective Sergeant Barbara Robbins with the University of Illinois Police Department was the Affiant in the four search warrants challenged by Mr. Hari for the search of his office, parents' home, residence and cellular phone. At the time the search warrants were sought, Detective Robbins was one of the main case agents investigating Mr. Hari and she knew a great deal about him. As submitted in the Motion and Memorandum in Support of a *Franks* Hearing, Detective Robbins changed the description of the getaway vehicle at the mosque bombing, what was seen (and not seen) on surveillance cameras in the area and , most concerning, she chose to exclude what she knew about CS1 and his antagonistic and malicious history with his brother, Mr. Hari.

There is little doubt that Detective Robbins wanted to search every place Mr. Hari stayed or frequently visited. She repeatedly laid out a number of crimes she believed he committed. But it is the role of the neutral, detached magistrate that reviews the facts before them and provides protection between the desires of law enforcement and a citizen's Fourth Amendment rights.

In the search warrants at hand, Detective Robbins misled the reviewing magistrate by submitting inaccurate statements and hiding the true motivations of CS1. Her Affidavits and the signed search warrants cannot be saved by the *Leon* exception.

Additionally, the exclusionary rule must apply where the warrant affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923. Put differently, the *Leon* good-faith inquiry asks "whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization." *United States v. Houston*, 665 F.3d 991, 995 (8th Cir. 2012) (citations and internal punctuation omitted). Under that standard, *Leon* will not save a warrant where a well-trained officer "would have known that his [or her] affidavit failed to establish probable cause and that he [or she] should not have applied for the warrant." *Malley v. Briggs*, 475 U.S. 335, 345 (1986).

Here, Detective Robbins' probable cause presentations failed to justify the searches with regard to particularity and nexus. Particularity and nexus are not complex legal concepts. And it was entirely unreasonable for Detective Robbins, a Sergeant with the University of Illinois Police Department of 21 years, to rely on the warrants because the particularity and nexus deficiencies were so glaring. Simply to suspect an individual of multiple criminal violations does not provide sufficient probable cause to search each and every location the individual goes.

Based on the record here, it appears that Detective Robbins and others were keen to arrest Mr. Hari and search his office, home, and parents' home so that they could verify their suspicions that each location contained evidence of wrongdoing. But the Fourth

Amendment requires a reverse ordering of events, *i.e.*, probable cause first, then search and seizure.  Law enforcement violated Mr. Hari's Fourth Amendment rights and the direct and derivative fruits cannot be saved by *Leon*. The evidence must be suppressed.

## IV.   CONCLUSION

For the above reasons, Mr. Hari requests that the Court reject the recommendation to deny Mr. Hari's motions and to (1) grant his motion for a *Franks* hearing and (2) grant his motion to suppress the evidence obtained in violation of his Fourth Amendment rights.

Dated: November 4, 2019                                Respectfully submitted,

*s/ Shannon Elkins*
_____
SHANNON ELKINS
Attorney No. 332161
Attorney for Defendant
Office of the Federal Defender
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415