UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 18-150(1) (DWF/HB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **MOTION OF THE UNITED** |
| Plaintiff, | ) | **STATES FOR ADMISSION** |
| | ) | **OF EVIDENCE PURSUANT** |
| v. | ) | **TO FEDERAL RULE OF** |
| | ) | **EVIDENCE 404(b)** |
| MICHAEL HARI, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and Assistant United States Attorneys John Docherty, Julie E. Allyn, and Allison Ethen, respectfully moves the Court for admission of the evidence described below pursuant to Fed. R. Evid. 404(b).

## I.   PROCEDURAL POSTURE

Trial of this case is scheduled to begin on April 27, 2020. At the Court's direction, *see* text-only docket entry of February 7, 2020 (CM/ECF Docket No. 175), the parties agreed on a briefing schedule for two pretrial motions, one of them this motion for admission of 404(b) evidence. Trial had originally been scheduled to commence on February 20, 2020, and under an earlier scheduling order of this Court (CM/ECF Docket No. 125, paragraph 10), the government's notice of the evidence which it would seek to introduce under Fed. R. Evid. 404(b) was due three weeks before trial. The government provided that notice, which will be referred to as "Notice of Intent" in this motion, on

January 30, 2020 (CM/ECF Docket No. 164), and now follows with this motion.  This

motion discusses the admissibility of both 404(b) evidence and of intrinsic evidence.

## II.    FACTS RELEVANT TO OTHER CRIMES EVIDENCE ADMISSIBLE PURSUANT TO FED. R. EVID. 404(b)

The evidence will show that in the spring and summer of 2017, defendant Michael

Hari recruited Michael McWhorter and Joe Morris to participate with the defendant in

committing crimes that served the defendant's extremist ideology.  Hari had known both

McWhorter and Morris, and their families, for some years.   To recruit McWhorter, the

defendant told him he could make up to $50,000 as a signing bonus for agreeing to

participate with the defendant in acts of physical violence against targets that were, as

McWhorter put it, "on the left," such as Antifa and Black Lives Matter.  McWhorter

eventually agreed.  Morris's own family background and upbringing were problematic, and

he had formed a relationship with Hari that was adulatory and father-son like.  Morris,

observed McWhorter, would do anything he was asked to do by Hari.

Hari, McWhorter, and Morris committed their first crime as a group on August 5,

2017, when they bombed the Dar al-Farooq mosque in Bloomington.

On August 4, 2017, Hari drove from central Illinois to Minnesota in a Nissan

Frontier crew cab pickup truck he had rented.  Morris and McWhorter were passengers.

At Hari's direction, Morris and McWhorter left their phones behind in Illinois to make it

impossible to track the conspirators by tracking their phones.   Neither Morris nor

McWhorter knew where they were going, or what they were going to do when they got

there, until the defendant told them, by which time they were only about an hour from

Bloomington.  McWhorter saw a pipe bomb in the cab of the truck, as well as two AR-15 rifles, one of which, he would learn later when he fired it himself, had been converted to fire in fully automatic mode.

Once in Bloomington, Hari parked the rented truck parallel to the curb in the mosque's parking lot.  Morris and McWhorter got out and went to a window of Dar al-Farooq, which, they learned later, was the window of the Imam's office.  Morris broke the window with a sledgehammer and then threw a plastic container holding a 50-50 mixture of diesel fuel and gasoline through the window he had just broken.  McWhorter then lit the fuse on the pipe bomb and threw it through the same window.  The pipe bomb was constructed from a length of PVC pipe, into which black powder had been packed, with caps at either end.  A hole had been drilled in one of the end caps, and a fuse threaded through the hole.  After the bomb was thrown, the two men got back into the rented pickup truck, and Hari drove away at high speed.  The bomb exploded, and the gas-diesel mixture caught fire.  Dar al-Farooq suffered fire, smoke, and water (from the building's fire suppression sprinkler system) damage.  There were no deaths or injuries, but many of the mosque's congregants and staff suffered significant, lingering trauma.

During the trip from Illinois to Minnesota and back, Hari discussed the possibility of bombing the Planned Parenthood clinic in Saint Paul and robbing a Bank of America branch in Missouri.  The motive behind the potential Planned Parenthood attack was Hari's opposition to abortion, while the Bank of America, in Hari's eyes, was affiliated in some way with George Soros.

Within days of the bombing of the Dar al-Farooq mosque, Hari, and then Morris and McWhorter, began referring to their organization as the "White Rabbits," following an online comment applauding the mosque bombing ("ain't no fun when the rabbit's got the gun"). Hari then made even clearer his identity as the leader of the organization that bombed the mosque by ordering patches for the members. Many of the patches depicted a white rabbit with a gun. Hari also wore a patch that named him a "pork eating crusader," while Morris had a patch that labeled him an "infidel." Any claim Hari might make that the mosque bombing was committed by someone else is amply refuted by Hari's celebratory actions following the mosque bombing, extending to naming his organization after what a third party said about the crime.

