UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 18-150(1) (DWF/HB)

UNITED STATES OF AMERICA,

                Plaintiff,              **TRIAL BRIEF OF THE**
                                          **UNITED STATES**

      v.

MICHAEL HARI,

                Defendant.

The United States of America, by and through its attorneys Erica H. MacDonald, United States Attorney for the District of Minnesota, and Julie E. Allyn, John Docherty, and Allison Ethen, Assistant United States Attorneys, respectfully submits its trial brief in this case. Included in this brief is a summary of the facts the government expects the evidence will establish at trial, as well as briefing regarding evidentiary matters that may arise during trial.

## I.      <u>SUMMARY OF EVIDENCE AT TRIAL</u>

Defendant Michael Hari ("Hari") is the leader of a terrorist militia group responsible for a multi-state criminal campaign of bombings. Hari called his extremist militia "The White Rabbits" with the motto: "Ain't no fun when the rabbit got the gun." Hari's base for his militia group was an office in the small town of Clarence, Illinois. There, Hari recruited several men, including co-defendants Joe Morris and Michael McWhorter. Hari outfitted his militia with tactical vests and assault rifles, and assigned them ranks. Hari's first mission of hate-fueled violence was to bomb the Dar al-Farooq Islamic Center in Bloomington, Minnesota.

*Bombing of the Dar al-Farooq Mosque*



In the early morning hours of August 5, 2017, as the sun was rising at 5:00 a.m., several men gathered for morning prayers at the Dar al-Farooq Islamic Center.  An Imam led these worshippers in prayer; a time for maintaining faith and devotion in the quiet of the pre-dawn.  The men's right to freely exercise their religion was shattered by the screams of one of the men, H.J., yelling "Fire! Fire!" through the hallways of the Mosque.

H.J. had finished his morning prayers before the others, and as he walked through the Mosque parking lot, he heard a loud noise of glass breaking.  H.J. immediately turned toward the sound and saw a man run from the Mosque and leap into a truck parked next to the building.  The truck sped away.  H.J. knew immediately something was wrong.  He saw the Imam's office window was broken – and he could see smoke inside.  H.J. ran into the Mosque yelling "Fire!" As he ran down the hallway, he heard and felt a loud explosion that shook the concrete walls of the Mosque.  The men in the Mosque scattered in shock

2

and confusion.  Soon they would learn their Mosque had been bombed by an improvised explosive device.  Even later, they would learn that three men, Defendant Hari and co-defendants Michael McWhorter and Joe Morris, drove from central Illinois to bomb their Mosque with a 10-pound black powder pipe bomb.  All because Hari and his men hated Islam and wanted Muslims out of the United States.  The sanctuary and the community of the Mosque would never be the same again after such a violent manifestation of hate.

*Investigation at the Scene*

The executive director of the Mosque, M.O., was inside at the time of the bombing and called for help.  First responders, including the Bloomington Fire Chief and Bloomington bomb squad technicians, assessed the scene and observed extensive blast damage: a broken and charred window, pieces of shrapnel throughout the room, and light




fixtures fallen from the ceiling and scattered around the office.  The carpet was shredded and burnt with a large stain of what turned out to be diesel fuel.  Luckily no one had been in the Imam's office at the time the bomb went off – as shrapnel had pierced through chairs and desks.

Realizing that a house of worship had been bombed, the bomb squad officers conducted a sweep of the building for victims and other explosive devices and called the Federal Bureau of Investigation (FBI) to the scene.

*Forensic Analysis*

The FBI's evidence response team arrived at the Mosque and collected evidence from the Imam's office.  This evidence included an intact, four-inch diameter end-cap and fragments of PVC pipe – parts typically associated with a pipe bomb.  The FBI submitted items of evidence collected from the bombed-out room and the grassy area outside the broken window to its laboratories in Quantico, Virginia for testing, including submissions for explosives analysis.  Forensic analysis corroborated what the bomb squad observed – the pieces collected from the Imam's office were in fact the fragmented remains of an improvised explosive device consistent with black powder having been packed into a sealed PVC pipe.

*The Minnesota Investigation*

For over seven months, the Minneapolis office of the FBI investigated multiple leads to find those responsible for the Mosque bombing.  They interviewed countless witnesses who worked at the Mosque, those who lived or were near the Mosque, suspicious vehicles, and purchasers of black powder.  Then, at the end of January 2018, over 500 miles

4

away, in Champaign, Illinois, FBI Agent Joel Smith received an anonymous tip.  The tipster claimed to know of a group of men who bombed the Mosque in Minnesota, and who attempted a bombing of the Women's Health Practice clinic in Illinois in November 2017. This group included Hari and his co-defendants Joe Morris and Michael McWhorter.

