UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 18-150(1) (DWF/HB)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>vs.<br><br>MICHAEL HARI,<br>    Defendant. | **Defendant's Motion in Limine<br>To Exclude Identification Evidence** |

Defendant Michael Hari submits this motion in limine to preclude a particular offering (or additional and as-yet unknown offerings) of improper identification evidence at trial. The reasoning follows—

**Background**

1. This case has been the subject of numerous rounds of pretrial briefing, and the Court is familiar with the charges and allegations. (*E.g.,* ECF 227 (trial brief containing synopsis of government's anticipated case-in-chief evidentiary presentation)). Of particular note here, the government claims that it will present trial evidence that Defendant Hari and others committed the charged offense by means of a "black powder pipe bomb," which is purported to have been fashioned sometime in August 2017. (ECF 227 at 3).

2. Owing to obligations imposed by the United States Constitution and Federal Rules of Criminal Procedure, the government has supplied the defense with a number of reports generated by law enforcement investigators and their interviews of potential witnesses. One report included a single-photo of Mr. Hari shown to a shop employee in

1

Arthur, Illinois on April 17, 2018. When defense counsel moved to suppress the identification procedure as unnecessarily suggestive and thereby depriving Mr. Hari of due process of law, the government confirmed that they would not be calling the witness nor presenting any information regarding the identification of Mr. Hari. (ECF 85, 109).

To date, the government has not provided any other reports suggesting that any non-accomplice-witness has positively identified Mr. Hari as a person connected with the Dar al Farooq bombing or the "black powder pipe bomb" at issue.

    3.    According to the discovery reports and publicly available literature, black powder is a substance with chemical properties capable of rapid release of energy. (Gov. Disc. 16,311-13). Black powder is thus used in a number of applications, such as a propellant for low-tech or vintage firearms. (Gov. Disc. 16,311-13).

    4.    The papers theorize the black powder used to construct the "pipe bomb" in question was procured from an Indiana company, owned and operated by a person identified here by the initials JC. (Gov. Disc. 16,311-13 & 24,906-07).

    5.    The papers indicate that law enforcement officials interviewed JC in person in July 2018. (Gov. Disc. 16,311). According to the report, long before this interview ("a few months back"), law enforcement officers had sent JC a facsimile transmission containing images of the "four Clarence suspects." (Gov. Disc. 16,311). During the July 2018 in-person interview, JC inquired: "[A]re you asking about these guys?" (Gov. Disc. 16,311). The report states that questioning officers responded in the affirmative, and also presented JC with "a booking photograph of [Defendant] Hari and driver's license photograph of [Defendant] McWhorter." (Gov. Disc. 16,311).

6. JC's response was disappointing from the perspective a law enforcement officer trying to build a case: "[H]e does not remember either of the men but that does not mean they were not in the store." (Gov. Disc. 16,311).

7. Nonetheless, according to the reports, the officers attempted to nudge JC into a positive identification of Mr. Hari and the other "suspects," as having purchased black powder in August 2017. (Gov. Disc. 16,311-13). An officer "advised that Hari sometimes wore a straw hat and dressed like the Amish with a white shirt and suspenders." (Gov. Disc. 16,312).

8. JC responded that the added information was of no assistance at all; but rather reinforced the inability to offer a positive identification of Mr. Hari. (Gov. Disc. 16,312). JC said: "[T]here are several Amish communities in the area and they all buy black powder from him in August before hunting season in September." (Gov. Disc. 16,312). Had a person matching the officer's description come into the store in August 2017, said JC, he would have "assumed that he was part of the local community that buys from him and pays in cash." (Gov. Disc. 16,312). He would have not asked for official identification credentials; nor taken the time to question the buyer; nor taken particular note of the transaction at all. (Gov. Disc. 16,312-13).

9. Making a final try, the officer asked about a hypothesized situation where an Amish-appearing person had been accompanied by a non-Amish-appearing person. (Gov. Disc. 16,312). JC responded this was the most common scenario that he typically encounters in operating his enterprise; no help at all in highlighting any particular transaction from a year prior. (Gov. Disc. 16,312).

10. The reports say that in December 2019—about 1.5 years after the first interview above and more than 2 years after the August 2017 target date—officers contacted JC yet again. (Gov. Disc. 24,906-07). This time, JC reported that he "suffered from a stroke years ago and struggles with memory issues." (Gov. Disc. 24,906-07).

11. The reports say that JC produced business records indicating a sale of 20 pounds of black powder on August 1, 2017. (Gov. Disc. 24,906). But no customer information accompanies the entry, and JC explained the entry merely indicates a sale to "a non-licensed individual over the age of 18 years old." (Gov. Disc. 24,906).

12. Defense counsel and a defense investigator spoke with JC on October 23, 2020. In the course of this interview—and contradicting everything above—JC now reports that he has developed a memory of the precise sale of black powder to a person dressed in Amish-like clothing on or about August 1, 2017, and that Defendant Hari is the person who made the purchase on that date.

13. The newly revealed positive identification does not appear in the government's discovery materials. JC's name appears on the government's witness list, and presumably is likely to present testimony at trial.

