UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 18-150(1) (DWF)

| | | |
|---|---|---|
| UNITED STATES OFAMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Defendant's Motion for a New Trial** |
| | ) | |
| MICHAEL HARI, | ) | |
| Defendant. | ) | |

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure (FRCrP), Defendant Hari respectfully submits this Motion for a New Trial, based upon suppression of exculpatory evidence within the meaning of the Supreme Court's decision in *Brady v. Maryland,* 373 U.S. 83 (1963) and its progeny.

## I.  The Legal Standard

Rule 33 provides: "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FRCrP 33(a). If the motion for new trial is grounded upon "newly discovered evidence," then the motion is timely so long as it is filed within three years of the verdict. FRCrP 33(b)(1).

Generally speaking, to succeed on such a motion the defendant must show:

1.    The evidence was unknown or unavailable to the defendant at the time of trial;

2.    The defendant was duly diligent in attempting to uncover it;

3.    The newly discovered evidence is material; and

4.    The newly discovered evidence probably will result in acquittal upon retrial.

1

*United States v. Beckman*, 787 F.3d 466, 491 (8th Cir. 2015).

However, this particular Rule 33 motion is based upon suppression of exculpatory evidence, contravening the Supreme Court's decision in *Brady v. Maryland,* 373 U.S. 83 (1963) and its progeny. The core holding of *Brady* is:

> [S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Id.* at 87. This is commonly known as the *Brady* rule. And in the case of a federal prosecution, any violation constitutes a deprivation of a defendant's right to a fair trial under the Due Process Clause of Fifth Amendment. *United States v. Agurs,* 427 U.S. 97, 107 (1976).

When a Rule 33 motion for new trial is based upon a claimed violation of the *Brady* rule, the Eighth Circuit Court of Appeals has placed primary focus upon the elements of that specific claim rather than the above general Rule 33 standard. *E.g., United States v. Carman,* 314 F.3d 321, 324 (8th Cir. 2002). In part, this is because "withholding of exculpatory evidence from the defense" is a constitutional violation that is "far more likely to result in an acquittal" than many others which may be discovered following the conclusion of trial. *United States v. Rubashkin,* 655 F.3d 849, 857 (8th Cir. 2011). Thus, for purposes of this motion, the principal question is whether there exists a violation of the *Brady* rule, and necessarily a deprivation of a fair trial under the Fifth Amendment Due Process Clause. *E.g., Carman,* 314 F.3d at 324; *accord, e.g., United States v. Garrett,* 898 F.3d 811, 816 (8th Cir. 2018) (reviewing *Brady*-premised motion for new trial under elements of *Brady* claim rather than generalized Rule 33 standard).

2

To establish a violation of the *Brady* rule, the defendant must establish:

1.      The evidence at issue was favorable to the defendant;

2.      The evidence was material to guilt; and

3.      The government suppressed the evidence.

*United States v. Ladoucer,* 573 F.3d 628, 636 (8th Cir. 2009). The inquiry calls for an evaluation of the suppressed evidence in question within the "context of the entire record." *Turner v. United States,* 137 S. Ct. 1885, 1893 (2017).

## II.   The Pertinent Record

### A.      The Charged Offense

Defendant Hari—alongside co-defendants Michael McWhorter and Joe Morris—was charged with multiple federal offenses in 2018. (ECF 14). Underlying all charged offenses was the core Actus Reus, alleging that on the days leading up to and including August 5, 2017, the defendants:

- constructed a destructive device, *i.e.,* a "pipe bomb"';

- traveled from Illinois to the Dar al-Farooq Islamic Center in Minnesota; and

- broke a window of the Dar al-Farooq mosque and threw a pipe bomb therein, causing an explosion and property damage;

all allegedly in violation of a number of federal criminal statutes. (ECF 14).

### B.      Pretrial Motions

In July 2019, Defendant Hari submitted a number of pretrial discovery motions, including:

- A motion for disclosure of evidence favorable to the defendant, under the above *Brady* rule, (ECF 82);

3

- A motion for discovery under FRCrP 16, including inspection of any items or materials which are "material to the preparation of the defense," (ECF 84);

- A motion for law enforcement agencies to retain notes and evidence procured in the course of official investigation at hand, (ECF 88); and

- A motion for discovery of information collected—perhaps unlawful interception of attorney-client privileged material—by Defendant Hari's pretrial jailors, (ECF 90).

