UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
District Court File No. 18-150 (1) (DWF/HB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **GOVERNMENT'S RESPONSE** |
| | ) | **IN OPPOSITION TO** |
| Plaintiff, | ) | **DEFENDANT'S MOTION FOR A** |
| | ) | **NEW TRIAL** |
| v. | ) | |
| | ) | |
| (1)   MICHAEL HARI, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, through its attorneys, W. Anders Folk, Acting United

States Attorney for the District of Minnesota and Assistant United States Attorneys Allison

K. Ethen and Timothy C. Rank, respectfully opposes Defendant Michael Hari's Motion for

a New Trial.  (Dkt. 434).  The Defendant's motion alleges that the government committed

*Brady* violations by failing to disclose two jail disciplinary reports pertaining to

codefendant Michael McWhorter.  While the reports were not produced prior to trial, the

Defendant has not met the burden of showing, as required to establish a *Brady* violation,

that the reports are favorable evidence, nor that material prejudice resulted from their

suppression.  The Defendant has therefore failed to meet the required burden and the

government respectfully requests that the Court deny the motion.

## FACTUAL BACKGROUND

On December 9, 2020, a jury found the Defendant guilty on all five felony counts

for which he was indicted.  (Dkt. 323).  The charges related to the Defendant planning and

directing the August 5, 2017 bombing of the Dar al-Farooq Islamic Center in Bloomington,

Minnesota.  At the Defendant's trial, which began on November 2, 2020 and included a multi-week continuance of the proceedings due to COVID-19, the government presented the testimony of 25 witnesses and nearly 300 exhibits.  (Dkts. 279, 282, 285-86, 301, 303, 305, 321).  The government's case-in-chief included testimony from codefendants Michael McWhorter and Joe Morris, who had previously pleaded guilty to charges related to the Dar al-Farooq bombing.  (Dkts. 43, 44).

During the discovery process, and in preparation for the testimony of both McWhorter and Morris, the government provided voluminous discovery to the Defendant. This included reports from Sherburne County Jail, where both codefendants were held prior to trial, summarizing what the government believed to be all of McWhorter's and Morris's disciplinary incidents.   For McWhorter, this involved a single minor violation on March 4, 2019, during which he possessed, and disposed of, some type of fermented alcohol in his jail cell.

On January 27, 2021, the government received a copy of McWhorter's preliminary presentence investigation report, which contained an account of additional disciplinary violations that McWhorter received while at Sherburne County Jail.  (Dkt. 343 at ¶ 6). Specifically, the preliminary PSR indicated that Sherburne County corrections officers had located "battery packs containing nails and pencil lead which had wires protruding from the battery packs," in McWhorter's cell on two occasions.  *Id*.  The described disciplinary incident was not familiar to the prosecutors reviewing the PSR. In response, the government immediately re-reviewed the discovery it had provided to the Defendant prior to trial; it discovered that the battery pack incidents had not been disclosed, nor did the

U.S. Attorney's Office casefile contain the disciplinary reports described in the preliminary PSR.

The U.S. Attorney's Office then obtained additional discipline reports pertaining to McWhorter. There were seven such reports, describing the following incidents:

- July 4, 2019: McWhorter failed to wear a jail wristband.

- August 10, 2019: McWhorter failed to wear a jail wristband.

- August 30, 2019: McWhorter's jail wristband broke; he obtained a replacement.

- September 5, 2019: All inmates in McWhorter's cellblock were warned not to keep spray bottles in their cells.

- December 19, 2019: McWhorter possessed a battery pack with wires connected to pencils.

- January 21, 2020: McWhorter possessed three radios installed with batteries which had wires, nails, and pencil lead attached.

- June 20, 2020: McWhorter fought with another inmate.

