UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 18-150(1) (DWF)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　Plaintiff,<br><br>vs.<br><br>MICHAEL HARI,<br>　　　　　Defendant. | **Defendant's Reply Memorandum in Support of Motion for a New Trial** |

Michael Hari has submitted a motion for new trial under FRCrP 33, and premised upon the core holding of *Brady v. Maryland* which is:

> [S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. 83, 87 (1963), *i.e.,* the *Brady* rule. (ECF 434). The government has submitted its opposition, (ECF 451), to which Mr. Hari offers this brief reply.

**1.    Agreed-Upon Facts**

With the government's submission, it is apparent that the parties agree upon at least some core facts. Specifically, prior to and during trial, there existed a jailor's disciplinary report concerning the carceral activities of cooperator-witness Michael McWhorter. (ECF 435, Sealed Addendum (Add.)). That same report reflected the jailor's discovery of an object within McWhorter's living quarters, described as "a battery pack with wires . . . attached to two pencils that were wrapped in pieces of playing cards." (Add. 2). According to the report: "Touching the ends of the pencils together creates heat, and ultimately fire." (Add. 2). The report labels this a "lighting device." (Add. 2). The "device" was confiscated

1

by jail officials as contraband in violation of jail rules, on the ground that "this device can start a fire." (Add. 2).

### 2. Incendiary Device

Despite all this, the government objects—quite strenuously—that it is inaccurate to label the jail contraband an "incendiary device," citing the federal statutory definition of the term found at 18 U.S.C. § 232(5). (ECF 451 at 5-6).

First, the opening memorandum made no mention of § 232(5), but instead used the term "incendiary device" as commonly defined: "Causing or designed to cause fires: *an incendiary device*." American Heritage Dictionary (5th ed. 2020) (defining "incendiary"), *available at* https://www.ahdictionary.com/word/search.html?q=incendiary. By the jailor's own description, the item found in McWhorter's cell most certainly meets that common definition. (Add. 2 ("Touching the ends of the pencils together creates heat, and ultimately fire.") & Add. 6 (asserting that such devices may be used to light cigarettes or—more alarmingly—dangerous drugs such as "K2")).

Second, and contrary to the government's position, the device in McWhorter's jail quarters would appear to meet the § 232(5)(C) definition as well, *i.e.,* "any incendiary bomb . . . *or similar device*." Certainly there are a number of federal courts that have "construed the statutory language expansively" to include all manner of items, even those that are not "flammable" in the scientific sense of the term. *United States v. Mena*, 933 F.2d 19, 26-28 (1st Cir. 1991). For example, a common lighter held near a container of non-flammable fluid. *Id.* If such a rudimentary concoctions are to be deemed an "incendiary device" under § 232(5)(C), then certainly McWhorter's fire-producing

2

"lighting device" must be as well.

In truth, the label one chooses to describe the device is not crucial to the real question at issue, *i.e.,* whether the government's suppression of the jailor's report violates the *Brady* rule. However, the government's surprisingly forceful—and seemingly incorrect—foray into semantics is suggestive of a keen interest in downplaying the discovery, in rehabilitating its star cooperator-witness and in distracting from the task of giving the newly revealed evidence full and fair consideration, as discussed further below.

### 3. "Exculpatory Evidence"

Citing a law dictionary, the government defines "exculpatory evidence" as that which "tends to establish a criminal defendant's innocence." (ECF 451 at 5). The government then proceeds to deny the suppressed jailor's report falls within the *Brady* rule, saying "this jail report simply does not make the Defendant innocent." (ECF 451 at 7).

This line argument is contrary to well-established Supreme Court doctrine under the *Brady* rule. The rule's scope is not drawn in the ultra-narrow manner suggested by the government. 373 U.S. at 87. Instead, the rule extends to suppressed evidence which may be broadly viewed as "favorable to an accused" and "material either to guilt or to punishment." *Id.* And contrary to the government's premise, "a showing of materiality [under the *Brady* rule] does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley,* 514 U.S. 419, 434 (1995).

Rather, a *Brady* violation occurs when "the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (cleaned up). This inquiry requires

3

an examination of the "cumulative effect of suppression" as viewed "within the context of the existing or potential evidentiary record." *Id.* at 437 & 439. Finally, the government tries to split the inquiry between positive evidence and impeachment, but this violates the "cumulative effect" rule, and in any event the Supreme Court has long "disavowed any different between exculpatory and impeachment evidence for *Brady* purposes." *Id.* at 433.

The government's tack, then, is to artificially downplay the significance of the suppressed evidence, *supra* § 2, and then require it to surmount an artificially high legal hurdle, § 3. As shown above, this is not the correct approach and the Court must instead follow the *Brady* rule principles laid down by the Supreme Court, as discussed further next.

4. **Undermined Confidence**

The remaining and correctly posed question, then, is whether "the government's evidentiary suppression undermines confidence in the outcome of the trial," when viewed "within the context of the existing or potential evidentiary record." *Kyles,* 514 U.S. at 434 & 439. The defense has already made its case on that question, (ECF 434 at 15-24), but here responds briefly to the government's assertions.

(a). **McWhorter as bomb-maker**

As noted in the opening memorandum, the defense offered a powerful potential use of the suppressed evidence, *i.e.,* to show that McWhorter was the true bomb-maker and not Mr. Hari. (ECF 434 at 10 & 17-18). This is directly contrary to what McWhorter claimed in the course of his testimony. (ECF 434 at 10 & 17-18). On this evidentiary question, it must be noted that the government's other cooperator-witness (Morris) has given conflicting accounts, first identifying Mr. Hari as the sole bomb-maker in his plea

4

agreement, but at trial testifying that Mr. Hari *and* McWhorter constructed the bomb. (ECF 434 at 11). If the bomb-maker was McWhorter alone, then this casts doubt upon McWhorter's entire narrative and lends credence to Mr. Hari's theory that the cooperator-witnesses were true perpetrators of the Dar al-Farooq bombing, and somehow colluded to lay blame with Mr. Hari.

