DISTRICT OF MINNESOTA
District Court File No. 18-CR-150 (1) (DWF/HB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **GOVERNMENT'S POSITION ON SENTENCING** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1)  MICHAEL HARI, | ) | |
| | ) | |
| Defendant. | ) | |

---

"[I]t is stuck in my mind that in America, in my mosque, somebody could attack me with a bomb."  Victim M.O., Tr. I at 89.

"I've never been in a situation as dangerous as this.  Not in a situation as dangerous as the one I faced that morning.  But, you know, I never thought, you know, something like this would happen to me here in America."  Victim H.J., Tr. I at 144.

"I was in fear.  I was afraid."  Victim M.H.H., Tr. VII at 1539.

"My older daughter, at the time she was six, she cried.  She was scared.  She asked me, Why?  What happened?  You know.  And I couldn't explain to her what happened, even though I knew what happened, you know.  It was -- I just told her it was an accident.  And then but, of course, later on she learned that it wasn't just accident, it was act…I mean, how do you explain that to a six, seven-year-old that someone bombed your community center?"  Victim D.H., Tr. VII at 1554-55.

---

The United States of America, through its attorneys, W. Anders Folk, Acting United States Attorney for the District of Minnesota and Assistant United States Attorneys Allison K. Ethen and Timothy C. Rank, submits the government's position on sentencing.  Based on the facts adduced at trial, the government respectfully requests that the Court apply upward departures as to Count 4, pursuant to United States Sentencing Guidelines § 2K2.4,

n. 2(b), and Counts 1-3, and 5 pursuant to United States Sentencing Guidelines § 3A1.4, n. 4., and sentence the Defendant to life in prison.

## **BACKGROUND**

On August 5, 2017, the Defendant[1] committed a violent act of domestic terrorism. Armed with two automatic firearms, a container with a mixture of gasoline and diesel fuel, and a 20-pound black powder pipe bomb, the Defendant and accomplices Joe Morris and Michael McWhorter bombed and set fire to the Dar al-Farooq Islamic Center in Bloomington, Minnesota. The explosion destroyed the Imam's office. It knocked out ceiling tiles and light fixtures. It rapidly burned the blinds and carpet. It propelled jagged shards of shrapnel throughout the office, ripping into and destroying furniture. The blast was so powerful that it blew debris through a broken window more than 140 feet into the surrounding parking lot. It triggered the fire suppression system, which caused flooding and massive amounts of water damage. But the real harm caused by the Defendant's crime was not the destruction of the building. The property damage was collateral to the Defendant's real purpose. This bomb – the Defendant's bomb – was an act of terror intended to destroy the heart of a community.

The Defendant accomplished what the Defendant set out to do. The Dar al-Farooq community was terrified. Many members began attending other mosques, and for those who remained, the fear of another attack stayed in their minds as they attempted to pray.

---

[1] At the time of filing, the Defendant's Motion under Docket 457 is pending. In recognizing the Defendant's request, the government has attempted to refer to Hari simply as "the Defendant" throughout this filing. Any identifiers to the contrary are inadvertent.

Parents, terrified for the safety of their children, no longer sent them to dugsi (religious education classes) at the mosque. Children attending the school adjoining the mosque walked past the broken window and crime scene tape, prompting questions about what had happened that parents and teachers could not – and should not need to – explain.

The bombing and the fire changed the atmosphere at Dar al-Farooq. What once was a welcoming and open place where families gathered and new Muslims were welcomed to the Minnesota community became a closed off and fearful place. The mosque was forced to hire an armed security guard stationed at the front doors, install exterior surveillance cameras, and require those who entered to be admitted through locked doors. All of this is antithetical to the tenets of Islam, where mosques are traditionally open at all times to allow unrestricted access for prayer. Visitors can no longer freely access the physical prayer space, and the entire community has been made wary and suspicious of everyone they do not recognize. Because of the reduced number of people attending the mosque and community center, and the substantial costs of the new security measures, Dar al-Farooq struggled financially.

The community's trauma was compounded by the elaborate measures taken to conceal the Defendant's involvement in the crime. In the days and months following the bombing, suspicion was pointed in all directions. Members of the Dar al-Farooq community were subjected to rumors and media reports speculated that this terroristic act was a hoax or a "fake hate crime."[2] The victims of this crime were subjected to further

---

[2] *See, e.g.*, *White House Defends Its Silence on Mosque Bomb*, BBC News (Aug. 8, 2017), https://www.bbc.com/news/world-us-canada-40870351.

feelings of alienation, wondering if they would be believed. The extensive trauma the Defendant caused was entirely foreseeable, and, as the evidence at trial demonstrated, it was exactly what the Defendant wanted.

