UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 18-150(1) (DWF/HB) |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S POSITION** |
| v. | ) | **PLEADING** |
| | ) | |
| MICHAEL HARI | ) | |
| (n/k/a Emily Claire Hari), | ) | |
| | ) | |
| Defendant. | ) | |

Emily Claire Hari grew up in rural, central Illinois, surrounded by farms and

prairies. She was an exceptionally bright kid who loved science, something her mother

taught in elementary school, and Emily had an eager mind. She was curious and took in

all the books and information around her, studying the living world. She excelled in

languages and spoke German and fluent Spanish by the age of fifteen. At sixteen, Emily

graduated from high school and was already off to college at the University of Illinois.

After marriage at nineteen and a bitter divorce, Ms. Hari raised her two daughters

by herself. She cooked for them, did their laundry and cared for them diligently out of her

strong love and connection to them. Being a good parent was important to Ms. Hari and

her daughters were always the center of her life. She tried to teach them everything she

knew.

Ms. Hari also used her intelligence and knowledge of the surrounding farm land

and Amish community to begin a farm auditing company, Equicert. She taught herself

about the Good Agricultural Practices audits and the Harmonized Standards used to bring

safe produce to market and she traveled all over the United States auditing the farms of

the Amish, Mennonite and others who employed a simpler way of farming. She was liked and well respected in these communities. At first, she and a friend were the only two auditors, but the company eventually grew to ten and expanded into Canada and Mexico.

While continuing her audits, Emily Hari and her daughters lived a peaceful, pacifist life among Anabaptist communities in Belize, Mexico and Illinois from 2000 - 2017. As a member of the Old German Baptist Brethren Church, her family lived a simpler lifestyle without running water or electricity.

Ms. Hari also used her fluency in Spanish when she traveled to Belize and lived on a Mennonite farm and when she moved to Mexico to begin a farm in Zaragoza. In Belize and Mexico she lived among the locals, spoke their language, and befriended many. According to her friends and family, Ms. Hari got along well with many types of people and treated others with respect. It is why her charges were such a surprise to those closest to her. According to her Amish friends and family, Emily Hari never said a derogatory word about anyone.

Emily Hari is not a one-dimensional person that fits neatly into a box. She is not a "White Nationalist," a "Neo Nazi," a "Skinhead," a "Boogaloo Boi," nor part of the "Arian Brotherhood." She is not a "sovereign citizen" type and has never agreed with their lifestyle. To her daughters and parents, she never expressed any anti-Muslim sentiment. She cannot be neatly categorized.

In fact, when Ms. Hari's daughters learned about the allegations, they cried and could not believe it.  It was not how they were raised, they were taught to treat everyone with kindness and respect. Ms. Hari's parents had a similar reaction. They were shocked.

2

They simply couldn't see how someone who had led such a peaceful, pacifist life could be connected with such charges. And Ms. Hari had never said anything negative about Muslims. The allegations didn't ring true. Something of this magnitude was completely out of character for their child and parent.

Emily Hari is more than a one-note caricature. She is a complex human being who has been convicted by a jury of her peers. She will stand before this Court for sentencing, facing life in prison. She asks the Court to consider a sentence that is just and proportionate rather than vindictive or symbolic. By looking at the 18 U.S.C. §3553(a) factors, Ms. Hari asks the Court to consider that she is more than this singular act and a maximum sentence is not warranted under these circumstances.

Ms. Hari was found guilty on Counts 1-5 of her indictment, charging her with five separate crimes for conduct committed on August 5, 2017.

Thus, she is adjudged guilty for:

(1) damaging and destroying religious property because of the religious character of the property (18 U.S.C. §§ 247 (a)(1) and (2)),

(2) intentionally obstructing and attempting to obstruct the free exercise of religious beliefs (18 U.S.C. §§ 247 (a)(2) and (2)),

(3) conspiring to commit the crimes in Count 1 and Count 2 by means of fire or explosive (18 U.S.C. §§ 844 (h) and (m)),

(4) carrying and using a destructive device while committing the crimes in Count 1 and Count 2 (18 U.S.C. §§ 924 (c)(1)(B)(ii) and (2)), and

(5) possessing the unregistered destructive device charged in Counts 3 and 4 while committing Counts 1 and 2 (26 U.S.C. §§ 5845 (a) and 5861(d) and 18 U.S.C. §2).

These five charges represent one conspiratorial act - throwing a makeshift pipe bomb into a dark, unoccupied room at the Dar al Farooq mosque. It is fortunate that no one was

3

physically hurt, but according to the testimony offered at trial, no one ever intended to physically harm anyone.[1] The intent was to "scare" the members of the mosque.[2]

Still, due to the presumptive (and disputed) application of 18 U.S.C. §§ 924 (c)(1)(B)(ii) and the corresponding 30 year mandatory minimum, Ms. Hari faces an advisory sentence of 468 – 495 months, 39 - 41 years in prison. At 50, a sentence within this range is a de facto life sentence for Ms. Hari.[3]

In the United States Sentencing Guidelines' criminal history category I, a sentence for this singular act is akin to First Degree Murder[4] or Production of Child Pornography.[5] And the Guideline's advisory sentencing range is higher than if she were to have committed the crimes of Assault with Intent to Commit First Degree Murder, Attempted First Degree Murder[6] and or Criminal Sexual Abuse of a child under 12.[7] But as trial fleshed out – even accepting the government's theory of the case in full – Ms. Hari did not physically injure, maim nor murder anyone, and she never intended to.

---

[1] McWhorter, Michael, Trial Transcript (hereinafter "TT"), Nov. 12, 2020, pp. 640, 641, 645; Morris, Joe, TT, Nov. 30, 2020, pp. 1073-1074.