The organization recruited new members, and Hari formalized the already-existing hierarchical structure of this paramilitary terrorist organization by making himself, the leader of the White Rabbits, a "captain," McWhorter a "sergeant," and Morris a "corporal." Hari purchased uniforms, and the military insignia of these ranks to put on the uniforms. Hari also went about using the White Rabbits' increased membership to form an entry team, that would actually perpetrate violent acts, and a security team, that would guard the perimeter and prevent the entry team from being interfered with.

On November 7, 2017, the group met at a building Hari rented and used as an office for the White Rabbits in the hamlet of Clarence, Illinois. At Hari's direction, from the office, the group got into another pickup truck that Hari had rented, this time a Dodge 2500, and drove to Champaign-Urbana. Once there, Hari dropped off Joe Morris near the Women's Health Practice, a medical clinic that offered, among other services, abortions.

Following Hari's instructions, Morris broke a window, again using a sledgehammer, and this time threw into the building a section of PVC pipe that was packed with thermite, an incendiary powder. Although the incendiary device was meant to ignite, it did not. Joe Morris got back into the rented pickup truck and the defendant again drove away. The following morning, a member of the clinic's staff found the incendiary device when she arrived for work.

On December 4, 2017, Hari had his White Rabbits perpetrate an armed robbery of a Walmart store in the central Illinois town of Watseka. Hari told the others they were going to rob Walmart because Walmart financially supported Antifa, and therefore taking money from Walmart was taking money from Antifa. Morris went into the Walmart while Hari remained in the car, this time a rented Nissan Rogue. Morris wore a mask and displayed a plastic airsoft gun. The group obtained about $1,000 in this robbery.

On December 16, 2017, the group went to Ambia, Indiana, which is just over the state line from Illinois. Hari told the group they were going to rob illegal immigrant drug dealers. Having learned the address of a Hispanic family, Hari and others went into the home, restrained the occupants with zip ties, and spent about half an hour rummaging through the house, before leaving empty-handed, the family apparently not being drug dealers after all.

The very next day, December 17, 2017, Hari drove the group to Mount Vernon, a town in southern Illinois, and attempted to rob the local Walmart. However, when confronted, a store employee raised an alarm, and the White Rabbits fled empty-handed.

Finally, on January 18, 2018, in an effort to raise money, Hari drove the group to the countryside near Effingham, in southern Illinois. There, Hari placed a thermite device on railroad tracks belonging to the Canadian National Railway, and ignited it. The thermite burned so brightly that the members of the organization could see it burning, when they left, from three miles away. Hari then sent an email from an encrypted email account to the Canadian National Railway, saying further vandalism would occur unless the railroad paid a certain amount in crypto-currency. The Canadian National appears to have simply ignored the group's demands.

### III.   ARGUMENT

All the 404(b) incidents described in the Notice of Intent are admissible under the standards set out in Rule 404(b) itself, and the cases construing that rule. In addition, all the incidents which are intrinsic to the crimes charged in the indictment, and which are also described in the Notice of Intent, are admissible, as explained below.

This is a conspiracy case, in fact, a case about a criminal organization, the White Rabbit domestic terrorist organization, led by Hari. The organization committed multiple crimes in the cause of advancing Michael Hari's extremist ideology, or, in the language of Fed. R. Evid. 404(b) itself, the ideology was the "motive and intent" for the crimes. The defendant was the leader of the White Rabbit organization. The White Rabbit's crimes had a particular pattern, and were conducted according to a rarely varying plan, namely that it was the defendant who selected the targets, assigned roles to his underlings, and explained the ideological reasons behind each of the crimes. The underlings then performed the physical act of perpetrating the crime itself. Again using the language of Rule 404(b) itself,

the Rule 404(b) evidence is admissible to show plan, and to show Hari's identity as leader of the White Rabbits.

The Rule 404(b) crimes are those described above in the fact section of this motion: the attempted fire-bombing of the Women's Health Practice on November 7, 2017; the armed robberies of two Wal-Mart stores, one on December 4, 2017 in Watseka, Illinois, and one on December 17, 2017 in Mount Vernon, Illinois; an armed home invasion in Ambia, Indiana on December 16, 2017; and an attempt to extort money from the Canadian National Railway on January 18, 2018.

To prove these bad acts to the required preponderance of the evidence standard, the government will call at least one witness for each of the incidents, may also offer into evidence a small number of photographs or documents related to each incident, and may also introduce evidence recovered from the hard drive of one of the defendant's computers. As to many of the bad acts offered under Rule 404(b), the witnesses will be cooperating defendants Joe Morris and Michael McWhorter, who will testify about these incidents in the course of their testimony.[1]  For the attempted bombing of the Women's Health Practice in Champaign, Illinois, the government will also call Champaign Police Officer and Bomb Technician Jeffrey Thomas.  The government does not anticipate calling any laboratory

---

[1] Morris and McWhorter pleaded guilty before this Court on January 24, 2019. Their guilty pleas encompassed both the Dar al-Farooq bombing and the Illinois crimes that are the subject of this motion.  Since Morris and McWhorter will testify about their plea agreements on direct examination and, the government anticipates, be impeached with their convictions on cross examination, it appears that some evidence of each 404(b) incident will be heard by the jury at the trial of this case.  It would be better for completeness and truth for the jury to also hear that the 404(b) crimes were committed by the defendants in a conspiracy with the defendant.

witnesses to testify to any of the 404(b) or intrinsic incidents, other than the defendant's possession of fully automatic firearms, and even as to that, the government is hoping to negotiate a stipulation with the defense that at least some of the firearms seized were fully automatic.