*The Illinois Investigation*

As the FBI in Illinois investigated the source of the tip, another, very different anonymous tip came through an ATF tip line on February 19, 2018.  This anonymous tip claimed there was a "possible terrorism threat" and the tipster made inflammatory, racist statements as to the motive behind the threat.  The tip claimed that a man, with the initials of J.O., had bomb making parts and supplies in his shed at a specific address in Clarence, Illinois.

Law enforcement immediately responded to J.O.'s home in Clarence and found the explosive materials as described by the tip.  J.O., however, told investigators he had nothing to do with those explosives, but he knew who did: Michael Hari.  J.O. explained he had a pending criminal case against Hari for assaulting him in June 2017.

On February 27, 2018, the FBI began canvassing the small town of Clarence, Illinois to see if anyone had knowledge involving the devices found on J.O.'s property.  This canvassing included Agent Smith talking with Herbert McWhorter ("Herbert"), Michael McWhorter's brother, on his front porch.  Herbert was living in a house just around the corner from Hari's office.

Herbert informed Agent Smith that Hari and Joe Morris had recently stashed a large duffel bag in his home.  With Herbert's consent, Agent Smith searched the duffel bag and

discovered multiple firearms, including four AR-15 style assault weapons with no serial numbers.  Agents would later learn that two of the firearms were altered to be fully automatic.  Among the weapons was a tactical vest belonging to Hari, with an attached patch that read: "Pork Eating Crusader."



While Agent Smith was talking with Herbert on the front porch, Hari arrived at the house wanting to speak with Herbert.  Agent Smith identified himself to Hari as an agent with the FBI.  Hari, however, ignored Agent Smith.  Hari asked Herbert where to find Ellis Mack ("E.J.")[1] and Herbert told Hari that E.J. was down the road at the home of Michael McWhorter and his wife Josie McWhorter ("Josie").  E.J. is Josie's McWhorter's then 18-old son, and Josie is married to Michael McWhorter.  Agent Smith observed Hari stare into Herbert's home for several seconds through the cracked open front door while officers

---

[1] E.J. Mack is a codefendant with Hari in charges from the Central District of Illinois.

6

were inside securing the recovered weapons for transport.  Hari then left and drove to Josie's home down the block.  After approximately 20 minutes, investigators observed Hari leave Josie's house with E.J.

Josie was not home when Hari left with E.J., but was with Michael McWhorter and Joe Morris at work in Rantoul, Illinois.  While the three were finishing work, Hari contacted Joe Morris and Michael McWhorter and warned them not to return to Clarence because of the FBI's presence in the town.  Josie drove Joe Morris and Michael McWhorter to a remote location so the men could lay low until the FBI left Clarence.  Hari kept the men on the run and in hiding for approximately a week and a half.  During this time, Hari believed he was starting a revolution and created videos he posted to YouTube to incite followers to respond to Clarence and fight against the federal government.

Agent Smith went to Josie's house while the men were still missing.  Josie gave Agent Smith three cell phones belonging to Hari, Joe Morris, and Michael McWhorter.  Agent Smith placed the phones in "airplane mode" to preserve any evidence, and the phones were later forensically imaged at the FBI offices in Springfield, Illinois pursuant to a search warrant.

*Co-defendants Michael McWhorter and Joe Morris*

Between March 10 and March 13, 2018, Michael McWhorter and Joe Morris resurfaced in Clarence and indicated they were ready to talk to law enforcement.  Joe Morris and Michael McWhorter described how Hari led them, and others, as part of the White Rabbit Militia in a campaign of bombings, home invasions, and armed robberies

using illegal, fully-automatic infantry assault rifles.[2]   The bombing of the Dar al-Farooq Islamic Center in Minnesota was their first target.