## Discussion

The Supreme Court has long recognized that "improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals." *Simmons v. United States,* 390 U.S. 377, 383 (1968). The danger heightens when paired with highly suggestive police methods, *e.g.,* when "police display to the witness only the picture of a single individual," and/or "the police indicate to the witness that they have other evidence

that one of the persons pictured committed the crime." *Id.* This is precisely the situation described above, and for this reason Defendant Hari requests an order precluding JC's anticipated in-court identification testimony. And for that matter, any other in-court or out-of-court identification evidence containing similar defects. The requested relief calls for a discussion of: (A) the legal standard applicable to improperly suggestive identification evidence; and (B) prophylactic measures to avoid identification testimony at trial.

**A.     Unfairly Suggestive Photographic Identification.**

An "eyewitness identification at trial following a pretrial identification by photograph" should be excluded when the "photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons,* 390 U.S. at 384. This inquiry requires a two-step analysis. A court is to: (1) determine whether the police-initiated pretrial identification procedures were impermissibly suggestive; and (2) if so, look to the totality of circumstances to determine whether the suggestive procedures created a substantial likelihood of misidentification. *United States v. Tucker,* 169 F.3d 1115, 1117 (8th Cir. 1999).

**1.     Suggestive Pretrial Identification Procedures**

The Supreme Court has long observed that certain police-initiated and out-of-court identification techniques are so unduly suggestive as to cast grave doubt upon resulting identification evidence. *E.g., Simmons,* 390 U.S. at 383. This includes, for example, situations in which the "police display to the witness only the picture of a single individual," and/or "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Id.* The Eighth Circuit has long held that

5

such techniques are "unnecessarily suggestive." *E.g., Ruff v. Wyrick,* 709 F.2d 1219, 1220 & n.2 (8th Cir. 1983).

Here, long before the initial in-person interview, officers sent JC a facsimile transmission containing images of the "four Clarence suspects." (Gov. Disc. 16,311). During the July 2018 in-person interview, officers presented JC with "a booking photograph of [Defendant] Hari and driver's license photograph of [Defendant] McWhorter." (Gov. Disc. 16,311). Officers made clear their claim that Defendant Hari and the rest had purchased black powder from JC's store "to make an explosive device," an assertion which JC accepted. (Gov. Disc. 16,313). And then, the police continually prompted JC to make a positive identification by supplying additional information about what Defendant Hari *might have been* wearing, or who he *might have been* standing next to. (Gov. Disc. 16,312).

In short, the police: (i) displayed to JC a single-suspect (or group-of-suspects) photograph; (ii) informed JC that Mr. Hari had purchased black powder to construct an illicit explosive device; and (iii) continually nudged him toward a positive identification. All of this presents "a compelling example of unfair" identification procedures which created a high likelihood of false identification down the road. *Foster v. California,* 394 U.S. 440, 443 (1968).

Despite all of that, however, JC did *not* identify Defendant Hari as a purchaser of black powder when he was interviewed in August 2017, nor when he was interviewed in July 2018, nor when he was interviewed in December 2019. The positive identification only came to the defense's attention in recent days as defense counsel attempted to follow

6

up with some of the government witnesses. As shown next, the new-and-contradictory identification must be excluded at trial.

### 2.  Totality of the Circumstances

Having demonstrated unduly and unnecessarily suggestive identification techniques above, the applicable standard turns to a totality-of-circumstances test which considers the following factors: (i) opportunity of witness to view the suspect at time of purported incident; (ii) witness degree of attention at time of purported incident; (iii) accuracy of witness prior description; (iv) level of certainty demonstrated by witness; and (v) length of time between relevant incident and testimony. *Tucker,* 169 F.3d at 1118.

Here, all of these factors cut strongly against the reliability of JC's new and self-contradictory identification. As noted above, from August 2017 to recently, there was no real evidence that JC had ever set eyes on Mr. Hari at all. Indeed, he consistently denied having recognized Mr. Hari's photo during that entire timeframe. He consistently admitted a zero level-of-certainty with respect to Mr. Hari's identification as a buyer of black powder at his store. He has admitted suffering from memory problems due to medical conditions. And yet now—more than three years after the alleged incident and after all the above denials—JC now claims the ability to positively identify Mr. Hari as a buyer of black powder at his store on or about August 1, 2017.

The abrupt reversal boggles the senses. The reality is, JC has long denied ability to positively identify Mr. Hari even under the highly suggestive police identification procedures above. Only now—on the eve of trial and years later—does JC claim the ability to offer a positive identification. This is a straightforward example of an unfair

identification procedure which presents an unacceptable danger of misidentification. The resulting identification evidence must therefore be excluded from trial.

### B.     Prophylactic measures

When it appears that a government witness will make an in-trial identification of the accused that is "infected by improper police influence," the task of a district court is to conduct a preliminary "screen [of] the evidence for reliability." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). A trial court is permitted to conduct hearings to decide such preliminary matters, FRE 104, and also to craft trial procedures to exercise reasonable control over the mode of examining witnesses and presenting evidence, FRE 611(a).

In this case, given the above analysis, the defense requests that the Court issue an order precluding JC from making an in-court identification of Mr. Hari. The defense requests that, prior to any testimony offered by JC, that the Court caution JC not to make any such identification. And the defense requests that the Court order the government to seek the Court's permission if it anticipates any of its witnesses making an in-court identification for the first time at trial.

Dated: October 28, 2020          Respectfully submitted,

*s/ Shannon Elkins*

SHANNON ELKINS
Attorney ID No. 332161
Attorney for Mr. Hari
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415