Specifically, in reference to the motion for discovery of information collected by Defendant Hari's pretrial jailors, at the motions hearing the government acknowledged the need to monitor the situation and inform defense counsel should any improprieties come to light. (ECF 127 at 7-9). It was acknowledged that the obligation extended to law enforcement case agents. (ECF 127 at 9). It was further acknowledged that "standard" materials from the jailors—*e.g.,* recordings of defendant telephone calls—were being collected and disclosed to the defense. (ECF 127 at 9-10).

The remaining motions listed above were presented unopposed and submitted on the papers. (ECF 127 at 4-5). All were granted. (ECF 125 at 1-2). Counsel's re-review of the government's pretrial disclosures shows multiple and voluminous productions from initial charge up to trial, including numerous records procured by law enforcement from jail facilities housing the cooperator-witnesses, discussed in more detail next.

## C.    Cooperator Witnesses

Codefendants McWhorter and Morris did not trouble with pretrial discovery nor pretrial motions. Both had transitioned from adversarial litigants to cooperator-witnesses long before they were ever appointed counsel in Minnesota. The arrangement was

4

formalized in January 2019 via plea agreements, (ECF 43 & 44), but the reality is that they both had been working with law enforcement officials for much longer. Both McWhorter and Morris had been working with law enforcement at least since March 2018, shortly after they had returned from a multi-day ramble through the Illinois countryside and months before formal charges had been instituted. (*E.g.,* ECF 1 at 5-8).

That early cooperator-sourced version of events rapidly morphed into the government's official theory of the case and dictated the direction of the investigation, as well as the specific allegations in the charging document, *e.g.,* the claim that "[Defendant Hari] constructed a destructive device, specifically, a pipe bomb." (ECF 14 at 3). Long before trial, it became clear that the government's case would hinge on the (very) early account of the cooperator-witnesses, who would present some form of the following version of events:

- In 2017, Defendant Hari "recruited" McWhorter and Morris to conduct acts of violence against targets "on the left," which included adherents to the religion of Islam.

- On August 4, 2017, Defendant Hari instructed Morris and McWhorter to travel with him from their central Illinois homes to Minnesota in a rented vehicle.

- For the trip, the three brought a "pipe bomb" fashioned from a plastic casing, gunpowder, and a liquid mixture of diesel fuel and gasoline.

- Upon arrival at their destination on August 5, 2017, the men smashed a window and threw a pipe bomb and the liquid mixture of diesel fuel and gasoline in the Dar al-Farooq Islamic Center.

- The pipe bomb exploded, causing fire and damage to the building.

(ECF 181 at 2-3; ECF 43 at 3-5; ECF 44 at 3-6).

Of note, the plea agreement of McWhorter is silent as to the identity of the person or persons who constructed the pipe bomb in question. (ECF 43 at 3-5). And that omission is particularly striking upon studying the plea agreement of Morris, which offers that Defendant Hari and McWhorter procured 20 pounds of black powder from an Indiana gun shop about two weeks prior to the above incident of August 4th and 5th of 2017, without saying how Morris came to know this purported information. (ECF 44 at 3-4). The Morris plea agreement also goes on to describe the pipe bomb in question and explicitly claims the device was "built by Hari by packing some of the black powder bought at the Indiana gun shop into a segment of PVC pipe." (ECF 44 at 4). As will be explored later, the above assertions clash with actual trial testimony of the cooperator-witnesses in a number of respects.

Prior to trial, the government and law enforcement officers fully accepted the above cooperator-witness version of events—to its maximal impact. The governments sought to corroborate the cooperator-witnesses' stories, most prominently, by offering an ultra-expansive presentation of Other Acts Evidence (OAE). (ECF 181). The defense objected, in part on the ground that that the proposed OAE was principally sourced from the very same cooperator-witnesses, and was therefore a form of attempted self-corroboration. (ECF 192 at 14). This Court issued a preliminary ruling which permitted a limited presentation of the OAE. (ECF 209).