In addition to obtaining the reports, the government made further inquiries into the incidents on December 19, 2019 and January 21, 2020 regarding McWhorter's possession of battery packs, wires, pencils, and nails. The Major of the Sherburne County Jail reported that inmates use these items "to light cigarettes, smoke K2, create tattoos, or use inside their radios," adding that other Sherburne inmates have possessed similar devices before. Contrary to the characterization in the Defendant's motion, and as discussed further below, it was not an "incendiary device." (*See* Gov't Attachment 1). For the incidents on December 19 and January 21, McWhorter received minor violations accompanied by the

loss of privileges such as use of the telephone and the library.  The Major reported that if McWhorter's possession of these materials had been a safety threat, correctional staff would have taken more severe action.  The government disclosed the Major's statement and the Sherburne reports to the Defendant on March 22, 2021.

## ARGUMENT

### I.  THE DEFENDANT BEARS THE BURDEN OF ESTABLISHING THE EXISTENCE OF A *BRADY* VIOLATION.

The defendant bears the burden of establishing the existence of a *Brady* violation. *Masten v. United States*, 752 F.3d 1142, 1146 (8th Cir. 2014).  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  Because the defendant has failed to show that the evidence at issue is favorable, and likewise has failed to show that the outcome of the trial was materially prejudiced by the inadvertent suppression of the evidence, the defendant has failed to meet this burden, and the motion should be denied.

#### A.  THE EVIDENCE IS NOT FAVORABLE TO THE DEFENDANT.

The first prong of the *Brady* test requires a defendant to show that the suppressed evidence is favorable to him.  "[T]he character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record." *Kyles v. Whitely*, 514 U.S. 419, 439 (1995).  Under *Strickler*, favorable evidence is further defined as

evidence which is either exculpatory in nature or has some type of impeachment value. *Strickler*, 527 U.S. at 281.

### 1. The Evidence is Not Exculpatory.

That codefendant McWhorter had modified batteries in his jail cell over two years after the bombing of the Dar al-Farooq mosque has no exculpatory value. Exculpatory evidence is evidence which tends to establish a criminal defendant's innocence. *Exculpatory Evidence*, BLACK'S LAW DICTIONARY (11th ed. 2019). The jury convicted the Defendant of five separate offenses:

| | | |
|---|---|---|
| One: | Intentionally damaging, defacing, or destroying religious real property because of its religious character, | |
| Two: | Intentionally obstructing by force the free exercise of religious beliefs, | |
| Three: | Conspiracy to commit a federal felony by means of fire or explosive, | |
| Four: | Carrying or using a destructive device during or in relation to a crime of violence, | |
| Five: | Possession of an unregistered destructive device. | |

(Dkt. 324). At the close of trial, the Court properly instructed the jury as to each element of each count of these offenses. (Dkt. 327).

The Defendant claims, incorrectly, that the battery device found in McWhorter's jail cell was an "incendiary device," and therefore draws the conclusion that possession of this device shows that McWhorter could have been the person who constructed the 20 pound homemade PVC pipe bomb which was used during this offense. (Def. Mot. 17). First and foremost, the Defendant's casual description of McWhorter's battery packs as an "incendiary device," is a wild misrepresentation of the actual definition of that term. *See*

18 U.S.C. § 232(5) ("explosive or incendiary device" means (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device…").  The device that McWhorter possessed was common jailhouse contraband used to light cigarettes, smoke K2, create tattoos, or use in conjunction with a radio.  (Gov't Attachment 1).  There is no evidence in the record, or even outside the record, to support the notion that this item was an explosive, that McWhorter was planning to blow up the jail with it, or even that it was capable of being used as a fire bomb.

Second, setting aside the Defendant's exaggerated characterization, even if McWhorter possessed an incendiary device in his cell, it is simply not relevant to the crimes for which the Defendant was convicted.  The Defendant argues that the jail disciplinary report would have been exculpatory to him because it would:

> (1) directly contradict McWhorter's testimony asserting that Defendant Hari alone built the bomb; (2) show that McWhorter along with Morris had created an elaborate fabrication of a key fact in order to shift blame to Defendant Hari; and (3) suggest that McWhorter and Morris alone built and detonated the bomb and only later concocted a false story that Defendant Hari had been involved.

(Def. Mot. 18).  The Defendant's first point is more properly categorized as impeachment evidence and will therefore be addressed below.  The Defendant's second two points are the same argument: that the evidence would have been used to show Morris and McWhorter acted without the Defendant and fabricated the Defendant's involvement after the fact.