The government doubts this Court would have received the defense evidentiary offer. (ECF 451 at 7). The claim is that the evidence would have been offered under FRE 404(b), came after the Actus Reus events, and therefore had no evidentiary value. (ECF 451 at 7). However, this contradicts the government's own positions in this very case, where it offered FRE 404(b) evidence of a post-Actus Reus bombing as a "signature" identifying Mr. Hari as the bomber in the present case, (ECF 181 at 9-14), and this Court did in fact permit the offer on that basis, (ECF 209 at 3-5).

Given the above record, it strains credulity to speculate that the Court would have denied Mr. Hari the opportunity to make his own FRE 404(b) presentation, which tends to identify McWhorter as the sole bomb-maker and therefore an alternative perpetrator. *See e.g., United States v. White Owl,* __ F.Supp.3d __, 2021 WL 235916 (D.N.D. 2021) (permitting defense FRE 404(b) presentation to support alternative perpetrator defense). The suppressed evidence was therefore favorable and material to the defense, and hence the suppression violated the *Brady* rule. *See, e.g., United States v. Stifel,* 594 F.Supp. 1525, 1540-43 (N.D. Ohio 1984) (finding *Brady* violation where government suppressed evidence suggesting alternative perpetrator in bombing case).

### (b). Impeachment of McWhorter

The government asserts the Court would not have permitted the defense to use the suppressed evidence concerning McWhorter's improvised fire-creation or "lighting device" for impeachment purposes, *e.g.,* to cast doubt upon McWhorter's direct testimony claims that: Mr. Hari made the bomb in question; McWhorter's denial of having built the bomb; McWhorter's claimed lack of knowledge concerning firearms and munitions; and so on. (ECF 434 at 19 & ECF 451 at 8-10). This too is belied by the trial record, which shows the Court permitting vigorous cross-examination of cooperator-witnesses concerning jailhouse letters and comments, without government objection. (*E.g.,* 5:TT at 1030-31 & 1038-39). It strains credulity to observe that the Court permitted cross-examination about jailhouse letters and comments about protected groups, but would deny cross-examination about an improvised fire-creation device which is highly probative as to so many core questions at issue for trial.

### (c). Context of existing or potential evidentiary record

Finally, the government argues that none of this matters anyway, because: (i) the trial testimony of cooperator-witness Morris corroborated McWhorter's account (ECF 451 at 12-14); and (ii) the evidence from sources other than cooperator-witnesses supports the government's theory of prosecution as well (ECF 451 at 15-16). Neither point is convincing.

*(i). Account of Cooperator-Witness Morris.* With respect to the testimony of cooperator-witness Morris, even McWhorter himself described Morris as cognitively stunted:

6

> Q. Can you -- what sort of a person was Joe Morris?
>
> A. It was kind of hard to explain. He's -- he's a nice guy, don't get me wrong, but he's not -- he's not all the way there, you might say.
>
> Q. Let me just kind of bottom-line it, how smart is he?
>
> A. He's not very smart, to be fair. Like, on a level of . . .he wouldn't comprehend normal stuff like, you know, like an educated person would comprehend. His level of comprehension is more closer to, like, my 12-or-13-year-old son.

(3:TT at 686). This actually understates the credibility problem, as the trial evidence revealed that Morris suffers from severe mental health disorders, including schizophrenia and accompanying distortions of reality. (ECF 434 at 11). Moreover, as already mentioned, Morris gave an account of the bomb's provenance which differed from McWhorter—one of many inconsistencies between the pair of cooperator-witnesses, as even the government acknowledged at trial. (ECF 434 at 11, 12).

Moreover, as mentioned above and in the opening memorandum, the defense theory of the case was that the pair somehow colluded to offer a generally consistent story, laying blame at Mr. Hari's feet. ECF 434 at 12). For reasons already discussed, the suppressed "lighting device" evidence would have added evidentiary heft to that hypothesis. As a matter of logic, one cannot dismiss the potential impact of suppressed evidence, based solely upon the very cooperator-witness evidence that the suppressed evidence would have impeached. The suppressed evidence would have aided the defense cause to a significant degree, and therefore a new trial is needed.

*(ii). Evidence sourced outside the cooperator-witnesses.* Last, the government cites evidence that is not directly sourced from cooperator-witnesses, *e.g.,* cell site location

records, car rental records, search engine search records, group photographs, and so on. If the independent corroboration were more robust, one might see the government's point. But in this case, it was undisputed that the Mr. Hari, McWhorter, and Morris were closely associated with one another, including living and working together for long stretches and freely sharing resources. All the evidence cited by the government is therefore just as consistent with McWhorter and Morris using Mr. Hari's identity and computers without the latter's knowledge. The claimed independent corroboration is thus illusory, and cannot be used to pardon the *Brady* violation.

In sum, then, the suppressed evidence was favorable to the defense and material to the question of guilt. The suppression thus "undermines confidence in the outcome of the trial." Mr. Hari respectfully persists in his motion for a new trial on these grounds.

Dated: June 23, 2021

Respectfully submitted,

*s/ Shannon Elkins*

SHANNON ELKINS
Attorney ID No. 332161
Attorney for Mr. Hari
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415