The Defendant wishes for a different America, one that does not guarantee and protect the free exercise of every religion. The Defendant's hatred of the Muslim faith runs deep, and the Defendant's efforts to carry out attacks in support of this hate were extensive. The Defendant wrote a manifesto, recruited, trained, and armed a militia, and conducted research to identify targets to terrorize. As the Defendant wrote in *The White Rabbit Handbook*, "There is no more anti-Christian religion, and no more anti-American philosophy on the face of the Earth than Islam." Gov't Ex. 310, at 56. The Defendant's purpose in bombing and burning Dar al-Farooq was to instill fear in the members of the mosque – to make all members feel deeply unsafe in their place of worship. The Defendant also wanted to frighten all Muslims, to send a message that Muslims are not wanted in America. As the "Speech," saved on the Defendant's laptop makes clear, the Defendant's vision for America means "Muslims expelled/Mosques burned." Gov't Ex. 301 at 5.

It was not only the Muslim faith that the Defendant attacked with violence and terror. The Defendant used these tactics against anything with which the Defendant disagreed. For example, on November 7, 2017, the Defendant directed the White Rabbits to burn down the Women's Health Practice in Champaign, Illinois, because the clinic, which offered abortions as one of many services, did not align with the Defendant's notions

of right and wrong.[3]  During this second attack, the Defendant used an incendiary device, a piece of PVC pipe containing homemade thermite, which was designed to burn the building down.

The Defendant was proud of these hateful beliefs and terroristic activities.  Upon returning to Illinois after bombing and burning Dar al-Farooq, the Defendant had a trophy photo taken with co-defendants McWhorter and Morris, posing with rifles and the sledgehammer used to break the Imam's window.  The Defendant pored through comments about the crime on the internet, eventually finding one that particularly resonated, which stated, "Ain't no fun when the rabbit got the gun."[4]  As the Defendant began to form the militia, the Defendant adopted that slogan and eventually named the group "The White Rabbits."  The Defendant's ambitions for the White Rabbit militia were lofty.  In the group's handbook, authored in the wake of the bombing, the Defendant wrote that the White Rabbits use, "guerilla warfare tactics to fight against the enemies of the people…We hit, we run, we hide, we do it again."  Gov't Ex. 310 at 73.  As the Court knows from the

---

[3] The Defendant's November 7 attack appears to be the culmination of an idea that the Defendant had prior to the bombing of Dar al-Farooq on August 5.  As co-defendant Joe Morris testified, while they were on their way to or from the mosque the Defendant discussed the idea of bombing a women's health clinic in Minnesota.  Morris described the clinic as a "glass building."  Tr. IV at 911.  Government Exhibit 305-002 shows that in days leading up to the bombing of Dar al-Farooq, the Defendant conducted an internet search for an address similar to the address of a Minnesota women's clinic, but because of a typo, the address was off by one digit.  Government Exhibit 338 shows this clinic is, in fact, a glass building.

[4] The Defendant wrote about finding the White Rabbit name, stating, "After an early mission when an enemy of the people complained, a commenter said, 'Ain't no fun when the rabbit got the gun.'  The logo and patch came from that comment, along with the nickname."  Gov't Ex. 310 at 73.

Defendant's other pending matters in the Central District of Illinois, the Defendant did "do it again," committing a series of violent acts in furtherance of his militia which only ended when all three co-defendants were arrested by the FBI in March 2018.

While the Defendant's writings are voluminous, one notable thing absent from the pages of hateful dialogue is any sense of remorse or empathy for the victims of this crime. Clearly the Defendant never thought of the victims as human beings, only as enemies who need to be violently expelled because in his view, "America is a white, Christian country." Gov't Ex. 310 at 11. Miraculously, not a single worshiper at Dar al-Farooq was physically injured by the Defendant's bomb.[5]  But every member of the Dar al-Farooq community was nevertheless harmed by that explosion.  To this day, the Dar al-Farooq community feels unsafe gathering, praying, and bringing their families to the mosque.  With a single calculated attack, the Defendant irrevocably destroyed the sense of safety and peace that a house of worship is supposed to provide.