[2] McWhorter, Michael, TT, Nov. 12, 2020, p. 634.

[3] The diminished life expectancy resulting from imprisonment was addressed by the United States Sentencing Commission which defines a life sentence as 470 months (or just over 39 years). This is based on average life expectancy and median age of individuals at time of sentencing. *See* U.S. Sentencing Commission Final Quarterly Data Report (2020) at Appendix A-8, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2020_Quarterly_Report_Final.pdf (last accessed Aug. 5, 2021).

[4] 18 U.S.C. §1111; U.S.S.G. §2A1.1 (a), app. n. 1 and 2(B).

[5] U.S.S.G. §2G2.1(a) and (b).

[6] U.S.S.G. §2A2.1(a)(1).

[7] 18 U.S.C. § 2241(c); U.S.S.G. §2A3.1.

Ms. Hari objects to the factual assertions in the presentence report and the United States Sentencing Guidelines as applied. She also maintains her objection to the applicability of 18 U.S.C. § 924(c) to 18 U.S.C. §§ 247 (a)(1) and (a)(2). However, Ms. Hari is aware that the Court has already ruled that the 30-year mandatory minimum statute applies. Thus, in light of the 18 U.S.C. § 3553 (a) factors present in the case, Ms. Hari respectfully asks the Court to consider that a combined sentence of 30 years – and possible release when Ms. Hari is elderly – is sufficient.

## SENTENCING ANALYSIS

In *Gall v. United States*, 128 S.Ct. 586 (2007), the United States Supreme Court clarified the two-step process to be followed in federal sentencing. The sentencing judge must first determine the guidelines range applicable to the defendant. *Gall*, 128 S.Ct. at 596. Then, the court must consider the factors in 18 U.S.C. § 3553(a) and determine whether a departure or a variance is appropriate. *Gall*, 128 S.Ct. at 596-97; *United States v. Pepper*, 131 S.Ct. 1229, 1241 (2011) (court required "to tailor the sentence … based on appropriate consideration of all the factors listed in § 3553(a)"); *United States v. Roberson*, 517 F. 3d 990, 993 (8th Cir. 2008).

In so doing, the Court is "to make an individualized assessment based on the facts presented" and must impose a sentence that is sufficient but not greater than necessary to accomplish the many goals of federal sentencing. *Gall*, 128 S.Ct. at 596-97. Following this directive in reverse order, this paper will first discuss the 18 U.S.C. §3553(a) sentencing factors and then the applicable guideline range and application of 18 U.S.C.

§924(c). The end will address the Court's prior findings and the culmination of all sentencing considerations.

## I.     THE 18 U.S.C. §3553(a) FACTORS

18 U.S.C. § 3553(a) explains, a sentencing court shall consider:

> the nature and circumstances of the offense and the history and characteristics of the defendant; … the need for the sentence imposed – to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most efficient manner.

In doing so, "the court shall impose a sentence sufficient, but not greater than necessary."

### A.  The Nature and Circumstances of the Offense

Misinformation has become the demise of our community.  What one group has been told about another group in recent years has led to great derision and division. It is not a new tactic, but it has been newly employed by politicians to create hate, fear, and support for the politicians who espouse the misinformation themselves. Action against particular communities has been encouraged and incited. It has turned citizen against citizen. Unfortunately, and sadly, the Muslim community has been a victim of this misinformation on a large scale.

Although the evidence was inadmissible at trial, because it was, in fact, misinformation, a number of "terrorist" and anti-Muslim websites and "news stories" were found on Ms. Hari's laptop by the FBI computer analyst.

6

On July 15, 2017, the internet history provides an article from www.wnd.com

entitled, "Minnesota Mosque Producing Radical Somali Terrorists."[8] This "article"

claims, "Waleed Idris al-Maneesey is a radical imam who heads up the Al-Farooq

mosque in Bloomington, Minnesota, attended by at least six known terrorists and terrorist

supporters." *Id*.  The author claims, "The reason the al-Farooq mosque is producing

jihadis who want to fight and kill Jews in the name of Allah is because that is what the

mosque teaches." *Id*.

After reading this article, the computer history is promptly followed by a Google

search for the "al Farooq mosque bloomington, mn." Five minutes later, to the

"AlFarooqYouthFamilyCenter" Facebook page. And four minutes later, a Google Search

for "Waleed Idris al-Meneesey" is conducted. At the end of the session, directions from

Paxton Illinois to the Dar al-Farooq mosque in Bloomington, Minnesota are sought on

Google Maps.

The next day, on July 16, 2021, the FBI computer analysis shows internet history

to a "news article" about "Mosqueing the neighborhood: Islamic supremacism destroys

another suburb, Bloomington."[9]  This "article" claims that "Islamic supremacists" are

---

[8] *See* "Minnesota mosque producing radical Somali terrorists" by Leo Hohmann (April 14, 2016), *available at* http://www.wnd.com/2016/04/minnesota-mosque-producing-radical-somali-terrorists/ (last accessed Aug. 11, 2021).

[9] *See* "Mosqueing the neighborhood: Islamic supremacism destroys another suburb, Bloomington" by Pamela Geller (Sept. 23, 2012) *available at* http://pamelageller.com/2012/09/mosqueing-the-neighborhood-islamic-supremacism-destroys-another-suburb.html/ (last accessed Aug. 11, 2021).

destroying a quiet residential neighborhood by treating the non-Muslims in the area with

disrespect and "obliterating the quality of life and tranquility of residential living … an

Islamic pattern we see time and time again in Sheepshead Bay, DuPage, Alexandria,

Murfreesboro, and Temecula. And now, Bloomington." *Id*. This article clearly attempts

to elicit fear by portraying Muslims as "Islamic supremacists" who have an ability to

"obliterate the quality of life and tranquility" of non-Muslims in every neighborhood. The

article is Islamophobic and shameful.