## A.     General Requirements for the Admission of Rule 404(b) Evidence

Federal Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The standard for admission of Rule 404(b) evidence is well settled. Such evidence is admissible if (1) it is probative of a material issue other than character, (2) is similar in kind and reasonably close in time to the crime charged, (3) is supported by evidence sufficient to allow the jury to find by a preponderance of the evidence that the other crime actually occurred, and (4) when weighed under Fed. R. Evid. 403's balancing test of risk of unfair prejudice against probative value, the risk of unfair prejudice does not substantially outweigh the probative value of the Rule 404(b) evidence. Rule 404(b) is a rule of "inclusion, such that evidence offered for permissible purposes is presumed admissible absent a contrary determination." *United States v. Williams*, 796 F. 3d  951, 958 (8th Cir. 2015) (*quoting United States v. Wilson*, 619 F. 3d 787, 791 (8th Cir. 2010)); *United States v. Adams*, 898 F. 2d 1310, 1312 (8th Cir. 1989) (noting that Rule 404(b) is "a rule of inclusion, permitting admission of such evidence unless it tends to prove only

the defendant's criminal disposition") (*quoting United States v. O'Connell*, 841 F. 2d 1408, 1422 (8th Cir. 1988)).

Each of the defendant's other bad acts as to which the prosecution will introduce evidence at trial is admissible under Rule 404(b) and the cases construing that rule.

### 1.   The Attempted Bombing of the Women's Health Practice in Champaign, Illinois on November 7, 2017.

Evidence of the attack on the Women's Health Practice is admissible, because evidence about the attempted bombing of the Women's Health Practice shows the defendant's intent and motive.  The Women's Health Practice attack illustrates how the defendant will use violence to advance his extremist views.  The Women's Health Practice attack also shows a pattern and plan to Hari's crimes, in that it is the defendant, again, who chooses the target and assigns roles, just as he did at the bombing of the Dar al-Farooq mosque.  Finally, the Women's Health Practice evidence shows the defendant's identity as the leader of the White Rabbits domestic terrorist organization.

### a.   The Attack on the Women's Health Practice is so Similar to the Bombing of the Dar al-Farooq Islamic Center that the two Crimes are "Signature Offenses."

The similarities between the bombings of Dar al-Farooq and the Women's Health Practice are so striking as to be "signature" crimes, highly probative of pattern and plan, and, importantly, showing the pattern of a bombing carried out by the defendant's organization was that the defendant selected a target based on ideology, then drove a rented pickup truck to the target with other White Rabbit members riding as passengers. When

they arrived at the target, it was those other White Rabbits who got out of the vehicle and did the physical act of perpetrating a bombing.

If both another crime and the crime charged involve "a unique set of 'signature facts' then evidence of the [other] act is admissible to show that the same person committed both crimes." *United States v. Young*, 701 F. 3d 1235, 1239 (8th Cir. 2012) (*quoting United States v. Almendares*, 397 F. 3d 653, 662 (8th Cir. 2005)).  The court should admit the evidence of the Women's Health Practice attack because it is so similar to the Dar al-Farooq bombing that "a reasonable juror could find from a comparison of the facts that the same person committed both crimes." *United States v. Oman*, 427 F. 3d 1070, 1075 (8th Cir. 2005).  Signature crimes are a special subset of the general rule that 404(b) evidence is admissible to show a plan or pattern.  *United States v. Carroll*, 207 F. 3d 465, 468 (8th Cir. 2000) (Evidence "may also be admitted under Rule 404(b) as direct proof of a charged crime that includes a plan or scheme element . . .").

The attacks on the Dar al-Farooq mosque and the Women's Health Practice closely parallel each other.  In both attacks, Hari rented a pickup truck – a Nissan Frontier crew cab for the Dar al-Farooq attack, a Dodge 2500 for the Women's Health Practice attack – from the Urbana, Illinois location of Enterprise Rent-A-Car.  In both cases, Hari revealed the plan of attack, and the target he had selected, to the other members of the organization only on the early morning or late night drive to the mosque or clinic.  In both attacks, Hari had Joe Morris break a window of the targeted building with a sledgehammer.  In Minnesota, Morris followed this up by throwing a flammable mixture of gasoline and diesel fuel through the window he had just broken; in Illinois Morris threw an incendiary

device through the window.  In both cases, a length of PVC pipe was used to hold either the black powder (Minnesota) or thermite (Illinois).  In both cases, Hari drove, and at the attack scene, he stayed in his rented pickup truck while either Morris, alone (Women's Health Practice) or Morris and McWhorter (Dar al-Farooq) went to the building and did the physical act of the crime.  And of course, both attacks were motivated by the defendant's views on either abortion or Muslims.  Although neither the bomb at Dar al-Farooq nor the incendiary device at the Women's Health Practice caused any injuries or deaths, in both cases they caused severe trauma.