*Hari Orchestrated the Bombing of the Mosque*

Joe Morris and Michael McWhorter described how Hari selected and planned the bombing of the Mosque to scare Muslims out of the country and show they are not welcome in America.  Hari rented a truck from Enterprise rental in Champaign, Illinois for the trip to Minnesota.  Hari loaded the truck with a pipe bomb and assault rifles, and drove to pick up Morris and McWhorter from their homes in Illinois.  Hari told the men to leave their cell phones at home.  Hari drove the men through the night, careful not to take tollways to avoid surveillance.  Once at the Mosque, Hari pulled the truck up alongside the curb outside the window of the office belonging to the Imam.  Hari stayed in the car while, at Hari's direction, Morris, swinging a sledgehammer, smashed the window.  McWhorter took the black powder pipe-bomb, lit the fuse, and threw the explosive device into the Imam's office.  To increase the damage, Morris then tossed a plastic container full of a 50-50 mixture of diesel fuel and gasoline into the office.  The men climbed back into the waiting get-away truck driven by Hari.  As Hari sped away from the Mosque, the men high-fived their "victory" in bombing the Mosque.

After Hari drove Morris and McWhorter out of the State of Minnesota, they stopped that day to rest in a motel.  Hari and the men searched online for news of the Mosque bombing.  Amongst the news coverage of the bombing were comments in praise for what

---

[2] Although the codefendants pled to these various crimes, the government will only offer evidence of these other crimes in accordance with the Court's ruling on the 404(b) evidence.

the men had done.  One commenter retorted to on online complaint about the bombing with the phrase: "Ain't no fun when the rabbit's got the gun."  Hari now had his name for his terrorist militia: the White Rabbits.

After the Mosque bombing, Hari recruited new members and formalized the already-existing hierarchical structure of his paramilitary terrorist organization by making himself the leader, the "captain," of the White Rabbits.  He named McWhorter a "sergeant," and Morris a "corporal."  Hari ordered patches for the militia members, including several depicting a white rabbit and his slogan. Hari drafted the "White Rabbit Handbook," which contained, among other things, his views on why Islam is incompatible with American government and advocating armed revolution.



*Search Warrants*

The base of the White Rabbits was an office Hari rented at 100 South Main Road in Clarence, Illinois.  When the FBI executed a search warrant at the office, they found it was filled with evidence of Hari's militia.  Items seized included live ammunition, a bullwhip, knives, Faraday bags (used to block cell phone signals), radio scanners, and cell phone

jammers.  Investigators also found tubs containing the full uniforms of men ready to commit assaults: green fatigues; helmets; bandoliers; tactical belts with magazine pouches; black masks; handcuffs; ankle cuffs; and load-bearing body armor vests displaying patches like "Infidel" and "White Rabbit."

Agents also searched Hari's parents' house, where he frequently stayed because his home had no electricity or running water.  There, Agents seized Hari's Dell laptop computer and one of his cell phones.  These devices, like the other cells phones obtained from Josie McWhorter, were later forensically imaged at the FBI offices in Springfield, Illinois and have been reviewed by FBI Computer Forensic Examiners pursuant to a search warrant.

Hari now stands charged in Minnesota, along with Joe Morris and Michael McWhorter, in a multi-count Indictment charging him with: Intentionally Defacing, Damaging and Destroying any Religious Property Because of the Religious Character of that Property; Intentionally Obstructing, and Attempting to Obstruct, by Force and the Threat of Force, the Free Exercise of Religious Beliefs; Conspiracy to Commit Federal Felonies by Means of Fire and Explosives; Carrying and Using a Destructive Device During and in Relation to Crimes of Violence; and Possession of an Unregistered Destructive Device.

## II.     ANTICIPATED EVIDENTIARY AND LEGAL ISSUES DURING TRIAL

### A. The Government may Introduce Out-of-Court Statements by the Defendant and his Co-conspirators

Hari led his co-defendants and other co-conspirators in a wide-ranging conspiracy as members of his paramilitary organization.  The government will be calling several of these cooperating co-conspirators and anticipates that, during trial, it will seek to admit numerous out of court co-conspirator statements.

Federal Rule of Evidence 801(d)(2)(E) governs the admissibility of co-conspirator statements and provides that a statement is not hearsay if it is offered against a party and "was made by the party's coconspirator during and in furtherance of the conspiracy."  *See* Fed. R. Evid. 801(d)(2)(E).  Such an out of court declaration is admissible against a defendant under this rule if the government demonstrates: (1) that a conspiracy existed; (2) that the defendant and the declarant were members of the conspiracy; and (3) that the declarations were made during the course of and in furtherance of the conspiracy.  *See United States v. Bell*, 573 F.2d 1040, 1043 (8th Cir. 1978).  Federal Rule of Evidence 104(a) requires the district court to apply a preponderance of the evidence standard in assessing the admissibility of evidence. *Bourjaily v. United States*, 483 U.S. 171, 176 (1987); *see also United States v. Meeks*, 857 F.2d 1201, 1203 (8th Cir. 1988).