Defendant Hari later moved to exclude the OAE for impeachment purposes, should he decide to testify at trial. (ECF 232). In part, the motion was based upon the unreliable nature of cooperator-witnesses, prejudice resulting from multiplicity of accusation, and

6

resulting burden upon the defendant's constitutional right to testify. (ECF 232 at 10-11). This Court again issued a preliminary ruling which presumptively excluded some categories of OAE for impeachment purposes, but permitted the use of other OAE for this purpose. (ECF 249 at 2-4).

With the construction of the government's case around the cooperator co-defendants, the matter proceeded to trial with the FBI case agents "central to the collection of much evidence in the case" at counsel table. (ECF 227 at 16-17).

### D.    The Trial Presentation

The relevant trial presentation is found in the transcripts (ECF 406-12), and are cited herein by volume and page number in format (Volume:TT at Page #).

### 1.    Opening Statements

#### (a) The Government

The government's theory of the case, as reflected in opening remarks, was broadly consistent with the above pretrial preludes. The government painted Defendant Hari as a clever ringleader and McWhorter and Morris as naïve dupes. (1:TT at 36-37). The government explained that Defendant Hari had a college education, while McWhorter and Morris lacked even a high school diploma. (1:TT at 35-36). The cooperators hailed from "small, rural town" in Illinois. (1:TT at 35). And Defendant Hari was much older than the cooperators. (1:TT at 36). The government claimed Defendant Hari was a "father figure" to Morris and a family friend and source of income to McWhorter. (1:TT at 36). In the government's telling, Defendant Hari "leveraged these emotional and financial connections" to goad the pair into committing crimes at Defendant Hari's bidding. (1:TT

at 36-37).

It was acknowledged that McWhorter and Morris committed the actual bombing of the Dar al-Farooq on August 5, 2017—not Defendant Hari. (1:TT at 38-39). But this non-action was portrayed not as a void in the government's case which must be filled by independent evidence of actual and active involvement, but rather the government painted this as a clever means of evading responsibility and capture. (1:TT at 38-39). "[T]he most important thing that [Defendant Hari] did" to avoid "being caught," claimed the government, was Defendant Hari "never got out of the truck" on the day of the bombing. (1:TT at 38-39).

(b) The Defense

For its rejoinder, the defense pointed out that the government's case was built upon the shaky foundation of these cooperator-witnesses. (1:TT at 53-57). Their strong incentives—in the form of greatly reduced punishment—to lay blame at Defendant Hari's feet. (1:TT at 53-57). The defense highlighted their shifting stories about the relevant events, including what the bomb looked like and who constructed it as well as their numerous meetings with law enforcement officials to hone the story, over a period of months extending to years. (1:TT at 53-57).

2.     **McWhorter Testimony**

When at last cooperator-witness McWhorter took the stand, he played the government's version of events—in strong alignment with his own self-interest—to the hilt. McWhorter attained only a 10th grade education. (3:TT at 581). McWhorter's association with the significantly-older Defendant Hari originated through his parents.

(3:TT at 581-82). McWhorter's parents, he claimed, told Defendant Hari of McWhorter's financial strains in summer of 2017. (3:TT at 590).

As McWhorter tells it, Defendant Hari approached him that summer offering paid employment. (3:TT at 591-95). The proposed job description involved violence against persons and buildings associated with "left-leaning" political actors and Defendant Hari informed McWhorter that this job could result in imprisonment or death. (3:TT at 595-97). Thus, as he claims, McWhorter knew he would be engaging in illicit acts. (3:TT at 599).

Despite the open peril and claim of non-political affiliation, McWhorter agreed to the proposed employment with little hesitation, explaining that he was unemployed and "desperate." (3:TT at 581, 597-98). He alleged that Defendant Hari offered a possible $50,000 sign-on bonus. (3:TT at 597-98). And yet, according to McWhorter's own account, he remained in Defendant Hari's employ for months with nary a word about a $50,000 bonus. Instead, he settled for a stipend of $500 per month for rent. (3:TT at 600).

McWhorter claimed that Defendant Hari supplied him with a firearm, even though he didn't have much prior experience with firearms of any kind. (3:TT at 607). But this too, was contradictory with his other testimony at trial, during which McWhorter demonstrated acute knowledge of firearms, including classifications, means of modification, and functionality. (3:TT at 606-11, 672-76, 711-12).