The claim that Morris and McWhorter were the main actors in the Dar al-Farooq bombing, that the two of them fabricated the defendant's involvement after the fact, and that McWhorter's possession of a battery pack with wires two years later lends weight to these assertions is problematic for several reasons. First, as this event was neither intrinsic nor a conviction, the Defendant would have had to move its admission under Federal Rule of Evidence 404(b). The Defendant would have been limited to using the evidence for a specified 404(b) purpose which, based on the Defendant's arguments, is likely intent, plan, motive, and/or knowledge of the Dar al-Farooq bombing on McWhorter's part. The government would have opposed the admission of the jail incidents as they have no tendency to show that McWhorter and Morris were the true perpetrators of the Dar al-Farooq bombing. The relevance of a retroactive piece of evidence like the jail reports is dubious. It is highly unpersuasive to argue that McWhorter knew how to build a pipe bomb, in fact built the Dar al-Farooq pipe bomb, and fabricated the Defendant's involvement all because two years after the fact he had a modified battery in his jail cell. It is far more likely that this type of argument would have strayed into impermissible propensity evidence – the logically flawed assertion that because McWhorter had a wired battery in 2019, he must necessarily have built a pipe bomb back in 2017.

The second, and larger, problem with the Defendant's argument is that this jail report simply does not make the Defendant innocent of these offenses. None of the elements of any of the charges in this case involve the actual construction of the pipe bomb. None of the elements of the offenses would require the government to even present evidence as to who constructed the pipe bomb. The issue is the Defendant's possession

7

and use of the pipe bomb.  It would not matter if the Defendant had someone else build the pipe bomb, if he bought the pipe bomb, or if he found the pipe bomb laying on the side of the road, his possession and use of the pipe bomb at Dar al-Farooq on August 5, 2017 is the same regardless.  The codefendants' knowledge of bombs, firearms, or other incendiary devices does not negate the Defendant's presence and involvement in the offenses for which the Defendant was convicted.  McWhorter's contraband battery device does not make it less likely that the Defendant possessed and used a pipe bomb, therefore, it is not exculpatory evidence.

## 2.  The Evidence is Not Impeaching.

The evidence at issue also would not have impeached McWhorter.  The Defendant argues that the jail disciplinary reports would have been used to impeach McWhorter's testimony in three ways: they would, "directly contradict McWhorter's testimony asserting that Defendant Hari alone built the bomb," (Def.  Mot. 18), and they would further contradict McWhorter's claims that he "has little knowledge or experience with munitions" and "[t]hat Defendant Hari procured black powder while in McWhorter's company." (Def. Mot. 19).  However, the Defendant's arguments regarding impeachment again neglect to account for what is required to legitimately use evidence like this, as spelled out in the Federal Rules of Evidence.  How would the battery pack incidents have been used to impeach McWhorter on these points?  Under the applicable Rules, it does not appear there is an evidentiary mechanism through which impeachment with this evidence would have been admissible.

### i.    Federal Rules of Evidence 608 and 609

When a party wishes to impeach a witness with a specific incident, such as a jailhouse report, Federal Rules of Evidence 608 and 609 explain the allowable limits of such inquiry.  In the present case, impeachment under Rule 609 is not permissible as the jail discipline record is not a criminal conviction.

Impeachment under Rule 608 is also unavailing.  "A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness. . ."  Fed. R. Evid. 608(a).  Further, under Rule 608(b), specific instances of conduct may be brought up on cross-examination, but only insofar as such instances are probative of a character for truthfulness or untruthfulness.  *Id.*  In the present case, McWhorter's jail reports are not probative of his honesty.  The reports indicate that McWhorter had jail contraband in his cell during two inspections.  The reports contain no allegations that McWhorter was deceitful or dishonest about the possession of these items.  They are therefore not relevant or admissible under Rule 608(b).