## ARGUMENT

The Defendant intended to terrorize the members of the Dar al-Farooq Islamic Center and succeeded.  The bombing caused permanent harm to the Muslim community throughout Minnesota and beyond.  The Sentencing Guidelines allow for the Court to

---

[5] The lack of injuries sustained by Dar al-Farooq worshippers is not the result of mitigating steps taken on the Defendant's part.  It was a fortuitous coincidence.  As McWhorter testified, despite seeing people inside of the mosque prior to the bombing, none of the co-defendants attempted to warn people that a bomb was going to explode.  Tr. III at 645. Additionally, after the fuse was lit, the co-defendants moved quickly to get away from the bomb, "I didn't want to be anywhere near, you know, that bomb when it went off."  Tr. III at 644.

depart upward to life in prison. Such a sentence is appropriate to address the seriousness of the Defendant's conduct and the need to deter the Defendant and others from committing acts of domestic terrorism. Therefore, the government requests that the Court sentence the Defendant to life imprisonment.

## I.   UNITED STATES SENTENCING GUIDELINES

The Sentencing Guidelines calculations contained in the final Presentence Investigation Report contemplate a mandatory minimum sentence of 30 years as to Count 4, (PSR ¶ 64), imposed consecutively to the remaining Counts 1-3 and 5, which are grouped together. (PSR ¶ 52).

As to Counts 1-3, and 5, the PSR properly assigns a total offense level of 31. This includes the following base level and enhancements:

|  | USSG Authority | Level |
|---|---|---|
| Base Offense Level | 2H1.1<br>2K1.4(a)(1) | 24 |
| Hate Crime Motivation | 3A1.1(a) | +3 |
| Organizer/Leader | 3B1.1(c) | +2 |
| Obstruction of Justice | 3C1.1 | +2 |
| Total Offense Level |  | 31 |

(PSR ¶¶ 55-64). Based on the Defendant's criminal history category of I, the Guideline range for Counts 1-3 and 5 would be 108-135 months. (PSR ¶ 130).

As to Count 4, 18 U.S.C. § 924(c)(2)(B)(ii) requires a mandatory minimum sentence of not less than 30 years. The statute further states that the mandatory minimum sentence shall be imposed consecutively to the punishment imposed on any other counts. 18 U.S.C.

§ 924(c)(1)(A).  Therefore, the Defendant's total applicable Guideline sentence for Counts 1-5 is 468-495 months imprisonment.

## II.   UPWARD DEPARTURE UNDER § 2K2.4 COMMENTARY NOTE 2(B)

Although the applicable Guidelines range calls for a lengthy sentence of imprisonment, the Defendant intentionally terrorized the entire Minnesota Muslim community, and the Defendant's conduct requires a sentence of imprisonment commensurate with the seriousness of the offense.  Therefore, the government requests that the Court apply an upward departure as to Count 4 based upon United States Sentencing Guideline § 2K2.4, note 2(B) to life in prison.  *See United States v. Davidson*, 437 F.3d 737, 741 (8th Cir. 2006) (finding that the statutory maximum sentence under § 924(c) is life imprisonment).

Pursuant to Guidelines § 2K2.4(b), "[I]f the defendant, whether or not convicted of another crime, was convicted of violating section 924(c)…of title 18, United States Code, the guideline sentence is the minimum term of imprisonment required by statute."   As noted above, the mandatory minimum sentence as to Count 4 is 30 years imprisonment, consecutive to the sentence imposed on Counts 1-3, and 5.  18 U.S.C. § 924(c)(2)(B)(ii). However, a court may depart from the Guidelines to sentence a defendant to more than the mandatory minimum.  *See* USSG § 2K2.4, note 2(B).  For example, an upward departure from the mandatory minimum can be warranted when the seriousness of the defendant's criminal history is significantly underrepresented or when it underrepresents the likelihood that the defendant will commit other crimes.  *Id.*, *see also*, USSG § 4A1.3(a)(1).

In the present case, an upward departure from the mandatory minimum is warranted (1) based on the seriousness of the Defendant's conduct, and (2) because a criminal history score of I significantly underrepresents the danger the Defendant poses to the community and the likelihood for recidivism. The jury convicted the Defendant on Count IV for possessing a destructive device (a pipe bomb) in relation to a crime of violence. The term "crime of violence" can encapsulate a wide spectrum of behavior. *See* 18 U.S.C. § 16 ("an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another.") In the present case, the Defendant committed a severe crime of violence. As discussed above, this attack was a premeditated bombing calculated to intimidate and threaten an entire Muslim community. The Defendant purposefully acted to terrorize the members of the Dar al-Farooq mosque, and reveled in the suffering and destruction that followed. The crimes of violence for which the Defendant possessed the pipe bomb were much more extreme than a typical crime of violence.