On the same day, another "article" is accessed at www.wnd.com. This "article,"

by the same author previously cited, Leo Hohmann, is entitled "Muslim 'Refugees'

Threaten Minnesota Community with Rape."[10] This sensational article inflates actual

events to stir anti-Muslim sentiments and elicit fear.

Then, another "article" is accessed on Breitbart.com. The "article," entitled

"Recent Somali Migrant Charged with Criminal Sexual Conduct in Minnesota," is

another inflated account of an actual event. [11] Although allegations involving one man

seem hardly newsworthy on a national level, Breitbart News focuses on the man's

---

[10] *See* "Muslim 'Refugees' Threaten Minnesota Community with Rape." *available at* http://www.wnd.com/2016/07/muslim-refugees-threaten-minnesota-community-with-rape/ (last accessed Aug. 11, 2021).

[11] *See* "Recent Somali Migrant Charged With Criminal Sexual Conduct in Minnesota" by Michael Patrick Leahy (Dec. 14, 2016) *available at*  http://www.breitbart.com/big-government/2016/12/14/newlyarrivedsomalimigrantchargedwithcriminalsexualconduct/ (last accessed Aug. 11, 2021).

nationality and immigration status as if to prove a point. *Id*. The implied message to the reader is clear, Somali immigrants are to be feared.

Lastly, on August 4, 2017, just hours before the bombing of the Dar al-Farooq mosque, the internet search history leads to www.jihadwatch.org and an "article" entitled, "Minneapolis: Muslims littering leads to discovery of their weapons arsenal and bomb-making equipment."[12] This "article" takes a routine police arrest involving guns, assault rifles, ammunition, and electronics and turns it into a terrorist plot to attack non-Muslims simply because the men arrested were Muslim. *Id*.  It is clear that the article intends to elicit division and fear and to convince the reader that there are "Muslim" terrorist cells in Minneapolis that are just waiting to act. The public comments that follow the "article" are telling. The "story" is effective.

This degrading, anti-Muslim, and Islamophobic rhetoric and misinformation has spread throughout the United States over the past several years through social media and the internet. Unfortunately, it has also come from elected top officials in government instead of just fringe racists. Public comments from officials have aided in supporting this

---

[12] *See* "Minneapolis: Muslims littering leads to discovery of their weapons arsenal and bomb-making equipment" by Robert Spencer (May 16, 2017) *available at* https://www.jihadwatch.org/2017/05/minneapolis-muslims-littering-leads-to-discovery-of-their-weapons-arsenal-and-bomb-making-equipment (last accessed Aug. 11, 2021).

hate and fear, feeding anti-Muslim ideas into the public consciousness.  Politicians have fueled and exploited the backlash to the country's changing diversity.[13]

The influence these types of hate-driven "news stories" provide is undeniable. Hate-driven groups in the United States rose 30 percent from 2016 – 2019, to the highest number in history. *Id*.  Elected officials told common people to fear immigrants and to take action against immigrants and that's what happened.

This look back into the internet history of Ms. Hari's computer and the atmosphere of United States in 2017 provides the backdrop of the events on August 5, 2017. It is the context in which the Dar al-Farooq mosque was bombed.

**B. The History and Characteristics of Emily Hari**

As described in Ms. Hari's Motion for Transgender Acknowledgment of Legal Name and Correct Pronouns as well as Presentence Report Amendment and Prison Recommendation (ECF Doc. 457), she grew up in a conflicted world. She wanted to be different than she was. She was tormented by her gender dysphoria.

As an adult, Ms. Hari's gender dysphoria became almost unbearable to handle. She strongly desired making a full transition but knew she would be ostracized from everyone and everything she knew. Thus, as she formed a rag-tag group of freedom fighters or militia men and spoke of missions to Cuba and Venezuela, Ms. Hari secretly looked up "sex change," "transgender surgery," and "post-op transgender" on the

---

[13] *See* "A Year in Hate: Rage Against Change." Southern Poverty Law Center (Feb. 20, 2019) *available at*  http://www.splcenter.org/fighting-hate/intelligence-report/2019/year-hate-rage-against-change (last accessed Aug. 11, 2021).

internet. As she purchased military fatigues for their "missions" she also purchased dresses and female clothing for a planned trip to Bangkok, Thailand for male-to-female surgery. She sought out information on transgender icons and looked for transgender documentaries on people who had transitioned from male-to-female. She was living a double life.

It is within this timeframe of inner-conflict that Ms. Hari is said to have bombed the Dar al-Farooq mosque with Joe Morris and Michael McWhorter. A time when politicians, elected officials, and "news" sources were telling white Americans to fear Muslim immigrants and inciting them to take action.


## II.     THE UNITED STATES SENTENCING GUIDELINES ANALYSIS

### A.  Ms. Hari Objects to the 3-Level Enhancement Pursuant to U.S.S.G. § 3A1.1 (a) – Hate Crime Motivation

U.S.S.G §3A1.1 (a) suggests,

> If the finder of fact at trial … or the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person, increase by 3 levels.

At trial, the jury found Ms. Hari guilty of Count 1 and Count 2 of the Indictment, charging her with intentionally defacing, damaging, and destroying religious real property because of the religious character of the Dar al-Farooq Islamic Center and intentionally obstructing, by force and threat of force, the free exercise of religious beliefs by members and other attendees of the Dar al-Farooq Islamic Center. Ms. Hari

objects to the factual assertions in the presentence report and thereby objects to this enhancement.