In both cases, Morris and McWhorter will testify that they were told by Hari what the plan was, that it was Hari who selected the target, Hari who drove to the target, and Hari whose views on issues – Muslim immigration or legalized abortion – motivated the attack.  The government stresses that this is a conspiracy case, indeed, an organizational case, in which different members had different roles, assigned to them by the defendant. The defendant assigned himself a role in which he kept aloof from the actual, physical, perpetration of the crime, and so inoculated himself from being observed.  In fact, he did not even leave his rented vehicle, but instead dropped off and picked up other organization members charged with the actual commission of the crime.  It is important for the jury to hear relevant testimony about a strikingly similar attack the defendant committed just three months after the Dar al-Farooq attack.

**b. The Time That Elapsed Between the Dar al-Farooq Bombing and the Attack on the Women's Health Practice was Brief, Such that the Women's Health Evidence Should not be Excluded Because of the Passage of Time.**

The passage of approximately 90 days between the Dar al-Farooq attack on August 5, 2017, and the Women's Health Practice attack on November 7, 2017, does not make the Women's Health Practice attack too remote from the Dar al-Farooq bombing to be admissible. The Eighth Circuit has upheld the admission of Rule 404(b) evidence about incidents separated from the crime charged by as much as 16 or 18 years. *See United States v. Walker*, 470 F. 3d 1271, 1275 (8th Cir. 2006) (upholding admission under Rule 404(b) of an 18 year-old armed robbery conviction); *United States v. Strong*, 415 F. 3d 902, 905-06 (8th Cir. 2005) (upholding admission under Rule 404(b) of 16 year-old robbery conviction). The three months that elapsed between the Dar al-Farooq bombing and the Women's Health Practice attempted fire-bombing does not even approach the outer limits of admissibility.

In addition, the Women's Health Practice attack, and indeed, all of the Rule 404(b) evidence discussed in this motion, was part of an ongoing conspiracy. As the government wrote earlier in this case, in its Opposition to Defendant's Motions to Suppress Search and Seizure Evidence (CM/ECF Doc. No. 133) at 13, the White Rabbits carried out "an ongoing, months-long, multi-state, criminal campaign of bombings, home invasions, and armed robberies (carried out with illegal, fully-automatic infantry assault rifles) . . ." Under these circumstances of ongoing criminal conduct, the 404(b) evidence proffered by

the government, including the Women's Health Practice attack, is relevant evidence of how this conspiracy conducted itself, notwithstanding any passage of time.

   c. **Under a Fed. R. Evid. 403 Balancing Test, the Women's Health Practice Evidence Should be Admitted, Because the Probative Value of the Evidence is not Substantially Outweighed by the Evidence's Potential for Unfair Prejudice.**

Given the strong probative value of this evidence, it is not possible that it could pose a potential for unfair prejudice so enormous as to substantially outweigh the probative value of this evidence.  As the Eighth Circuit has held "[t]hough all Rule 404(b) evidence is inherently prejudicial, the test under Rule 403 is whether its probative value is *substantially* outweighed by the danger of *unfair* prejudice."  *United States v. Gutierrez-Ramirez*, 930 F. 3d 963, 968 (8th Cir. 2019) (*quoting United States v. Riepe*, 858 F.3d 552, 561 (8th Cir. 2017)) (emphasis in original).  "Fed. R. Evid. 403 is concerned with unfair prejudice, or an undue tendency to suggest decision on an improper basis*." United States v. Warfield*, 97 F. 3d 1014, 1027 (8th Cir. 1996).  Prejudicial evidence is evidence which "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or cause[s] a jury to base its decision on something other than the established propositions in the case."  *United States v. Adams*, 2014 WL 12690185 *5 (8th Cir. 2014) (*quoting* Weinstein, *Federal Evidence*, § 403[3] at 403-36).

The government does not seek to introduce evidence that has the potential to persuade by illegitimate means, such as grisly photographs, *United States v. Edwards*, 159 F. 3d 1117, 1129 (8th Cir. 1998).  The proffered evidence is testimony, some photographs

of the Women's Health Practice building, and business records and computer records showing the defendant's rental of a pickup truck.

While there will be no unfair prejudice to the defendant from the admission of this evidence, any remaining concern on that score can be mitigated by a limiting instruction both when the Rule 404(b) evidence is admitted, and in the Court's final charge to the jury. "[T]he presence of a limiting instruction diminishes the danger of any unfair prejudice arising from the admission of other acts." *United States v. Halk*, 634 F. 3d 482, 488 (8th Cir. 2011) (*quoting United States v. Franklin*, 250 F. 3d 653, 659 (8th Cir. 2001)).

The evidence of the Women's Health Practice attempted bombing should be admitted to show the jury that Hari committed both crimes, that both crimes followed a plan in which Hari played the role of planner, target locator, and getaway driver, and in which Hari was the leader of the White Rabbit domestic terrorist organization.