In making its determination as to the admissibility of coconspirator statements, the district court may consider any relevant evidence, including the hearsay statements sought to be admitted.  *See Bourjaily*, 483 U.S. at 176–79; *see also Meeks*, 857 F.2d at 1203.  Although the statements themselves may be considered in determining their admissibility,

there must be at least some independent evidence (other than the statements) of the existence of the conspiracy before the statements are admitted. *United States v. Garbett*, 867 F.2d 1132, 1134 (8th Cir. 1989). The district court's discretion to admit co-conspirator statements "is particularly broad in a conspiracy trial."  *United States v. Davis*, 457 F.3d 817, 824 (8th Cir. 2006). The government will make the proper showing at trial for the admission of out-of-court statements by Hari and his co-conspirators as being admissible as substantive evidence against Hari.

### B.  Electronic Evidence

As in most modern criminal cases, evidence seized in this case includes computers and cell phones. Accordingly, as in most criminal trials, the government will seek to admit electronic evidence during its case-in-chief. The electronic evidence primarily includes data retrieved from Hari's cell phone and his Dell Laptop computer taken from his parents' house. Witnesses will testify as to the seizure of Hari's laptop and cell phones, and as to the items found in the electronic evidence. These witnesses will include FBI Computer Forensic Examiner Vicki Klemz, who will testify regarding the retrieval and review process of data found on the phones and Dell computer. The data on the cell phones includes, text messages, contact information, and photographs. The data retrieved from the computer includes, for example, writings and videos made by Hari, as well as relevant evidence of terms used to search the internet. The data from the computer and cell phones is admissible under a variety of justifications: the United States will present sufficient chain of custody; witnesses will testify to the authentication of the items; and the evidence

contains "distinctive characteristics" to help establish its authenticity.  *See* Fed. R. Evid. 901(b)(4).

### C.  Forensic Experts

"Federal Rule of Evidence 702 permits a district court to allow the testimony of a witness whose knowledge, skill, training, experience or education will assist a trier of fact in understanding an area involving specialized subject matter."  *United States v. Molina*, 172 F.3d 1048, 1056 (8th Cir. 1999).  Under Supreme Court precedent, "the [district] judge is to act as a gatekeeper in determining whether the proposed expert's testimony both is relevant and rests upon a reliable foundation." *United States v. Evans*, 272 F.3d 1069, 1094 (8th Cir. 2001).  District courts have wide latitude in determining the reliability of an expert's proposed testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999), .

An expert's opinion may be based on hearsay or facts not in evidence, where the facts or data relied upon are of the type reasonably relied upon by experts in the field. Fed. R. Evid. 703.

The Government provided the defense with a notice of its intent to call various experts on January 23, 2020.  The Government similarly provided to defense the relevant curricula vitae, reports, and notes, forming the basis of the opinions. The Government expects to call several of those expert witnesses in its case-in-chief to testify at trial:

- Robert Mothershead, a Forensic Chemist at the FBI laboratory, who will testify regarding his examination of the material recovered from the Imam's office;

- David Defusco, a Senior Explosive Enforcement Specialist with the ATF, who will testify as to the nature of the explosive devices;

- Jaqueline Slebrch, a Fingerprint Specialist at the FBI laboratory, who will testify regarding attempts to find fingerprints on several bomb debris items;

- Amanda Bakker, a Forensic DNA Biologist at an ATF laboratory, who will testify regarding DNA found on firearms;

- Other expert witnesses from the FBI laboratory in Quantico, Virginia may be called depending on the presentation of 404(b) evidence or for any rebuttal case. Notice of the testimony of those experts was provided to defense by letter dated January 23, 2020.

Additionally, although several witnesses are fact witnesses, since they may give what could be characterized as expert testimony, notice of their testimony was similarly disclosed in the expert disclosure letter. These witnesses include Bloomington Bomb Technicians Officer Mansur and Officer Risdall, Cellular Analysis Survey Team FBI Agent Greg Catey, and FBI Computer Forensic Examiner Vicki Klemz.