McWhorter then presented his version of events with respect to the August 5, 2017 bombing of the Dar al-Farooq mosque. Not surprisingly, McWhorter testified broadly in line with the government's pretrial representations. According to McWhorter:

- Approximately a week prior to the Dar al-Farooq bombing, McWhorter and

> Defendant Hari traveled to an Indiana gun dealer, where the pair procured black powder;
>
> - On August 4, 2017, Defendant Hari picked up McWhorter in a rental vehicle and then Morris, and the group proceeded to drive throughout the night to Minnesota despite knowing nothing about the pipe bomb or reason for the trip;
>
> - At some point, McWhorter learned the vehicle contained a pipe bomb, and Defendant Hari informed the group that the objective was to use the device to damage a mosque;
>
> - Morris and McWhorter broke a window and threw the pipe bomb into the Dar al-Farooq mosque while Defendant Hari remained in the vehicle;
>
> - The device detonated as the group made its escape.

(3:TT at 615-46).

McWhorter specifically denied having constructed the bomb, in response to a prosecution question. (3:TT at 648). He asserted that Defendant Hari constructed the bomb. (3:TT at 648). He claimed that Defendant Hari had told him so. (3:TT at 648). He also testified as to some Court-permitted OAE items, including the claim that Defendant Hari constructed a separate bomb in McWhorter's presence after the August 5th, 2017 Dar al-Farooq bombing. (3:TT at 724).

Under defense questioning, McWhorter understood he had pled guilty to charges carrying a 35-year statutory minimum prison term, but that his sentence would be lowered upon the government's motion for his cooperation. (3:TT at 764-65). He also described his co-defendant and fellow cooperator Morris as cognitively "slower than normal" and immature. (3:TT at 686-87).

### 3.      Morris Testimony

At the time of trial testimony, Morris was 25 years of age and reported he had only completed up to the eighth grade. (4:TT at 887-88). He described his own serious mental disorders including diagnosed schizophrenia, manifesting in distorted perceptions of reality at times. (4:TT at 892-93; 5:TT at 1070-72). For example, he heard voices that did not exist. (*Id.*) At the time of the events at issue, he described having a very close relationship with Defendant Hari, claiming he was "like a father." (4:TT at 916).

With respect to events of August 4-5, 2017, Morris offered an account similar to that of McWhorter in many respects. (4:TT at 903-26). There were some significant discrepancies, however. Prominently, Morris testified that Defendant Hari *and* McWhorter constructed the bomb together. (5:TT at 1044-45). This directly conflicts with the testimony of McWhorter, who claimed that Defendant Hari alone had constructed the bomb. (3:TT at 648).

However, Morris and McWhorter certainly shared the same powerful cooperation incentives. Like McWhorter, Morris pled guilty to charges that carry a 35-year statutory minimum prison term. (5:TT at 1026). Like McWhorter, Morris knew the government must be satisfied with his cooperation to earn a sentence below the 35 years. (5:TT at 1026). And his jail letters express hopes for a prison term of 5 to 10 years. (5:TT at 1030).

### 4.      Closing Arguments

#### (a)  The Defense

In closing, the defense observed that McWhorter and Morris cooperated enthusiastically and repeatedly, once it became clear that the law enforcement officers were

closing in. (10:TT at 2164-66). The defense noted consistencies between the two accounts on perhaps five main points, with divergence on a number of others. (10:TT at 2168-71). The unusual pattern of consistency on five points but inconsistency on others raised the question of collusion, rather than honest attempt to accurately recall and relate historical events, argued the defense. (10:TT at 2168-69, 2172). Morris in particular demonstrated compromised facility as a witness and appeared coached. (10:TT at 2174-75).

> The defense argued:
>
> I don't think there's any doubt that Michael McWhorter and Joe Morris bombed the Dar al-Farooq Mosque on August 5th, 2017. They both pled guilty to 35-year mandatory minimums and they both were claim – claimed responsibility for the mosque bombing. * * * Sadly, these two, who had been living together for months, working together for months, driving to work together for months, must have colluded on their ten-day trip to the countryside . . . Because Michael Hari is the one who owns CRSS. He's the one who has the olive drab military uniforms, helped the guys get the guns. He's the one that they needed to use as a scapegoat. And they agreed then that Mr. McWhorter, and his family members, and Mr. Morris could get out of some really bad trouble if they pinned this on Mr. Hari.