### i.    Federal Rule of Evidence 613

The Defendant's arguments that he would have used the evidence to contradict McWhorter's testimony that the Defendant built the bomb and that McWhorter had little knowledge of explosives suggest that the Defendant believes McWhorter could have been impeached through Federal Rule of Evidence 613(b), evidence of a prior inconsistent statement.  To the extent this was the theory under which the Defendant would have offered this evidence, it is impermissible for two reasons: (1) the battery pack incidents are not statements and (2) they are not inconsistent with McWhorter's testimony.   First,

9

McWhorter's possession of modified batteries is an instance of conduct. It is not a statement uttered by McWhorter regarding the bombing of Dar al-Farooq or the other relevant circumstances surrounding the events of trial.

As to the question of inconsistency, McWhorter's conduct in jail is not inconsistent with his trial testimony. At trial, McWhorter testified, among many other things, that (1) the Defendant built the bomb, (Tr. III at 648), (2) McWhorter had a limited knowledge of firearms prior to meeting the Defendant, (*Id.* at 607), and (3) McWhorter travelled with the Defendant to buy black powder from a gun shop in Indiana a few days before the bombing, in early August 2017. (*Id.* at 616). It is entirely possible for McWhorter to possess modified batteries in his jail cell in 2019 and 2020 without calling into question any of the outlined points of testimony. The existence of one set of facts has no relevance to the truth or consistency of the other. They simply have no bearing on one another. Therefore, the jail incidents are not "inconsistent" under the most basic definition of that term.

The Defendant has not shown that the jail reports are impeachment evidence and has further failed to show how such evidence would have even been admissible as such at trial. As discussed above, the Defendant has also failed to show that these incidents are exculpatory. Because of these two failures, the Defendant has not met the burden to show that the suppressed evidence is favorable and therefore the Defendant's *Brady* claim fails.

### B.  THE EVIDENCE WAS INADVERTENTLY SUPPRESSED BY THE GOVERNMENT.

The government does not contest the second prong of the *Brady* evaluation.  The FBI had copies of the jailhouse reports at issue, but inadvertently failed to provide them to the U.S. Attorney's Office, and therefore they were not produced to the defense. The prosecutors learned of the disciplinary reports during the PSR process, obtained the reports, and disclosed them to the Defendant.  Although this suppression was inadvertent, the government understands that a lack of bad faith is not a relevant consideration in assessing the existence of a *Brady* violation.

### C.  THE RESULT DID NOT MATERIALLY PREJUDICE THE DEFENDANT.

The Defendant has also not shown that material prejudice resulted from suppression of the evidence.  Under *Brady*, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Kyles*, 514 U.S. at 433-34.

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.* at 434 (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985)).  In assessing the materiality prong of *Brady*, the Court should cumulatively evaluate the evidence introduced at trial "in order to examine the net effect of the allegedly suppressed evidence." *Mark v. Ault*, 498 F.3d 775, 783 (8th Cir. 2007).  Looking at the totality of all the evidence

11

presented to the jury during this trial, the Court can conclusively find that the outcome was fair and worthy of confidence.

The Defendant argues that the jailhouse reports caused material prejudice because, had the jury been allowed to hear testimony about the battery pack incidents, it would have "badly damaged McWhorter's initial statements to law enforcement and testimony at trial," leading to the conclusion that "McWhorter had tricked law enforcement from the get-go, thereby casting grave doubt upon the quality of the investigation." (Def. Mot. 22). The Defendant's conclusory allegations that the entire foundation of the investigation of this crime has been undermined by McWhorter's possession of jail contraband more than two years later ignore the context of the rest of the evidence presented at trial. The five guilty verdicts in this case were not based solely on McWhorter's testimony, but rather the testimony of approximately 25 government witnesses, approximately 280 government exhibits, and an extensive FBI investigation which corroborated both Morris's and McWhorter's testimony.