Moreover, the Defendant's criminal history score of I severely underrepresents the Defendant's likelihood to reoffend. As the Court is aware, the bombing of Dar al-Farooq was merely the Defendant's first step toward creating a militia and committing additional crimes to further a hateful and terroristic agenda. From August 2017 through March 2018, the Defendant directed the White Rabbits to commit multiple robberies and home invasions, burn down a women's health clinic, set fire to railroad tracks, plant bombs on a neighbor's property, and abscond from law enforcement. The Defendant's criminal behavior only ended when the FBI arrested all three co-defendants on March 13, 2018.

9

This behavior demonstrates that the Defendant is not deterred by the legality of his actions and has little regard for the law.  Based on this conduct, a criminal history score of I severely underrepresents the danger the Defendant poses to society.  Therefore, the government respectfully requests the Court depart upward on Count 4 to life in prison.

## III.   UPWARD DEPARTURE UNDER COMMENTARY NOTE 4 TO TERRORISM ENHANCEMENT – § 3A1.4

The government also requests that the Court apply an upward departure based upon the terrorism enhancement contained in United States Sentencing Guideline § 3A1.4, note 4.  An upward departure pursuant to the terrorism enhancement would allow the Court to add 12 levels to the total offense level, as follows:

|  | USSG Authority | Level |
|---|---|---|
| Base Offense Level | 2H1.1 2K1.4(a)(1) | 24 |
| Hate Crime Motivation | 3A1.1(a) | +3 |
| Terrorism Enhancement | 3A1.4(a) | +12 |
| Organizer/Leader | 3B1.1(c) | +2 |
| Obstruction of Justice | 3C1.1 | +2 |
| Total Offense Level | | 43 |

USSG § 3A1.4(a).  It would further move the Defendant from criminal history category I to criminal history category VI.  USSG § 3A1.4(b).  An upward departure to a total offense level of 43 and a criminal history category of VI would bring the Defendant's adjusted Guidelines range to life imprisonment.  However, the maximum sentence would allow for a departure of up to 70 years.  USSG § 5G1.2.

To apply the upward departure pursuant to note 4, the Court must find (1) that the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B); and (2) that the Defendant's terrorist motive was to

10

intimidate or coerce a civilian population.  In this case, both elements are met.  The Defendant's conduct terrorized the Minnesota Muslim community and is exactly the kind of conduct that the Sentencing Commission intended to reach with this departure.  The Court should apply the departure in this case.

### A.  INVOLVED OR INTENDED TO PROMOTE UNDER 18 USC § 2332B(G)(5)(B)

The first requirement under commentary note 4 requires the Court to find that the offense, or offenses, "involved or intended to promote one of the crimes enumerated in 18 U.S.C. § 2332b(g)(5)(B)."  USSG § 3A1.4, n. 4(B).  Specifically, the Guidelines provide that a direct violation of one of the enumerated offenses is not necessary to apply the terrorism enhancement at sentencing.  Instead, § 3A4.1 requires either that the defendant's crime "involved, *or was intended to promote*," one of the listed offenses.  *See id.* (emphasis added).  In interpreting the phrase "intended to promote," the Sixth Circuit Court of Appeals has explicitly ruled,

> We begin with the assumption that the "intended to promote" language means something different from the word "involved."  A defendant who intends to promote a federal crime of terrorism has not necessarily completed, attempted, or conspired to commit the crime; instead the phrase implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism. On this reading, the offense of conviction itself need not be a "Federal crime of terrorism."

*United States v. Graham*, 275 F. 3d 490, 516 (6th Cir. 2001).  In *Graham*, the defendant was convicted on conspiracy, pursuant to 18 U.S.C. § 371.  *Id*. at 514-15.  At sentencing, the district court determined that the terrorism enhancement applied to the conspiracy count, finding that the conspiracy intended to promote multiple federal crimes of terrorism

which were not included as the object crime of the original conspiracy charges. *Id.* at 516. The Sixth Circuit agreed, holding, "the defendant need not have been convicted of a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5) for the district court to find that he intended his substantive offense of conviction or his relevant conduct to promote such a terrorism crime." *Id.* at 517.

The Second, Fourth, Fifth, Seventh, and Eleventh Circuits have followed the holding in *Graham*. *See e.g. United States v. Awan*, 607 F.3d 306, 314 (2d Cir. 2010); *United States v. Kobito*¸994 F.3d 696, 702-03 (4th Cir. 2021); *United States v. Fidse*, 862 F.3d 516, 522-53 (5th Cir. 2017); *United States v. Arnaout*, 431 F.3d 994, 1000-01 (7th Cir. 2005); *United States v. Mandhai*, 375 F.3d 1243, 1247-48 (11th Cir. 2004). The government has found no holdings contrary to the *Graham* decision in any other circuit.