Despite the jury's finding, the testimony at trial did not establish that the Dar al-Farooq mosque was chosen because it was a religious place of worship or because the conspirators wished to obstruct the free exercise of religious beliefs. Joe Morris testified, that Hari told him about the mosque and "that they were a recruiting center for ISIS."[14] Joe Morris testified that the mosque was chosen to harass the untouchables, the people the government can't touch, like George Soros, people who fund terrorists. (TT, Nov. 30, 2020, p. 1032). He confirmed the mosque was targeted "[b]ecause they're a recruiting center for ISIS." (TT, Nov. 30, 2020, p. 1036). And that's what he told the FBI on March 28, 2018, soon after his arrest, the mosque was bombed to give the recruiters a little shove. (TT, Nov. 30, 2020, p. 1037).

Similarly, at trial Michael McWhorter testified that the Dar al-Farooq was bombed because "it was a terrorist training school. It was supposed to be a terrorist training school." (TT, Nov. 12, 2020, p.647). Neither of the co-conspirators testified that the mosque was bombed "because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person" as required for the §3A1.1 enhancement to apply. Only the argument of the government prosecutors, not the evidence, indicated that the Dar al-Farooq mosque was "intentionally selected" because of "religion." The testimony was clear. The mosque was selected

---

[14] Joe Morris, Trial Transcript ("TT"), November 13, 2020, p. 920.

because it was believed to be a terrorist recruiting center or terrorist training school for ISIS.

Ms. Hari's computer search history also leads to this conclusion. It explains how an individual living in rural Clarence, Illinois learns of a mosque in Bloomington, Minnesota. It also provides a motive for the bombing.  According to the testimony at trial, the mosque was targeted because it was believed to be a terrorist recruiting and training center.  The enhancement does not apply.

### B.  Ms. Hari Objects to the 2-Level Enhancement Pursuant to U.S.S.G. §3B1.1(c) - Organizer, Leader, Manager, or Supervisor

Ms. Hari denies the factual basis portion of the presentence report. She denies constructing the pipe bomb thrown in the window of the Dar al-Farooq mosque and she denies any participation in the trip Joe Morris and Michael McWhorter made to bomb the mosque.  For all of these reasons, she maintains that she was not the organizer, leader, manager or supervisor for the bombing of the Dar al-Farooq mosque.

Although Ms. Hari admits to her involvement and leadership in Crisis Recovery Services ("CRSS"), and the White Rabbit group, this company and group had nothing to do with the bombing of the Dar al-Farooq mosque. The White Rabbit group had not even been formed on August 5, 2017 when the Dar al-Farooq mosque was bombed.

For these reasons, Ms. Hari objects to the 2-level enhancement pursuant to U.S.S.G. §3B1.1(c) and denies any leadership, organizer or managerial role in the mosque bombing.

### C. Ms. Hari Objects to the 2-Level Enhancement Pursuant to U.S.S.G. §3C1.1 and Denies an Attempted Escape

The probation office has assessed a 2-level enhancement for Obstruction of Justice under U.S.S.G. §3C1.1 and alleges that Ms. Hari attempted to escape from custody on Feb. 13, 2019 during transfer from the Central District of Illinois to the District of Minnesota. U.S.S.G. §3C1.1 applies,

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense by 2 levels.

Thus, a sentencing court must find that Ms. Hari attempted to obstruct or impede the administration of justice with respect to the investigation, prosecution or sentencing of the instant offense of conviction and the obstructive conduct related to the offense of conviction, namely, damaging and destroying religious property because of the religious character of the property and intentionally obstructing and attempting to obstruct the free exercise of religious beliefs.

Ms. Hari denies attempting to escape from custody on February 13, 2019. No video, testimony or evidence of escape has been offered. Ms. Hari has not been given a chance to confront her accuser. In fact, a report regarding the incident was only written because of an "inquiry of possible use of force" on February 13, 2019 against Ms. Hari. [15]

---

[15] TPO Margaret Maples, Incident Report, Michael Hari, Grady County Law Enforcement Center, Feb. 15, 2019 ("Inmate jumped out of the van and fell on the ground.").

Prior to the use of force inquiry, "[n]o report nor mention of the incident had been made by the transport officers to their chain of command."[16]

Ms. Hari submits that during the loading of additional inmates into the transport van, inmates were required to move seats. In doing so, Ms. Hari fell out of the van, fully shackled and in leg irons, unable to catch herself from falling. She was then pinned to the ground by a transport officer. She did not attempt to flee.

Additionally, at the time of the February 13, 2019 transport, Ms. Hari had been in the Central District of Illinois waiting for her Illinois trial.  Although she was represented by counsel in both Illinois and Minnesota, both counsel believed that the Illinois trial was going to precede the Minnesota trial.  Thus, Ms. Hari did not know why she was being transported nor taken to the Grady County Correctional Facility in Oklahoma on February 13, 2019. Ms. Hari did not willfully attempt to obstruct or impede the administration of justice with respect to the prosecution of the instant offense of conviction and the U.S.S.G. §3C1.1 enhancement for the obstruction of justice does not apply.

Based upon these objections, Ms. Hari submits that the total offense level is 24.  In criminal history category I, an offense level 24 yields an advisory guideline range of 51-63 months of imprisonment. This guideline range, however, is to be imposed consecutive to Ms. Hari's conviction in Count 4 of the Indictment if the Court again finds that 18 U.S.C. §924(c) applies to Count 1 or 2 of the Indictment.

---

[16] Omar Ampie, U.S. DEPT. OF JUSTICE, U.S. MARSHALS SERVICE, Incident Field Report - Narrative (Feb. 15, 2019).

## III.    THE STATUTORY ANALYSIS

### A. Ms. Hari Objects to the Application of the 18 U.S.C. 924(c) Sentencing Enhancement

18 U.S.C. § 924(c) seeks to penalize anyone who "uses or carries a firearm," and does so "during and in relation to any crime of violence." § 924(c)(1)(A).[17] Before the jury's finding, Ms. Hari asked the Court to resolve the purely legal question as to whether the charged § 924(c) predicate even qualified as a "crime of violence" under the law and statutory definition. *United States v. Moore*, 38 F.3d 977, 978-79 (8th Cir. 1994). The Court found that it did. *See* ECF Doc. 152.