## 2.      Armed Robbery of the Watseka Walmart on December 4, 2017 and the Mount Vernon Walmart on December 17, 2017

The White Rabbit organization, under the defendant's leadership, continued to commit crimes according to the plan they had used at Dar al-Farooq.  On December 4, 2017, driving a rented Nissan Rogue, Hari transported the members of his organization to the Walmart in Watseka, Illinois.  Again, the crime was motivated by Hari's ideology applied to current events.  Hari believed Walmart was funding Antifa, the loosely organized antifascist organization, and that therefore taking money from Walmart was taking money from Antifa.  Once again, Hari remained in his rented vehicle, while Joe Morris went inside and actually perpetrated the robbery.  It was, again, Hari who chose the target, Hari who

supplied the ideological justification for the crime, and Hari who drove the rented vehicle. In these armed robberies of Walmart stores, Hari again showed himself to be the leader of the White Rabbit organization, who directed co-defendants to commit crimes for the organization, because of the ideas that formed Hari's motive and intent.

Under the cases cited above in the discussion of the Women's Health Practice attack, there is no question of either the Watseka Walmart or Mount Vernon Walmart robberies being so remote in time from the Dar al-Farooq attack as to make them inadmissible. Only four and one half months passed between the Dar al-Farooq attack and the second of the two Walmart robberies, the one in Mount Vernon.

Nor can there be a claim that the evidence of either Mount Vernon or Watseka carries with it the potential for any unfair prejudice. Again, the evidence will be presented almost entirely in the form of testimony. The victims of the crime will not be called to testify by the prosecution.[2] Rather, the testimony will be testimony by participants in the crime.

_____

[2] At page four of his Reply to the Government's Response in Opposition to his Motion for a Continuance, the defendant claims that "representations made by Assistant United States Attorney Eugene Miller in the Central District of Illinois directly contradict representations made by Assistant United States Attorneys John Docherty and Julie Allyn in their recent Notice of the Government's Intent to Introduce Evidence Pursuant to Federal Rule of Evidence 404(b)." The defendant's Reply is CM/ECF Doc. No. 172. This claim of defendant's is false. When questioned by Judge Mihm about a defense claim that the government would, essentially, try the entire Illinois case through Rule 404(b) evidence AUSA Miller responded, quite correctly, that the Minnesota AUSAs would not call the Walmart or Ambia victims. This remains a true statement. As discussed above, the number of witnesses the government will call in Minnesota to testify to Rule 404(b) incidents will be limited, and will not include either the Ambia or the Walmart victims.

The Court should admit evidence about the Watseka and Mount Vernon Walmart robberies pursuant to Fed. R. Evid. 404(b).  The evidence is probative of motive, intent, plan, and identity.  The incidents will be proven, through first hand testimony, to at least a preponderance of the evidence.  These two robberies are not remote in time from the crime charged, nor do they have the slightest potential to persuade by illegitimate means, much less so much potential as to outweigh the evidence's undoubted probative value.  Under the standards of Rule 404(b), evidence of these two armed robberies is admissible.

### 3.    Armed Home Invasion in Ambia, Indiana on December 16, 2017

The government will introduce evidence about an armed home invasion, on December 16, 2017, in Ambia, Indiana.  Hari again provided the rationale for the crime, and took the organization's members to the house they were going to attack.  He claimed, as justification for what they were about to do, that the White Rabbits were entitled to rob drug dealers, to take their money, and to keep it.  The house the organization targeted on the night of December 16 was the home of a family that Hari apparently (but wrongly) thought were drug-dealing immigrants who were in the United States in violation of U.S. immigration law.  The testimony of Morris and McWhorter will show that during this crime, the occupants of the home in Ambia were restrained with zip ties, that the White Rabbits' ransacking of the home looking for drugs and money lasted about thirty minutes, and that defendant Hari pretended to be a police officer during the home invasion.

Again, the probative value of the evidence is high.  The Ambia home invasion illustrates that it is the defendant who makes the plan, chooses the target, and proffers a justification for criminal acts that is rooted in a political ideology.  The testimony of

16

witnesses will prove the Ambia home invasion happened to the required preponderance of the evidence standard.

The home invasion is not far removed from the Dar al-Farooq attack.  (In fact, it occurred the day before the Mount Vernon Walmart armed robbery.)  And the home invasion, as it will be presented, through first hand participant testimony, and not through the testimony of victims, has no potential for unfair prejudice.

Evidence of the Ambia home invasion should be admitted pursuant to Fed. R. Evid. 404(b).

### 4.      Attempted Extortion From the Canadian National Railway.

On January 18, 2018, Hari led the White Rabbits to far southern Illinois, and the countryside outside the town of Effingham.  There, Hari placed a thermite device (thermite is the same incendiary substance used in the device Joe Morris threw through the broken window of the Women's Health Practice) on the tracks of the Canadian National Railway. The defendant's plan was to burn the tracks away, then to threaten the Canadian National with more such acts unless it paid an extortionate demand in digital currency.  As at Dar al-Farooq and the Women's Health Practice, the defendant is using explosive and incendiary devices in furtherance of his ideological objectives.

Co-defendants who were at Effingham will testify to the incident, which will, again, be proven by a preponderance of the evidence.