**D. Fed. R. Evid. 1006 Summaries**

Fed. R. Evid. 1006 allows a party to prepare a summary of voluminous writings to prove the content of those writings. Because this case involves some voluminous evidence, such as cell phone records and credit card purchase histories, the government intends to offer summary charts into evidence in order to assist the jury. "The testimony of a summary witness may be received so long as she bases her summary on evidence received in the case and is available for cross-examination." *United States v. Ellefsen*, 655 F.3d 769, 780 (8th Cir. 2011) (quoting *United States v. King*, 616 F.2d 1034, 1041 (8th Cir. 1980)) (permitting IRS Revenue Agent to testify as summary witness that management fees at issue in tax evasion case constituted constructive dividends).

Summary charts are properly admitted when (1) the charts fairly summarize voluminous trial evidence, (2) they assist the jury in understanding testimony already introduced, and (3) the witness who prepared the charts is subject to cross-examination with all documents used to prepare the summary. *United States v. Spires*, 628 F.3d 1049, 1052-53 (8th Cir. 2011) (citing Fed. R. Evid. 1006); *see also United States v. Boesen*, 541 F.3d 838, 848 (8th Cir. 2008) (holding charts summarizing clinic's revenue stream were properly admitted into evidence in health care fraud trial). "Also, summaries may include assumptions and conclusions so long as they are 'based upon evidence in the record.'" *Spires*, 628 F.3d at 1053.

As an example, the government will use such summaries to show financial records and telephone connectivity between telephone numbers assigned to Hari and his co-conspirators as well as compilation of evidence extracted from electronic devices. All of the documents underlying the summary charts have been disclosed to the defense.

### E.  Stipulations and Self-Authenticating Records Pursuant to Federal Rule of Evidence 902

The government has proposed several stipulations that would shorten the trial and obviate the need to call custodians of record as witnesses. For example, the government has proposed stipulations concerning the authenticity of business records (including bank records) and the National Firearm Registry. The government will continue to seek stipulations in advance of the pretrial conference. While no stipulations have yet been agreed on, the government is hopeful the parties will agree on at least some stipulations to be put on the record at the pretrial conference.

With respect to any business records for which Hari is unwilling to stipulate with respect to foundation, the government has provided and will continue to provide notice to defense counsel of its intent to offer these business records without a records custodian pursuant to the self-authentication provisions of Federal Rules of Evidence 803(6) and 902(11).  Federal Rule of Evidence 902(11) provides that certified domestic business records of regularly conducted activities can be self-authenticating and therefore admissible under Federal Rule of Evidence 803(6) if accompanied by a written declaration from a records custodian or other qualified person certifying that the records: (a) were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (b) were kept in the course of a regularly conducted activity; and (c) were made by the regularly conducted activity as a regular practice.  The Advisory Committee Notes to the 2000 Amendments make it clear that a declaration that satisfies 28 U.S.C. § 1746 would satisfy the declaration requirements of Federal Rule of Evidence 902(11).  The records have been and will continue to be identified with particularity to the defense in the government's Federal Rule of Evidence 902 notices, and these records have been provided in discovery.  Certifications for these records have been made available for defense review.  The government intends to introduce all such records into evidence *en masse* at the outset of the trial.

### F. The Government Should be Permitted to have a Second FBI Agent at Counsel Table

This is a complex case, involving a large number of people, expert witnesses, activity in both Minnesota and Illinois, and a great deal of evidence.  FBI Special Agent

16

Brenda Kane, based in Minnesota, has been involved in this case since the bombing of the Mosque.   Similarly, FBI Special Agent Joel Smith, previously based in Illinois, was involved in this case since receiving information from the tipster in Illinois concerning the bombing of the Women's Health Practice.  Both agents have been central to the collection of much of the evidence in the case.  This is a case which merits a second agent at the prosecution table.

### G. Jury Nullification

The government is concerned that Hari, a man charged with bombing a Mosque because he wanted Muslims out of the country, may attempt to introduce any irrelevant, immaterial, and unfairly prejudicial evidence for the purpose of jury nullification.  Based on rhetoric in comparable cases throughout the country, the government anticipates that Hari may seek to introduce testimony and argument aimed at, for example, (i) suggesting that prosecution of this case is politically motivated; (ii) attacking the propriety of federal civil rights laws; and/or (iii) asserting the prosecution violates his First Amendment rights (hereinafter, collectively referred to as "Hari's potential nullification evidence").   Hari's writings in the White Rabbit Handbook and his YouTube videos demonstrates he believes committing acts of violence is defensible to advance his ideological beliefs.  Hari should be precluded from attempting to justify his violent crimes with arguments that he, for example, is a patriot fighting to defend America, or from claiming that the prosecution is politically motivated.