(10:TT at 2175-76).

### (b) The Government

The government argued the cooperator accounts corroborate one another and their accounts match in key respects, though departing in some areas deemed "less important" by the prosecution. (10:TT at 2144-45). On rebuttal, in perhaps an ill-advised tack, the prosecutor personalized his own incredulity of the above defense theory:

> Well, as an exercise in speculation and in exceeding the evidence wildly, that was really quite something. Apparently, there is, according to the defense, a conspiracy, of which I apparently am a member, to frame [Defendant] Hari.

(10:TT at 2185). The prosecutor forcefully argued that there existed not even a "particle of

12

evidence" that the cooperator-witnesses colluded in their stories at any time. (10:TT at 2187-89). And the prosecutor claimed to "know" that Defendant Hari had been responsible for the bomb at issue. (10:TT at 2192-93). That the above defense theory was "absurd" and "an insult to [the jurors'] intelligence." (10:TT at 2193-94).

### 5.   Verdict

The above trial proceedings commenced on November 9, 2020 and concluded on December 9, 2020, a month later. (ECF 279-323). After deliberation, the jury returned verdicts of guilty as to all charged counts. (ECF 324). At this time, sentencing proceedings have not yet occurred and no final judgment has been entered. Hence, this Court retains jurisdiction over any post-trial motions.

### E.   Post-Verdict Disclosures

By letter dated March 22, 2021—more than three months after the verdict—the government disclosed additional discovery to the defense. Copies of the relevant correspondence and discovery materials have been submitted under seal as an addendum to this motion. (Add.).

The cover letter states that, in preparing for sentencing of McWhorter, prosecutors first noticed unfamiliar jail disciplinary reports referenced in the presentence investigation report. (Add. 1). And prosecutors obtained these reports from the Court's probation office. (Add. 1). The prosecutors explain,

> We then followed up with the FBI, and discovered that several discipline reports had not been forwarded to us by the Bureau.

(Add. 1). The prosecutors then dispatched the FBI to investigate a reference to Michael

McWhorter's possession of "battery packs with wires" at the Sherburne County Jail, resulting in a new report, (Add. 6).

Review of the referenced disciplinary reports shows that, in December 2019, a year before trial commenced, jail officials discovered an improvised incendiary device within the cell of McWhorter. (Add. 2). The device was described as:

> [A] battery pack with wires coming out of it. The wires were attached to two pencils that were wrapped in pieces of playing cards. Touching the ends of the pencils together creates heat, and ultimately fire.

(Add. 2). This was deemed a "minor" offense of contraband possession, resulting in disciplinary action. (Add. 2).

The jail reports show that in December 2020—following the trial verdict—jail officials discovered yet another device of this same sort, secreted in McWhorter's cell. (Add. 5). McWhorter was again disciplined. (Add. 5).

According to a witness statement created by an FBI agent, the above improvised incendiary devices are sometimes crafted and used by inmates to generate heat for purposes of lighting cigarettes and creating tattoos, among other uses that jail officials prohibit. (Add. 6).

At least the December 2019 report was in the possession of the FBI prior to trial. (Add. 2). And based upon the timing of the December 2020 report, it is reasonable to conclude that McWhorter possessed the second device in his jail cell at the very time he was testifying above, as to his own ignorance of firearms and incendiary devices, and that Defendant Hari alone was the one who assembled the bomb which was detonated at the Dar al-Farooq mosque.

14

### III.  Discussion

Defendant Hari respectfully moves for a new trial under FRCrP 33(a) & (b)(1), on the ground that pretrial suppression of the above-referenced disciplinary reports, (Add. 1-6), constitutes suppression of exculpatory evidence in contravention of the Fifth Amendment Due Process Clause, as articulated in the *Brady* rule:

> [S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Brady v. Maryland,* 373 U.S. 83, 87 (1963). As noted earlier, to succeed on a motion for new trial based on a violation of the *Brady* rule, the defendant must show:

1.    The evidence at issue was favorable to the defendant;

2.    The evidence was material; and

3.    The government suppressed the evidence.

*United States v. Ladoucer,* 573 F.3d 628, 636 (8th Cir. 2009). Below, each item is discussed in turn.