## 1. Joe Morris Corroborates Michael McWhorter.

The Defendant's intense focus on McWhorter as "far-and-away the most important government witness," (Def. Mot. 21) blatantly ignores the testimony of Joe Morris. While McWhorter was of course an important cooperating witness, the Defendant fails to acknowledge that Joe Morris, the third person in the truck and codefendant, also testified at length about the Defendant's involvement in the bombing of Dar al-Farooq and the subsequent events. Morris's and McWhorter's testimony was lengthy and each corroborated the other on numerous points; the government will not seek to enumerate

every consistency in this memorandum.  However, as to the events of August 5, 2017, it is

undeniable that at trial, Morris and McWhorter both testified that:

- The Defendant rented the Nissan truck from Enterprise Rental, (Tr. III at 612, Tr. IV at 905),

- The Defendant introduced them to each other on the drive from Illinois to Minnesota, (Tr. III at 628, Tr. IV at 905),

- The Defendant told them about his plan to bomb the mosque approximately one hour prior to arrival in Bloomington, (Tr. III at 632, Tr. IV at 915),

- The Defendant had firearms, the black powder PVC pipe bomb, a scanner, and a signal jammer in the truck on the way to Minnesota, (Tr. III at 623-24, Tr. IV at 906, 908, 925),

- The Defendant stopped to buy diesel fuel/gasoline, (Tr. III at 630, Tr. VI at 913),

- The Defendant drove the truck, (Tr. III at 622, Tr. IV at 912),

- Joe Morris broke the window and threw in the diesel fuel/gasoline, (Tr. III at 641, Tr. IV at 922), and,

- Michael McWhorter lit the bomb and threw it inside. (Tr. III at 642, Tr. IV at 923).

In addition to consistent testimony about the Dar al-Farooq bombing, Morris further

corroborated McWhorter's testimony regarding the circumstances and events following the

bombing.  For example, both codefendants testified that:

- Immediately after the bombing, the codefendants drove to a small motel, (Tr. III at 649, Tr. IV at 927),

- After the motel, the codefendants returned to Rankin, Illinois, where they stayed at McWhorter's home for multiple days, (Tr. III at 654, Tr. IV at 929-930),

13

- At McWhorter's house, McWhorter's wife took a trophy photo of the Defendant, McWhorter, and Morris, posing with guns and the sledgehammer used to break the window at Dar al-Farooq, (Tr. III at 654, Tr. IV at 931),

- The Defendant formed and led their militia and named it "The White Rabbits," (Tr. III at 666, Tr. IV at 934),

- The Defendant established ranks for the militia members, designating the Defendant as "Captain," McWhorter as "Sergeant," and Morris as "Corporal," (Tr. III at 670, Tr. IV at 941),

- The militia operated out of an office building in Clarence, Illinois, (Tr. III at 668, Tr. IV at 934),

- The Defendant had a Dell laptop computer, (Tr. III at 661, Tr. V at 1055),

- The Defendant made purchases such as tactical gear (Tr. III at 676, Tr. IV at 949), White Rabbit patches, (Tr. III at 681, Tr. IV at 953), and firearms for the militia, (Tr. III at 606-08, Tr. IV at 947),

- The Defendant, McWhorter, Morris, and McWhorter's son Mack went on the run from the FBI in March 2018. (Tr. III at 714, Tr. V at 1014).

The record also reflects the uncontested fact that codefendants McWhorter and Morris have been kept separate since their arrests on March 13, 2018, (Tr. VII at 1643), and that aside from a brief conversation during transport, they have not spoken since their arrest.  (Tr. V at 1023).  While the Defendant is free to baselessly characterize the testimony of Morris and McWhorter as "deeply suspicious" and is free to speculate that the codefendants "colluded to shift blame from themselves to Defendant Hari" (Def. Mot. 17), what is clear is that the testimony of Morris and McWhorter aligned on all the above, and the record contains no evidence of collusion.