Therefore, that the Defendant in this case was not convicted of one of the enumerated offenses contained in 18 U.S.C. § 2332b(g)(5)(A) does not mean that USSG § 3A41.4, n. 4 does not apply. Based on the evidence introduced at trial, the Defendant's conduct was clearly intended to promote specific offenses enumerated as a "federal crime of terrorism" in 18 U.S.C. § 2332b(g)(5)(b). The most obvious applicable predicate offenses would include:

1. 18 U.S.C. § 844(i) (maliciously damaging or destroying any real property used in interstate commerce). On August 5, 2017, the Defendant, together with co-defendants Morris and McWhorter, used a pipe bomb (explosive) and an incendiary mixture of gasoline and diesel fuel (fire) to damage the Dar al-Farooq Islamic Center; and,

2.  18 U.S.C. § 2332a, use of a weapon of mass destruction, a term which, according to 18 U.S.C. § 2332a(c)(2)(A) includes a destructive device, which in turn is defined, at 18 U.S.C. § 921(a)(4)(A)(i) to include "any explosive [or] incendiary . . . bomb." The pipe bomb and incendiary mixture used in the Dar al-Farooq attack meets these statutory criteria.

Based on the "intended to promote" language contained in § 3A1.4, the decision in *Graham*, and the decisions thereafter, the convictions in this case show the Defendant intended to promote multiple federal crimes under 18 U.S.C. § 2332b(g)(5)(B).

## B. INTIMIDATION OR COERCION OF A CIVILIAN POPULATION

For the substantive terrorism Guideline enhancement to apply, the Defendant must have intimidated, coerced, or retaliated against "government conduct." *See* USSG § 3A1.4 (a) (requiring the offense to involve a "federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g)(5)(A)). The upward departure contained in note 4 is intended to apply in cases like this one, where the Defendant's conduct intimidated a civilian population. Part B of Application Note 4 to USSG § 3A1.4 provides:

> [T]here may be cases in which . . . (B) the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. In such cases an upward departure *would be warranted* . . .

*Id.* (emphasis added).

13

The evidence at trial clearly demonstrated that the Defendant's intentions were to intimidate and coerce—in other words, to terrorize—a civilian population, Muslim worshippers, into either ceasing the practice of their religion or leaving the country altogether.   The Defendant's choice of target clearly illustrates this intention.   The Defendant did not act against one specific person by singling out the Imam, the Director of the Mosque, or any single worshipper.   Rather, the Defendant targeted a communal place of worship while congregants were praying inside the building.   The Defendant knew this attack would have a broad impact.   Accordingly, the evidence at trial demonstrated that the Defendant intended to intimidate, coerce, and influence a civilian population or people.

The government requests that the Court recognize the Defendant's crime for what was—an act of domestic terrorism against a religious group that the Defendant hates—and depart upward under the terrorism enhancement to sentence the Defendant to a term of life imprisonment.

## IV.   STATUTORY SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

A life sentence in this case is not only appropriate based on the recommendations of the Sentencing Guidelines, it is also warranted by the factors set forth in 18 U.S.C. § 3553(a).   In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence.   552 U.S. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure

is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors"). In the present case, the following factors weigh particularly heavily in favor of following the Guidelines recommendation.

## A. NATURE AND CIRCUMSTANCES OF THE OFFENSE

On August 4, 2017, the Defendant and co-defendant Michael McWhorter left Clarence, Illinois, in a rented Nissan pickup truck. The Defendant drove to Roberts, Illinois, where they collected co-defendant Joe Morris. McWhorter and Morris had never met before – the Defendant had recruited them both for the militia group,[6] and introduced them to each other for the first time that day. The three drove to Minnesota, where, based on the Defendant's representations, both Morris and McWhorter believed they were about to embark on a paid "security" job.

The Defendant instructed Morris and McWhorter to leave their phones, and all traceable electronics, at home. The Defendant packed the vehicle with "mission critical equipment,"[7] including a signal jammer, radio scanner, Faraday bag, two AR-15 ghost guns, a sledgehammer, black balaclavas, gloves, and a 20-pound black powder bomb with

---

[6] The Defendant had known Joe Morris since Morris was approximately 8 or 9 years old. Tr. IV at 889. Morris described the Defendant as a father ("We were close…he's been like a father to me.") Tr. IV at 916. The Defendant used this "fatherly" sway over Morris to convince him to stop taking prescribed psychiatric medications and to indoctrinate him with white supremacist and other extremist ideologies. When asked to describe Morris's mental capacity, McWhorter explained, "[Morris] wouldn't comprehend normal stuff like, you know…his level of comprehension is more closer to, like, my 12-or-13-year-old son." Tr. V at 686. The Defendant knew this and exercised influence over Morris. As Morris testified, when the Defendant asked him to do something, "I usually did it." Tr. IV at 940.
[7] See Gov't Ex. 307. In an email, the Defendant refers to the signal jammer he purchased as "mission critical." The email is sent on July 29, 2017, one week before the bombing of Dar al-Farooq.