Now, Ms. Hari renews her objection to the application of 18 U.S.C. § 924 (c) to 18 U.S.C. §§ 247 (a)(1) and (a)(2) and herein reincorporates Defendant's Motion to Dismiss with Supporting Memorandum. *See* ECF Doc. 94. Specifically, Ms. Hari asserts that the 18 U.S.C. § 924(c) charge (Count 4, a statutory sentencing enhancement) is unconstitutional under the void-for-vagueness doctrine of the Due Process Clause. And Ms. Hari should not be subject to § 924 (c)(3)(A)'s 30 year mandatory minimum.

### 1.  The Force Clause

Count 4 of the Indictment charges that Ms. Hari carried and used a destructive device "during and in relation to a crime of violence" in violation of 18 U.S.C. § 924(c).

---

[17] The term "firearm" includes a "destructive device." 18 U.S.C. § 921(a)(3) & (4). And § 924(c) calls for a 30-year minimum term of imprisonment upon a charge and conviction that the "firearm" at issue constituted a "destructive device." § 924(c)(1)(B)(ii). The jury has found that Ms. Hari "did knowingly carry and use" a "destructive device" under this provision.

*See* ECF 14.  The term "crime of violence" is statutorily defined in 8 U.S.C. § 924(c)(3)

in one of two definitional categories known as the "force clause" and the "residual

clause." However, in *United States v. Davis*, 139 S. Ct. 2319, 2326-27 (2019), the United

States Supreme Court recently held that the "residual clause" is void for vagueness,

leaving only analysis as to whether 18 U.S.C. § 247 (a) fits the criteria for being a "crime

of violence" under the "force clause," 18 U.S.C. § 924 (c)(3)(A), which explains,

> the term "crime of violence" means an offense that is a felony and –
> … has as an element the use, attempted use, or threatened use of physical
> force against the or person or property of another.

## 2.  The Categorical Approach

To determine the purely legal question as to whether a charged § 924(c) predicate

fits the "crime of violence" definitional category, the Court must employ what is known

as the "categorical approach." *See Diaz v. United States*, 863 F.3d 781, 783-84 (8th Cir.

2017) (using categorical approach with respect to § 924(c)(3)(A) Force Clause). Under

the categorical approach, a court is to examine the "statutory definition of a particular

offense" and not the "underlying facts" of that offense. *United States v. Moore*, 38 F.3d

977, 979 (8th Cir. 1994). The Supreme Court recently confirmed that this is the correct

mode of analysis in the context of § 924(c) predicates in *Davis*. 139 S. Ct. at 2327-33.

In *Davis*, the Supreme Court observed that the § 924(c)(3) "crime of violence"

categories bear a striking resemblance to other statutes which have long been deemed to

require categorical analysis when considering applicability of predicate convictions

offered by the government, i.e., the Armed Career Criminal Act (ACCA), 18 U.S.C. §

924(e) and the general definitional statute found at 18 U.S.C. § 16. *See* 139 S. Ct. at 2325-26.

Hence, *Davis* stands as a confirmation of the above circuit rule, i.e., that categorical analysis is to be used when considering the viability of § 924(c)(3) predicates offered by the government—under the § 924(c)(3)(A) "force clause." *See Diaz*, 863 F.3d at 783-83 & *Moore*, 38 F.3d at 979. And further, *Davis* indicates that the same principles which apply to categorical analysis of ACCA and (more particularly) § 16, also apply to § 924(c)(3). *See Davis*, 139 S. Ct. at 2325-33.

The categorical approach seeks to place statutes of conviction into defined categories. That is to say, identify those criminal statutes which *always necessarily* result in a conviction that fits under a defined category. To accomplish this, the categorical approach requires a court to determine the essential elements of the predicate conviction or offense. *See*, *e.g.*, *Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016). The idea is that if the essential elements of a given statutory crime meet a categorical definition, then every single conviction under that statute must always necessarily fit under the category as well. *See id*.

### 3.  The elements of 18 U.S.C. § 247 (a)

The categorical approach calls for a comparison of the elements of a crime with the statutory category at issue. *See id*. Here, the Court must determine if the elements of 18 U.S.C. § 247 (a) fit under the "force clause" of 18 U.S.C. § 924(c)(3)(A). Thus, the Court must first determine the essential elements of the predicate statute and then those elements must be examined to see whether they require a showing of "force" which is

18

equal to or greater than the minimum threshold described in the "force clause." *See Curtis Johnson v. United States*, 559 U.S. 133, 136-37 & 144-45 (2010) (ACCA force clause) & *Leocal v. Ashcroft*, 543 U.S. 1, 7-10 (2004) (§ 16(a) force clause).

The entire point of this analysis is to avoid judicial fact-finding about the circumstances surrounding any predicate conviction or alleged offense on offer. *See*, *e.g.*, *Taylor v. United States*, 495 U.S. 575, 600-01 (1990). Hence, the categorical approach requires a court to completely ignore any facts or circumstances underlying the predicate conviction or offense being examined. *See*, *e.g.*, *Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2013). The inquiry must be limited to the above comparison of offense elements with category description. *See id*.

Because a categorical inquiry seeks to include only those statutes which produce convictions that always necessarily fit within the category, it is a useful exercise for courts to determine the least-culpable conduct that can result in a conviction, i.e., "presume that the conviction rested upon nothing more than the least of the acts criminalized" by the predicate statute. *Moncrieffe*, 569 U.S. at 190-91 (internal punctuation and citation omitted). That being said, there must be a "realistic probability" (as opposed to a "theoretical possibility") that any given least-culpable conduct would be proscribed by the statute. *Id*.