The evidence is probative of plan, motive, and identity.  The motive was to raise money for the organization.  The plan, again, was hatched entirely by the defendant, as leader of the White Rabbit organization, with Morris and McWhorter acting as the muscle

who actually carried out the defendant's scheme.  There is no potential for unfair prejudice at all, and certainly no potential for unfair prejudice so great that it outweighs the probative value of this evidence.

Although this incident is the one furthest in time from the Dar al-Farooq attack, it still occurred only about five months after the mosque was bombed.  Under the cases cited above, this is not even close to the span of time that would lead a court to exclude the proffered 404(b) evidence on the grounds of remoteness in time.

The evidence of the attempt to extort money from the Canadian National Railway should be admitted.

> **5.    Evidence of Defendant Hari's Efforts to Frame his Neighbor, J.O., is Intrinsic Evidence, so Intextricably Intertwined with the Crimes Charged in Minnesota as to be Outside the Scope of Rule 404(b).**

The Minneapolis office of the FBI committed considerable resources to the Dar al-Farooq investigation, and followed up on numerous leads.  But the bombing was eventually solved because of an investigation by the FBI's Springfield, Illinois Office into an anonymous tip.  Investigation showed the tip had been an attempt to frame J.O., a neighbor of defendant Hari in Clarence Illinois, for possession of explosives.  In response to that tip, law enforcement first learned of Michael Hari, and as a result of law enforcement's investigation, Michael Hari fled from law enforcement.

Evidence of the tip, and of law enforcement's response to it, is intrinsic to the Dar al-Farooq bombing.  The story of the Dar al-Farooq bombing cannot be told to the jury without also telling the jury about this tip, and of the events this tip triggered.  Because

evidence of the tip and subsequent events is "intextricably intertwined" with evidence about Dar al-Farooq, the tip evidence is not subject to the strictures of Rule 404(b).

Rule 404(b) applies only to extrinsic evidence, not to intrinsic evidence. *United States v. Johnson*, 463 F.3d 803, 808 (8th Cir. 2006). Intrinsic evidence is "evidence of conduct other than the wrongful conduct at issue offered for the purpose of providing the context in which the charged crime occurred." *United States v. Guzman*, 926 F. 3d 991, 999-1000 (8th Cir. 2019). Intrinsic evidence may be evidence that is "inextricably intertwined" with the charged conduct. Examples of intrinsic evidence in the "inextricably intertwined" category include motive evidence, *United States v. Johnson*, 463 F. 3d 803, 808 (8th Cir. 2006) and *United States v. Hall*, 604 F. 3d 539, 543 (8th Cir. 2010) (evidence that defendant was motivated to relocate to Missouri and perpetrate charged fraud scheme because he had deceived so many victims with an earlier fraud scheme in Texas); and evidence of armed robberies that are essential to understanding a charged murder conspiracy, *United States v. McGuire*, 45 F. 3d 1177, 1188 (8th Cir. 1995).

Evidence may also be intrinsic because it is "evidence that 'merely completes the story' or provides context to the charged crime." *Guzman*, 926 F. 3d at 1000. In *Guzman*, the intrinsic evidence was law enforcement's follow up to a tip – officers were told that Guzman's co-defendant Morales had a pistol, which motivated the police to stop and search a minivan, which, in turn, led to the execution of a search warrant which discovered the narcotics for which the defendant was on trial. The defendant claimed the evidence of his firearms possession was improperly admitted, but the Court of Appeals upheld the district court's admission of that evidence as intrinsic evidence, outside the scope of Rule 404(b).

19

The Eighth Circuit has upheld the admission, outside Rule 404(b), of evidence of police activity spurred by some other act of the defendant other than the one for which he is on trial. *United States v. Shores*, 700 F. 3d 366, 371 (8th Cir. 2012) (*quoting United States v. Molina*, 172 F. 3d 1048, 1055 (8th Cir. 1999)) (evidence of a controlled buy was intrinsic, because it provided the police with a portion of the probable cause that allowed the officers to obtain a search warrant).

On February 19, 2018, an anonymous tip came into the ATF's national tip line.  The tip was an email full of misspellings and without any punctuation, and it read:

> this is a possible terrorism threat I know a man named [J.O.] he is about 30 years old he is always talking about getting the niggers and here lately he said he is really going to get them he has been buying a lot of wierd chemicals like nail polish remover and battery acid and I thought he was making meth because he has science things like beakers too but he said no it is for a nigger schredder and he has four big black suitcases in his shed and a little greay bag and they are full of stuff like pipes and caps and wires nails and he told me to watch the news this week he lives at [address in Clarence, Illinois] his house is a brown and yellow trailer and a garage put together and he has a lot of sheds but the one with that stuff in it is the red shed with white boards that is far in the back of his yard i know his kid and we hang out but i am afriad someone will get hurt if someone doesnt do something i also sent something about it to the newspaper so if you just blow it off like you did that school schooter kid in florida the press will know you got a tip so you better check it out just saying you did screw up once and he has a rebel flag on a pole in front of his house there is lots of them in town but his is the brown and yellow house on the north end of main road he also has kids and he just got out of jail [J.O.] and you better check it out because i thin it is bomb stuff for sure.