Such nullification evidence or argument is impermissible as it would serve no purpose other than to improperly encourage jurors to set aside the Court's instructions and

decide the case on an impermissible basis.  The government seeks to highlight this concern

before the start of trial because any reference to Hari's potential nullification evidence—

even if just during *voir dire* or opening—could result in prejudice that cannot be undone

by the Court simply sustaining a timely objection from the government.

Certainly such nullification evidence is not relevant under Fed. R. Evid. 401.  Hari's

potential nullification evidence would encourage jurors to act in direct conflict with the

stated goals of Rule 403 of the Federal Rules of Evidence because such evidence would

serve only one purpose: to inflame the jury's emotions.  Hari asserting to the jury that

prosecution of his case is politically motivated against his political beliefs, or justifying his

actions as First Amendment protected speech, would suggest to the jurors that they should

decide the case based on political views, rather than on the basis of the substantive law

governing this action.  Admission of this sort of evidence would substantially risk unfair

prejudice and confusion, and would likely mislead the jury by unjustifiably distracting it

from the actual elements of the charged conduct.  In order to avoid such a result, and in

order to adhere to the tenets and principles of the Federal Rules of Evidence, the Court

should not allow such evidence.

The importance of guarding against attempts at jury nullification is supported by

longstanding precedent and practice.  *See e.g. United States v. Sepulveda*, 15 F.3d 1161,

1190 (1st Cir. 1993) ("the Court shall step in and 'block defense attorneys' attempts to

serenade a jury with the siren song of nullification"); *United States v. Trujillo*, 714 F.2d

102, 106 (11th Cir. 1983) ("[N]either the court nor counsel should encourage jurors to

violate their oath.") (citing *United States v. Dougherty*, 473 F.2d 1113, 1130-37 (D.C. Cir.

1972)); *United States v. Moylan*, 417 F.2d 1002, 1006 (4th Cir. 1969) ("Public and private safety alike would be in peril if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court, and become a law unto themselves."); *United States v. Thomas*, 116 F.3d 606, 614 (2d Cir. 1997) ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable *or that courts may permit it to occur when it is within their authority to prevent it*.") (emphasis added); *United States v. Powell*, 955 F.2d 1206, 1213 (9th Cir. 1992).

The decision in *United States v. Lucero* is particularly instructive. *See* 895 F.Supp. 1421 (D. Kan. 1995). *Lucero* was a civil rights case in which defendants were charged with violating the Freedom of Access to Clinic Entrances (FACE) Act by interfering with individuals' rights to obtain reproductive health services. *Id.* In their defense, the defendants sought to present, among other things, "philosophical" evidence regarding the implications of abortions. *Id.* at 1426. In refusing to admit such evidence, the court began its analysis by noting that jurors should not be encouraged "to violate their oath by refusing to apply the law as given in the court's instructions." *Id.* (citing *United States v. Trujillo*, 714 F.2d 102, 105-06 (11th Cir. 1983)). The court then determined that the defendants' proposed evidence was "irrelevant for any purpose other than to provoke the finder of fact to disregard the law" and that it was "irrelevant to any material issue in the case." *Id.* Consequently, the court excluded the proposed evidence under Fed. R. Evid. 402. *Id.* However, the court did not stop there, adding that, "even if such evidence were relevant, its probative value would be substantially outweighed by the likelihood that its presentation would result in unfair prejudice and confusion of the issues." *Id.* Finally,

and relatedly, the District Court in *Lucero* also explicitly rejected the defendants' claims based on the First Amendment.  *Id.* at 1425 ("Criminal conduct is not rendered protected speech in a given case merely because the actor intended to send a message, political or otherwise . . . [D]efendant is charged because of his conduct, not because of his message." (citing *United States v. O'Brien*, 391 U.S. 367, 376 (1968))).

Like the court in *Lucero*, this Court should be prepared to prohibit Hari's attempts to inject his political philosophy into the trial for the improper purpose of nullification.


Date:  September 29, 2020                    Respectfully Submitted,

                                             ERICA H. MacDONALD
                                             United States Attorney

                                             *s/ Julie E. Allyn*

                                             BY: JULIE E. ALLYN
                                             Assistant United States Attorney
                                             Atty. Reg. No. 256511

                                             JOHN DOCHERTY
                                             Assistant United States Attorney
                                             Atty. Reg. No. 017516X

                                             ALLISON ETHEN
                                             Assistant United States Attorney
                                             Atty. Reg. No. 0395353