### A.  The Suppressed Evidence was Favorable to the Defendant

### (1)    Evidence "Favorable" to the defendant

"Evidence favorable to the defendant includes not only exculpatory evidence but also evidence that tends to impeach government witnesses." *United States v. Baez,* 983 F.3d 1029, 1044 (8th Cir. 2020). "Exculpatory evidence" includes that which tends to raise doubt about the defendant's guilt. *California v. Trombetta,* 467 U.S. 479, 485 (1984).

The suppressed evidence at issue here—*i.e.,* the jail disciplinary report showing that key cooperator-witness McWhorter possessed an improvised incendiary device in his

prison cell (Add. 2)—was "favorable" to Defendant Hari under the above definition. This can be demonstrated by looking at the "context of the entire record," as the Supreme Court instructs. *Turner v. United States,* 137 S. Ct. 1885, 1893 (2017).

**(2)      Relevant context of record**

Here, as detailed above in section II, the government's case-in-chief was principally grounded upon the accounts of cooperator-witnesses McWhorter and Morris. The record shows the cooperator-witnesses supplied these accounts to law enforcement early in the criminal process, shortly after arrest and long before commencement of formal charges. Oddly, and by the government's own commentary at trial, their stories diverge in a number of respects, yet align closely on points that the government deemed most important, *e.g.,* that Defendant Hari was the leader and planner of the Dar al-Farooq bombing. One point of divergence was the rather critical question of who constructed the bomb. McWhorter says it was Defendant Hari alone; Morris says both McWhorter and Hari were the builders.

At all events, the government's theory of the case—in line with the cooperator-witness claims—was that Defendant Hari was older and more educated than these purported naïve dupes. That Defendant Hari manipulated these men, taking advantage of McWhorter's financial straits and Morris's mental disabilities and emotional attachments.

McWhorter's testimony eagerly hewed to this theme. McWhorter claimed to be apolitical before his brief association with Defendant Hari, and yet it is claimed that he abruptly and enthusiastically engaged in politically-motivated acts of violence over a period of months. McWhorter claimed to have little prior experience with firearms, and yet during testimony, spoke about the functions and modification of firearms with remarkable

confidence. McWhorter claimed to have had no hand in constructing the bomb used against the Dar al-Farooq mosque, and yet somehow managed to detonate the device with no training or skill whatever, after having first laid eyes on it an hour earlier.

The entire story is, of course, theoretically possible, and yet deeply suspicious in so many ways. Particularly where, as here, the cooperator-witnesses are facing a 35-year prison term, reducible only upon the government's discretionary motion to reward "substantial assistance." 18 U.S.C. § 3553(e).

Defendant Hari advanced the theory that the cooperator-witnesses, at some unknown point, colluded to shift blame from themselves to Defendant Hari for the Dar al-Farooq bombing. A bombing which the cooperator-witnesses perpetrated together and without Defendant Hari. And critically, the suppressed jail disciplinary report on McWhorter (Add. 2) would have been highly favorable to this defense, in many ways.

### (3)    Defendant-"favorable" usages of suppressed evidence

### (a)    McWhorter as hypothesized bomb-maker

McWhorter claimed no hand in constructing the bomb used to damage the Dar al-Farooq mosque. He took pains to claim little or no technical skill in mechanical weapons, including firearms of which he spoke with remarkable confidence. That version of events fits neatly with the government's theory (gleaned early from cooperator statements) that Defendant Hari was the mastermind and ringleader of this group and took advantage of the others. However, the theory runs headlong into a number of contradictory pieces of information. For example, Morris testified that both McWhorter *and* Defendant Hari constructed the bomb together. To add yet more confusion of the issue, this Morris

17

testimony contradicts his own plea agreement, which identifies Defendant Hari as the sole bomb-maker.