## 2.  The FBI Investigation Corroborates Morris and McWhorter

In addition to corroboration by Morris, the Defendant also neglects to mention that McWhorter's testimony, and previous statements to the FBI, were corroborated by independent investigation.  Again, the government will not attempt to exhaustively catalog every piece of evidence that aligned with McWhorter's testimony, but the following examples are notable:

- Records from the Defendant's cell phone show the phone tracking through Iowa back to Illinois on August 5, 2017, (Gov't Tr. Ex. 188),

- Records from the Defendant's cell phone show the phone tracking from Illinois to the approximate location of the Deer Creek Products black powder gun shop in Indiana on August 1, 2017, (*id.*),

- The owner of Deer Creek Products testified, and produced his ledger, confirming that he sold 20 pounds of black powder in a cash transaction on August 1, 2017, (Gov't Tr. Ex. 183),

- Enterprise Car Rental records show the Defendant rented a grey Nissan Frontier pickup truck from July 27-August 6, 2017.  The truck was returned the day after the bombing, (Gov't Tr. Ex. 265),

- The trophy photograph depicting the Defendant, McWhorter, and Morris wearing balaclavas and holding guns and a sledgehammer was found on the Defendant's laptop and phone, (Gov't Tr. Ex. 326),

- The Defendant's laptop computer connected to McWhorter's internet router in Rankin, Illinois in the days after the bombing, (Gov't Tr. Exs. 233, 300),

- The Defendant's laptop revealed Google searches for driving directions to Dar al-Farooq approximately two weeks prior to the bombing.  The Google searches included the use of "Street View" to scout Dar al-Farooq's surroundings, (Gov't Tr. Ex. 305),

- The Defendant's laptop computer revealed research on Dar al-Farooq in the approximately two weeks prior to the bombing, (Gov't Tr. Ex. 300, 306),

15

- The Defendant's laptop computer contained speeches and writings authored by the Defendant espousing the Defendant's Islamophobic bias, (Gov't Tr. Exs. 301, 303, 310),

- The Defendant's purchase records confirmed key purchases such as firearm parts for the recovered weapons, a signal jammer, a scanner, personalized White Rabbit patches, ingredients for thermite, tactical gear, and uniforms. (Gov't Tr. Ex. 269).

McWhorter's testimony was thoroughly supported by other witnesses, business documents, cellular records analysis, forensic computer analysis, and the Defendant's own writings.

### 3.   Cross Examination of McWhorter

If, despite the evidentiary hurdles mentioned above, evidence that McWhorter possessed two modified battery packs had been put before the jury, it is highly doubtful that it would have affected the jury's credibility determination.   The defense had the opportunity to thoroughly cross-examine McWhorter, choosing to test him on points related to bias, motivation to lie, and inconsistent statements, to name a few.   For example, the jury heard and considered extensive questioning regarding the number of times McWhorter spoke to the FBI and prosecutors, (Tr. III at 746), his cooperation as a government witness, (*id.*), his mandatory minimum sentence, (Tr. III at 764), and that he hoped to earn a reduced sentence by testifying truthfully during the trial. (Tr. III at 766). The defense also confronted McWhorter with his own social media postings, (Tr. III at 749), to show political beliefs and anti-Muslim sentiment, and asked him about racist and homophobic slurs that the defense suggested McWhorter used during conversations with others. (Tr. III at 767).   The defense questioned McWhorter about testimony he gave that

was inconsistent with the evidence – for example, that he believed the black powder bought in Indiana came in clear containers (Tr. III at 757) and that he thought the bomb could have been made of metal.  (Tr. III at 755).

The jury convicted the Defendant on all five counts.  They clearly credited McWhorter's testimony, in whole or in part.  If they believed McWhorter, despite all the facts elicited on cross, it is unlikely they would have chosen to disbelieve McWhorter based on these attenuated and irrelevant jail incidents.  In this case, the Court can have confidence in the jury's credibility determination.  Assessing the context of all the evidence mentioned above, and the totality of the evidence contained in over 2,200 pages of trial transcript, Michael McWhorter's possession of jail contraband over two years after the incident in question does not undermine confidence in the outcome of the trial.  The Defendant has failed to show material prejudice and has not met the defense's burden under the third prong of the *Brady* test.

## <u>CONCLUSION</u>

The Government respectfully requests that the Court deny Defendant's Motion for a New Trial.

Dated:        June 16, 2021                          Respectfully Submitted,

                                                     W. ANDERS FOLK
                                                     Acting United States Attorney

                                                     */s Allison K. Ethen*

                                                     BY:
                                                     ALLISON K. ETHEN
                                                     TIMOTHY C. RANK
                                                     Assistant United States Attorneys