15

4-inch diameter PVC pipe and endcaps.  After driving all night and avoiding toll roads because of the surveillance cameras at toll plazas, the Defendant stopped at a gas station approximately one hour outside of Bloomington, Minnesota.  While there, the Defendant purchased diesel fuel and gasoline mixed in a plastic container.  Shortly after that, the Defendant told Morris and McWhorter, for the first time, that they were on their way to bomb a mosque.

Specifically, the Defendant told Morris and McWhorter that they would arrive at Dar al-Farooq before morning prayers, so that when worshippers arrived at the mosque, they would find it bombed.  The three co-defendants arrived late, a few minutes past five in the morning of Saturday, August 5, 2017, meaning that morning prayers were already underway.  Rather than abort the mission, the Defendant gave Morris and McWhorter black balaclavas and gloves, so that they would not be recognized or leave fingerprints or DNA. The Defendant told Morris to break the window of Dar al-Farooq with a sledgehammer and to throw the gasoline/diesel mixture through the broken window so that the explosion from the pipe bomb would also cause the building to burn.  The Defendant told McWhorter to handle the bomb.  As he described at trial, McWhorter lit the fuse on the bomb and threw it through the window Morris had broken.

The Defendant quickly drove Morris and McWhorter away from the mosque, and they listened hopefully to the police scanner for news.  When they heard emergency communications confirming the bomb had detonated, the Defendant congratulated and praised Morris and McWhorter for a job well done.  When they learned that the bomb had

exploded in the Imam's office, the Defendant was pleased, and referred to it as a "hole in one." Tr. III at 647.

The explosion caused substantial damage to the office. As depicted in security camera video from inside the mosque, the blast was strong enough to cause a cinder block wall to bow outwards and ejected debris more than 140 feet into the surrounding parking lot. Photographs of the damage show the shrapnel shredded leather chairs and furniture, puncturing large holes in the ceiling, carpet, and the Imam's desk. The diesel and gasoline mixture started on fire, burning part of the carpeting. The building's sprinkler system activated, quickly extinguishing the fire, but also adding water damage to the blast, fire, and smoke damage the building had already suffered. Bomb squad technicians and other first responders located hundreds of pieces of PVC fragmentation in and around the Imam's office.

The largest intact piece of the bomb recovered was one of the PVC endcaps, measuring four inches in diameter. Multiple experts at trial, including a bomb squad technician and an FBI explosives examiner, testified that the Defendant's pipe bomb was the largest diameter pipe bomb they had ever examined.

Approximately five worshippers were praying or had just finished morning prayer when the bomb exploded. One of them, H.J., saw the truck driven by the Defendant as he left the mosque that morning. As H.J. watched the truck, he heard the noise of the Imam's office window breaking and he saw at least one man running back to the Nissan. H.J. was frightened, but he knew something dangerous had happened, and so he bravely ran back into the mosque to warn those inside. As he ran down the hallway, the bomb detonated.

17

The Imam's office is located across a narrow hallway from the prayer room. Surveillance video admitted at trial showed that there were several worshippers inside of the prayer room at the time the bomb exploded, as well as some men, including H.J. and M.H. standing in the hallway separating the prayer room and the Imam's office. In addition, Dar al-Farooq's director, M.O., was in his office, adjacent to the Imam's, at the time of the explosion. M.O. testified that he felt the impact from the blast on his body and that the explosion left him dazed and disoriented.

All the worshippers were traumatized by the bombing, and several members of the mosque testified at trial that they did not return to Dar al-Farooq for quite some time after the blast – a year in the case of H.J. and longer for others. Another victim who frequently prayed at the mosque, D.H., testified that because of the bombing it is now difficult for her to pray, because instead of concentrating single-mindedly on her dialogue with God, she is on alert for another attack. The executive director of Dar al-Farooq testified that attendance at the mosque, and at dugsi are both down by 50 percent since the bombing.