Accordingly, the Court must consider the elements of the offenses of Count 1 and 2 of the Indictment. Count 1 charges a violation of 18 U.S.C. § 247 (a)(1), the elements of which required a jury finding that:

(1)  The defendant intentionally damaged religious property,

    (2)  The defendant did so because of the religious character of the property, and

    (3)  The crime was in or affecting interstate commerce.

1 *Modern Fed. Jury Instructions—Criminal* § 17-19 (Lexis 2018). Count 2 charged a

violation of § 247(a)(2) and required a jury finding that:

    (1)  The defendant intentionally obstructed a person in the enjoyment of that
         person's free exercise of religious beliefs,

    (2)  The defendant did so intentionally, by force or threat of force, including by
         threat of force against religious property as alleged in the indictment, and

    (3)  The crime was in or affecting interstate commerce.

Thus, now that a jury has found the necessary elements of the offenses and has convicted

Ms. Hari of both, the question for the Court to ascertain is whether these elements fit

within the "force clause" of § 924(c)(3)(A).

### 4.  The question of applicability

    As observed earlier, an offense will qualify as a "crime of violence" under the §

924(c) force clause only so long as the statutory offense "has as an element the use,

attempted use, or threatened use of physical force against the person or property **of**

**another**." § 924(c)(3)(A) (emphasis added).

    The statutory predicate must require a showing of force directed at *the property of*

*someone other than the actor*, not the property *owned or otherwise held by the actor*

*himself*. This is a crucial distinction, as multiple courts have held statutes which permit a

conviction owing to force directed at one's own property will not qualify under

categorical analysis. *See*, *e.g.*, *United States v. Salas*, 889 F.3d 681, 683-84 (10th Cir.

2018) (federal arson statute does not categorically qualify under § 924(c)(3)(A) Force

Clause, since statute "does not require, as an element, the use of force against the property 'of another'" as it "may apply to a person who destroys his or her own property"); *United States v. Whaley*, 552 F.3d 904, 907 (8th Cir. 2009) (for ACCA purposes, generic definition of arson offense is "malicious burning of real or personal property of another") (emphasis added); *Tran v. Gonzales*, 414 F.3d 464, 469 (3d Cir. 2005) (state reckless burning/exploding statute does not categorically fit under § 16(a) force clause, since one element permits "intentionally starting a fire on one's own property or that of another" with the former possibility failing to qualify under the § 16(a) "property of another" criterion).

But as the elements of the offenses demonstrate, § 247(a) does not categorically nor necessarily require force against property of another. Rather, § 247(a)(1) requires a showing of damage to any religious property, motivated by the religious character of that property. *See* 1 *Modern Fed. Jury Instructions—Criminal* § 17-19 (Lexis 2018). And §247(a)(2) requires a showing of obstructing a person's free practice of religious belief, including by threatening force against any religious property. *See*, *e.g.*, *United States v. Corum*, 362 F.3d 489 (8th Cir. 2004).

Neither offense requires that that requisite damage or threats be directed at the property "of another." Rather, under either statute, a conviction may lie where the defendant damages or makes threats against his or her own property.

For example, religious leaders might damage or destroy their own property to unite followers or garner public sympathy—either of which would constitute religious-motivated damage to property under § 247(a)(1) and threats to property which interfere

21

with religious practice under § 247(a)(2). *See*, *e.g.*, *Andrade v. United States*, 116 F.Supp.2d 778, 785 (W.D. Tex. 2000) (finding that members of Branch Davidian religious sect set fire to their own compound), aff'd, 338 F.3d 448 (5th Cir. 2003). Or one religious subgroup could damage its own property to falsely accuse, punish, or eliminate another subgroup. This is no speculative or far-flung notion, as intra-sect religious disputes occur with some frequency, and have even been prosecuted under federal statutes. *See*, *e.g.*, *United States v. Miller*, 767 F.3d 585, 589-91 (6th Cir. 2014) (prosecution under 18 U.S.C. § 249(a)(2) for assult based upon religion of victims, where dispute within Amish community led to multiple intra-sect assaults).

Although no exemplar case in which such a scenario was successfully prosecuted under § 247(a), the absence is hardly surprising given the paucity of cases in which the federal government has brought a § 247(a) charge. What's important is that the statutory language of § 247(a) fully embraces such a legal theory. § 247(a)(1) (statutory crime applies to anyone who "defaces, damages, or destroys any religious real property," regardless of ownership status of said property) & § 247(a)(2) (applies to anyone who uses "force or threat of force, including [] threat of force against religious real property," again regardless of ownership status of said property).

The most analogous example may be in 18 U.S.C. § 844(i), a federal arson statute, which applies to anyone who "maliciously damages or destroys . . . by means of fire or explosive, any building, vehicle, or other real or personal property." Again, § 844(i) says nothing about ownership status of the "building, vehicle, or other real or personal property" at issue. And courts have taken this omission to mean that § 844(i) reaches acts

22

in which the defendant is accused of damaging his or her own property by means of fire or explosive. *See*, *e.g.*, *United States v. Anderson*, 783 F.3d 727, 733-37 & 750 (8th Cir. 2015) (upholding § 844(i) conviction of business owner who arranged to burn down his own restaurant). And for this same reason, courts have recognized that a § 844(i) conviction does not categorically fit under the § 924(c)(3)(A) "force clause," as it does not require use of force against the "property of another." *See*, *e.g., Salas*, 889 F.3d at 683.