When law enforcement responded to Clarence, they indeed found the bomb-making materials where the tip had said they would be.  But J.O. and his wife, H.O., knew nothing about the bomb-making materials on their property.  Law enforcement also learned that

relations between J.O. and his neighbor, the defendant Michael Hari, were strained, because Hari had been charged criminally with assault in Illinois state court after holding a replica gun to J.O.'s head after Hari thought J.O. had been on his property.  The word-for-word text of the tip quoted above, including misspellings and the absence of punctuation, was found by the FBI on defendant Hari's laptop, and will be introduced as a government exhibit at trial.

As the chronology below shows, evidence of the false tip law enforcement received about bombs on J.O.'s property, and of the investigative steps law enforcement took in response to the tip is intrinsic, not within Rule 404(b), and should be admitted.

A number of FBI agents went house to house conducting numerous interviews in Clarence on February 27, 2018.  Clarence is a very small town, and the FBI's activity was visible to almost everyone in town.  Defendant Hari, after the search of J.O.'s property that had been caused by Hari's phony tip, relocated firearms, including some fully automatic weapons, to the Clarence home of Michael McWhorter's brother Herbert.  When the FBI went to Herbert's house, Herbert consented to a search of his residence.  The FBI found the weapons upstairs in a duffel bag.  Seeing the activity at Herbert's house, and knowing his weapons were stashed there, defendant Hari went to Herbert's house to see what was happening.  When defendant Hari arrived at Herbert's house, he saw the FBI in the process of taking possession of the weapons.  Defendant then went to the home of Michael and Josie McWhorter, where he took Michael McWhorter's stepson, E.J. "Ellis" Mack, and left.  Mack seemed reluctant to accompany Hari, but Hari said "let's go" and propelled Mack towards a car.

Michael McWhorter, his wife Josie McWhorter, and Joe Morris were at work.  Hari instructed them by telephone that because the FBI had found the weapons, they should meet Hari and Mack at a location in the countryside outside Clarence after work.  When they arrived there, Michael McWhorter and Joe Morris joined Hari and Mack, while Josie returned home to Clarence.

For the next two weeks, Hari, Mack, McWhorter, and Morris hid from law enforcement and lived in the countryside.  For some of their time, they were able to sleep in barns, or in the basement of the home of a friend of Hari's.  At one point, while in the friend's basement, Hari was able to log onto a computer.  Hari made a video, in which the four men, wearing masks, took turns speaking into the camera, seeking help from militia groups in pushing back against what Hari and the others characterized as an FBI "takeover" of Clarence.  This video was also found by the FBI on the hard drive of defendant's computer and will be introduced as an exhibit at trial.  Eventually, though, on March 10, 2018, McWhorter and Mack, tired of the hardships of life on the run, returned home to Clarence.  The following day, McWhorter was interviewed by the FBI at his home, and confessed to not only crimes in Illinois, but also to the Dar al-Farooq bombing.

On March 13, 2018, Hari, Morris, and McWhorter were all arrested on federal charges from the Central District of Illinois of possession of a machine gun.  All three were taken into custody.  McWhorter and Morris were transferred to Minnesota in early 2019, and on January 24, 2019, entered guilty pleas that resolved both the Minnesota case and the Illinois case against them.  They remain in custody pending testimony at Hari's trial, and then sentencing.

Defendant Hari was also transferred to Minnesota.  On February 18, 2019, Hari was being transferred to a flight leaving the Marshals Service's hub in Oklahoma City.  The Marshals Service often houses federal prisoners who are in transit through the Oklahoma City hub at the Grady County Correctional Facility, which is just outside Oklahoma City. When the Grady County Sheriff's Office van in which Hari was being transported stopped to take on more prisoners, Hari jumped out the van's open door and tried to escape. However, the sheriff's deputies quickly apprehended him.

6. **Hari's Flight from Law Enforcement in Response to Law Enforcement's Investigation into his Phony Tip, and Hari's Later Attempt to Escape from Custody, are also Admissible as Evidence of Consciousness of Guilt.**

Defendant Hari's flight from law enforcement on February 27, 2018, the day the FBI came to Clarence and found the assault rifles Hari had taken on the trip to Dar al-Farooq, and of Hari's attempted escape from custody on February 13, 2019, while being transported from Illinois to Minnesota to face charges on the Dar al-Farooq bombing, are also admissible, because these two efforts of Hari's at eluding justice demonstrate consciousness of guilt.

Evidence of both Hari's flight and of Hari's attempted escape is not only admissible, it is admissible without any need for a Rule 404(b) analysis.  On February 27, 2018, the day the FBI found the assault rifles Hari had brought to the Dar al-Farooq bombing, and Hari knew they had been found, Hari fled Clarence in the company of coconspirators and remained away until March 10.  Flight and escape is direct evidence of the crime charged itself, not evidence of another crime from which the jury may legitimately draw an

incriminating inference about the crime charged. *United States v. Davis*, 867 F. 3d 1021, 1030 (8th Cir. 2017) (analyzing evidence of flight separately from analysis of Rule 404(b) evidence; "It is 'well established' that evidence of flight is admissible and has probative value as circumstantial evidence of consciousness of guilt. . . .")(*quoting United States v. Thompson*, 690 F. 3d 977, 991 (8th Cir. 2012), *in turn quoting United States v. Hankins*, 931 F. 2d 1256, 1261 (8th Cir. 1991)).