The entirety of the record, then, is unclear and self-contradictory concerning the crucial question: Who constructed the bomb which detonated at the Dar al-Farooq mosque? If it was Defendant Hari—as the government advocates on the word of McWhorter and to a lesser-extent Morris—this goes a long way toward substantiating the government's theory that Defendant Hari was present for and directly involved with the main events which were controverted at trial. But if the bomb-maker was McWhorter, this would: (1) directly contradict McWhorter's testimony asserting that Defendant Hari alone built the bomb; (2) show that McWhorter along with Morris had created an elaborate fabrication of a key fact in order to shift blame to Defendant Hari; and (3) suggest that McWhorter and Morris alone built and detonated the bomb and only later concocted a false story that Defendant Hari had been involved.

The suppressed evidence concerning the incendiary device found in McWhorter's jail cell supports a powerful inference to support the latter hypothesis. (Add. 2). The evidence demonstrates that McWhorter is quite adept with construction of improvised incendiary devices, contrary to his statements to law enforcement and testimony at trial. The evidence shows that McWhorter is equally adept at concealing such a device, even in the highly monitored jail environment. In short, the suppressed evidence could have and would have been offered by the defense to show that McWhorter was the sole bomb-maker, which in turn undermines the government's theory of the case and presents a cascade of defendant-favorable inferences listed above.

18

(b)     Impeachment of McWhorter testimony

For the same reasons, the suppressed evidence would have been used to forcefully impeach the testimony of McWhorter, clearly the most critical witness at trial given the acknowledged weaknesses with the testimony of Morris (*e.g.,* mental health difficulties, self-contradictory account of events, etc.). When McWhorter denied having created the bomb under government questioning, the suppressed evidence would have impeached the assertion with great force. The same is true for a number of other McWhorter assertions at trial, including McWhorter's testimonial claims that:

- Defendant Hari alone created the bomb;

- McWhorter has little knowledge or experience with munitions, and was only able to engineer such devices under tutelage of Defendant Hari;

- That Defendant Hari procured black powder while in McWhorter's company;

and so on. In short, the suppressed evidence would have strongly impeached the core claims of the government's most critical witness. It was defendant-favorable in this respect as well.

(c)     Lost defense opportunities

The Supreme Court has observed that a *Brady* violation does not merely "deprive[] the defense of certain evidence," but also carries the potential to impair the adversary process by prompting the defense to "abandon lines of independent investigation, defense, or trial strategies that it otherwise would have pursued." *United States v. Bagley,* 473 U.S. 667, 682 (1985). The high court recognized that such effects can be difficult to gauge in a post-trial proceeding, which further counsels for examination of suppression in light of the

entire record and totality of circumstances. *Id.* at 683.

Here, the record would suggest that timely disclosure would have, at a minimum, led to closer inquiry into McWhorter's history and background with respect to munitions, particularly improvised modifications of firearms and incendiary devices. It would have caused the defense to inquire further into McWhorter's jail accommodations, which in this case seemingly would have revealed that by day McWhorter was coming before this Court to testify as to his own lack of experience and skill level with munitions and improvised devices. And by evening, going back to a jail cell that contained yet another (and apparently more complicated) incendiary device of his own making. (Add. 5). Hence, the record strongly indicates that the *Brady* violation deprived Defendant Hari of opportunities of independent investigation and additional lines of defense. The suppressed evidence was "favorable" in this way as well.

### B.    The Suppressed Evidence was Material

To establish a *Brady* violation, the defendant must show the suppressed evidence was not just defense-favorable, but also "material" in the sense of giving rise to a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley,* 514 U.S. 419, 433 (1995). The Supreme Court has explained that, in the *Brady* rule context, this test does *not* require the defendant to show that disclosure would have resulted in acquittal. *Id.* at 434. Rather, a *Brady* violation occurs when it can be shown that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

20

As explained above, far-and-away the most important government witness was McWhorter. McWhorter was the first co-defendant to cooperate with law enforcement, very early in the investigation. McWhorter was quick to enter into a cooperation bargain, requiring satisfactory "substantial assistance" to lower an otherwise-mandatory 35-year prison term. Law enforcement accepted McWhorter's version of events, which transitioned into the government's theory of the case from beginning to end. Hence, any damage to the substantive testimony or credibility of cooperator-witness McWhorter, meant equal-or-greater damage to the government's theory of the case.