The Defendant's crime was not some momentary lapse of judgment. The trauma caused by this terrorist attack on the Dar al-Farooq mosque was exactly what the Defendant intended. The Defendant spent weeks researching and planning the bombing and arson of the mosque. The Defendant drove hundreds of miles to purchase the black powder used to make the 20-pound pipe bomb. The Defendant recruited a team to carry out the attack. The Defendant rented a truck and drove over 1,000 miles, taking extensive security measures on the trip to avoid detection. And after the attack was successful – after the Imam's office was destroyed and the Dar al-Farooq community was heartbroken and

terrified – the Defendant took pleasure and pride in this crime.  To this day the Defendant has shown no remorse for his actions.  The nature and circumstances of the Defendant's offense support a life sentence.

### B.  HISTORY AND CHARACTERISTICS OF THE DEFENDANT

The Defendant does not have a lengthy criminal history.  The Defendant's sole conviction came after a jury trial in Ford County, Illinois, where the Defendant was found guilty of kidnapping and absconding with the Defendant's daughters to Belize.

Criminal history aside, the Defendant had what appears to be a stable and supportive upbringing.  The Defendant's father, who testified at trial, was in the military and the Defendant's mother was a science, math, and English teacher who encouraged her children to pursue science in their spare time.  As an adult, the Defendant received a Bachelor of Science degree from the University of Central Texas, completed post-graduate work in criminal justice, and claims to be fluent in English, Spanish, and German.  The Defendant became a Ford County Sheriff's Deputy for a brief time in the 1990s but resigned after multiple complaints of misconduct were filed and disciplinary warnings were issued.  *See,* *e.g.* Gov't Att. 1 (comments from the Sheriff regarding the Defendant's performance including, "The closest I can compare you too is the German Gestapo of World War II…You have absolutely not charitable trait whatsoever.  There is a violator of the law and an inadvertent violator and you will never be able to tell the difference.").  The Defendant eventually went on to own multiple businesses, including a gun shop, a farm, and an organic agricultural company.  Despite a solid upbringing, loving parents, advanced

19

education including post-graduate work focused on criminal justice, and a background in law enforcement, the Defendant still chose to commit violent acts of domestic terrorism.

The Defendant is a smart, educated person.  In planning and executing the attack on Dar al-Farooq, the Defendant understood exactly the nature of this crime and the potential repercussions.  The Defendant knew that this bombing would have a broad and traumatic effect on the community.  That was exactly the Defendant's plan.  The Defendant was not a victim of radicalization by some influential person or hate group – instead, the Defendant self-radicalized, and worked to radicalize others.   Indeed, the Defendant knowingly leveraged the "father figure" influence over Joe Morris to make him hate the same groups the Defendant hated and to carry out acts of terrorism against them.  The Defendant's history and characteristics support a life sentence.

### C.  THE NEED FOR THE SENTENCE IMPOSED TO REFLECT THE SERIOUSNESS OF THE OFFENSE AND TO DETER CRIMINAL CONDUCT.

Bias-motivated hate crimes destroy the sense of security of entire communities.  It is rational and appropriate that the Sentencing Guidelines enhance the punishment for such crimes.  Crimes motivated by religious bias are increasing, as measured by the number of people murdered in religiously motivated attacks.  As this bar graph shows, the number of people murdered in attacks motivated by religious bias in 2018, the year following the Dar al-Farooq attack, was equal to the number killed in such attacks in the preceding seven



**Figure 2. FBI Hate Crime Data: individuals killed due to religious affiliation**

*Figure 2 shows the number of individuals killed due to reasons of religious affiliation and bias as tracked by FBI Hate Crime statistics. This number is included as a subset of the total number of individuals victimized for religious affiliation reflected in figure 1.*

*Source: FBI UCR hate crime statistics, table 7, https://www.fbi.gov/services/cjis/ucr/hate-crime*

years *combined*.  Attacks on houses of worship are a serious problem in the United States, and the problem is getting worse.   As the map below shows, mass shootings, bombings/arsons, and vehicle rammings directed at religious congregations have taken place from coast to coast.[8]

These include the attack on the Sikh Temple in Oak Creek, Wisconsin, which occurred five years to the day before the Dar al-Farooq bombing, on August 5, 2012, and resulted in six deaths.   Other, even more horrible attacks followed, including the mass

---

[8] Source: United States Department of Homeland Security



shooting at the Tree of Life synagogue in Pittsburgh, in which eleven victims were killed and six others, including four responding police officers, were injured. Similarly, in the Poway Synagogue mass shooting in southern California, one person was killed, and three others, including the synagogue's rabbi, were injured.