The same interpretation should apply to § 247(a) because the statutory language fully embraces situations in which the defendant damages or otherwise uses force against his or her own "religious real property," a scenario that finds historical example as shown above. *See*, *e.g.*, *Andrade*, 116 F.Supp.2d at 785. Accordingly, using categorical analysis, § 247(a) does not fit within the § 924(c)(3)(A) force clause and Ms. Hari should not be subject to the 30 year mandatory minimum prescribed by § 924(c)(3)(A).  Thus, despite a jury's finding, Count 4 is infirm under the law and must be set aside or dismissed.

In recognition of the Court's prior ruling, however, Ms. Hari now asks for a sentence at the already severe mandatory minimum.  Such a sentence would be sufficient, but no greater than necessary.

IV.    **THE REMAINING 18 U.S.C. §3553(a) SENTENCING CONSIDERATIONS**

A. **The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment, and to Avoid Unwarranted Sentence Disparities**

Ms. Hari is not the first person to be convicted of this type of offense, characterized by the government as a "terrorism" or "domestic terrorist" offense. But while the statutory sentence of the civil rights violation is not more than ten years, the penalty for possessing a destructive device while committing the civil rights violation is a mandatory minimum of 30 years. 18 U.S.C. § 241; 18 U.S.C. §924(c). In cases such as this, the latter is rarely charged.  In fact, in several other prosecutions for conspiring to use destructive devices or weapons of mass destruction, the prescribed sentences have been significantly lower.

Comparison with other "terrorism" or "domestic terrorism" type cases throughout the country reveals that sentences vary widely, but most remain far below the range of life. In fact, as of 2011, just over 10% of individuals prosecuted and sentenced in association with "terrorism" were sentenced to 15 years or longer.[18]

For example, Mohamed Osman Mohamud, (10-CR-00475-HZ (D. Oregon)), a Portland man, placed a "bomb" (provided by the FBI) near a Christmas tree lighting ceremony with the goal of getting "the most casualties." *United States v. Mohamud*, 843 F.3d 420, 429-30 (9th Cir. 2016). He connected the wires on a "detonator" and used a cell

---

[18] Francesca Laguardia, *Terrorists, Informants, and Buffoons: The Case for Downward Departure as a Response to Entrapment*, 17 Lewis & Clark L.Rev. 171, 190 (2013).

phone to attempt to "detonate the bomb." Following his arrest, FBI agents found videos of past Portland Christmas Tree Lighting Ceremonies, al Qaeda videos, references to "jihad," and plans to "secure [him]self from the FBI." *Id.* The jury rejected his entrapment defense, and he was sentenced to 30 years imprisonment. *Id.* at 431-32.

In another case, James Cromitie, (09-CR-00558-Cm (S. D. N.Y.)), was convicted of conspiracy and attempt to use weapons of mass destruction for a plot to attack an Air National Guard Base in New York and to bomb two synagogues in the Bronx. *United States v. Cromitie*, 727 F.3d 194, 199 (2d Cir. 2013). In that case, the defendant drove and placed "bombs" in the trunks of pre-parked cars, after surveilling targets and establishing battle plans. *Id.* at 203. He was sentenced to a 25-year mandatory minimum sentence under 18 U.S.C. § 2332g.[19] *Id.* at 204.

In the case of Michael Finton, (09-CR-30098-DRH-CJP (C. D. Ill.), an Illinois man, pleaded guilty to attempting to use a weapon of mass destruction to bomb a federal courthouse in Springfield, Illinois. He parked a truck with a completed "bomb," activated a timer, and then called a detonator via cell phone with the hope that he would "kill innocent civilians, committed public servants, and dedicated first responders." He also

---

[19]  Mr. Cromitie was convicted of: Count 1 – Conspiracy to use a weapon of mass destruction 18 U.S.C. § 2332a; Count 2-4 – Attempt to use a weapon of mass destruction 18 U.S.C. § 2332a; Count 5 Conspiracy to acquire and use anti-aircraft missiles 18 U.S.C. § 2332g; Count 6 – Attempt to acquire and use anti-aircraft missiles 18 U.S.C. § 2332g; Count 7 – Conspiracy to kill officers and employees of the United States 18 U.S.C. §§ 1114, 1117; and Count 8 – Attempt to kill officers and employees of the United States 18 U.S.C. §§ 1114, 2.

hoped that his bomb would be big enough to destroy a target across the street—a congressman's office. He received 28 years in prison.[20]

Obviously, these do not represent the totality of "terrorism" cases where sentences were imposed. They do, however, illustrate the variety of sentences and reflect the overall trend that life sentences are often rejected in favor of more circumscribed sentences measured in years rather than lifetimes. And in each case, the defendants were punished for what they actually did, not what could have happened.

Despite the above-noted defendants' motives to "kill innocent civilians" or accomplish "the most casualties," their plans were thwarted. Thus, the Court should consider that the pipe bomb thrown into the Dar al-Farooq mosque was intended to scare the members of the mosque, and that's just what it did. No one was injured, maimed nor physically harmed, and that wasn't the plan. For the act, a sentence of 30 years is sufficient in this case.

### B. The Need to Afford Adequate Deterrence and Protect the Public From Further Crimes of the Defendant

In United States Department of Justice's recent report *Five Things About Deterrence*, May 2016, the National Institute of Justice summarized a large body of research related to deterrence and made two significant findings.[21] First, the article

---

[20] *See* PRESS RELEASE, United States Attorney's Office Central District of Illinois, "Illinois Man Admits Plotting to Bomb Federal Courthouse and Is Sentenced to 28 Years in Prison," May 9, 2011, *available at* https://archives.fbi.gov/archives/springfield/press-releases/2011/si050911.htm (last accessed Aug. 10, 2021).