Evidence of flight and of escape are specific types of evidence that a defendant has sought to avoid or shift blame for his criminal activity. "It is 'universally conceded' that evidence 'of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.'" *Davis*, 867 F. 3d at 1030 (*quoting United States v. Thompson,* 690 F. 3d 977, 991 (8th Cir. 1991) (in turn *quoting United States v. Hankins*, 931 F. 2d 1256, 1261 (8th Cir. 1991)).

To determine whether evidence of flight and escape from custody are circumstantial evidence of guilt, the court evaluates: The degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. *Davis*, 867 F. 3d at 1030 (*quoting United States v. Thompson*, 690 F. 3d at 991) (in turn *quoting United States v. Hankins*, 931 F. 2d at 1261).

Here, Hari fled when he realized the FBI had discovered assault rifles and other firearms stashed at the Clarence home of Herbert McWhorter. With the discovery of these

firearms by federal authorities, Hari knew his leadership role in the White Rabbits, who had carried firearms at all the crimes they committed, was about to be discovered. Tellingly, Hari not only fled himself, he also took with him when he fled the potential witnesses to his role as leader of the White Rabbits. The circumstances surrounding his flight show Hari fled because of his consciousness of guilt about all the White Rabbits' crimes, again including the Dar al-Farooq bombing. Specifically, assault rifles had been carried on all the White Rabbit criminal excursions, including Dar al-Farooq, as well as the Ambia home invasion, Women's Health Practice, and the two Walmart armed robberies. In addition, Hari took with him coconspirators who would have been able to give law enforcement information about all the crimes the White Rabbits had committed (including the Dar al-Farooq bombing). From Hari's consciousness of guilt about, among other crimes, the Dar al-Farooq bombing, the jury can infer Hari's actual guilt of the Dar al-Farooq bombing. The day the FBI came to Clarence, all those who had been to Dar al-Farooq left town, and stayed gone, and in hiding, as long as they could endure living rough in the outdoors.

### 7. Evidence of the Defendant's Possession of Firearms, Some of Them Fully Automatic, is also Admissible Without a Rule 404(b) Analysis.

The evidence of Hari possessing firearms, including fully automatic firearms, should also be admitted without a Rule 404(b) analysis. McWhorter, Morris, and Johnson will all testify that Hari converted AR-15 assault rifles from semi-automatic to fully automatic in the garage of his parents' home in Paxton, Illinois. Hari's DNA is on one of the firearms. Like the Women's Health Practice evidence, the evidence of firearms

possession is sought not to show criminal propensity, but for scheme or plan.  Defendant

was the leader of a domestic terrorist organization, and the nature of that domestic terrorist

organization was to possess, and to use, firearms.  The evidence at trial will show that

defendant carried two AR-15 assault rifles in the Nissan Frontier when he and his

accomplices went to bomb Dar al-Farooq, and that one cooperating defendant later fired

one of those AR-15s on full automatic.  The evidence will also show that when the

defendant and his accomplices robbed a Walmart or attempted to burn the Women's Health

Practice, they went armed.   Firearms suffuse the activities of the White Rabbits, and

testimony about firearms at the trial of this case will be a straightforward recounting of the

organization's activities.

### 8.    Evidence of Hari's Discussion of Other Potential Bias-Motivated Crimes the Organization Could Commit is Also Admissible Because it is Intertwined with Evidence of this Conspiracy.

Finally, planning crimes that could be potentially committed, and discussing

potential plots, was something the White Rabbits often did.  The government at trial will

elicit evidence that on the drive to and from Minnesota to perpetrate the Dar al-Farooq

bombing, Hari talked about potentially attacking the Planned Parenthood location in Saint

Paul, and also talked about detouring to Missouri on the way back to Illinois to rob a Bank

of America location, because defendant associated the Bank of America with George

Soros.  The jury should not be artificially denied a proper look at the activities and mindset

of the defendant as he drove to and from Minnesota.  The potential bombing of Planned

Parenthood was a reflection of Hari's willingness to use violence in connection with his

anti-abortion views, and Hari's discussion of perhaps robbing a branch of the Bank of

America by his view that George Soros was somehow a financier of left-wing causes. These discussions, in short, are further proof of motive.

## **CONCLUSION**

For all the reasons set out above, the United States moves this Court to admit, either under Fed. R. Evid. 404(b), or else as direct evidence, as appropriate, all of the evidence described in this motion.

Dated: February 26, 2020

Respectfully Submitted,

ERICA H. MacDONALD
United States Attorney

*s/ John Docherty*

BY:   JOHN DOCHERTY
Assistant United States Attorney
Attorney Reg. No. 017516X

JULIE E. ALLYN
Assistant United States Attorney
Attorney Reg. No. 256511

ALLISON ETHEN
Assistant United States Attorney
Attorney Reg. No. 0395353