The Supreme Court encountered a similar situation in *Kyles*. There, a cooperating witness referred to as "Beanie" approached police with information suggesting that his acquaintance, Kyles, committed a murder. 514 U.S. at 423-28. The record showed that the police ignored a number of red flags associated with cooperator-witness Beanie, including strong evidentiary indicators that the Beanie was the true culprit and was manipulating the police for his own advantage. *Id.* Nonetheless, Kyles was charged with and convicted of the offense. *Id.* at 429-31. Post-conviction proceedings revealed the prosecution had failed to disclose defendant-favorable evidence, including certain police files showing the cooperator's active role in the steering the police investigation and evidence suggesting that the cooperator could very well be the true culprit and trying to frame-up Kyles. *Id.* at 428-29.

The Supreme Court held that suppressed evidence was "material" for the purposes of the *Brady* rule. Of particular significance here, the high court observed:

Beanie's various statements would have raised opportunities to attack not

21

only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation, as well. By the State's own admission, Beanie was essential to its investigation and, indeed, "made the case" against Kyles. [] Contrary to what one might hope for from such a source, however, Beanie's statements to the police were replete with inconsistencies and would have allowed the jury to infer that Beanie was anxious to see Kyles arrested for [the] murder. Their disclosure would have revealed a remarkably uncritical attitude on the part of the police.

*Kyles,* 514 U.S. at 445. All of this, said the Supreme Court, would "have laid the foundation for a vigorous argument that the police had been guilty of negligence" and pinned the wrong suspect for the crime. *Id.* at 447.

The same rationale applies here. As already noted, McWhorter was the government's key cooperator-witness. The suppressed evidence would have badly damaged McWhorter's initial statements to law enforcement and testimony at trial. It would have called into question whether McWhorter had tricked law enforcement from the get-go, thereby casting grave doubt upon the quality of the investigation. As in *Kyles*, consideration of the suppressed evidence places "the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. The suppressed evidence is therefore "material" within the meaning of the *Brady* rule.

### C. The Government Suppressed the Evidence

The prosecution indicates that it knew nothing about the disciplinary report of the incendiary device at the time of trial, (Add. 1), and counsel has no reason to doubt it. However, the same correspondence indicates the FBI case agents *did* have the report during trial; and it has long been held that a *Brady*-violative nondisclosure in the hands of investigating law enforcement must be imputed to the prosecution. *Kyles,* 514 U.S. 437-

38; *accord, e.g., United States v. Robinson,* 809 F.3d 991, 996-97 (8th Cir. 2016). This is sensible, because the *Brady* rule is aimed ensuring a fair trial and not policing governmental conduct; this is why the *Brady* rule has always applied "irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

Moreover, the *Brady* rule imposes upon the prosecution a "duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles,* 514 U.S. at 437. Here, law enforcement agents were keeping tabs on the jail records pertaining to the cooperator-witnesses—including disciplinary records—as evidenced by other discovery disclosures to the defense. This triggers the duty to ensure all such disciplinary records are screened for defendant-favorable and material information, such as the report at issue here.

It was mentioned earlier that at least some government actors have taken personal offense at the defense arguments and theories presented at trial. None was intended then, nor now. The defense is merely challenging the government's evidence and the credibility of the co-defendant cooperators, as is contemplated by our adversarial system of criminal justice, and in a manner that is similar to the *Kyles* case.

If law enforcement intentionally withheld McWhorter's disciplinary records, Defendant Hari is deserving of a new trial. But regardless of intent, it has come to light that defendant-favorable and material evidence was in a government agent's hands (or available to a government agent) but not disclosed prior to trial. This triggers the *Brady* rule and implicates the Due Process right to a fair trial, regardless of good faith. Defendant Hari respectfully requests that the Court grant a new trial due to the *Brady* violation. Defendant

Hari's constitutional right to Due Process requires it.


Dated: May 26, 2021                    Respectfully submitted,

                                       *s/ Shannon Elkins*
                                       _____
                                       SHANNON ELKINS
                                       Attorney ID No. 332161
                                       Attorney for Mr. Hari
                                       107 U.S. Courthouse
                                       300 South Fourth Street
                                       Minneapolis, MN 55415