As to attacks on mosques specifically, even just in Minnesota, incidents include: An attack at a mosque in northeast Minneapolis in November 2019, in which a glass door was broken and the attacker shouted at a mosque member inside;[9] strips of bacon being

---

[9] *Attack on Minneapolis Mosque Comes as Reports of Hate Crimes Drop,* Star Tribune, (Nov. 12, 2019), http://www.startribune.com/attack-on-minneapolis-mosque-comes-as-reports-of-hate-crimes-drop/564818952/?refresh=true.

deposited at the front door of a mosque in Rochester in June of 2018;[10] and a teenage girl entering the Da'wah mosque in St. Paul in July 2016, to find the mosque had been broken into and notes left reading "Muhammad was a rapist" and "F**k Islam."[11]  The attack on the Dar al-Farooq mosque, in short, is a crime in which the need for a sentence that embodies general deterrence is enormous.

### D.   THE NEED FOR THE SENTENCE IMPOSED TO PROTECT THE PUBLIC FROM THE DEFENDANT

The Defendant poses a clear and imminent threat to public safety.  From at least July 2017 through March 2018, the Defendant plotted and executed multiple violent crimes in furtherance of an extreme ideology and to advance the goals of the White Rabbit militia. Aside from the bombing of Dar al-Farooq and the attempted arson at the Women's Health Practice in Champaign, Illinois, the Defendant is currently facing multiple criminal charges in the Central District of Illinois for conduct related to the robbery of several Wal-Marts, the arson and attempted extortion of the Canadian Pacific Railway, the possession of fully automatic weapons, and the invasion of a personal residence of victims wholly unconnected with any of the above.  All of these crimes were extensively planned – by the Defendant alone – who spent thousands of dollars buying weapons, chemicals, and tactical gear to outfit the White Rabbits to commit these crimes.[12]

---

[10] *Police Investigate After Bacon is Left at Rochester Mosque¸* MPR News (Jun. 25, 2018), https://www.mprnews.org/story/2018/06/25/police-investigate-bacon-left-at-rochester-mosque.

[11] *Hate Message Allegedly Left at St. Paul Mosque¸* CBS Minnesota, (Jul. 26, 2016), http://minnesota.cbslocal.com/2016/07/26/st-paul-mosque-hate-speech.

[12] The numerous items the Defendant purchased to outfit his militia are detailed in Government Exhibit 269, attached here as Government Attachment 2.

In addition to the charged conduct, the Defendant's behavior leading up to arrest on March 13, 2018 illustrates the danger the Defendant poses to the community. On February 19, 2018, the Defendant submitted an "anonymous" tip to law enforcement, accusing a neighbor of possessing bombs. In reality, the Defendant had assembled and planted the bombs on the neighbor's property to attempt to get the neighbor in trouble. Shortly after this incident, the FBI and several law enforcement officers arrived in Clarence, Illinois, to investigate the Defendant. When FBI agents located firearms, which the Defendant had stashed at an acquaintance's house for safekeeping, the Defendant fled from law enforcement, taking McWhorter, Morris, and a third co-defendant, Mack, along. While on the run, the Defendant made a video, which was posted to YouTube, calling on neighboring militias for assistance in revolting against police and the FBI.

Moreover, the Defendant has a substantial knowledge of firearms and explosives. According to records of the Defendant's purchases, the Defendant bought disassembled firearm parts to create "ghost guns," or untraceable firearms. Not only did the Defendant have the knowledge and ability to assemble these weapons, but as both co-defendants testified at trial, the Defendant also drilled out the lower receiver of two assault rifles to enable them to fire as fully automatic weapons. During the searches conducted in this case, the FBI located those weapons, in addition to several other guns. The FBI also located a book (*The Anarchist's Handbook*), which contained detailed descriptions of how to build pipe bombs, like the one used at Dar al-Farooq, and how to create thermite, the mixture used at the Women's Health Practice.

The Defendant's criminal actions only ended when the Defendant was apprehended and taken into custody in connection with this case.  This conduct demonstrates that the Defendant will remain a danger to society at large, and a sentence of life is appropriate to protect the public.

### A. THE KINDS OF SENTENCES AVAILABLE

As analyzed above, the Court has the legal authority to depart upward on all five counts of conviction.  Given the facts and circumstances outlined in this memorandum, along with those facts which the Court heard at trial and which will be presented by the victims during sentencing, the government requests that the Court utilize this power to depart upwards and to impose a sentence commensurate with the severity of the Defendant's crimes as well as the Defendant's lack of remorse.

### CONCLUSION

The Government respectfully requests that the Court sentence the Defendant to a term of life imprisonment.

Dated:        August 11, 2021                    Respectfully Submitted,

                                                 W. ANDERS FOLK
                                                 Acting United States Attorney

                                                 */s Allison K. Ethen*

                                                 BY: ALLISON K. ETHEN
                                                 TIMOTHY C. RANK
                                                 Assistant United States Attorneys