[21] *See* Five Things About Deterrence, U.S. DEPT. OF JUSTICE, Office of Justice Programs, National Institute of Justice, May 2016, available at https://ncjrs.gov/pdffiles1/nij/247350.pdf

explains that evidence shows "sending an individual convicted of a crime to prison isn't a very effective way to deter crime. ... [p]rison is an important option for incapacitating and punishing those who commit crimes, but the data show long prison sentences do little to deter people from committing future crimes."

Additionally, it is also a well-known fact that older offenders are substantially less likely than younger offenders to recidivate following release. Put another way, as an offender ages, recidivism rates begin to decline.[22] Thus, Ms. Hari's age is an important factor in support of a sentence at the mandatory minimum, 360 months. Such a sentence would put Ms. Hari beyond her mid-70s upon release, an age at which she is unlikely to reoffend.

Furthermore, there is no empirical proof that sentencing Ms. Hari to a sentence of more than 30 years will deter others from this type of conduct. While a significant sentence (30 years) may deter others from committing crimes, there is no evidence to suggest that a longer sentence would provide *more* deterrence. For these reasons, Ms. Hari asks the Court to consider that 30 years is enough.

### C. The Kinds of Sentences Available

18 U.S.C. § 924(c) criminalizes possessing, using or carrying a destructive device during and in relation to a crime of violence. The provision mandates a distinct penalty be imposed "in addition to the punishment provided for [the predicate] crime." 18 U.S.C.

---

[22] *See* U.S. SENT'G COMM'N, The Effects of Aging on Recidivism Among Federal Offenders. (Dec. 2017), *available at* The Effects of Aging on Recidivism Among Federal Offenders (ussc.gov) (last accessed Aug. 10, 2021).

§ 924(c)(1)(D)(ii).  In this case, § 924(c) prescribes a mandatory minimum of 30 years, that must be consecutive or "in addition to" the sentence Ms. Hari is to receive for Count 1 and 2 of the Indictment, damaging religious property and intentionally obstructing and attempting to obstruct the free exercise of religious beliefs.

When considering the 18 U.S.C. § 3553(a) factors and calculating a just sentence, however, the Court may contemplate the sentence as a whole in arriving at what is sufficient, but no greater than necessary.

In *United States v. Dean*, 137 S.Ct. 1170 (2017), the United States Supreme Court held that a federal judge may consider  the mandatory minimum imposed under 18 U.S.C. § 924(c) when calculating a just or appropriate sentence for the predicate count. As Chief Justice Roberts explained, "sentencing courts have long enjoyed discretion in the sort of information they may consider when setting an appropriate sentence," but 18 U.S.C. § 3553(a) specifies the factors courts *must* consider.  *Id*. at 1175. "The §3553(a) factors are used to set both the length of separate prison terms and an aggregate prison term comprising separate sentence for multiple counts of conviction." *Id*. at 1175.

> As a general matter, the foregoing provisions permit a court imposing a sentence on one count of conviction to consider sentences imposed on other counts. Take the directive that a court assess the 'need for the sentence imposed … to protect the public from further crimes of the defendant.'

*Id*. at 1176 (*citing* 18 U.S.C. §3553(a)).

In *Dean*, the sentencing court, The Honorable Mark W. Bennett, found that a sentence of 30 years and one day was "more than sufficient" where Mr. Dean, "lacking any significant history of any violence," would be in prison until well after his fiftieth

birthday, but felt restricted in its variance. [23] Believing the court had to consider the guidelines of the predicate offense separate from the § 924(c) conviction, Mr. Dean was sentenced to 30 years and 40 months.[24]  On appeal, the Eight Circuit confirmed the lower court's ruling, but Supreme Court held that the sentencing court *could* consider the appropriateness of the aggregate sentence and remanded for resentencing.[25] At resentencing, Mr. Dean was sentenced to 360 months (the 30-year mandatory minimum) and one day.[26]

Here, Ms. Hari has been found guilty of damaging religious property because of the religious character of the property and obstructing and attempting to obstruct the free exercise of religious beliefs. She had no crimes of violence prior to this incident. And in fact, Ms. Hari was a member of the Old German Baptist Brethren Church, an Amish/Anabaptist pacifist community, from 2000 – 2017 where violence was forbidden.[27] For seventeen years, she lived a simpler lifestyle and avoided all violence.[28]

---

[23] *United States v. Dean*, 2014 WL 7339215, N.D. Iowa, Dec. 23, 2014.

[24] *Id*.

[25] *United States v. Dean*, 810 F.2d 521 (8th Cir. 2015); *Dean v. United States*, 137 S.Ct. 1170 (2017).

[26] *United States v. Dean*, 2017 WL 11549168, N.D. Iowa, July 17, 2017.

[27] *See* Presentence Report ("PSR"), *United States v. Michael* Hari, 18-CR-150 (DWF/HB) (ECF Doc. 423); *see also, e.g.,* THE AMISH, Religions, BBC, ("Amish are pacifists and conscientious objectors. They avoid all violence – including angry words or going to law.") *available at* https://www.bbc.co.uk/religion/religions/christianity/subdivisions/amish_1.shtml (last accessed Aug. 7, 2021).

[28] *Id*. at p. 19, note 1.

At 50 years old, if the Court were to impose a sentence of 30 years, Ms. Hari will not be released until well after her 75th birthday, an age when most people begin to experience physical and mental impairments and an age where recidivism is virtually nonexistent.

## CONCLUSION

Ms. Hari respectfully asks the Court to consider that the severe mandatory minimum, 30 years, is a sufficient sentence in light of the 18 U.S.C. §3553(a) factors. And that it would be unnecessary to keep her imprisoned beyond her late 70s.

Dated: August 11, 2021                    Respectfully submitted,

*s/ Shannon Elkins*

SHANNON ELKINS
Attorney ID No. 332161
Attorney for Emily Hari
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415